UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re PARMALAT SECURITIES LITIGATION

This document relates to: 04 Civ. 9771

MASTER DOCKET
04 MD 1653 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DR. ENRICO BONDI,

Plaintiff,

-against-

04 Civ. 9771 (LAK)

GRANT THORNTON INTERNATIONAL, et al.,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

Appearances:

John B. Quinn
Loren Kieve
Michael B. Carlinsky
R. Brian Timmons
Terry L. Wit
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
*Attorneys for Plaintiff*

Brian M. Cogan
James L. Bernard
Quinlan D. Murphy
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Defendant Grant Thornton International*

Bruce R. Braun
Linda T. Coberly
Theodore Z. Polley III
WINSTON & STRAWN LLP
*Attorneys for Defendant Grant Thornton LLP*

Michael J. Dell
Timothy P. Harkness
Jonathan A. Popolow
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
*Attorneys for Defendant Deloitte Touche Tohmatsu*

Alan N. Salpeter
Stephen M. Shapiro
Michele Odorizzi
Daniel L. Ring
Robert J. Ward
MAYER, BROWN, ROWE & MAWE LLP
*Attorneys for Defendants Deloitte & Touche USA LLP and Deloitte & Touche LLP*

Richard A. Martin
Kevin J. Toner
Mark Picard
Patryk J. Chudy
HELLER EHRMAN WHITE & MCAULIFFE LLP
*Attorneys for Defendant Deloitte & Touche S.p.A.*

**Table of Contents**

I. Facts . . . 2
A. The Parties . . . 2
1. Plaintiff . . . 2
2. Defendants . . . 3
a. Deloitte Defendants . . . 3
b. Grant Thornton Defendants . . . 5
B. Grant Thornton and the Origins of the Parmalat Fraud . . . 6
C. Deloitte Takes Over as Parmalat's Primary Auditor . . . 9

II. Pleading Standards . . . 13

III. Vicarious Liability . . . 15
A. Legal Standards . . . 16
1. Agency . . . 16
2. Joint Venture . . . 17
3. Alter Ego . . . 18
B. Deloitte Defendants . . . 20
1. DTT . . . 20
2. Deloitte USA . . . 23
a. Agency . . . 23
b. Joint Venture . . . 24
c. Alter Ego . . . 26
C. Grant Thornton Defendants . . . 28
1. GTI . . . 28
2. GT-USA . . . 29
D. Conclusion . . . 30

IV. Group Pleading . . . 31

V. Specific Claims . . . 31
A. Professional Malpractice . . . 31
1. Deloitte USA . . . 32
B. Fraud & Negligent Misrepresentation . . . 34
C. Aiding and Abetting Fraud and Constructive Fraud, and Aiding and Abetting Breach of Fiduciary Duty . . . 37
D. Theft and Diversion of Assets . . . 40
E. Conversion . . . 42
F. Aiding and Abetting Fraudulent Transfer . . . 43
G. Unjust Enrichment & Civil Conspiracy . . . 46
H. Deepening Insolvency . . . 46
I. Claims on Behalf of Creditors . . . 51

VI. Conclusion . . . 55

LEWIS A. KAPLAN, *District Judge.*

In December 2003, the Parmalat dairy conglomerate collapsed in scandal.[1] Dr. Enrico Bondi, the Extraordinary Commissioner of Parmalat Finanziaria, S.p.A., Parmalat S.p.A. and its affiliates in Extraordinary Administration in Italy (collectively "Parmalat"), brings this action against Parmalat's former auditors and their affiliates on the grounds of professional malpractice, fraud, aiding and abetting fraud and constructive fraud, negligent misrepresentation, aiding and abetting breach of fiduciary duty, theft and diversion of corporate assets, conversion, aiding and abetting fraudulent transfer, deepening insolvency, and unlawful civil conspiracy. Defendants move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). These motions raise issues similar to those resolved in a prior opinion in the related securities action.[2]

## *I. Facts*

The complaint alleges the following facts, which the Court assumes to be true for purposes of this motion.

### A. *The Parties*

#### 1. Plaintiff

Plaintiff Dr. Bondi has been appointed by the Italian government as the Extraordinary

---

1 Complaint for Damages and Other Relief ("Cpt.") ¶ 1.

2 *In re Parmalat Securities Litig.*, __ F. Supp.2d __ , 2005 WL 1527674 (S.D.N.Y. June 28, 2005).

Commissioner of Parmalat, a position he contends is similar to that of a bankruptcy trustee in the United States.[3] He brings this action on behalf of Parmalat against its former auditors Grant Thornton S.p.A. ("GT-Italy"), now known as Italaudit, S.p.A., and Deloitte & Touche S.p.A. ("Deloitte Italy") and their respective affiliates Grant Thornton International ("GTI") and Grant Thornton LLP ("GT-USA"), and Deloitte Touche Tohmatsu ("DTT") and Deloitte & Touche USA LLP and Deloitte & Touche LLP (collectively "Deloitte USA").[4]

2. Defendants

a. Deloitte Defendants

DTT is a Swiss verein,[5] headquartered in New York and the umbrella firm for the international accounting enterprise commonly known as "Deloitte."[6] DTT claims that a Swiss verein is similar to an incorporated membership association and is legally distinct from its members.[7] Deloitte USA is Deloitte & Touche LLP and Deloitte & Touche USA LLP, both of which are

---

3 *Id.* ¶¶ 32-33.

4 Plaintiff commenced this case in Illinois state court. Defendants removed it to federal court. The Judicial Panel on Multidistrict Litigation transferred it here. *In re Parmalat Securities Litig.*, 350 F. Supp.2d 1356 (J.P.M.L. 2004).

5 "Verein" means association, society, club or union. CASSEL'S GERMAN DICTIONARY 662 (1978); *see also* LANGENSCHEIDT'S STANDARD DICTIONARY OF THE ENGLISH AND GERMAN LANGUAGES 1163 (6th ed. 1970).

6 Cpt. ¶¶ 122, 125.

7 Memorandum in Support of Deloitte Touche Tohmatsu's Motion to Dismiss ("DTT Mem.") 2 n.1 (quoting *Jeffries v. Deloitte Touche Tohmatsu, Int'l*, 893 F. Supp. 455, 457 n.1 (E.D. Pa. 1995) (citing an affidavit stating the same)).

Delaware limited liability partnerships and together comprise the United States member firm of the Deloitte organization. Deloitte Italy is a società per azione, an Italian limited liability entity, and the Italian member firm of DTT. Plaintiff alleges that Deloitte Italy partners Adolfo Mamoli and Guiseppe Rovelli, who served as lead partners on the Parmalat audit, "were Deloitte's contact persons in Italy"[8] and that they held positions with specialized groups of DTT.[9]

According to plaintiff, Deloitte firms hold themselves out as an integrated worldwide accounting organization with DTT at the helm of "a global strategy executed locally in nearly 150 countries."[10] The Deloitte firms report revenue on a combined basis[11] and have a centralized decision making process.[12] DTT creates professional standards to which member firms must adhere and oversees that adherence to ensure that "clients receive 'uniform, quality service wherever they do business, anywhere in the world.'"[13] It enforces compliance also with a global ethics program, the violation of which subjects a member firm or partner to expulsion.[14]

Plaintiff asserts that Deloitte operated as a unified accounting firm in respect of the

---

8 Cpt. ¶ 143.

9 *Id.* ¶ 160.

10 *Id.* ¶ 125 (quoting a Deloitte web page).

11 *Id.* ¶ 129.

12 *Id.* ¶ 130.

13 *Id.* ¶ 133.

14 *Id.* ¶ 137.

Parmalat audit with 32 member firms or offices joining together to audit Parmalat and its subsidiaries. DTT, Deloitte Italy and the member firms shared in the compensation received for the Parmalat audit and each contributed funds and/or resources to that project.[15]

b. Grant Thornton Defendants

GTI is an Illinois nonprofit corporation headquartered in London that serves as the umbrella organization for the Grant Thornton firms providing accounting services to mid-size companies.[16] GT-USA is an Illinois limited liability partnership and the United States member firm of GTI.[17] Prior to January 2004, GT-Italy, a società per azione, was the Italian member firm of Grant Thornton.[18]

Plaintiff alleges that GTI and its member firms hold themselves out as a unified accounting organization with offices in 100 countries.[19] Member firms are required to adhere to certain standards and to comply with Grant Thornton procedures.[20] GTI performs a regular review of its member firms and requires that they use the Grant Thornton logo and name when bidding for

---

15 *Id.* ¶¶ 174-75.

16 *Id.* ¶¶ 35, 80.

17 *Id.* ¶ 36.

18 *Id.* ¶ 37.

19 *Id.* ¶¶ 80-81, 84.

20 *Id.* ¶ 86.

and providing services.[21] Members firms cooperate on certain engagements, plaintiff alleges, and individual partners of these firms attend meetings together and participate in global practice groups.[22]

B. *Grant Thornton and the Origins of the Parmalat Fraud*

Beginning in the mid-1990s, Parmalat faced mounting losses from its operations in South America and elsewhere.[23] To hide these losses, as well as the personal diversion of funds by Parmalat's founder and chief executive Calisto Tanzi,[24] insiders at Parmalat, including Tanzi, chief financial officer Fausto Tonna, and its auditors, Lorenzo Penca and Maurizio Bianchi from GT-Italy, devised a scheme to use offshore companies to offload debt and manufacture the appearance of revenue.[25]

Initially, the scheme involved three shell companies incorporated in the Cayman Islands and Netherlands Antilles that were used to remove debt from Parmalat's balance sheet.[26] In 1998, Parmalat insiders and its auditors at Grant Thornton incorporated Bonlat Financing, Ltd.

---

21. *Id.* ¶¶ 87, 91.

22. *Id.* ¶ 88.

23. *Id.* ¶ 190.

24. *Id.* ¶¶ 176, 190, 197.

25. *Id.* ¶¶ 191, 195-96.

26. *Id.* ¶¶ 192-97.

("Bonlat"), a Cayman Islands company that became the principal vehicle for the fraud.[27] Bonlat then served as a dumping ground for Parmalat liabilities, all the while booking fictitious sales and revenue.[28]

One of the more notable fictitious transactions involved the "sale" of 300,000 tons of powdered milk to a Cuban state importer for $620 million.[29] Bonlat purportedly sold the milk through Camfield Pte. Ltd. ("Camfield"), a Singapore based company with the same address as the offices of Foo Kon Tan Grant Thornton, the Singapore member firm of Grant Thornton.[30] In fact, no such sale took place. Instead, Tonna had drawn up the papers supposedly documenting the sale and forged the signature of the supposed buyer.[31]

As a result of the fictitious and dummy transactions that Parmalat's insiders and GT-Italy auditors executed through Bonlat, its holdings represented forty percent of Parmalat's assets by the end of 2002.[32] Indeed, it reported ownership of a Bank of America account containing $4.9

---

27 *Id.* ¶ 200.

28 *E.g.*, *id.* ¶¶ 203-08, 244, 246.

29 *Id.* ¶¶ 228-31.

30 *Id.* ¶ 232.

31 *Id.* ¶ 230.

32 *Id.* ¶ 208.

billion.[33] Grant Thornton[34] drafted a request to Bank of America to confirm the existence of the account during its audit of Bonlat's financial statements for 2002, but apparently never sent it.[35] "Instead, Grant Thornton accepted, directly from Parmalat, a letter purporting to be from Bank of America dated March 6, 2003" that certified the existence of the bank account.[36] The bank account, however, did not exist, and the letter turned out to have been forged by a member of Parmalat's finance department.[37]

Notwithstanding its success, there were limits to the extent to which Bonlat could be used to hide Parmalat's massive losses. Accordingly, the Parmalat insiders and the company's lawyer, Gian Paolo Zini, created Epicurum, Ltd., a Cayman Islands investment fund that was "'given' a $100 million receivable from Boston Holding, Inc., another allegedly fake company run by Zini in New York.'"[38] Other assets were transferred to Epicurum, and Bonlat's books revealed a $625 million investment from Epicurum in the form of promissory notes.[39] Grant Thornton

---

33 *Id.* ¶ 210.

34 Plaintiffs use the generic term "Grant Thornton" to refer to all of the Grant Thornton defendants – GT-Italy, GTI, and GT-USA. The Court uses the plaintiff's terminology, although it readily is apparent that plaintiff here is referring to GT-Italy.

35 Cpt. ¶ 210.

36 *Id.* ¶ 211.

37 *Id.* ¶ 212.

38 *Id.* ¶¶ 216-17.

39 *Id.* ¶ 219.

accepted the assurances of Parmalat insiders that the Epicurum investment had been made on an arm's length basis and did not independently investigate the transaction other than to assure itself that the names of Epicurum's directors did not "sound Italian."[40]

Grant Thornton apparently had every reason to doubt the legitimacy of the Epicurum fund. Although Bonlat's supposed investment in Epicurum was in the form of promissory notes, there was nothing to indicate that they were collectible or that the interest due on them was being paid.[41] Once GT-Italy partners Bianchi and Pena pointed out these deficiencies, Tonna and the GT-Italy auditors decided to transform the promissory notes into an equity investment[42] in consequence of which Parmalat's financial statements reflected a nonexistent asset of $625 million.[43]

C. *Deloitte Takes Over as Parmalat's Primary Auditor*

Meanwhile, Parmalat had hired Deloitte Italy as its principal auditor in 1999, when it was obliged by Italian law to switch auditors.[44] Deloitte Italy and other Deloitte member firms audited Parmalat and its various subsidiaries and affiliates around the world, while GT-Italy served

---

40 *Id.* ¶ 221.

41 *Id.* ¶ 224.

42 *Id.* ¶ 225.

43 *Id.* ¶ 226. In its review letter dated October 31, 2003, Deloitte Italy qualified its opinion accompanying Parmalat's mid-year report, stating that it could not obtain an independent fair value of a derivative financial contract Parmalat had entered into with Epicurum. *Id.* ¶ 291.

44 *Id.* ¶ 4.

as the auditor for Bonlat and some of Parmalat's other offshore entities.[45] The audit reports that Deloitte Italy and its member firms prepared for Parmalat Finanziaria bear the names and logos of DTT and Deloitte & Touche, with an Italian address.[46]

The complaint details several transactions that, plaintiff argues, should have revealed to Deloitte that there was a massive fraud taking place at the company. One such allegedly questionable transaction began on July 10, 2001, when Parmalat Finance Capital Ltd. ("Parmalat Finance") recorded a receivable from the Western Alps Foundation in the amount of $18,126,584.[47] That amount increased to $21.9 million by the end of 2001 and then grew to $28,853,000 on March 1, 2002. "It then was reversed and disappeared from Parmalat Capital's books on March 15, 2002."[48] There never was any documentation for this transaction, which was just as well, plaintiff contends, since the telephone and address for the Western Alps Foundation were the same as for Zini in New York and the Western Alps Foundation had been dissolved as of September 25, 2001.[49] Dr. Bondi contends that the Deloitte auditors did not investigate this transaction or others that would have

---

45 *Id.* ¶ 49.

46 *Id.* ¶¶ 146-47.

47 *Id.* ¶ 268.

48 *Id.*

49 *Id.* ¶¶ 270-71.

alerted them to the scope of the fraud.[50] *In toto*, he claims, Deloitte[51] auditors "'missed' some $5.176 billion in debts that had been 'offloaded' to Bonlat as 'intercompany debt'" and then removed from Parmalat's financial statements.[52]

In addition to failing to blow the whistle on the alleged fraud, plaintiff contends that Deloitte auditors actively assisted Parmalat insiders in their efforts. One example involved the audit of Parmalat's Brazilian subsidiaries in 2001 and 2002.[53] In 2002, Wanderlay Olivetti, the partner at Deloitte Touche Tohmatsu Auditores Independentes ("Deloitte Brazil") in charge of auditing Parmalat Participações do Brasil ("Parmalat Participações"), Parmalat's Brazilian subsidiary, raised questions with respect to certain intercompany transactions that were not documented properly.[54] The chief financial officer of Parmalat's Brazilian operations told the Brazilian auditors that "the transaction was designed and instructed by the Parent company to improve the margin of Parmalat [Participações] sales and also not report material losses in Brazil."[55] On February 4, 2002, Olivetti

---

50 Deloitte & Touche Malta took over the audit of Parmalat Capital in April of 2002. *Id.* ¶ 249.

51 Plaintiff uses the term "Deloitte" to refer to the defendants DTT, Deloitte USA, and Deloitte Italy.

52 Cpt. ¶ 243.

53 Cpt. ¶¶ 400-06. Olivetti previously had raised concerns about intercompany transactions in respect of Parmalat Participações' financial statements for 2001 and certain "receivables" from Bonlat and other Parmalat offshore entities that he did not believe would be paid. *Id.* ¶ 407.

54 *Id.* ¶¶ 412-14.

55 *Id.* ¶ 416.

sent an e-mail to Adolfo Mamoli, the Deloitte Italy partner in charge of the Parmalat audit, about his concerns, stating that Deloitte would have to include "a detailed footnote in the financial statements to disclose the transaction."[56] He noted also that other transactions would have to be explained in an "emphasis paragraph."[57]

On April 5, 2002, Mamoli sent a note to James Copeland, the chief executive officer of DTT and Deloitte USA. He stated that Deloitte Brazil was having problems with certain transactions, expressed concern that Parmalat would fire Deloitte as its worldwide auditor, and asked Copeland to intervene.[58] Although the complaint does not indicate whether Copeland in fact did anything in response to this request, in May 2002, Olivetti apparently agreed not to issue a qualified opinion. Instead, he included only an emphasis note, which plaintiff claims would not raise the same red flags as an auditor's exception or qualification.[59] Deloitte Italy then certified Parmalat's 2001 financial statements without any note of these problems.[60]

Olivetti again raised concerns about the financial statements of Parmalat Participações with Mamoli, particularly in respect of $554 million in receivables it had from Bonlat.[61] He asked

---

56 *Id.* ¶ 417.

57 *Id.* ¶ 418.

58 *Id.* ¶¶ 419-20.

59 *Id.* ¶¶ 421-22.

60 *Id.* ¶ 427.

61 *Id.* ¶ 443.

Mamoli to "'perform certain investigations at Bonlat' and to 'verify if your team in Italy has information about Bonlat.'"[62] Subsequently, he "threatened to refuse to sign off on Parmalat Participações' financials, which in turn would have made it difficult for the other Deloitte member firms to sign off on Parmalat's overall consolidated financial statements."[63] In consequence, plaintiff alleges, the "global Deloitte organization 'removed' Olivetti from any further role in auditing Parmalat's Brazilian operations."[64]

The complaint alleges other instances in which Deloitte auditors omitted significant qualifications or exceptions from Parmalat's consolidated financial statements or failed to follow up on clear warning signals. Plaintiff contends that insiders at the company were able to waste, steal or squander approximately $10 billion as a result of Deloitte and Grant Thornton's failure to audit Parmalat properly and to disclose the fraud and their participation in and furtherance of it.

## *II. Pleading Standards*

In deciding a Rule 12(b)(6) motion, the Court accepts as true the well-pleaded allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.[65] Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support

---

62 *Id.* ¶ 444.

63 *Id.* ¶ 446.

64 *Id.*

65 *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 10541 (2002) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994)).

of his claim which would entitle him to relief."[66] Although such motions are addressed to the pleading, a district court may consider also the full text of documents partially quoted in the complaint where the documents are "integral" to it and relied upon by the plaintiff.[67] Accordingly, review of the exhibits submitted in connection with defendants' moving papers is appropriate.[68]

Plaintiff must plead the circumstances of any alleged fraud with particularity.[69] The complaint in such instances therefore must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."[70] Although intent may be averred generally, plaintiff nevertheless is required to "allege facts that give rise to a strong inference of fraudulent intent."[71] The requisite intent may be pleaded "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

---

66 *Cohen v. Koenig,* 25 F.3d 1168 (2d Cir. 1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

67 *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,*75 F.3d 801, 808-09 (2d Cir. 1996). Such documents are considered only for the fact that the statements they contain were made, but not for their truth.

68 Defendants provide the full text of the web pages and audit letters partially quoted in the complaint.

69 FED. R. CIV. P. 9(b).

70 *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 186 (2d Cir. 2004) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996)).

71 *Id.* at 187 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

recklessness."[72]

"Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his [or her] alleged participation in the fraud."[73] It is not necessary, however, that plaintiff connect a particular insider or affiliate to an allegedly deceptive corporate statement.[74] In other contexts, by contrast, a complaint will fail where a plaintiff lumps separate defendants together in vague and collective fraud allegations.[75]

### *III. Vicarious Liability*

The issues on this motion arise, in large part, in consequence of the defendants' organization, which is detailed above and in the Court's recent opinion on these defendants' motions to dismiss the securities complaint in this multi-district litigation,[76] familiarity with which is presumed. In brief, plaintiff claims that DTT and Deloitte USA had an agency, joint venture, or *alter ego* relationship with Deloitte Italy, and that GTI and GT-USA had an agency, joint venture, or *alter ego* relationship with GT-Italy, and that they therefore are liable vicariously for the acts and

---

72. *Id.* (quoting *Acito*, 47 F.3d at 52).

73. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

74. *Id.* (citing *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986)).

75. *E.g.*, *Ellison v. Am. Image Motor Co.*, 36 F. Supp.2d 628, 640 (S.D.N.Y. 1999).

76. *In re Parmalat Sec. Litig.*, __ F. Supp.2d __ , 2005 WL 1527674 (S.D.N.Y. June 28, 2005).

omissions of their Italian affiliates.[77]

Defendants respond that each is legally and factually separate from each other and their Italian affiliate and consequently is not liable for the acts or omissions of those firms. Moreover, they contend that plaintiff has failed to make sufficient allegations of their own conduct to state any claim for relief and that the entire complaint therefore should be dismissed as to them.

As these arguments turn, in significant part, on issues of vicarious liability, the Court first considers the question whether defendants and their Italian affiliates had agency, joint venture, or *alter ego* relationships.

### A. *Legal Standards*[78]

#### 1. Agency

A principal-agent relationship exists when the principal has the right to control the manner and method in which the agent performs his work and the agent has the power to act on the principal's behalf.[79] "An agent's authority may be either actual or apparent, and actual authority may

---

77

Cpt. ¶¶ 115, 118-19, 166, 171, 173.

78

As the transferee forum in this diversity action, the Court applies the substantive law that would be applied by the transferor forum, which in this case is the Northern District of Illinois. *See Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993); *In re Rezulin Products Liab. Litig.*, 210 F.R.D. 61, 69 (S.D.N.Y. 2002); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp.2d 392, 399 (S.D.N.Y. 2002). All parties agree, or at least assume, that the applicable substantive law is that of Illinois.

79

*Lang v. Silva*, 715 N.E.2d 708, 716 (Ill. App. Ct. 1999) (citing *Knapp v. Hill,* 657 N.E.2d 1068 (Ill. App. Ct. 1995)); *Letsos v. Century 21–New West Realty*, 675 N.E.2d 217, 224-25 (Ill. App. Ct. 1996); *see also* RESTATEMENT (SECOND) AGENCY § 14 (1958).

be either express or implied."[80] The existence of an agency relationship may be established by direct or "circumstantial evidence, including the situation of the parties, their acts, and other relevant circumstances."[81] The alleged agent's authority, however, is established only on the basis of words or conduct of the alleged principal.[82] While the "mere licensing of a trade name does not create an agency relationship, either ostensible or actual,"[83] a subsidiary nonetheless may be the agent of a parent so long as all the requirements of agency are met.[84]

2. Joint Venture

"A joint venture is an association of two or more persons to carry on a single enterprise for profit."[85] The legal principles that govern partnerships govern joint ventures as well,

---

80 *Amigo's Inn, Inc. v. License Appeal Comm. of City of Chicago*, 822 N.E.2d 107, 113 (Ill. App. Ct. 2004); *see Gilbert v. Sycamore Mun. Hosp.*, 622 N.E.2d 788, 795 (Ill.1993); *FDL Foods, Inc. v. Kokesh Trucking, Inc.*, 599 N.E.2d 20, 27 (Ill. App. Ct. 1992).

81 *Prodromos v. Everen Securities, Inc.*, 793 N.E.2d 151, 156 (Ill. App. Ct. 2003) (citing *Tomaso v. Plum Grove Bank,* 473 N.E.2d 588 (Ill. App. Ct. 1985)).

82 *First American Title Insurance Co. v. TCF Bank, F.A.,* 676 N.E.2d 1003, 1008 (Ill. App. Ct. 1997); *Tierney v. Community Memorial General Hosp.*, 645 N.E.2d 284, 293 (Ill. App. Ct. 1994).

83 *Slates v. Int'l House of Pancakes, Inc.*, 413 N.E.2d 457, 464 (Ill. App. Ct.1980).

84 *Caliguri v. First Colony Life Ins. Co.*, 742 N.E.2d 750, 756 (Ill. App. Ct. 2000); *Weil, Frieburg & Thomas, P.C. v. Sara Lee Corp.*, 577 N.E.2d 1344, 1350 (Ill. App. Ct. 1991).

85 *Dremco, Inc. v. South Chapel Hill Garden, Inc.*, 654 N.E.2d 501, 504 (Ill. App. Ct. 1995); *see In re Johnson*, 552 N.E.2d 703, 707 (Ill. 1989).

"for a joint venture essentially is a partnership carried on for a single enterprise."[86] The touchstone of either form is that each party contributes property and they have a community of interests in the profits of the enterprise.[87]

The existence of a joint venture may be inferred from allegations showing that an enterprise was entered into and the intent of the parties to do so,[88] with intent being the most important element.[89] Courts have found the following factors determinative of such intent:

> "(1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill or knowledge by each joint venturer; (4) some degree of joint proprietorship or mutual right to exercise control over the enterprise; and (5) provision for the joint sharing of profits and losses."[90]

3. *Alter Ego*

Illinois will find an *alter ego* relationship when one entity so controlled and dominated the affairs of a wrongdoer that the wrongdoer may be said to be its instrumentality and "observance of the fiction of separate existence would, under the circumstances, sanction a fraud or

---

86 *Bachewicz v. Am. Nat'l Bank & Trust Co.*, 490 N.E.2d 680, 682 (Ill. 1986); *In re Johnson*, 552 N.E.2d at 707-08.

87 *Landers-Scelfo v. Corporate Office Systems, Inc.,* 827 N.E.2d 1051, 1057-58 (Ill. App. Ct. 2005).

88 *Ambuul v. Swanson*, 516 N.E.2d 427, 429 (Ill. App. Ct. 1987); *O'Connell v. Pharmaco*, 517 N.E.2d 688, 691 (Ill. App. Ct. 1987).

89 *Maimon v. Telman*, 240 N.E.2d 652, 654-55 (Ill. 1968); *Ambuul*, 516 N.E.2d at 429.

90 *Ambuul*, 516 N.E.2d at 429.

promote injustice."[91] In determining whether one firm has dominated a wrongdoer, courts have considered factors such as: "(1) inadequate capitalization; (2) failure to observe corporate formalities; (3) commingling of funds; (4) the absence of corporate records; and (5) the failure to maintain arm's-length relationships among related entities."[92] No one factor is dispositive, and the existence of common officers and directors alone is not sufficient to make one entity the *alter ego* of another.[93]

Finally, although the *alter ego* analysis generally occurs in the context of a parent and subsidiary, the doctrine is not so limited.[94] "[T]he separate corporate identities of corporations

---

91 *Main Bank of Chicago v. Baker*, 427 N.E.2d 94, 101 (Ill. 1981).

92 *Logal v. Inland Steel Indus., Inc.*, 568 N.E.2d 152, 156 (Ill. App. Ct. 1991); *see also Pederson v. Paragon Pool Enterprises*, 574 N.E.2d 165, 168 (Ill. App. Ct.1991); *Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir.1985) (applying Illinois law); *Pirelli Armstrong Tire Corp. v. Titan Tire Corp.*, 4 F. Supp.2d 794, 797 (C.D. Ill. 1998) (same).

93 *Main Bank of Chicago*, 427 N.E.2d at 101 (citing *Superior Coal Co. v. Dep't of Finance*, 36 N.E.2d 354 (Ill. 1941)).

94 This analysis is known also as "piercing the corporate veil" and generally refers to the circumstances in which a court will disregard a business organization's limited liability form. *See, e.g.*, *Peetoom v. Swanson*, 778 N.E.2d 291, 294-295 (Ill. App. Ct. 2002) ("[A] court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity."); *Federal Insurance Co. v. Maritime Shipping Agencies, Ltd.* 380 N.E.2d 873, 880 (Ill. App. Ct. 1978) ("A corporation may be the *alter ego* of another corporation and where this occurs the distinct corporate entity will be disregarded and the two corporations will be treated as one."), *abrogated on other grounds as stated in Harris v. Harris*, 555 N.E.2d 10, 20 (Ill. App. Ct. 1990).

owned by the same parent will likewise be disregarded in an appropriate case."[95]

B. *Deloitte Defendants*

1. DTT

The Court recently concluded that an agency relationship between DTT and its member firms working on the Parmalat audit could be inferred from similar allegations made in the securities complaint filed in this multidistrict litigation.[96] Both complaints contain substantially similar allegations against the auditor defendants and each defendant makes the same or similar arguments. The Court therefore arrives at the same conclusion here and incorporates its prior reasoning.[97] Nevertheless, a few added words are appropriate.

DTT argues that it does not hold itself out as one firm and that the web sites to which plaintiff cites carry disclaimers that state that "neither [DTT] nor any of its member firms has any liability for each other's acts or omissions" and that each of the firms "is a separate and independent legal entity."[98] It relies on *In re Lernout & Hauspie Securities Litigation,*[99] in which the court found,

---

95 *Main Bank of Chicago*, 427 N.E.2d at 102. Although none of the defendants here owns shares in another, the absence of such ownership is not fatal to an *alter ego* claim. *See Macaluso v. Jenkins*, 420 N.E.2d 251, 255 (Ill App. Ct. 1981).

96 *See In re Parmalat Sec. Litig.*, __ F. Supp.2d __, 2005 WL 1527674 **8-9.

97 The law of agency applied there was that of New York. Illinois and New York's definition of an agency relationship do not differ in any material respects.

98 Memorandum in Support of Deloitte Touche Tohmatsu's Motion to Dismiss ("DTT Mem.") 6.

99 230 F. Supp.2d 152 (D. Mass. 2002).

*inter alia*, that KPMG International did not hold itself out as a single entity because disclaimers on its web page stated otherwise.

DTT's reliance is misplaced. To begin with, written disclaimers of agency are not controlling, but merely raise an issue of fact with respect to an alleged agent's authority.[100] A disclaimer may be overcome where a principal's actions are "sufficiently inconsistent" with any such disclaimer or limitation of authority.[101] Plaintiff here has alleged that DTT had control over the member firms such that it could require the removal of Olivetti from the Parmalat account. This conduct arguably is inconsistent with any purported disclaimer, and the disclaimer therefore cannot defeat plaintiff's claim at this early stage.

DTT next argues that the fact that the Deloitte defendants share a set of professional standards, an associational name, and cooperate in peer reviews does not indicate that its member firms acted pursuant to its authority in conducting the audit of Parmalat. It cites cases in which courts have dismissed claims against international accounting enterprises such as Deloitte absent specific allegations that the international auditor controlled the activities of the member firm.[102]

---

100 *See Schlunk v. Volkswagen Aktiengesellschaft*, 503 N.E.2d 1045, 1053-54 (Ill. App. Ct. 1986); *Slates*, 413 N.E.2d at 464-65; *accord Rankow v. First Chicago Corp.*, 870 F.2d 356, 359 (7th Cir. 1989) (applying Illinois law).

101 *Rankow*, 870 F.2d at 359.

102 *See Newby v. Enron Corp.*, 394 F.3d 296, 308-09 (5th Cir. 2004) (citing *Worldcom*, *infra*, and noting that the fact that Andersen Worldwide Societe Cooperative ("AWSC") was responsible for promulgating and enforcing professional standards would not be sufficient to hold it liable for the actions of its United States member firm Arthur Andersen); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp.2d 334, 385 n.41 (D. Md. 2004) (allegations that Deloitte operated as a single entity supported only by citations to the corporate website describing Deloitte as a global name and the fact that Deloitte US served as a "file reviewer" for Deloitte Netherlands to ensure that audits conformed to U.S. GAAP

The allegations in the cases upon which DTT relies differ. In the bulk of the cases, the plaintiffs did not make any specific factual allegations of agency and relied only on the public relations materials proclaiming the firms' unity or unified professional standards to assert that an international accounting concern was one global firm.[103] In another case, plaintiffs relied statements from the putative agent that proclaimed the existence of an agency relationship which, as noted, are insufficient to allege the existence of an agency relationship.[104]

---

not sufficient to establish that firm was one agent or partner of the other); *Nuevo Mundo Holdings v. Pricewaterhouse Coopers, LLP*, No. 03 Civ. 0613 (GBD), 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) (rejecting claim that PricewaterhouseCoopers and its member firms and AWSC and its member firms were unified global accounting firms or that their Peruvian firms were their agents when the plaintiff's only specific allegations were the statements of the agents themselves and the fact that the member firms shared an associational name); *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087 (S.D.N.Y. Jun. 25, 2003) (rejecting theory that Arthur Andersen was the agent of AWSC on the sole allegation that AWSC is "an umbrella organization for its member firms worldwide."); *In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp.2d 391, 396 (S.D.N.Y. 2003) (concluding that general allegations that AWSC set the management and policies for Andersen member firms was insufficient for the purpose of pleading control person liability under Section 20 of the Exchange Act of 1934); *In re Lernout & Hauspie Sec. Litig.,* 230 F. Supp.2d at 170-72 (concluding that plaintiffs had failed to plead agency where made general allegations that KPMG International touted itself in public relations materials as a global firm that provided service around the world through global service teams and that there was collaboration and coextensive responsibility for auditing Lernout & Hauspie); *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654, 662-63 (S.D.N.Y. 1997) (declining to find that the U.S. firm of Peat Marwick acted as defendant's agent for purposes of personal jurisdiction where plaintiff made no specific factual allegations and conceded that defendant did not control the activities of Peat Marwick), *aff'd*, 173 F.3d 844 (2d Cir. 1999) (table); *Reingold v. Deloitte, Haskins & Sells*, 599 F. Supp. 1241, 1253 n.10 (S.D.N.Y. 1984) (finding no personal jurisdiction over defendant's Australian member firm on the ground that there was no evidence of control and that statements of firm unity were insufficient).

103 *E.g.*, *Newby*, 394 F.3d at 308-09; *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp.2d at 385 n.41; *In re Worldcom, Inc. Sec. Litig.*, 2003 WL 21488087 *9-10; *In re Lernout & Hauspie Sec. Litig.,* 230 F. Supp.2d at 170-72; *Reingold*, 599 F. Supp. 1253 n.10.

104 *Nuevo Mundo Holdings*, 2004 WL 112948 *3.

Here, in addition to the statements culled from Deloitte's web site, plaintiff points to DTT's alleged intervention to direct Olivetti in his conduct of the Parmalat audit, and its ultimate removal of him when he sought to qualify his audit opinion. It could be inferred from these allegations that DTT had control over its member firms in their work for Parmalat and that the member firms audited Parmalat as its agent. Such nonconclusory allegations are all that is required of plaintiff at this stage.

Plaintiff has alleged adequately that DTT had an agency relationship with its member firms conducting the Parmalat audit. The Court consequently does not consider his alternate theories of vicarious liability.

2. Deloitte USA

a. Agency

Plaintiff here contends that each Deloitte member firm was an agent of the other[105] and that Deloitte USA effectively acted as the functional U.S. arm of Deloitte & Touche S.p.A.[106] He alleges further that Deloitte USA holds itself out as a key constituent of the international Deloitte enterprise.[107]

Deloitte USA asserts that, at best, plaintiff alleges that it was an agent of either DTT or Deloitte Italy and that he therefore has failed to state a claim against it because one agent is not

---

105 Cpt. ¶ 173.

106 *Id.* ¶ 170.

107 *Id.* ¶ 169.

liable for the acts of a co-agent or a principal.

Plaintiff does not respond to this point. This is regrettable, as plaintiff's mere assertion that the member firms were agents of one another does not advance his claim against Deloitte USA. To begin with, an agent generally is not liable for the acts of co-agents or, for that matter, any other person or entity that the agent does not control. Moreover, Deloitte USA cannot be said to have controlled Deloitte Italy if, as is alleged, Deloitte Italy was in control of Deloitte USA. To be sure, an agent may serve two principals so long as the dual agency is disclosed to both,[108] but plaintiff does not appear to claim that Deloitte USA was a principal and this failure is fatal to any claim of vicarious liability on the basis of an agency relationship.

b. Joint Venture

Plaintiff next contends that the Deloitte firms audited Parmalat as a joint venture. He asserts that its existence may be inferred from the fact that they contributed funds to this effort and that they received tens of millions of dollars in fees from Parmalat for their services.[109]

Deloitte USA argues that plaintiff's allegations are not sufficient because he has failed to allege the necessary elements of a duty to share profits and losses and control. It first contends that plaintiff's allegation of shared monetary compensation is not the type of duty to share profits required for the existence of a joint venture. It relies on *Industrial Hard Chrome, Ltd. v. Hetran,*

---

108 *Weill, Freiburg & Thomas, P.C.*, 577 N.E.2d at 1350 (citing *Warner v. Young*, 139 N.E. 393, 394 (Ill. 1923)).

109 Cpt. ¶¶ 173-75.

*Inc.*,[110] in which the court, applying Illinois law, concluded that Hetran had failed to allege a joint venture between it and plaintiff in part because there was no allegation of any shared risk.[111] Instead, the only allegation was that plaintiff and defendant had agreed to refer business to one another and therefore each company assumed its own financial risk. Other Illinois courts similarly have concluded that a mutual economic benefit that does not include any shared risk, such as a joint quote to a third party or the pro-rata sharing of transaction costs, is insufficient to establish a joint venture.[112]

Plaintiff's allegation that each firm shared in compensation is vague and does not indicate how that compensation was divided and whether there was any element of shared risk involved. Nonetheless, the Court cannot say at this stage that plaintiff could prove no facts showing that this compensation mechanism in fact was a duty to share profits or losses.

Deloitte USA next contends that plaintiff's allegations of control are inadequate because they suggest only cooperation between the firms. Control for purposes of a joint venture refers to the right "to direct and govern the conduct of each other in connection with the joint venture."[113]

Plaintiff argues that the right of control may be inferred from the allegations that

---

110 90 F. Supp.2d 952 (N.D. Ill. 2000).

111 *Id.* at 956.

112 *Palin Manufacturing Co. v. Water Technologies Inc.*, 431 N.E.2d 1310, 1314-15 (Ill. App. Ct. 1982) (joint quote); *Barrett v. Poag & McEwen Lifestyle Centers–Deer Park Town Center*, No. 98 C 7783, 1999 WL 691850 *7 (N.D. Ill. Aug. 26, 1999) (sharing of costs).

113 *Ambuul*, 516 N.E.2d at 430.

Copeland and the greater Deloitte organization removed auditor Olivetti, that several member firms worked on specific tasks together in connection with the Parmalat audit and that they all followed to the same auditing standards. But these allegations cut just the other way.

To begin with, the Olivetti incident suggests that member firms did not have right to control the work or management of their sister firms and that such control was the province of DTT. To be sure, Copeland was an employee of Deloitte USA and Mamoli therefore could have written to him to request help with Olivetti in that context. However, the complaint is clear that it was the global organization that allegedly removed him.[114] Similarly, the fact that all of the firms used the same auditing procedures does not give rise to an inference that any one firm could direct the policies or procedures of another firm, or that if they could, each firm had an equal right to direct the policies of another firm. Plaintiff therefore has failed to allege the existence of a joint venture.

c. *Alter Ego*

Plaintiff next contends that Deloitte USA may be liable on the basis of its *alter ego* relationship with Deloitte Italy. He argues that the member firms, including Deloitte USA and DTT, commingled their assets, operated with centralized management, shared fees among individual member firms, and applied uniform standards.[115]

Deloitte USA responds that it is not clear which firm is supposed to be its *alter ego*.

---

114

*See* Cpt. ¶ 446 ("[T]he global Deloitte organization 'removed' Olivetti from any further role in auditing Parmalat's Brazilian operations.").

115

Opposition to Defendants' Motions to Dismiss ("Bondi Opp.") 28-29 (citing Cpt. ¶¶ 79, 133-40).

In any event, it contends, the complaint does not allege the type of domination and control necessary for an *alter ego* relationship. Finally, it asserts that even if plaintiff alleged that Deloitte Italy or DTT were the mere instrumentality of Deloitte USA, Parmalat knew whom it was hiring to conduct its audit and therefore would not be able to establish the second requirement for imposing *alter ego* liability– that "observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice."[116]

The Court agrees that plaintiff's allegations fall short. Plaintiff here does not allege that Deloitte Italy and Deloitte USA had overlapping personnel, failed to maintain corporate records or had inadequate capitalization. The only allegation of overlapping personnel is with regard to Deloitte USA and DTT, which shared the same chief executive. The overlap of some personnel, without more, however, is insufficient to conclude that an *alter ego* relationship exists.[117] Moreover, plaintiff's contention that the Deloitte member firms commingled funds mischaracterizes his own allegations. He does not cite any particular paragraph of the complaint for this assertion, and the only allegations the Court is aware of that relate to funds are that the Deloitte entities reported revenue on an aggregate basis and shared in compensation generated by the Parmalat engagement.[118] This is not what is meant by the "commingling of funds." But perhaps most significantly, plaintiff does not make any specific allegations that either Deloitte Italy or DTT in fact controlled Deloitte USA or used it for a fraudulent purpose. Nor does he allege any facts from which it could be

116 *Main Bank of Chicago*, 427 N.E.2d at 101.

117 *Main Bank of Chicago*, 427 N.E.2d at 101 (citing *Superior Coal Co. v. Dep't of Finance*, 36 N.E.2d 354 (Ill. 1941)).

118 *See* Cpt. ¶¶ 129, 174.

inferred that Deloitte USA actually controlled or used Deloitte Italy or DTT as its instrumentality. The complaint therefore fails sufficiently to allege an *alter ego* relationship between Deloitte USA and Deloitte Italy or DTT.

C. *Grant Thornton Defendants*

1. GTI

GTI makes many of the same arguments as does DTT and cites the same cases. Specifically, it argues that the complaint fails to allege that GTI had the power to control the manner in which GT-Italy delivered services to Parmalat and that plaintiff's claims therefore fail under any theory of vicarious liability.

Plaintiff responds that it has made specific allegations of control by pointing to the fact that GTI expelled GT-Italy for its part in the fraud and after it would not cooperate in an internal investigation. He alleges that,after news of the alleged fraud at Parmalat broke, GTI investigated the Italian member firm and on December 31, 2003 announced that it had requested that GT-Italy accept the resignation of that firm's chairman and suspend other partners in the firm who were associated with the scandal.[119] The Italian firm complied with these requests. On January 8, 2004, GTI announced that GT-Italy had failed to provide appropriate assurances or access to individuals and information in the course of GTI's investigation. Consequently, it stated, it had expelled GT-Italy from its organization and stated that GT-Italy no longer could operate as part of Grant Thornton or

---

[119] *Id.* ¶ 103.

use any part of the Grant Thornton name.[120]

For the reasons discussed in respect of DTT's arguments and in its opinion on GTI's motion to dismiss the securities complaint,[121] the Court concludes that plaintiff adequately has alleged the existence of any agency relationship between GTI and GT-Italy. Suffice it to say here that plaintiff's specific allegations with respect to GTI's expectancy of control over GT-Italy and its power to discipline both individual partners and an entire firm give rise to an inference of control typical of an agency relationship.

As plaintiff's agency allegations would be sufficient to subject GTI to vicarious liability, the Court does not consider his alternate theories.

2. GT-USA

GT-USA contends that plaintiff's theories of agency, joint venture and *alter ego* fail as there are no specific allegations against it in the entire complaint. It argues that the complaint does not contain any allegations about what GT-USA is alleged to have done, other than to say that it played a role in auditing Parmalat's operations in the United States.[122] Even assuming that GT-USA audited Parmalat USA, it contends, plaintiff does not allege that it engaged in any wrongdoing.

Plaintiff purports to respond to this argument but in doing so only cites to portions of the complaint relating to Deloitte USA. In other words, he does not address the absence of

---

120 *Id.*

121 *See In re Parmalat Sec. Litig.*, __ F. Supp.2d __ , 2005 WL 1527674 * 13.

122 Cpt. ¶¶ 99, 117.

specific allegations regarding GT-USA nor does he explain how GT-USA is alleged to have controlled any wrongdoer here. Plaintiff therefore has failed to articulate a factual or legal basis on which GT-USA could be liable vicariously for the acts or omissions of GT-Italy.

D. *Conclusion*

To sum up, plaintiff has alleged an agency relationship between DTT and its member firms engaged in the Parmalat audit, and GTI and GT-Italy adequately. As principals, they could be liable for the acts of their agents and their agents' knowledge, and consequently *scienter*, could be imputed to them. Plaintiff therefore has stated a claim against GTI and DTT to the extent that its claims against Deloitte Italy and GT-Italy are sufficient. Consequently, GTI and DTT's arguments that the complaint must be dismissed as against them because they are not alleged, for example, to have made any misstatements of material facts or aided and abetted any breach of fiduciary duty, are without merit.

In respect to Deloitte USA and GT-LLP, however, plaintiff has failed to allege an adequate basis for vicarious liability. The claims against Deloitte USA, then, will rise or fall depending on plaintiff's allegations regarding its involvement.

GT-USA is another matter. The complaint does not allege that GT-USA did anything in regard to Parmalat, let alone anything tortious. Plaintiff therefore has failed to state any claim that would entitle it to relief and the complaint will be dismissed as to GT-USA.

Having considered vicarious liability, the Court now turns defendants' arguments in respect of plaintiff's substantive claims.

## *IV. Group Pleading*

Defendants first move to dismiss the complaint under Rule 9(b), asserting that plaintiff uses the terms "Deloitte" and "Grant Thornton" to refer collectively to the various entities within each organization. They contend that he thus fails to make clear which alleged actions are attributed to which entities.[123]

As this Court recently noted in respect of the securities complaint, defendants' point is well taken and plaintiff's use of the firm names is unwise.[124] "Nevertheless, it is clear from the complaint that plaintiffs attribute the alleged misrepresentations and omissions to the Italian entities and that they sue the other Deloitte and Grant Thornton entities entirely, or, at least, primarily on vicarious liability theories."[125] In these circumstances, the concerns of Rule 9(b) are not implicated. Plaintiff's claims therefore will be considered on their merits.

## *V. Specific Claims*

### A. *Professional Malpractice*

Bondi's first claim is for professional malpractice. He contends that Deloitte and Grant Thornton failed to provide competent auditing services to Parmalat, that its conduct fell well below the applicable standard of care, and, as a result, Parmalat has been injured.

To state a claim for professional malpractice, a plaintiff must allege that defendant

---

123 *E.g.*, GTI Mem. 12-13.

124 *See In re Parmalat Sec. Litig.*, __ F. Supp.2d __ , 2005 WL 1527674 *4.

125 *Id.*

owed plaintiff a duty of reasonable professional competence, that it breached that duty, and that the plaintiff's injury was proximately caused by that breach.[126] Pursuant to the Illinois Public Accounting Act, there can be no liability absent privity except where the accountant committed fraud or knew the information was intended for the plaintiff's benefit.[127]

Defendants Deloitte Italy and GT-Italy were in privity with Parmalat Finanziaria and Parmalat S.p.A. and do not move to dismiss this claim.[128] Plaintiff's allegations of an agency relationship between GTI and GT-Italy and DTT and Deloitte Italy are sufficient to state a claim against them on these grounds.

1. Deloitte USA

Deloitte USA moves also to dismiss this claim on the ground that it was not in privity with the Parmalat entities that plaintiff represents and that plaintiff's general allegations that Deloitte USA did not provide honest or capable accounting services are insufficient to plead malpractice.

Plaintiff responds that the complaint alleges a contractual relationship in its assertions that Deloitte USA performed services for "'various Parmalat entities in the United States, including Parmalat USA,'"[129] and that "'Deloitte & Touche LLP acted for and in conjunction with the overall

---

126 *See Hills v. Bridgeview Little League Assoc.*, 745 N.E.2d 1166, 1178 (Ill. 2001); *Congregation of the Passion v. Touche Ross & Co.*, 636 N.E.2d 503, 515 (Ill. 1994).

127 225 Ill. Comp. Stat. Ann. 450/30.1 (West 2004).

128 GT-Italy, now known as Italaudit, S.p.A., is a defendant here but has not put in an appearance.

129 Bondi Opp. 57-58 (quoting Cpt. ¶ 170).

audit of Parmalat Finanziaria and Parmalat by Deloitte & Touche S.p.A.'"[130]

Even assuming this were sufficient to allege privity, a point on which the Court expresses no opinion, plaintiff's claim would fail because he does not allege the manner in which Deloitte USA is alleged to have committed malpractice. The allegations in respect of Deloitte USA's audit of Parmalat USA are that, it issued an early warning report in January 1993 indicating that Parmalat USA had high levels of debt[131] and consequently asked Parmalat to issue a management representation that it would "cover" Parmalat USA's debts.[132] Plaintiff alleges further that Mike Power, a Deloitte USA auditor in New Jersey, raised concerns about a $26.5 million goodwill amortization associated with the creation of the Parmalat USA corporation that was not included in Parmalat USA's financial statements submitted for inclusion in Parmalat's consolidated

---

130 *Id.* at 58 (quoting Cpt. ¶ 171).

Plaintiff suggests that he brings suit on behalf of Parmalat USA, see Cpt. 34, but his other filings with the Court make clear that he does not. *See, e.g.*, Plaintiff's Reply Memorandum Supporting His Motion to Remand 4 ("'None of the three U.S. debtors is under Dr. Bondi's extraordinary administration. He therefore has no authority over, and cannot seek to recover in this action on behalf of, any of the three U.S. entities."); Defendant Deloitte & Touche S.p.A.'s Memorandum of Law In Support of Its Motion to Dismiss Plaintiff's Complaint, Ex. A, Memorandum of Law in Support of (i) Verified Petition for the Commencement of a Case under Section 304 of the Bankruptcy Code and (ii) for the Entry of a Temporary Restraining Order and Preliminary and Permanent Injunctions and *Related* Relief Under Section 304(b) of the Bankruptcy Code at 1-2 (listing the entities in extraordinary administration. Although a motion to dismiss is addressed to the four corners of the complaint, the Court may look to matters in the public record, including cases and papers filed with the Court and sworn to under Rule 11. *Cf. Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998). Plaintiff's lack of candor in this regard is decidedly unappealing.

131 Cpt. ¶ 460.

132 *Id.* ¶ 461.

financial statements for the year ending December 31, 2003.[133]

Professional malpractice is governed by Rule 8, and plaintiff need only make a short and plain statement of the claim.[134] The short and plain statement, however, must give the defendant notice of the nature of the claim. Simply asserting that Deloitte USA's actions constituted malpractice is not sufficient for even this minimal standard.[135] As the Second Circuit has explained, "a simple declaration that defendant's conduct violated the ultimate legal standard at issue . . . does not suffice. But it is enough to assert facts from which, construing the complaint liberally and in the plaintiff's favor, one could infer such a violation."[136]

Here, the allegations do not give rise to an inference that Deloitte USA breached its duty and plaintiff does not explain how any of these actions fell below the requisite standard of care. Nor does he link any of these alleged actions to Parmalat's losses. These allegations therefore are insufficient to state a claim for accounting malpractice.

B. *Fraud & Negligent Misrepresentation*

Counts two and four claim fraud and negligent misrepresentation. To state a claim for fraud, plaintiff must plead "(1) a false statement of material fact, (2) knowledge or belief of the

---

133 *Id.* ¶ 462.

134 *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168 (1993); *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

135 *See Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir. 2001).

136 *Id.*

falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance."[137] The circumstances of the fraud with be pled with particularity.[138]

A claim for negligent misrepresentation is the same as one for fraud except with respect to the defendant's mental state. A defendant does not have to know that the statement is false; carelessness or negligence with respect to the truthfulness of the statement is sufficient.[139] In addition, a plaintiff must allege that the "defendant owes a duty to the plaintiff to communicate accurate information."[140]

Deloitte USA contends that the fraud and negligent misrepresentation claims fail as to it because plaintiff does not allege that it made any misrepresentations.[141]

While the failure to allege a misrepresentation by Deloitte USA is fatal to any claim of negligent misrepresentation, liability for fraud in Illinois may extend to knowing participants in fraudulent conduct in addition to those who actually make a misrepresentation or omit material

---

137 *Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 546 N.E.2d 580, 591 (Ill.1989).

138 FED. R. CIV. P. 9(b).

139 *Bd. of Educ. of City of Chicago*, 546 N.E.2d at 591; *Brogan v. Mitchell Int'l, Inc.*, 692 N.E.2d 276, 278 (Ill. 1998).

140 *Bd. of Educ. of City of Chicago*, 546 N.E.2d at 591.

141 DTT and GTI move also to dismiss this claim on the grounds that they did not make any misrepresentations, negligent or otherwise. But this argument is without merit, as plaintiff has alleged the existence of an agency relationship sufficiently.

information that they have a duty to disclose.[142] The question then, is whether plaintiff adequately has alleged that Deloitte USA knowingly participated in the alleged fraud.

Here, plaintiff alleges that Adolfo Mamoli wrote to James Copeland, chief executive of both Deloitte USA and DTT, for help in resolving his dispute with Brazilian auditor Wanderley Olivetti and that Copeland may or may not have responded to that request by getting Olivetti to desist in seeking to qualify his opinion of Parmalat Participações.

Deloitte USA disputes plaintiff's innuendo with respect to the Mamoli letter, noting that the complaint does not allege that Copeland did anything in response to Mamoli's request, or even if he did, that his actions were knowing.[143] Beginning with the latter point, the Court agrees that plaintiff's allegations do not give rise to a strong inference that Copeland acted, if at all, with *scienter*. Mamoli's note did not state the nature of the dispute between Deloitte Italy and Olivetti and plaintiff makes no other specific allegations with respect to Copeland's knowledge.[144] Although

---

142 See *Creighton v. Elgin*, 69 N.E.2d 501 (Ill. 1946); *Citizens Sav. & Loan Ass'n v. Fischer*, 214 N.E.2d 612, 616 (Ill. App. Ct. 1966) ("The rule is that whoever participates in a fraudulent act is guilty of fraud."). *See infra* Part IV.C for a discussion of whether this conduct gives rise to liability as fraud or aiding and abetting fraud.

143 Memorandum of Deloitte & Touche USA LLP and Deloitte & Touche LLP in Support of their Motion to Dismiss ("Deloitte USA Mem.") 15.

144 The plaintiffs in the securities action also before this Court alleged that Copeland or other Deloitte executives "silenced" auditors who raised questions about the Parmalat fraud. *See In re Parmalat Sec. Litig.*, __ F. Supp.2d __ , 2005 WL 1527674 ** 11-12. The claim against Copeland under Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), was dismissed for failing to allege that he made any misrepresentations or committed a deceptive act within the meaning of that statute. The Court therefore did not reach the question whether that allegation was sufficient to allege *scienter*. Plaintiff here does not allege that Copeland or any other Deloitte USA executive silenced any auditor, and the Court therefore does not reach the question here.

he contends that Deloitte USA had access to the books and records of Deloitte Italy,[145] he does not allege that Copeland actually accessed this information. Finally, as plaintiff has not alleged adequately the existence of an agency relationship the knowledge of Deloitte Italy may not be imputed to Deloitte USA. Consequently, plaintiff has not alleged that Deloitte USA knowingly participated in a fraudulent act. This claim therefore must be dismissed as to it.

C. *Aiding and Abetting Fraud and Constructive Fraud, and Aiding and Abetting Breach of Fiduciary Duty*

Deloitte Italy, DTT and Deloitte USA (collectively, the Deloitte defendants) argue that count three, aiding and abetting fraud, and count five, aiding and abetting breach of fiduciary duty, fail as a matter of law because these causes of action do not exist under Illinois law.[146] They principally rely on *Koutsoubos v. Casanave,*[147] and *Ronovitch v. Kaufman*,[148] two federal cases that applied Illinois law. The courts there followed the Seventh Circuit's observation in *Cenco, Inc. v. Seidman & Seidman*[149] that Illinois does not recognize a tort of aiding and abetting fraud because, as suggested above, any person who would be liable for aiding and abetting fraud would be liable

---

145 Cpt. ¶ 152.

146 DTT acknowledges that some Illinois courts have recognized claims of aiding and abetting breach of fiduciary duty but implies that this Court should decline to follow them. *See* DTT Mem. 13.

147 816 F. Supp. 472 (N.D. Ill. 1993)

148 905 F.2d 1040 (7th Cir. 1990).

149 686 F.2d 449 (7th Cir. 1982).

also as a primary violator.[150] In other words, a separate tort of aiding and abetting would be superfluous as the same conduct can give rise to liability for fraud.

Plaintiff responds that those federal cases denying the existence of aiding and abetting no longer are good law because the Illinois Appellate Court has recognized civil aiding and abetting liability in general[151] and claims of aiding and abetting fraud and aiding and abetting breach of fiduciary duty in particular.[152]

The Illinois Court of Appeals has followed Section 876 of the *Restatement (Second) of Torts* in imposing civil aiding and abetting liability.[153] Section 876 provides:

> "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he [or she]
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his

---

150 *Id.* at 452.

151 *Wolf v. Liberis*, 505 N.E.2d 1202 (Ill. Ct. App. 1987).

152 *See Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756 (Ill App. Ct. 2003), *appeal denied*, 807 N.E.2d 982 (Ill. 2004); *Hefferman v. Bass*, 04 C 5748, 2005 WL 936900 * 3 (N.D. Ill. Apr. 15, 2005).

153 *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756 (Ill App. Ct. 2003), *appeal denied*, 807 N.E.2d 982 (Ill. 2004); *Clausen v. Carroll*, 684 N.E.2d 167, 171 (Ill App. Ct. 1997); *Sanke v. Bechina*, 576 N.E.2d 1212, 1213 (Ill App. Ct.), *appeal denied*; 584 N.E.2d 140 (Ill. 1991); *Wolf*, 505 N.E.2d at 1208; *see also Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623 (7th Cir. 2000) (noting that some Illinois cases "have language (weakly) consistent with the separate-tort idea") (citing *Carter Coal Co. v. Human Rights Comm'n*, 633 N.E.2d 202, 205 (Ill. 1994) and *Wolf* , 505 N.E.2d at 1208)).

> own conduct, separately considered, constitutes a breach of duty to the third person."[154]

Since the *Cenco* decision, state courts have applied this section to find a cause of action for aiding and abetting negligent driving,[155] fraud, and breach of fiduciary duty.[156] In *Thornwood, Inc. v. Jenner & Block*,[157] the Illinois Appellate Court addressed a similar challenge to the legal sufficiency of an aiding and abetting claim for breach of fiduciary duty and fraud and concluded that Illinois recognizes such claims.[158] Given this trend in the lower courts, the Court cannot agree with defendants that *Thornwood* is an outlier unworthy of the respect that a federal court sitting in diversity must give to the decisions of the Illinois Court of Appeals.[159]

---

154 RESTATEMENT (SECOND) OF TORTS § 876 (1979).

155 *See Wolf*, 505 N.E.2d at 1208; *Sanke*, 576 N.E.2d at 1213.

156 *Thornwood*, 799 N.E.2d at 767-68; *see also Hefferman v. Bass*, 04 C 5748, 2005 WL 936900 *3 (N.D. Ill. Apr. 15, 2005) (applying Illinois law and recognizing a claim for aiding and abetting a breach of fiduciary duty).

157 799 N.E.2d 756 (Ill App. Ct. 2003), *appeal denied*, 807 N.E.2d 982 (Ill. 2004).

158 *Id.* at 767-78. Deloitte Italy asserts that *Thornwood* does not recognize a cause of action for aiding and abetting fraud, only breach of fiduciary duty. It misreads the case. Although the *Thornwood* panel dedicated its discussion there to the question whether a lawyer could be liable for aiding and abetting breach of fiduciary duty, it ultimately reinstated both the claim of aiding and abetting fraud and breach of fiduciary duty.

159 *Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465 (1967) (The judgment of an intermediate appellate state court "'is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'")(quoting *West v. Am. Tel. & Tel., Co.*, 311 U.S. 223, 237 (1940)); *see also West*, 311 U.S. at 236 (a federal court sitting in diversity "is not free to reject the state rule merely because it has not received the sanction of the highest state court").

In any event, this dispute is academic for the present. The Seventh Circuit and the intermediate Illinois courts agree that knowingly assisting another to commit fraud gives rise to civil liability under Illinois law. They simply disagree on whether such conduct should be called fraud or aiding and abetting fraud. Although this dispute may have to be resolved for purposes of charging a jury, the only question here is whether plaintiff has stated a legally sufficient claim on the basis of the conduct alleged, regardless of the label applied.[160]

Deloitte USA next argues that even if Illinois were to recognize the claim of aiding and abetting fraud and breach of fiduciary duty, plaintiff does not state a claim because he has not alleged any conduct by them and does not allege that they knew about Parmalat insiders' breaches of duty. This Court agrees for the reasons discussed above.

D. *Theft and Diversion of Assets*

The Deloitte defendants next contend that plaintiff's claim of theft and diversion of corporate assets, count six, lacks a basis in Illinois law.[161] Plaintiff responds that Illinois courts have recognized this claim, but provides no authority for this proposition.[162] He argues further that other

---

160 *Cf. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 909 n.10 (1990) (plaintiff does not have to apply the correct label to a motion containing a request for extension of time); *Terry v. UNUM Life Ins. Co. of America*, 394 F.3d 108, 110-11 (2d Cir. 2005) (complaint should not be dismissed where plaintiff is entitled to some relief, even if it is not the relief request) (citing *Norwalk CORE v. Norwalk Redevelopment Agency*, 398 F.2d 920, 925-26 (2d Cir. 1968)).

161 *See Jacobs v. Paynter*, 727 F. Supp. 1212, 1220 (N.D. Ill. 1989).

162 Plaintiff cites *Central States, Southeast and Southwest Areas Pension Fund v. Gaylur Prods. Inc.*, 384 N.E.2d 123 (Ill. App. Ct. 1978), but it is inapposite.

jurisdictions such as South Carolina[163] and New York[164] recognize a claim of diversion and invites the Court to recognize such a claim here.

The Court declines the invitation. The New York and South Carolina cases plaintiff cites do not recognize a general cause of action against an auditor for diversion of corporate assets.[165] Even if they did, plaintiff provides no reason why Illinois would adopt the same rule. This claim therefore will be dismissed.[166]

---

The court there considered plaintiff's action on a promissory note against a corporation and its president. The trial court had dismissed the claim against the company's president. The Illinois Court of Appeal reversed, finding that plaintiff had pleaded sufficient facts to pierce the veil between the company and its president. Although the court mentioned that the president had "fraudulently diverted and misappropriated" over $70,000 of the corporation's funds, it did so only for purposes of establishing that veil piercing was appropriate. *Id.* at 128.

163 *In re Greenwood Supply Co.*, 295 B.R. 787, 795-96 (Bankr. D. S.C. 2002).

164 *Toscano v. Toscano*, 285 A.D.2d 590, 591, 728 N.Y.S.2d 189, 190 (2d Dep't 2001).

165 The Appellate Division's decision in *Toscano* did not recount the facts of the case, as it dealt primarily with the applicable statute of limitations. The cases to which it cites, however, involved claims against officers, directors or shareholders of closely held corporations and it is in this context that the court's conclusion must be read.

166 GTI does not join the arguments of the Deloitte defendants seeking to dismiss the claims of deepening insolvency, theft, and aiding and abetting fraudulent transfer. Generally, the defendant bears the burden of persuasion that the plaintiff has not stated a claim. *See* 2 MOORE'S FEDERAL PRACTICE § 12.34[1][a](3d ed. 2000). Nevertheless, a court may dismiss a claim *sua sponte* under Rule 12(b)(6) where the nonmovant has had notice and an opportunity to be heard. *See Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1995); *Citadel Management, Inc. v. Telesis Trust, Inc.,* 123 F. Supp.2d 133, 147 (S.D.N.Y.2000). Plaintiff here has had ample notice that dismissal of this claim is sought on the ground of legal insufficiency and has had the opportunity to respond to the arguments of the Deloitte defendants. The Court therefore will dismiss this claim against GTI as well.

E. *Conversion*

Count seven claims that the defendants received millions of dollars in fees and other compensation and that they participated in converting or aided and abetted Parmalat's culpable insiders to convert corporate property to their own purposes.

To state a claim for conversion, a plaintiff must allege that "(1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property."[167]

The Deloitte defendants challenge plaintiff's claim of conversion, asserting that he has failed to establish this last element, that Deloitte wrongfully assumed control over the property. They argue that Deloitte's receipt of professional fees cannot ground a conversion claim, as the funds were transferred voluntarily to it and that they therefore did not "wrongfully and without authorization" assume control over them.[168]

Plaintiff argues that his claim for conversion is sufficient on two grounds. First, he contends that his claim for conversion of professional fees is sufficient, but does not address any of the cases cited by defendants. Second, he asserts that his claim may survive on the basis of defendants' alleged participation in the conversion of Parmalat funds by culpable insiders. That is, he argues that his allegation that the Deloitte defendants assisted Parmalat's insiders in obtaining control or ownership of corporate property and funds is sufficient for purposes of an aiding and

---

167 *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill.1998).

168 *See Roderick Development Inv. Co., Inc. v. Cmty.*, 668 N.E.2d 1129, 1134-36 (Ill. App. Ct. 1996); *General Motors Corp. v. Douglass*, 565 N.E.2d 93, 100 (Ill. App. Ct. 1990).

abetting conversion claim.

The Deloitte defendants respond that no Illinois case has recognized secondary liability for conversion because such liability would be inconsistent with the remedy for conversion – return of the specific, identifiable asset.

However appealing this logic, it is not the law. Illinois long has followed the rule that an individual who participates in conversion may be liable although he or she does not personally benefit from the conversion.[169] This is so because "the essence of conversion is not acquisition of property by the wrongdoer, but deprivation of the owner."[170] The Court therefore will not dismiss plaintiff's claim on the ground that the Deloitte entities did not retain ownership of the Parmalat property they allegedly participated in converting. Plaintiff has failed to allege that Deloitte USA knowingly participated in converting any property, however, and therefore this claim will be dismissed against it.

F. *Aiding and Abetting Fraudulent Transfer*

Plaintiff alleges in count nine that defendants aided and abetted Parmalat's culpable insiders in fraudulently transferring property of the corporation.

---

169

*See Nat'l Acceptance Co. of Am. v. Pintura Corp.*, 418 N.E.2d 1114, 1117 (Ill. App. Ct. 1981), *citing with approval, Ferriman v. Fields*, 3 Ill. App. 252 (1878) ("All persons who order, direct, aid, abet or assist the . . . the conversion of personal property, are liable for all the damages, though not benefitted by the act."); *see also DeKalb Bank v. Purdy*, 562 N.E.2d 1223, 1233 (Ill. App. Ct. 1990) (affirming a trial court's reversal of a jury's verdict for aiding and abetting conversion upon the conclusion that there had been no conversion).

170

*Nat'l Acceptance Co. of Am.*, 418 N.E.2d at 1117.

The Illinois Uniform Fraudulent Transfer Act ("UFTA") provides that a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation" with, as relevant here, "actual intent to hinder, delay, or defraud any creditor of the debtor."[171]

The Deloitte defendants argue that the Illinois UFTA does not provide a cause of action for aiding and abetting fraudulent transfer and that there can be no claim in the absence of statutory authorization.[172] Moreover, they assert that even if a claim for aiding and abetting could lie in some circumstances, it would not here because they are not alleged to have been transferees. Since the remedy for a fraudulent transfer is to void the conveyance, the Deloitte defendants argue, such a remedy would be worthless where, as here, they do not control the allegedly fraudulently conveyed property.[173]

Plaintiff responds that Illinois recognizes aiding and abetting liability for fraudulent conveyances, pointing to language in *Firstar Bank, N.A. v. Faul*[174] to the effect that one who

---

171 740 Ill. Comp. Stat. Ann. 160/5(a).

172 *See* Deloitte & Touche S.p.A.'s Memorandum in Support of Its Motion to Dismiss Plaintiff's Complaint ("Deloitte Italy Mem.") 8 (citing 37 C.J.S. FRAUDULENT CONVEYANCES § 217 (2004) ("In the absence of a statute a claim for aiding and abetting a fraudulent conveyance will not lie.").

173 *Id.* at 9 (citing *Atlanta Shipping Corp. v. Chemical Bank*, 631 F. Supp. 335, 348 (S.D.N.Y. 1986) (applying New York law)).

174 No. 00 C 4061, 2001 WL 1636430 (N.D. Ill. Dec. 20, 2001).

participates in effecting a fraudulent conveyance may be held liable for it.[175] The question there was whether a transferee who was legally separate from the debtor corporation could be liable for the fraudulent transfer notwithstanding the fact that the corporation, not the defendant, was the debtor. Although the court agreed that defendant could be held liable for participating in the fraudulent conveyance, it explained also that the fraud claim against him would be sufficient to make him a debtor under the Illinois Uniform Fraudulent Transfer Act.[176] Thus, although the court's language there was broad, its application here is limited.

Fraudulent transfer is a creature of statute. Consequently, many courts have resisted claims of aiding and abetting where they are not created by the UFTA or another statute.[177] Those courts that have recognized aiding and abetting liability generally have limited such claims to defendants who were transferees of the assets or beneficiaries of the conveyance.[178]

---

175 *Id.* * 6 ("Illinois law permits a cause of action for fraud against any party who participates in a fraud, and we see no reason not to extend this rule to fraudulent conveyances.") (internal citation omitted).

176 *Id.*

177 *See, e.g.*, *Rohm & Hass Co. v. Capuano*, 301 F. Supp.2d 156, 161 (D.R.I. 2004) (discussing the Rhode Island UFTA) (citing cases); *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, No. 03 Cv. 0132 (DFH), 2004 WL 771230 *14 (S.D. Ind. Mar. 24, 2004) (citing "the multitude of other courts . . . holding that there is no accessory liability under the Uniform Fraudulent Transfer Act."); *see also* 2 Bankr. Litig. § 14:9 ("Courts have been hesitant to develop theories of recovery against those who assist in making fraudulent transfers. Those who assist fraudulent transfers but do not necessarily receive any direct benefit from the transfer itself have remained largely outside of the remedies available to creditors.").

178 *See, e.g.*, *FDIC v. Porco*, 75 N.Y.2d 840, 552 N.Y.S.2d 910 (1990).

Plaintiff asserts that defendants are transferees, as they have received millions of dollars in fees and therefore they should be liable for at least that transfer, if not the billions of dollars they allegedly aided and abetted others in looting from the company.

Whether a claim for aiding and abetting liability exists is a question of Illinois statutory law. The legislature has not expressly authorized such a claim and no court has recognized one in comparable circumstances. This Court consequently declines to create such a claim here.

G. *Unjust Enrichment & Civil Conspiracy*

DTT and GTI challenge also plaintiffs remaining claims for unjust enrichment and civil conspiracy. In respect of the civil conspiracy claim, they argue that plaintiff has not alleged sufficiently that they knew of the conspiracy and assisted Parmalat in perpetrating the fraud. They argue also that plaintiff's unjust enrichment claim fails because he has not pleaded an independent tort against DTT and GTI.

These arguments are unavailing. First, plaintiff has pleaded the existence of an agency relationship adequately. His allegations against Deloitte Italy and GT-Italy therefore would be sufficient to establish the necessary elements of a civil conspiracy claim. Second, assuming without deciding that an independent tort is necessary, he has alleged successfully an independent tort against DTT and GTI and therefore states a claim for unjust enrichment.

As plaintiff has failed to allege that Deloitte USA knew of the conspiracy or that the Parmalat entities that plaintiff represents here paid it any fees, these claims will be dismissed as to it.

H. *Deepening Insolvency*

The Deloitte defendants next contend that plaintiff's claim for deepening insolvency,

count ten, must fail because there is no such cause of action under Illinois law.

Deepening insolvency "refers to the 'fraudulent prolongation of a corporation's life beyond insolvency,' resulting in damage to the corporation caused by increased debt."[179] Plaintiff contends that Parmalat's auditors Grant Thornton and Deloitte knew or should have known that Parmalat's liabilities far outstripped its assets.[180] Nonetheless, by breaching their duties as auditors to fairly report on its true state of financial health,[181] he contends, they "willfully and knowingly enabled and allowed Parmalat's culpable insiders to continue to borrow billions of dollars of money, and to divert those billions of dollars to purposes other than those for which they were ostensibly borrowed."[182] Plaintiff alleges further that Grant Thornton and Deloitte's assistance to Parmalat's culpable insiders drove the company "further and further into debt" and made bankruptcy inevitable.[183]

Whether Illinois law recognizes a distinct cause of action for deepening insolvency is an open question. In *Schacht v. Brown*,[184] the Seventh Circuit faced the question whether the liquidator of a bankrupt insurance company had standing to assert deepening insolvency as an injury

---

179 *In re Global Service Grp., LLC*, 316 B.R. 451, 456 (Bankr. S.D.N.Y. 2004) (quoting *Schacht v. Brown,* 711 F.2d 1343, 1350 (7th Cir.), *cert denied,* 464 U.S. 1002 (1983)).

180 Cpt. ¶¶ 602-04.

181 *Id.* ¶ 605.

182 *Id.* ¶ 608.

183 *Id.* ¶¶ 610-11.

184 711 F.2d 1343 (7th Cir. 1983).

under the Racketeer Influenced and Corrupt Organizations Act ("RICO").[185] The court explained that it was not convinced that Illinois would "accept[] . . . a rule which would bar a corporation from recovering damages due to the hiding of information concerning its insolvency."[186] Such a rule, it concluded, "would create perverse incentives for wrong-doing officers and directors to conceal the true financial condition of the corporation from the corporate body as long as possible."[187] Accordingly, it held that the liquidator had standing to pursue its RICO claim.

In *Holland v. Arthur Andersen & Co.*,[188] the Illinois Appellate Court declined to rule on deepening insolvency as a compensable injury, finding that the plaintiff had not raised an issue of fact that the company actually had suffered such an injury.[189] More recently, in *Shapo v. O'Shaughnessy*,[190] another RICO case, a district court followed the Seventh Circuit in finding that deepening insolvency is an injury separate from the underlying predicate acts. No Illinois case, however, has addressed whether deepening insolvency is a stand alone tort.

Other jurisdictions have faced claims of deepening insolvency but have not been clear

---

185 18 U.S.C. §§ 1961 *et seq.* (2000 ed., Supp. II).

186 711 F.2d at 1350.

187 *Id.*

188 571 N.E.2d 777 (Ill. App. Ct. 1991).

189 *Id.* at 782.

190 246 F. Supp.2d 935 (N.D.Ill. 2002).

as to whether it is a damage theory or an independent tort.[191] In *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co, Inc.*,[192] the Third Circuit concluded that "'deepening insolvency' constitutes a valid cause of action under Pennsylvania state law."[193] Although the panel stated that Pennsylvania would view deepening insolvency as a "cause of action," i.e., a separate tort, other portions of the opinion suggest that it was speaking of deepening insolvency as an injury. The plaintiffs there brought a claim for fraudulent inducement and the precise question before the court was whether deepening insolvency was a cognizable injury such that the creditor's committee had standing to bring a claim for fraudulent inducement on behalf of the debtor corporation.[194] The court therefore was not required to decide whether Pennsylvania would view deepening insolvency as an independent cause of action.[195]

By contrast, in another case brought by plaintiff related to the events at issue, a trial

---

191 *E.g.*, *Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n,* 274 F.3d 924, 935- 36 (5th Cir. 2001) (noting a continuing trend of recognizing deepening insolvency as an injury); *MCA Financial Corp. v. Grant Thornton LLP*. 687 N.W.2d 850, 858 (Mich. Ct. App. 2004) (suggesting that Michigan might recognize such a claim); *see also* Sabin Willett, *The Shallows of Deepening Insolvency*, 60 BUS. LAW. 549, 549 (2005) ("Whether deepening insolvency is a cause of action or merely a damage theory remains . . . murky[.]").

192 267 F.3d 340 (3d Cir. 2001).

193 *Id.* at 344.

194 *Id.* at 346, 352.

195 Ultimately, the Third Circuit affirmed the dismissal of the plaintiffs' complaint, however, concluding that it was barred by the doctrine of *in pari delicto*. One district court has followed this opinion and concluded that there is a separate cause of action for deepening insolvency in Pennsylvania. *See In re CITX Corp. Inc.*, 2005 WL 1388963 *10 (ED.Pa. Jun. 7, 2005).

court in New Jersey rejected this claim,[196] explaining that it would be an abuse of discretion to create a new cause of action.[197] A Utah appellate court also rejected such a claim, concluding that any action for deepening insolvency would belong to the shareholders, not the corporation.[198]

A tort consists of a duty, a breach, and damages proximately caused by the breach.[199] Plaintiff here contends that defendants owed Parmalat the "continuing duty to honestly and fairly audit the company and report on its true state of financial health."[200] In other words, the duty claimed is that of an auditor to its client. The purported breach is that the defendants did not conduct a proper audit of the company[201] – i.e., that defendants breached their professional duty of care to their client Parmalat. Plaintiff's claim of deepening insolvency, then, is nothing more than a claim of professional malpractice, and the deepened insolvency at issue is a type of damage plaintiff alleges to have suffered as a result. To be sure, one perhaps might imagine circumstances in which a defendant might have a duty not to drive an insolvent corporation into deeper insolvency. Whatever that duty may be – if, in fact, it exists under Illinois law and is separate from any other duty – it is

---

196 *Bondi v. Citigroup, Inc.*, 2005 WL 975856 (N.J. Super. Ct. Feb. 28, 2005); *see also In re Global Servs. Grp.* LLC, 316 B.R. 451, 457-59 (Bankr. S.D.N.Y. 2004) (holding that New York recognizes deepening insolvency only as a theory of damages and not as an independent tort).

197 *Id.* *21.

198 *Coroles v. Sabey,* 79 P.3d 974, 983 (Utah Ct. App. 2003).

199 *E.g.*, W. PAGE KEETON, ET AL, PROSSER & KEETON ON TORTS 2 n.3 (5th ed. 1984).

200 Cpt. ¶ 605.

201 *Id.* ¶¶ 607-11.

not at issue here. This claim is duplicative and will be dismissed.[202]

I. *Claims on Behalf of Creditors*

Scattered throughout the complaint, most notably in his prayer for relief, plaintiff urges an award of $10 billion to compensate "these companies and their estates for the general losses that these companies' bondholders, noteholders and other lenders have incurred as a result of the acts and omissions of the defendants" set forth in the complaint.[203] He seeks another $10 billion for Parmalat's shareholders.[204] Deloitte Italy moves to dismiss plaintiff's claim to the extent that he seeks to recover on behalf of creditors, bondholders, shareholders, and other third parties. It contends that plaintiff does not stand in the shoes of these parties and, whatever the merit of these claims, cannot assert them here.

The parties, with an exception discussed below, rely on federal authorities and analogies to bankruptcy law. The Court therefore discusses the issue in these terms although it is far from clear that federal law would govern if any party contended otherwise.[205]

Under federal law, bankruptcy trustees have standing to pursue the claims of the

---

202 As discussed, it will dismissed also against GTI because plaintiff here has had notice and an opportunity to defendant the claim.

203 Cpt. at 125.

204 *Id.*

205 This case was commenced in the Illinois state courts which presumably would have applied Illinois law either to the substantive issue or, at least, to determine the governing law.

bankruptcy estate, that is, the insolvent corporation.[206] While a bankruptcy trustee may assert only the claims that belong to the bankruptcy estate, those claims may include the interests of creditors in the sense that the trustee has the duty to marshal the assets of the estate so that they can be distributed to creditors on a *pro rata* basis.[207] However, while a trustee pursues the interests of the bankruptcy estate and derivatively the interests of its creditors, he or she does not have standing to pursue the individual claims of creditors or even of creditors as a class. Accordingly, a trustee "has no standing to assert claims of damage to the defrauded purchasers of securities."[208] Whether a claim belongs to the bankruptcy estate or to an individual creditor is a question of state law.[209]

Plaintiff responds that, although an Italian extraordinary administrator is similar to a bankruptcy trustee, his position is not the same. He implies that Italian law perhaps takes a more expansive view of which or whose claims he may assert here. But he does not so demonstrate.[210]

---

206

*See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 n.4 (2d Cir. 1985).

207

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 697 (2d Cir. 1989) (citing *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1342-43 (7th Cir. 1987)); *cf. In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015,1017 (Ill. 1994) ("[T]he Director as rehabilitator of an insolvent . . . company has only those rights the company had as of the date of rehabilitation, and while the creditors are the beneficiaries of his actions, the Director is not authorized to assert creditors' claims on behalf of creditors.").

208

*Hirsch*, 72 F.3d at 1093 (quoting *Bloor*, 754 F.2d at 62 n.4) (in turn citing *Rochelle v. Marine Midland Grace Trust Co.*, 535 F.2d 523, 527 (9th Cir. 1976)).

209

*St. Paul Fire & Marine Ins. Co.*, 884 F.2d at 700; *In re Mediators, Inc.*, 105 F.3d 822, 825 (2d Cir. 1997).

210

Plaintiff contends that extraordinary administration "constitutes a 'governmental temporary taking' of the distressed corporation, with the purpose of avoiding its liquidation" and

His vague allusions to potentially differing law are not entitled to any weight. In the absence of proof to the contrary, foreign law therefore may be presumed to be the same as local law.[211]

Plaintiff next contends that, even under United States law, he has standing to assert that claims of creditors as a general body citing, *inter alia*, *St. Paul Fire & Marine Insurance Co. v. PepsiCo, Inc.*[212] The Second Circuit there considered whether an *alter ego* action belonged to the creditors or the debtor corporation, such that it could be asserted by the trustee. In determining that the action could be brought by the trustee outside of the bankruptcy proceedings, the court explained that "[i]f a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim."[213]

Although this language is broad, the circuit did not reject the principle that a trustee may bring only the claims of the debtor corporation. Indeed, it reaffirmed that the *alter ego* claim

---

therefore that he represents Parmalat's Extraordinary Administration and not simply Parmalat. Bondi Opp. 67 n.11. So be it. But neither the complaint nor plaintiff's memorandum details the scope of his authority other than to state that he has the "power and duty . . . to perform any action he deems necessary and appropriate to preserve the estate and causes of action available to the companies for the benefit of all of their creditors." Cpt.¶ 33.

211

*See Fairmont Shipping Corp. v. Chevron Int'l Oil Co.*, 511 F.2d 1252, 1261 n.16 (2d Cir. 1975); *Bartsch v. Metro-Goldwyn-Mayer*, 391 F.2d 150, 155 n.3 (2d Cir. 1968); *accord Bel-Ray Co., Inc v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 440-41 (3d Cir. 1999) (party seeking to rely on foreign law has the burden of proving its content sufficiently to enable the court to apply it in a particular case).

212

884 F.2d 688 (2d Cir. 1989).

213

*Id.* at 701 (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1107 (2d Cir. 1988)).

was the property of the bankruptcy estate and therefore could be asserted by it.[214] Significantly, *St. Paul Fire & Marine Ins. Co.* does not help the plaintiff here, who seeks to recover for certain classes of creditors, namely the bondholders, noteholders and shareholders, most of whom are now pursuing a securities fraud action on their own behalf in another action now before this Court. The fact that plaintiff puts the word "general" before his claims does not change the fact that he seeks recovery on behalf of specific groups of creditors.[215] Paragraphs two and three of the plaintiff's prayer for damages therefore are stricken and so much of his claim as seeks recovery for injuries not belonging to the bankruptcy estate dismissed.

---

214 *Id.* at 705.

215 As the Seventh Circuit has explained, whether a claim is labeled personal or general is not the operative inquiry, as the question is only whether the claim belongs to the corporation. *See Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir.1994).

*VI. Conclusion*

For the foregoing reasons, the defendants' motions to dismiss the complaint are disposed of as follows:

1. The motions to dismiss of GTI and DTT are granted to the extent that counts six, nine and ten and so much of the complaint as seeks recovery on behalf of creditors other than the entities in extraordinary administration are dismissed against them. The motions are denied in all other respects.

2. The motions to dismiss the complaint of Grant Thornton LLP and Deloitte & Touche LLP and Deloitte & Touche USA LLP are granted.

As it is not clear that plaintiff could not amend his complaint to state a claim against GT-USA and Deloitte USA on counts one through five, seven, and twelve,[216] plaintiff is granted leave to amend the complaint on or before August 8, 2005 in a final opportunity to do. Should he amend, plaintiff shall file and serve a red- or black-lined copy of the pleading.

SO ORDERED.

Dated: July 14, 2005

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

216 The complaint appears to be misnumbered, as there is no count eight and count twelve is directly preceded by count ten.