UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re PARMALAT SECURITIES LITIGATION

This document relates to: 04 Civ. 0030

MASTER DOCKET
04 MD 1653 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

> Catherine A. Torell
> Steven J. Toll
> Mark S. Willis
> Julie Goldsmith Reiser
> Joshua S. Devore
> COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
>
> Stuart M. Grant
> John C. Kairis
> James J. Sabella
> Diane Zilka
> GRANT & EISENHOFER P.A.
>
> *Attorneys for Plaintiffs*
>
> Joseph M. Donley
> KITTREDGE, DONLEY, ELSON, FULLEM & EMBICK, LLP
> *Attorneys for Defendant Pavia e Ansaldo*

LEWIS A. KAPLAN, *District Judge*.

        Pavia e Ansaldo ("Pavia"),[1] an Italian law firm named as a defendant in the first amended consolidated class action complaint filed by purchasers of the securities of Parmalat Finanziaria S.p.A. and affiliates (collectively "Parmalat"), moves to dismiss for failure to state a

---

[1] The parties agree that Pavia incorrectly was designated in the complaint as BBLP Pavia e Ansaldo.

claim, failure to plead fraud with particularity, and lack of subject matter jurisdiction. This action has been the subject of three previous opinions – disposing of the motions to dismiss of the auditor defendants (the "Auditors Opinion"),[2] a member of Parmalat Finanziaria S.p.A.'s Board of Statutory Auditors,[3] and the financial institution defendants (the "Banks Opinion")[4] – familiarity with which is assumed.

## I. The Complaint as It Applies to Pavia

Gian Paolo Zini was a partner in Pavia and one of Parmalat's most important outside lawyers.[5] In 1997, he left Italy to open Pavia's New York office, of which Parmalat was the major, if not the only, client. In February 2001, Pavia's New York office closed, and all of the lawyers and staff working in it began working for Zini & Associates, P.C. ("Zini & Associates"), a new firm established by Zini.[6] Accordingly, the plaintiffs seek to hold Pavia liable only for activities

---

[2] *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. June 28, 2005) ("*Parmalat I*").

[3] *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2005 WL 1630893 (S.D.N.Y. July 12, 2005) ("*Parmalat II*").

[4] *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2005 WL 1653638 (S.D.N.Y. July 13, 2005) ("*Parmalat III*").

[5] Pavia makes a number of factual assertions, most of them unsupported, including a statement that from 1997 to 2000, Zini was a member not only of Pavia but of Pavia & Ansaldo, P.C., a New York professional corporation. *See* Pavia Mem. 5. It is not clear that the existence of the New York professional corporation and Zini's role in it would be material, but the Court does not reach this issue because it is inappropriate at this early stage to convert the motion to dismiss into one for summary judgment. *See, e.g.*, *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000). Accordingly, the Court does not consider evidence – let alone unsupported assertions – outside the complaint.

[6] Cpt. ¶¶ 28, 66-67, 190.

conducted from January 5, 1999 (the start of the Class Period, as defined in the earlier opinions[7]) to February 2001.[8]

The complaint alleges that Pavia's New York office and later Zini & Associates were "the nerve center" of the Parmalat fraud. Zini and Pavia "drafted, negotiated and reviewed many of the legal documents that were necessary to effectuate the fraudulent transactions described" throughout the complaint. They "created various entities and engineered transactions to hide the Company's growing debt and divert Parmalat funds to [founder and chief executive officer Calisto] Tanzi and companies owned by his family."[9] Beyond these generalities, however, the complaint specifies Pavia's involvement in only two schemes.[10]

First, the complaint alleges that Pavia and Zini were involved in a scheme to fake the sale of certain Parmalat trademarks. Some years ago, Italy's antitrust authority ordered Parmalat to divest several brands and trademarks. Parmalat, however, allegedly could not find a buyer. On November 16, 2000, Parmalat therefore sold the trademarks for a stated value of $56 million to Newlat S.r.l. ("Newlat"), an Italian corporation that Pavia had created nine days before. In a set of

---

[7] *See Parmalat III*, 2005 WL 1653638, at *1; *Parmalat I*, 375 F. Supp. 2d at 282.

[8] Zini and Zini & Associates are defendants in this suit, but neither moves to dismiss.

[9] Cpt. ¶¶ 68, 872.

[10] Activities that the complaint links to Zini but that unambiguously occurred after the February 2001 closing of Pavia's New York office – such as the alleged use of the Epicurum investment fund to perpetrate accounting fraud, *see, e.g., id.* ¶¶ 354-367, 886-87 – are irrelevant to the allegations against Pavia. Other allegations that mention Zini or Pavia and cover the relevant time period fail for other reasons. *See* footnote 39 below.

transactions "arranged"[11] by Pavia, Newlat or its parent issued to Parmalat $56 million in promissory notes, which Parmalat recorded in its financial statements as a receivable from a third party.[12] This was quite misleading, because Parmalat knew that Newlat was a shell with no assets and never would pay the notes.[13]

The other alleged scheme also involved Parmalat's booking receivables from a shell corporation created by Zini. On June 23, 2000, Parmalat reported that it had purchased $88.4 million in bonds from Web Holdings, Inc. ("Web Holdings"), a company created by Pavia. Again, this was misleading because Web Holdings was merely a shell with the same address and telephone number as Pavia's New York office and Zini & Associates.[14] Indeed, Web Holdings, along with other shell companies, was used to divert funds to the Tanzi family and commit other frauds.[15] On July 10, 2001 – after Pavia's New York office closed but possibly in consequence of actions taken when it was still

---

[11] *Id*. ¶ 75.

[12] *Id*. ¶¶ 75, 873-77.

[13] The complaint sets forth subsequent developments in this scheme, but all occurred after Pavia's New York office was replaced by Zini & Associates. In particular, on December 18, 2001, the promissory notes issued by Newlat were replaced by a $59 million note issued by Findairy Corporation, which Zini and his firm had incorporated in Delaware. The note was signed by Zini. By the beginning of 2002, Newlat had been acquired by an outside party, which sold Newlat to a firm that later sold Newlat to Boston Holdings Corporation, an entity that Zini and his firm had incorporated in Delaware and whose president was Zini's brother-in-law. On September 18, 2002, either Newlat, or the promissory note – the complaint simply is not clear – somehow disappeared into Bonlat Financing LLC, a shell entity that Parmalat allegedly used to hide much of its debt and liabilities. *Id*. ¶¶ 74-75, 879-81.

[14] *Id*. ¶¶ 71, 884.

[15] *See id*. ¶ 72; *see also id*. ¶¶ 340, 884.

open – Parmalat booked a receivable in the amount of approximately $18 million from Western Alps Foundation, a Delaware entity that was controlled by Web Holdings and that had the same address as Zini & Associates. The amount of the receivable increased to $21.9 million at the end of 2001, and was $28.853 million by March 1, 2002.[16]

The complaint asserts causes of action against Pavia under Section 10(b) of the Securities Exchange Act of 1934[17] and Rule 10b-5 thereunder.[18] It asserts also a claim against Pavia under Section 20(a) of the Act[19] for alleged primary violations of Section 10(b) and Rule 10b-5 by Zini.

## II. Motions to Dismiss

In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the plaintiffs' favor.[20] Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[21]

---

[16] *Id*. ¶ 882.

[17] 15 U.S.C. § 78j(b).

[18] 17 C.F.R. § 240.10b-5.

[19] 15 U.S.C. § 78t(a).

[20] *E.g.*, *Flores v. Southern Peru Copper Corp.*, 343 F.3d 140, 143 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[21] *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (internal quotation marks omitted)).

### III. *Pleading a Violation of Rule 10b-5*

Section 10(b) makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Rule 10b-5 in turn provides:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> "(a) To employ any device, scheme, or artifice to defraud,
>
> "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> "in connection with the purchase or sale of any security."

Most claims under Rule 10b-5 allege misrepresentations or omissions in violation of Rule10b-5(b). The elements of such claims are different from those based on alleged violations of subsections (a) and (c). Both types of claims, however, are subject to heightened pleading requirements regarding *scienter*. Under the Private Securities Litigation Reform Act ("PSLRA"), the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[22] The required state of mind is "an intent to deceive,

---

[22] 15 U.S.C. § 78u-4(b)(2).

manipulate, or defraud."[23] A plaintiff may allege this intent sufficiently "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[24]

To state a claim based on a misrepresentation or omission in violation of Rule 10b-5(b), plaintiffs must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."[25] These allegations must satisfy Rule 9(b) and the PSLRA. Rule 9(b) requires that the circumstances constituting fraud be stated with particularity, which means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[26] The PSLRA is to similar effect, providing that for each allegation of a misrepresentation or misleading omission:

"the complaint shall specify each statement alleged to have been misleading, the

---

[23] *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (internal quotation marks omitted)); *accord Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

[24] *Kalnit*, 264 F.3d at 138 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995) (internal quotation marks omitted)); *accord Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004).

[25] *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998) (internal quotation marks omitted)), *pet'n for cert. filed*, 73 U.S.L.W. 3632 (Apr. 11, 2005) (No. 04-1371); *accord Ganino*, 228 F.3d at 161.

[26] *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation marks and citation omitted)); *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001).

reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[27]

To state a claim based on conduct that violates Rule 10b-5(a) or (c), the plaintiff must allege that a defendant (1) committed a deceptive or manipulative act, (2) with *scienter*, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries.[28]

The PSLRA's pleading requirements regarding misleading statements and omissions do not apply to claims that allege no misrepresentation or omission but rest instead on Rule 10b-5(a) and (c). Such claims, however, nevertheless sound in fraud and therefore come within Rule 9(b). The plaintiffs therefore must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue.[29]

### IV. *Pavia's Liability for the Acts of Zini and Other Lawyers in Its New York Office*

Pavia argues that it is a *studio associato,* an Italian organizational form that is not liable for the torts of its member lawyers, and that the allegations regarding Zini therefore do not state a claim against it.[30] The plaintiffs respond that (1) New York, not Italian, law governs Pavia's

---

[27] 15 U.S.C. § 78u-4(b)(1).

[28] *See Parmalat III*, 2005 WL 1653638, at *10; *Parmalat I*, 375 F. Supp. 2d at 285.

[29] *See Parmalat III*, 2005 WL 1653638, at *10.

[30] Pavia Mem. 12-15.

liability for the actions of its New York lawyers because the relevant activities occurred here, (2) even if Italian law did govern, the Court should disregard Pavia's submissions regarding it because they consist only of translated snippets from potentially inapposite judicial decisions, and in any case, (3) Pavia misstates Italian law. The Court finds it necessary to address only the third point.

The complaint alleges that Zini was a "partner" in Pavia, which gives rise at least to a reasonable inference that Pavia was a partnership. The plaintiffs maintain,[31] moreover, and Pavia acknowledges in its reply brief,[32] that beginning in the late 1990's, Italian law gave lawyers the option of forming a partnership or comparable entity, rather than a *studio associato*. It appears also that an Italian partnership is liable for the torts of its partners and employees committed in the course of the partnership business.[33]

Pavia maintains that it was organized as a *studio associato*, not a partnership. But this assertion is inconsistent with, or at least unsupported by, the complaint. The Court therefore is obliged for purposes of this motion to regard Pavia as a partnership that is liable for the torts of Zini and other Pavia employees committed in the course of Pavia's business. Of course, one assumes that

---

[31] Pl. Mem. in Opp'n to Pavia Mot. ("Pl. Mem.") 22.

[32] Pavia Reply Mem. 6.

[33] The parties do not directly address Italian law on this point, but they appear to assume that it does not differ from local law. The Court therefore applies New York law. *See Fairmont Shipping Corp. v. Chevron Int'l Oil Co.*, 511 F.2d 1252, 1261 n.16 (2d Cir. 1975); *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 155 n.3 (2d Cir. 1968); RESTATEMENT (SECOND) CONFLICT OF LAWS § 136 cmt. h.

Under New York law, a tort committed by a partner or employee in the course of the partnership's business is imputed to the partnership. *See, e.g.*, N.Y. PARTNERSHIP LAW § 24 (McKinney 1988); *Pedersen v. Manitowoc Co.*, 25 N.Y.2d 412, 419, 306 N.Y.S.2d 903, 909 (1969); *Caplan v. Caplan*, 268 N.Y. 445 (1935).

the questions whether Pavia actually was organized as a *studio associato* or as a partnership and, if the former, whether it is liable under Italian law for the actions of its associates are subject to prompt and objective resolution. But the Court cannot make those determinations on a motion addressed to the face of the complaint.[34]

## V. Sufficiency of the Rule 10b-5(b) Claim

As this Court noted in the Auditors and the Banks Opinions, the Second Circuit has propounded a "bright line" rule pursuant to which a defendant will not be liable under Rule 10b-5(b) for a misstatement or omission of another unless the misstatement or omission is attributed to the defendant at the time it is made.[35] Here the complaint does not attribute any statements or actionable

---

[34] Pavia insists that "[p]laintiffs cannot create a partnership through pleading." Pavia Reply Mem. 1. This is a puzzling statement. If the plaintiffs plead that Pavia is a partnership, or otherwise allege facts making such an inference reasonable, the Court of course is obliged to accept the allegation or inference at this stage.

[35] *Parmalat III*, 2005 WL 1653638, at *16 (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998)); *Parmalat I*, 375 F. Supp. 2d at 297.

The plaintiffs seek to avoid the bright line rule of *Wright*, but none of the cases they cite supports their position. *In re Global Crossing, Ltd. Securities Litigation*, 322 F. Supp. 2d 319, 332-34 (S.D.N.Y. 2004), formulated a modified version of the bright line rule:

"a plaintiff may state a claim for primary liability under section 10(b) for a false statement (or omission), even where the statement is not publicly attributed to the defendant, where the defendant's participation is substantial enough that s/he may be deemed to have *made* the statement, and where investors are sufficiently aware of defendant's participation that they may be found to have *relied* on it as if the statement had been attributed to the defendant." *Id*. at 333.

*See also In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 166-67 (D. Mass. 2002) (cited in Pl. Mem. 11). Assuming without deciding that these variations on *Wright* are correct, they would not help the plaintiffs. There is nothing in the complaint other than vague assertions to suggest that Zini "participated" in any substantial way in any statements and omissions challenged in the complaint. *See* footnote 36 below; *cf. Parmalat III*, 2005 WL 1653638, at *26 n.203.

omissions to Zini or Pavia.[36] It therefore will be dismissed to the extent that it asserts a Rule 10b-5(b) claim against Pavia, either directly or through Section 20(a).

VI. *Sufficiency of the Rule 10b-5(a) and (c) Claim*

A. *Primary Violation of Section 10(b)*

The allegations against Pavia, like those against the banks,[37] require the Court to consider the contours of Rule 10b-5(a) and (c).

Under *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,[38] aiding and abetting a primary violation of Rule 10b-5 by another does not give rise to liability. Thus, the question is whether the complaint sufficiently alleges that Zini (while he was at Pavia) and Pavia were primary violators of Section 10(b). The only allegations that the Court finds it necessary to analyze in any depth are those connected to the two schemes reviewed earlier in this opinion, as the

---

[36] The plaintiffs cite also *In re Livent, Inc. Noteholders Securities Litigation*, 174 F. Supp. 2d 144 (S.D.N.Y. 2001), but the court there applied the bright line rule, albeit by treating the solicitation of purchases of certain securities as statements, express or implied, about their value. *Id.* at 154-55. Finally, the plaintiffs rely on *In re Vivendi Universal, S.A. Securities Litigation*, No. 02 Civ. 5571 (HB), 2003 WL 22489764, at *25-26 (S.D.N.Y. Nov. 3, 2003), but that case, as relevant here, held only that the group pleading doctrine could be used to attribute press releases and other documents published by a corporation to one of its executives. Whatever the interaction of the group pleading doctrine and the bright line rule, the group pleading doctrine is not at issue here.

[37] The complaint contains vague allegations that Parmalat issued false and misleading financial statements "with the active participation" of Zini and Pavia, Cpt. ¶¶ 468, 516, and that Zini and Pavia "knew" that Parmalat's financial statements "had not been prepared in accordance with applicable rules and regulations or financial and accounting principles," *id.* ¶ 573. These allegations are wholly insufficient for reasons stated in an earlier opinion. *Parmalat III*, 2005 WL 1653638, at *19 n.159.

[38] *See Parmalat III*, 2005 WL 1653638.

511 U.S. 164 (1994).

complaint's other allegations against Pavia all are patently insufficient.[39]

---

[39] Following are nearly all of the other allegations and the reasons why they fail:

- Numerous offering documents identified Pavia as Parmalat's "legal advisor" or as an entity "to whom communications associated with the offerings should be sent." Cpt. ¶ 69. This allegation does not set forth in particularized terms any deception perpetrated by Pavia.

- Pavia set up a large number of shell entities "to facilitate the improper transfer of funds to off-shore entities to hide Parmalat's debt, to inflate its assets and to benefit the Tanzi family at the expense of Parmalat's investors." The complaint identifies the shell entities but does not explain how any of them (other than the ones involved in the schemes reviewed earlier in this opinion) were used to deceive purchasers of Parmalat's securities. *Id.* ¶ 77. These allegations therefore run afoul of Rule 9(b).

- The complaint alleges that Pavia was involved in the creation and use of Bonlat as a key shell entity. The most specific allegation against Pavia concerning Bonlat, however, is that Pavia "prepared contracts that would adjust balance sheets of other corporations in the Group while permitting the diversion of funds to Tanzi-held entities outside of the Parmalat Group . . . ." *See id.* ¶¶ 14, 225, 888-89. This allegation runs afoul of Rule 9(b) for the reasons just stated as well as afoul of *Central Bank* and the bright line rule. Insofar as this allegation charges misrepresentations on Parmalat's balance sheet, Pavia is alleged only to have aided and abetted that violation.

- Pavia's bank accounts "were used to transfer huge sums of money to key Parmalat insiders, to pay bribes to other Parmalat employees, to transfer funds between Parmalat accounts and companies, and to pay the Law Firm Defendants (and Zini) for their role in the fraudulent scheme." *Id.* ¶ 78; *see also id.* ¶¶ 889-90. Zini, moreover, directed a program of document destruction shortly before he was arrested on December 31, 2003. *Id.* ¶ 93. These allegations suggest that Zini was involved in a great deal of illegal activity, but for purposes of stating a claim for damages for violation of Rule 10b-5, they run afoul of Rule 9(b) and *Central Bank*. *Cf. Parmalat III*, 2005 WL 1653638, at *19 n.159.

- Pavia provided legal opinions and advice to Parmalat and its bankers in connection with several transactions challenged by the plaintiffs and reviewed in the Banks Opinion. Cpt. ¶ 885. This sort of conduct, however, cannot be considered a violation of Rule 10b-5(a) or (c). Even if the underlying transactions were deceptive devices or contrivances, furnishing a legal opinion or legal advice without more at most would be aiding and abetting. *Cf. SEC v. Coven*, 581 F.2d 1020, 1028-30 (2d Cir. 1978); *SEC v. Spectrum, Ltd.*, 489 F.2d 535 (2d Cir. 1973); *SEC v. Nat'l Student Marketing Corp.*, 457 F. Supp. 682, 700-01, 712-15 (D.D.C.

Most of the cases and commentary addressing the post-*Central Bank* liability of lawyers under Section 10(b) considered circumstances in which a lawyer either facilitated the misstatement or omission of another or directly made a statement (or omission) that reached investors.[40] Few decisions appear to have considered a situation like that alleged here, one in which lawyers allegedly designed and helped perpetrate transactions intended to misrepresent a client's financial situation. As in the Banks Opinion and for substantially the same reasons, the Court returns to the text of Section 10(b) and inquires whether Zini's and Pavia's acts as alleged in the complaint amounted to the use or employment of a deceptive device or contrivance.[41]

---

1978).

- Pavia created Buconero LLC as part of a scheme to disguise debt as equity. Cpt. ¶¶ 24, 255. The Court already determined in the Banks Opinion, however, that Citigroup's actions in connection with Buconero did not amount to the use of a deceptive device or contrivance. *Parmalat III*, 2005 WL 1653638, at *20. Accordingly, Pavia's far less significant role – which is not well specified but which appears to have involved the incorporation of Buconero – did not, either.

- Zini incorporated an entity to serve a not clearly specified function in the scheme to factor worthless invoices reviewed in the Banks Opinion. Cpt. ¶ 301; *see Parmalat III*, 2005 WL 1653638, at *6-7. This act is not alleged to have been deceptive. At most this allegation asserts that Zini aided and abetted the primary violators in connection with the invoice-factoring scheme.

40  *See, e.g., Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263 (6th Cir. 1998); *Trust Co. of Louisiana v. N.N.P. Inc.*, 104 F.3d 1478 (5th Cir. 1997); *Kline v. First Western Gov't Sec., Inc.*, 24 F.3d 480 (3d Cir. 1994); Lewis D. Lowenfels & Alan R. Bromberg, *Liabilities of Lawyers and Accountants Under Rule 10b-5*, 53 BUS. LAW. 1157 (1998); James D. Cox, *Just Deserts for Accountants and Attorneys After* Bank of Denver, 38 ARIZ. L. REV. 519 (1996); Ann Maxey, *Competing Duties? Securities Lawyers' Liability After* Central Bank, 64 FORDHAM L. REV. 2185 (1996); *see also Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837 (2d Cir. 1998) (concluding, in context of allegations that attorneys furthered a fraudulent scheme by making misrepresentations to the SEC and drafting a rescission offer to note holders that omitted material information, that *Central Bank* precludes a private cause of action for conspiracy to violate Section 10(b)).

41  *See Parmalat III*, 2005 WL 1653638, at *16-19.

The complaint alleges in substance that Parmalat sold assets and lent money to Newlat and Web Holdings, shell companies created and controlled by Zini and Pavia. In the case of Newlat, the sale was a fiction designed to allow Parmalat to book as receivables obligations that it knew would not be paid. In the case of Web Holdings, the loan from Parmalat was not a loan at all, but rather a payment to the Tanzi family. Depicting the payment as a loan rather than an outright transfer presumably served a dual function – it disguised the embezzlement, and it made Parmalat appear healthier than it was.

Like the factoring and securitization of worthless invoices reviewed in the Banks Opinion, these transactions were "inventions, projects, or schemes with the tendency to deceive because they created the appearance of a conventional" sale and loan "when, in fact, the reality was quite different."[42] Nor is there any dispute that Zini and Pavia "used" or "employed" these devices.[43]

B.  *Other Elements of a Section 10(b) Claim*

Pavia challenges the sufficiency of the allegations regarding *scienter*. There is no need to dwell on this point. Zini and Pavia's creation and use of the shell entities, if proven, is more than sufficient circumstantial evidence of conscious misbehavior.[44] The requirements of causation and

---

[42] *Id.* at *20.

[43] In the Banks Opinion, the Court concluded that BNL's and Citigroup's roles in the arrangements based on worthless invoices amounted to use or employment for purposes of Section 10(b). *Id.* In those schemes, BNL and Citigroup not only designed the transactions, but were parties to them. The same is true here, except that Parmalat's counterparties with respect to the deceptive devices were not Pavia, but shells created and controlled by it. Just as BNL and Citigroup used or employed the factoring and securitization arrangements, Pavia – through Newlat and Web Holdings – used or employed the arrangements at issue here.

[44] *Cf. id.* at *21-22.

of a connection to the purchase and sale of securities are satisfied for purposes of the relevant allegations against Pavia, substantially for the reasons stated in the Banks Opinion.[45]

### VII. Sufficiency of the Section 20(a) Claim

Section 20(a) of the Exchange Act provides that:

"[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."[46]

A complaint asserting a claim under Section 20(a) must allege a primary violation of the securities laws and control by the defendant over the primary violator.[47]

The complaint adequately alleges certain primary violations committed by Zini. The only remaining issue is the sufficiency of the allegations regarding control of Zini by Pavia.

To satisfy this requirement, the plaintiffs must allege that "the defendant possessed 'the power to direct or cause the direction of the management and policies of [the allegedly controlled] person, whether through the ownership of voting securities, by contract, or otherwise.'"[48]

---

[45] *See id.* at *21, *22-24.

[46] 15 U.S.C. § 78t(a).

[47] Pavia argues that the complaint must allege as well culpable participation by the controlling person, but the Court disagrees. *Parmalat III*, 2005 WL 1653638, at *27 & n.215; *Parmalat I*, 375 F. Supp. 2d at 307-10.

[48] *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).

Here the complaint alleges that "Pavia had direct involvement in and oversight of the day-to-day activities of Zini and its other partners and employees with respect to services they performed on behalf of Pavia for Parmalat related entities."[49] Zini is alleged to have been a partner in the firm.[50] Absent evidence to the contrary, plaintiffs are entitled to an inference that the partnership had the power to manage or direct any single partner.[51] While these allegations of control perhaps are not extremely detailed, they do not need to be at this stage.[52] They are sufficient to allege control for purposes of Section 20(a).[53]

---

[49] Cpt. ¶ 1252.

[50] *Id*. ¶ 190.

[51] Pavia bases its attack on the sufficiency of the allegations of control on the assertion that Zini was part of a New York professional corporation: "if any entity could be claimed to be in control of Zini . . . it would be the [New York professional corporation] from which Zini operated during the relevant time period." Pavia Mem. 28-29. As explained, it is not clear that these assertions about matters outside the complaint are material, but the point is moot, as the Court excludes them.

The Court rejects as well Pavia's argument that under Italian law, Pavia did not have (a) the right or (b) the ability to control Zini with respect to his dealings with Parmalat. For reasons explained earlier, the Court assumes for purposes of this motion that Pavia was a partnership, not a *studio associato*, and that an Italian partnership functions in much the same way as a New York partnership. The finer points about Pavia's internal dynamics must await the development of a factual record.

[52] *See, e.g.*, *In re Philip Servs. Corp. Sec. Litig.*, No. 98 Civ. 835 (MBM), 2004 WL 1152501, at *19 (S.D.N.Y. May 24, 2004); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp.2d 392, 415-16 (S.D.N.Y. 2003) (for purposes of pleading the control element of a § 20(a) claim, "[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required."); *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 284-85 (S.D.N.Y. 1994).

[53] *Cf. Parmalat III*, 2005 WL 1653638, at *28; *Parmalat I*, 375 F. Supp.2d at 310-11.

## VIII. Subject Matter Jurisdiction

Pavia argues that the Court lacks subject matter jurisdiction over the claims against it. It is mistaken. In assessing whether federal subject matter jurisdiction extends to claims based on transnational securities frauds, courts examine "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or on United States citizens."[54] Here the allegations against Pavia center on the activities of its New York office. Accordingly, the Court has subject matter jurisdiction over the claims against Pavia.

---

[54] *SEC v. Berger*, 322 F.3d 187, 192 (2d Cir. 2003); *accord Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 121-22 (2d Cir. 1995); *Parmalat III*, 2005 WL 1653638, at *24.

*IX. Conclusion*

Pavia's motion to dismiss [04 MD 1653, docket item 106] is granted, and the complaint dismissed against Pavia, except to the extent that Counts XX and XXIII of the complaint seek to hold Pavia liable for its own and Zini's participation in the Newlat and Web Holdings transactions discussed above. The plaintiffs are granted leave to amend the complaint on or before September 8, 2005 to cure the deficiencies noted in this opinion. Should they amend, they shall serve and provide the Court with a red- or black-lined copy of the new pleading that highlights all differences between the new pleading and the First Amended Consolidated Class Action Complaint.

SO ORDERED.

Dated: August 16, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)