UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

MASTER DOCKET

This document relates to: 04 Civ. 0030                    04 MD 1653 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


Appearances:

Steven J. Toll                           A. Robert Pietrzak
Catherine A. Torell                      Thomas McC. Souther
Mark S. Willis                           Daniel A. McLaughlin
Julie Goldsmith Reiser                   Joseph B. Tompkins, Jr.
Joshua S. Devore                         Alan C. Geolot
COHEN, MILSTEIN, HAUSFELD &              Mark P. Guerrera
TOLL, P.L.L.C.                           SIDLEY AUSTIN BROWN & WOOD LLP

Stuart M. Grant                          *Attorneys for the Bank of America*
John C. Kairis                           *Defendants*
James J. Sabella
Diane Zilka
GRANT & EISENHOFER P.A.

*Attorneys for Plaintiffs*

LEWIS A. KAPLAN, *District Judge.*

      The plaintiffs in these consolidated class actions were investors in the securities of

the international dairy conglomerate Parmalat Finanziaria S.p.A. and its subsidiaries and affiliates

(collectively "Parmalat").[1] They seek recovery from Parmalat's officers, directors, accountants,

---

[1] *In re Parmalat Sec. Litig*, 376 F.Supp.2d 472, 480 (S.D.N.Y. 2005) ("*Parmalat III*").

lawyers, and banks under Sections 10(b)[2] and 20(a)[3] of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5[4] thereunder.

In an opinion dated July 13, 2005 ("*Parmalat III*"), this Court dismissed the First Amended Complaint (the "FAC") to the extent it asserted claims against defendants Bank of America Corp. ("BAC"), Bank of America, N.A. ("BANA"), and Banc of America Securities Ltd. ("BASL") (collectively, "BoA").[5] Plaintiffs subsequently filed a Second Amended Complaint (the "SAC"), which adds a number of new allegations regarding BoA's role in the alleged fraud. The action is before the Court on BoA's motions to dismiss the SAC.[6]

## I. Background

### A. Dismissal of the FAC

The FAC alleged that BoA (1) devised and implemented a number of deceptive transactions involving Parmalat in violation of Rule 10b-5(a) and (c), (2) misrepresented or omitted information about those transactions in violation of Rule 10b-5(b), and (3) was liable as a controlling person under Section 20(a) for Rule 10b-5 violations committed by various BoA subsidiaries, agents,

---

[2] 15 U.S.C. § 78j(b).

[3] *Id*. § 78t(a).

[4] 17 C.F.R. § 240.10b-5.

[5] *Parmalat III,* 376 F.Supp.2d at 517.

[6] The BoA defendants have filed two separate motions to dismiss, one on behalf of BAC and BANA and the other on behalf of BASL.

and employees.

In *Parmalat III,* this Court dismissed all three claims against BoA.  It first rejected the Rule 10b-5(a) and (c) claim because plaintiffs had not alleged facts indicating that the transactions BoA devised and implemented actually were deceptive.   As that opinion made clear,

> "In each of these cases, what remains when the bluster is stripped away are financings and investments . . .  Any deceptiveness resulted from the manner in which Parmalat or its auditors described the transactions on Parmalat's balance sheets and elsewhere.  In entering into these transactions, [BoA] therefore did not use or employ a deceptive device or contrivance."[7]

Next, the Court dismissed plaintiffs' Rule 10b-5(b) claims, concluding that BoA could not be held liable for alleged misrepresentations made by Parmalat and that claims based on alleged misstatements by BoA itself either were time-barred or pleaded with insufficient particularity.  The Court concluded also that any alleged omissions by BoA were not actionable because plaintiffs had not alleged any basis for finding that BoA had a duty to disclose the information omitted.[8]  The Section 20(a) claim was dismissed for want of a primary violation.[9]

B.      *BoA's Motion to Dismiss the SAC*

The SAC asserts claims under Rule 10b-5(a) and (c), Rule 10b-5(b), and Section 20(a) and adds a number of new allegations aimed at curing defects identified by the Court in *Parmalat III.*  Most significantly, the SAC contains several pages of new allegations regarding three

---

[7]

376 F.Supp.2d at 505.

[8]

*Id.* at 514-15.

[9]

*Id.* at 516.

allegedly deceptive transactions: (1) a $300 million loan to Parmalat's Brazilian subsidiary, Parmalat

Empreendimentos e Administracao ("PA") in December 1999, (2) the subsequent restructuring of

the PA transaction through CUR Holdings, a special purpose vehicle allegedly controlled by BoA,

and (3) the 2001 restructuring of a 1998 loan from BoA to Parmalat's Venezuelan subsidiaries.  It

adds also allegations regarding BoA's *scienter*, the BoA defendants' control over various

subsidiaries and employees, and defendant BASL's contacts with this forum.

BoA argues that the SAC suffers from the same defects that doomed the FAC.

Specifically, it contends that the SAC fails to (1) allege that any of the transactions BoA participated

in was deceptive, (2) allege that BoA made any actionable misrepresentations or omissions regarding

the transactions, (3) plead facts giving rise to a strong inference of *scienter*, (4) state a claim under

Section 20(a), and (5) allege facts supporting the exercise of personal jurisdiction over BASL.

Notably, plaintiffs concede for purposes of this motion that, under *Parmalat III,* the

SAC fails to plead any actionable omissions or misrepresentations attributable to BoA and therefore

does not state a claim under Rule 10b-5(b).   Accordingly, this opinion will address only BoA's

remaining arguments.

## II.    *Legal Standards*

In deciding a Rule 12(b)(6) motion, the Court accepts as true the complaint's well-

pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[10]  Dismissal

is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support

---

[10]

*E.g.*, *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 237 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

of his claim which would entitle him to relief."[11]

## III.     Discussion

### A.     Rule 10b-5(a) and (c): Deceptive and Manipulative Acts and Devices

To state a claim under Rule 10b-5(a) and (c), a plaintiff must allege that the defendant (1) committed a deceptive or manipulative act (2) with *scienter*, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and (4) that defendants' actions caused the plaintiffs' injuries.[12]

Although the heightened pleading requirements of the PSLRA do not apply to claims under Rule 10b-5(a) and (c), such claims must be pleaded with specificity under Rule 9(b).[13] Accordingly, a plaintiff alleging market manipulation in violation of Rule 10b-5(a) and (c) must specify, with particularity, "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue."[14]

---

[11]      *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (internal quotation marks omitted)).

[12]      *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir. 2000); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,*75 F.3d 801, 808 (2d Cir. 1996).

[13]      *Parmalat III,* 376 F.Supp.2d at 492.

[14]      *In re Global Crossing*, 322 F. Supp.2d 319, 329 (S.D.N.Y. 2004) (quoting *In re Blech Sec. Litig.*, 961 F. Supp. 569, 580 (S.D.N.Y. 1997)); *accord In re Natural Gas Commodity Litig.*, 358 F. Supp.2d 336, 343 (S.D.N.Y. 2005); *Endovasc Ltd. v. J.P. Turner & Co.*, No. 02 Civ. 7313 (LAP), 2004 WL 634171, at *5 (S.D.N.Y. Mar. 30, 2004); *SEC v. U.S. Envtl., Inc.*, 82 F. Supp.2d 237, 240 (S.D.N.Y. 2000).

As discussed above, the SAC adds allegations regarding three transactions: the PA private placement, the CUR Holdings transaction, and the 2001 restructuring of a 1998 loan from BoA to Parmalat Venezuela ("PV").[15] The first two transactions were discussed at length in the FAC. Accordingly, the SAC can succeed in these respects where the FAC failed only if plaintiffs have alleged new facts about the two transactions *and* these new facts, if proved, would permit the conclusion that the transactions were deceptive. The third transaction is essentially new: although the FAC discussed the 1998 loan to PV, it did not focus on the 2001 restructuring. Whether this transaction was a deceptive or manipulative act therefore is a matter of first impression.

1.     *The Parmalat Administracao Private Placement*

Although the SAC is quite confusing,[16] plaintiffs have added several pages of new allegations in an attempt to clarify their view of the PA transaction. According to the SAC, it became clear in late 1999 that PA, Parmalat's Brazilian arm, was failing. Although Parmalat had an opportunity to sell at least a portion of PA to independent investors, it feared that accepting the low price they offered would have revealed that it had paid too much to purchase PA in the late 1990s and would force a write-down on its balance sheet when the market learned the true value of PA.[17] BoA then designed a transaction in which two BoA-controlled special purpose entities (the

---

[15]

       Plaintiffs concede that the SAC does not state a separate claim under Rule 10b-5(a) and (c) based on trasnactions involving Wishaw Trading, S.A. *See* Opp'n Br. at 18 n.17.

[16]

       For example, in the middle of a discussion of the PA transaction, plaintiffs insert two paragraphs about the CUR Holdings deal. SAC ¶¶ 418-19.

[17]

       SAC ¶ 412.

"SPEs") would purchase an 18.18 percent equity stake in PA for $300 million,[18] which would have implied a market valuation of PA of about $1.65 billion. To finance this purchase, the SPEs issued $300 million worth of four year notes guaranteed by Parmalat S.p.A. and then used the proceeds to buy the 18.18 percent equity stake in PA. The notes allegedly were secured by a put agreement which required Parmalat Capital Finance to buy back the 18.18 percent stake at a significant premium if PA did not become publicly listed.[19]

The Court assumes that plaintiffs' allegations, if true, would make out a fairly persuasive case that Parmalat took advantage of a carefully structured transaction to mislead the marketplace into believing that outside investors had put $300 million of equity into PA for an 18.18 percent stake in the company when, in fact, the economic reality was quite different. What actually happened is that outside investors purchased only debt issued by the two SPEs, not equity in PA itself.[20] Even the 18.18 percent equity stake purchased by the two SPEs, in plaintiffs' view, was not really an equity investment because BoA knew that PA would never become publicly listed and that Parmalat therefore would have to buy back the stake at a premium.[21] Further, the two SPEs sold only $105 million of the debt to outside investors; BoA and Parmalat itself bought the remaining notes, with BoA investing $165 million and Parmalat providing an additional $30

---

[18]       *Id.* ¶ 413.

[19]       *Id.* ¶¶ 413-15.

[20]       *Id.* ¶ 414; Opp'n Br. at 7-8.

[21]       SAC ¶ 415.

million.[22]

Misleading as Parmalat's portrayal of this transaction may have been, plaintiffs have not alleged that the underlying transaction was deceptive or manipulative. There was nothing misleading about BoA and Parmalat providing portions of the $300 million investment in PA.[23] Nor was the structure of the transaction deceptive in itself. What plaintiffs really are arguing is that they were misled about the nature and substance of the PA transaction. Rather than the outside equity investment that was portrayed to the public, the transaction in substance was a loan largely by Parmalat itself and BoA. But this amounts to nothing more that a Rule 10b-5(b) claim for fraudulent misrepresentation, and this Court determined in *Parmalat III* that BoA made no actionable

---

[22]

    *Id.* ¶¶ 415-16.

[23]

    Plaintiffs claim that the fact that Parmalat invested $30 million in PA makes the deal a deceptive "round-trip" transaction because it allowed Parmalat to loan money to PA in secret, while falsely creating the appearance of outside equity investment. SAC ¶ 416. In other words, plaintiffs claim that the transaction deceptively overstated the amount of outside investment in PA by ten percent by including the $30 million dollars contributed by Parmalat itself. As discussed above, the fact that Parmalat invested in its subsidiary, however, does not render the transaction itself – as opposed to the characterization of the transaction – deceptive.

    Nor does Parmalat's investment in its subsidiary constitute "round-tripping," as that term has been used by other courts in this district. Although the Second Circuit has not defined the term in the context of Section 10(b) claims, a number Southern District courts have used it to describe a scheme whereby one company provides funds to a second company (either directly or by overpaying for some service), which uses those funds to purchase goods or services from the first company in order to create the appearance of revenue in the first company. *See, e.g., In re Elan Sec. Litig.,* 385 F.Supp.2d 363, 367 (S.D.N.Y. 2005); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.,* 381 F.Supp.2d 192, 226 (S.D.N.Y. 2004). Here, Parmalat indirectly contributed $30 million to PA in the form of a loan, but there is no evidence that PA used any portion of the $30 million to make sham purchases from Parmalat in order to create the false appearance of revenue or that PA itself recorded the $30 million loan as revenue. Courts have used the term "round-tripping" also to describe the practice of buying and selling securities on the same day in order to inflate trading volumes. *See, e.g., In re Duke Energy Corp. Sec. Litig.,* 282 F.Supp.2d 158, 159 (S.D.N.Y. 2003). There is no allegation of any such activity here.

misrepresentations about any of the Parmalat transactions and is not liable for misrepresentations made by Parmalat.[24]  Similarly, the fact that BoA allegedly knew PA never would be listed publicly does not render the PA transaction deceptive absent allegations that BoA itself – rather than Parmalat – knowingly misrepresented the likelihood of public listing.[25]  But this does not end the analysis. Plaintiffs argue also that PA transaction was deceptive because the $300 million price placed upon the 18.18 percent stake was based on a seventeen month-old valuation by the consulting arm of Deloitte & Touche LLP – which estimated PA's value at $1.6 billion – despite the fact that BoA knew that the study had become "completely obsolete" based on intervening losses by PA and changes in the Brazilian economy.[26]  They claim that the PA transaction therefore is "indistinguishable from other Parmalat transactions this Court [] found to be deceptive" in *Parmalat III.*[27]

Plaintiffs first liken the PA deal to deceptive  transactions in which affiliates of Citigroup Inc. and Banca Nazionale de Lavoro S.p.A. ("BNL") paid Parmalat for invoices they allegedly knew to be worthless in order to disguise what were essentially secret loans from those institutions to Parmalat.[28]  Like the Citigroup and BNL transactions, plaintiffs assert, "[BoA's] orchestration of the [PA transaction] was dependent on a largely worthless item: Parmalat's Brazilian

---

24

      *Parmalat III,* 376 F.Supp.2d at 514-15.

25

      *Id.*

26

      SAC ¶¶ 421, 1050.

27

      Opp'n Br. at 11.

28

      *Id.* at 10 (citing *Parmalat III,* 376 F.Supp.2d at 504).

operations."[29]   They liken the deal also to the purchase by Credit Suisse First Boston ("CSFB") of a series of convertible bonds from Parmalat and its transfer of the conversion right back to Parmalat, which recorded the right as an asset on its balance sheet.[30]

Plaintiffs' allegations concerning the PA transaction present a close question. Nevertheless, read in the light most favorable to plaintiffs, the SAC alleges that BoA knowingly used the outdated $1.6 billion Deloitte valuation to place an inflated price on the PA private placement. This caused the two SPEs to overpay for their investment in PA, a fact that was irrelevant to BoA because BoA knew that PA would not become publicly listed and that the two SPEs therefore would be able to put their entire investment back to Parmalat at a profit.   The combination of the overvaluation and the put agreement, then, created the appearance that BoA believed that PA was worth the full $1.6 billion and was willing to invest its own money based on that valuation, when in fact BoA knew that PA was worth far less and was willing to invest only because the put guaranteed that BoA would be repaid at a premium.[31]   Accordingly, plaintiffs' allegations regarding the PA transaction state a claim under Rule 10b-5 (a) and (c).

---

[29]   *Id.* at 10.

[30]   *Id.* at 9-10; *Parmalat III,* 376 F.Supp.2d at 489-90.

[31]   Even assuming the truth of plaintiffs' allegations, the PA transaction would have  involved a significant risk for BoA – i.e., the possibility that Parmalat would be unable to pay upon exercise of the put, in which case the two BoA-controlled SPEs would have been left holding an overvalued stake in PA.  Although this risk casts doubt on whether BoA actually designed the transaction as plaintiffs have alleged, any such doubt bears on plaintiffs' ability to prove their allegations, not on the sufficiency of the pleading. At this stage, the Court must assume the truth of plaintiffs' allegations.

2.      *The CUR Holdings Transaction*

a.      *The Original Allegations*

The CUR Holdings  transaction was described in the FAC as follows:

"when it became obvious that Parmalat could not raise the money to redeem the notes [issued in the PA private placement, BoA] tried to restructure this transaction through another special purpose vehicle, CUR Holdings.  Bank of America and Parmalat characterized CUR Holdings as a company controlled by Banca Catonale Dei Grigioni, when, in fact, the real control was exercised by an anonymous Cayman Islands company funded and controlled by Bank of America, through its agent, Sala. As part of this restructuring, Bank of America proposed to enter into a 'Zero Coupon / Interest Rate Savings' transaction with Parmalat that would provide $300 million needed to reduce the notes, with the remainder coming from CUR Holdings . . . Bank of America planned to propose another private placement to Parmalat to take out its own and CUR Holdings exposure."[32]

In *Parmalat III,* this Court found that these allegations, like the allegations regarding the PA private placement, were insufficient because plaintiffs failed to allege that the transaction itself was deceptive.[33]

b.      *The Sufficiency of the New Allegations*

In an attempt to rehabilitate this claim, plaintiffs add several new pages of allegations regarding the transaction.

First, plaintiffs have expanded their allegations regarding BoA's role in devising and implementing the transaction.  BoA's role in the transaction, however, is immaterial unless the transaction itself was deceptive.

---

[32]      FAC ¶ 851.  *See also* SAC ¶ 895 (which is virtually identical to FAC ¶ 851).

[33]      *Parmalat III,* 376 F.Supp.2d at 505.

Second, they have added allegations regarding BoA's intent to use the CUR Holdings transaction to reduce its exposure to Parmalat. Plaintiffs assert that this rendered the transaction deceptive because the deal "was dependent on a fiction of [BoA] pretending to take on additional exposure."[34] It is hard to see how this helps their case. Even if BoA did reduce its exposure to Parmalat, plaintiffs make no allegation that BoA represented otherwise. Nor do they explain how the reduction itself would have deceived investors.

Finally, plaintiffs add allegations that BoA and its employees designed the CUR Holdings transaction to "bypass disapproving investors who had already 'responded negatively' to the private placement"[35] and that BoA "formed CUR Holdings because Enron charitable trusts were no longer seen in a good light."[36] These allegations do not avail. The fact that BoA designed the transaction to appeal to a different class of investors than the group that invested in the PA transaction does not render the transaction deceptive, nor does BoA's reasonable desire to avoid an investment vehicle that had been discredited by misuse at Enron.

Accordingly, the SAC does not state a claim under Rule 10b-5(a) and (c) based on the CUR Holdings transaction.

---

[34] Opp'n Br. at 13; SAC ¶ 418.

[35] SAC ¶ 423.

[36] *Id.* ¶ 419.

3.      *The 2001 Restructuring of the Loan to Parmalat Venezuela*

a.      *The Original Allegations*

Although the FAC did not focus on the 2001 restructuring, it described BoA's original loan to PV.

According to plaintiffs, in September 1998, BoA organized a special purpose entity called USPP Trust II ("USPP"), which it used to raise $80 million through a private placement of medium term notes guaranteed by Parmalat S.p.A. USPP then transferred the $80 million proceeds of the private placement to a Parmalat subsidiary, Eurofoods IFSC Limited ("Eurofoods"), which then deposited the $80 million plus a $1.6 million transaction fee in a BoA account. Using the $80 million as collateral, BoA then issued an $80 million loan to PV.[37] According to the FAC, however, BoA and Parmalat failed to disclose that the debt placements were related to the loan to PV and that certain side agreements required Parmalat to pay additional interest.[38]

In *Parmalat III,* this Court concluded that the loan itself was not deceptive and that any claim based on BoA's failure to disclose facts about the loan was time-barred.[39]

b.      *The Sufficiency of the New Allegations*

In an attempt to avoid this problem, plaintiffs have added allegations regarding what they characterize as a restructuring of the PV loan in September 2001. They appear to claim that

---

[37]
    *Parmalat III,* 376 F.Supp.2d at 486-87; *see also* FAC ¶ 846; SAC ¶ 888 (which is nearly identical to FAC ¶ 846).

[38]
    *Parmalat III,* 376 F.Supp.2d at 486-87.

[39]
    *Id.* at 487, 515.

these allegations defeat the statute of limitations on claims based on the 1998 loan because they show that the original loan to PV was just the beginning of an ongoing deceptive scheme that continued at least until 2001.[40]  Even if this were so, it would not help plaintiffs because the Court already has determined that the 1998 loan was not deceptive.[41]

      Plaintiffs argue also that the 2001 restructuring was itself a deceptive transaction. According to the SAC, as part of the 1998 transaction, Parmalat took out an insurance policy with The Interregional Reinsurance Co., Ltd. ("Interregional") to insure against the risk of political upheaval in South America and Eurofoods subsequently made the premium payments to Interregional on Parmalat's behalf.[42]  Plaintiffs allege that the PV loan was restructured in 2001 so that BoA "would divert all amounts due to Parmalat from Eurofood directly into an account at Graubndner Kantonalbank (GBK)," a newly added party to Parmalat's insurance contract with Interregional that, according to plaintiffs, "had no obligation to provide any coverage and in fact had no role in the transaction."[43]  Eurofood paid the insurance premiums to GBK, which then set in motion "a series of transactions that ultimately resulted in the funds being transferred to [BoA employee] Sala and Parmalat senior management."[44]  According to the SAC, then, "[r]ather than being legitimate payments for insurance coverage, the premiums paid by Eurofood were in fact

---

[40]

    Opp'n Br. at 14.

[41]

    *Parmalat III,* 376 F.Supp.2d at 487.

[42]

    SAC ¶ 434.

[43]

    *Id.* at ¶ 436.

[44]

    *Id.*

shams which concealed the outright misappropriation and embezzlement of those funds from Parmalat entities to entities owned and controlled by Sala and Parmalat insiders."[45]  At one point, SAC further alleges that "Sala admitted to Italian prosecutors that he and others used the GKB account to embezzle from Parmalat."[46]  At another, it asserts that Sala admitted that GKB was added to the policy to "set up a looting fund" and not for any legitimate business purpose.[47]

In at least one respect, these attempts to clarify the complaint fail utterly.  The SAC's assertion that the PV loan was restructured so that BoA "would divert all amounts due to Parmalat from Eurofood" makes little or no sense in view of the fact that the SAC does not allege that any amounts were due to Parmalat from Eurofood, either as part of the PV transaction or otherwise.  It alleges only that Eurofood, prior to the so-called restructuring of the PV loan, was paying insurance premiums to Interregional *on behalf of* Parmalat, not *to* Parmalat.  Certainly there is no basis for concluding that the "restructuring" was deceptive or manipulative because it diverted amounts due to Parmalat given the lack of any allegation that there were any such amounts due, let alone the breathtaking leap that BoA did the diverting.

The allegations relating to the change in the payee of the ostensible insurance premiums from Interregional to GBK stand somewhat differently.  The plaintiffs' theory is that GBK performed no services but nevertheless received payments from 2001 onward and that Sala and Parmalat insiders then embezzled funds from Eurofood. If, indeed, the insurance policy was changed

---

[45]
     *Id.*

[46]
     *Id.* at ¶ 437.

[47]
     *Id.* at ¶ 889.

in 2001 to provide for payments to GBK despite the fact that GBK performed no services, that transaction arguably was deceptive because it was capable of misleading investors into believing that the payments were legitimate when, in fact, they were not. To that extent, then, this transaction may have been a deceptive or manipulative device within the meaning of Rule 10b-5(a) and (c).

*4.* Scienter

Having determined the SAC adequately alleges that the PA transaction and the 2001 change in the political risk insurance policy associated with the PV loan were deceptive, the next question is whether it sufficiently alleges that BoA entered into those transactions with the requisite *scienter*.

Under the Private Securities Litigation Reform Act ("PSLRA"), plaintiffs alleging a violation of Rule 10b-5 must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[48] The required state of mind is "an intent to deceive, manipulate, or defraud."[49] A plaintiff may plead this intent "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[50]

---

[48]    15 U.S.C. § 78u-4(b)(2).

[49]    *Ganino*, 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (internal quotation marks omitted)); *accord Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

[50]    *Kalnit*, 264 F.3d at 138 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995) (internal quotation marks omitted)); *accord Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004).

Plaintiffs have not shown that BoA had motive and opportunity to commit fraud. Although they allege that BoA engaged in deceptive transactions in order to earn fees from Parmalat,[51] a desire to earn fees is too generic to make out the requisite motive.[52]

Plaintiffs' allegations of conscious misbehavior and recklessness, however, are sufficient with respect to both transactions. The SAC alleges that BoA designed and implemented the PA transaction with knowledge of Parmalat's precarious financial condition and with the intention of making Parmalat seem like a healthier company than it actually was.[53] In *Parmalat III,* the Court found that similar allegations with respect to deceptive transactions involving Citigroup and CSFB were sufficient to give rise to an inference of *scienter.* For example, the Court explained that:

> "CSFB . . . is said to have structured the transactions, participated in them as Parmalat's counterparty, and underwritten the relevant bond issues, all so that Parmalat could overstate its assets and understate its debt. These allegations, if proven, are more than sufficient to give rise to an inference of conscious misbehavior, let alone recklessness."[54]

---

[51] SAC ¶¶ 876-89.

[52] *Kalnit,* 264 F.3d at 139 (motives "possessed by most corporate directors and officers" are too generic to support an allegation of fraud); *San Leandro,* 75 F.3d at 814; *Vogel v. Sands Bros. & Co., Ltd.,* 126 F.Supp.2d 730, 739 (S.D.N.Y. 2001) ("[The] alleged desire to realize greater transaction fees . . . [is] insufficient to show an improper motive."); *Fisher v. Offerman & Co., Inc.,* No. 95 Civ. 2566, 1996 WL 563141, at *7 (S.D.N.Y. Oct. 2, 1996) ("[A]n underwriter's alleged motive to earn its underwriting fees is not alone sufficient to sustain a strong inference of fraudulent intent.").

[53] SAC ¶¶ 422-24, 876, 879-80.

[54] *Parmalat III,* 376 F.Supp.2d at 507.

The same reasoning applies here. Plaintiffs have alleged facts sufficient to give rise to a strong inference that BoA acted with the requisite *scienter* with respect to the PA transaction.

The situation is more complex with respect to the claim based on the change in the payee on the political risk insurance policy related to the PV transaction, although the Court ultimately reaches a similar conclusion. The SAC alleges that the deal "was restructured such that Bank of American would divert" amounts due to Parmalat from Eurofood into the GKB account, that GKB provide no services, and that Sala and others ultimately embezzled all or part of the money through "a series of transactions."[55] It asserts also that Sala has admitted that GKB was inserted to create a "looting fund" and not for any legitimate business purpose.[56]

In considering whether these allegations are sufficient, it is important to keep one's eye on the ball and not to be diverted by the fact that Sala doubtless knew that he was doing something wrong when he embezzled money from Parmalat. The allegedly deceptive or manipulative transaction here was not the embezzlement, but the change in the political risk policy that changed the payee from Interregional to GKB. What allegedly made that transaction deceptive or manipulative was the (alleged) fact that GKB was to provide no services, which resulted in the transaction creating a false impression as to the reason for the payments. In assessing whether the complaint adequately alleges *scienter,* one therefore must look at the change in the insurance policy.

The allegation that the insertion of GKB into the policy was designed by BoA as a means to facilitate looting, if adequately based, would satisfy the *scienter* requirement. Sala's

---

[55]

SAC ¶¶ 435-36.

[56]

*Id.* ¶ 889.

alleged admission is an adequate basis. In consequence, the *scienter* requirement is satisfied as to the alleged insurance policy change.

B.      *Section 20(a): Control Person Liability*

Section 20(a) of the Exchange Act provides that:

"[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."[57]

A plaintiff asserting a claim under Section 20(a) must allege a primary violation of the securities laws and control by the defendant over the primary violator. Although the question has not yet been put to test by the Second Circuit, this Court repeatedly has held that plaintiffs need not allege culpable participation by the controlling person.[58]

As discussed above, plaintiffs have alleged primary violations based on the PA transaction and the insertion of GKB as a party to the political risk policy related to the PV transaction. The remaining question, then, is whether plaintiffs have alleged control by the various BoA entities over their respective subsidiaries and employees. To plead control over a primary violator, a plaintiff must allege "that the defendant possessed 'the power to direct or cause the

---

[57]

15 U.S.C. § 78t(a).

[58]

*See, e.g., Parmalat III,* 376 F.Supp.2d at 515-16; *In re Parmalat Sec. Litig.,* 375 F.Supp.2d 278, 310 (S.D.N.Y. 2005); *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F.Supp.2d 385, 406 n.124 (S.D.N.Y. 2005); *Neubauer v. Eva-Health USA, Inc.,* 158 F.R.D. 281, 284 (S.D.N.Y. 1994).

direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"[59]

The SAC asserts claims against (1) BAC, a Delaware corporation with its principal place of business in North Carolina; (2) BANA, a wholly owned subsidiary of BAC also headquartered in North Carolina; and (3) BASL, a wholly owned subsidiary of BANA with its principal place of business in London.[60]  Plaintiffs claim that:

- BAC controlled BANA and BASL, along with several entities and employees not named as defendants: Banc of America Securities, LLC ("BASLLC"), Bank of America International ("BAI"), Luca Sala ("Sala"), Antonio Luzi ("Luzi"), and Luis Moncada ("Moncada");

- BANA, in turn, controlled BASL, BASLLC, BAI, Sala, Luzi, and Moncada;

- BASL, in turn, controlled BASLLC, BAI, Sala, Luzi, and Moncada.[61]

The SAC further asserts that "[b]y virtue of the superior position as employers," each of the BoA defendants:

- "had the power to influence and control and did influence and control, directly or indirectly" the various subsidiaries and employees discussed above;[62]

- "had direct involvement in the day-to-day operations" of the controlled

---

[59]

S.E.C. v. First Jersey Sec. Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2 and adopting this standard for a Section 20(a) claim), cert. denied, 522 U.S. 812 (1997).

[60]

SAC ¶¶ 189-92.

[61]

Id.

[62]

Id. ¶¶ 1258, 1264, 1270.

entities and employees "with respect to the transactions with Parmalat related entities and therefore are presumed to have had the power to control or influence the particular conduct giving rise to the securities violations, and exercised that power;"[63]

- was "provided with or had unlimited access to copies of internal documents, reports, press releases, public filings and other statements alleged . . . to be misleading and/or used in furtherance of the plan, scheme and course of conduct set forth herein, and had the ability to prevent the scheme and fraudulent course of conduct described herein from being perpetrated."[64]

The SAC alleges also that BASL acted as an agent for BANA, as evidenced by, *inter alia,* three letters in which BASL expressly stated that it acted as agent for BANA.[65]

Although these allegations are not particularly detailed, they need not be at this stage. Allegations of control are not averments of fraud and therefore need not be pleaded with particularity. They need satisfy only the less stringent requirements of Fed. R. Civ. P. 8.[66] These allegations are at least as detailed as the allegations of control regarding Citigroup and BNL that the Court found sufficient in *Parmalat III.*[67] Accordingly, the Court holds that plaintiffs have alleged

---

[63]
　　*Id.* ¶¶ 1259, 1265, 1271.

[64]
　　*Id.* ¶¶ 1258, 1264, 1270.

[65]
　　*Id.* ¶ 195.

[66]
　　*See, e.g., Parmalat III,* 376 F.Supp.2d at 516-17 (at the pleading stage, allegations of control are governed by Rule 8); *In re Philip Servs. Corp. Sec. Litig.,* 383 F.Supp.2d 463, 485 (S.D.N.Y. 2004); *In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 415-16 (S.D.N.Y.2003) (for purposes of pleading the control element of a § 20(a) claim, "[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required."); *Neubauer,* 158 F.R.D. at 284-85.

[67]
　　*Parmalat III,* 376 F.Supp.2d at 516-17.

control and therefore have stated a claim against BoA under Section 20(a).

C.      *Personal Jurisdiction Over BASL*

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing jurisdiction.  The applicable standard depends upon the procedural context in which the jurisdictional challenge is raised.[68]  Where, as here, no discovery has taken place, the plaintiff need make only a *prima facie* showing of jurisdiction "by pleading in good faith, . . . legally sufficient allegations of jurisdiction."[69]  If affidavits are submitted, the Court is to resolve factual disputes in the plaintiff's favor.[70]

The Exchange Act allows the exercise of personal jurisdiction to the limits of the Due Process Clause of the Fifth Amendment.[71]  The due process analysis defendant's contacts with the United States as a whole.[72]

Where a defendant has "continuous and systematic" contacts with the forum, a court may "exercise its power . . . [irrespective of whether] the subject matter of the suit is [] related to

---

[68]

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990), *cert. denied,* 498 U.S. 854 (1990).

[69]

*Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) (quoting *Ball*, 902 F.2d at 197); *accord In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003).

[70]

*See Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001); *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).

[71]

*S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (citing *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 998 (2d Cir.), *cert. denied*, 423 U.S. 1018 (1975)).

[72]

*In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d at 207.

those contacts"[73] – in other words, it asserts general jurisdiction. If such continuous or systematic contacts are lacking, however, it nevertheless may assert specific jurisdiction by adjudicating only claims "'arising out of or related to the defendant's contacts with the forum.'"[74]

　　　　BASL is a limited liability company organized under the laws of the United Kingdom with its principal place of business in London.[75] As discussed above, it is a wholly owned subsidiary of BANA, which, in turn, is a wholly owned subsidiary of BAC. BAC describes itself as a "global financial services organization," providing services through a "Global Network," with offices in 30 countries across the U.S., Canada, Europe, Latin America, the Middle East and Africa.[76]

　　　　Plaintiffs allege that BAC and BANA "directly and indirectly controlled and directed the acts" of BASL from the United States and that BASL's "involvement in transactions with Parmalat entities was on the authority of, at the direction of, and for the benefit of" BAC and BANA.[77] As noted above, plaintiffs further allege that BASL acted as an agent for BANA in connection with Parmalat transactions.[78]

---

[73]

　　　　*Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 568 (2d Cir.), *cert. denied,* 519 U.S. 1006 (1996) (internal quotation marks omitted).

[74]

　　　　*Id.* (quoting *Helicopteros Nacioonales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414-16 & nn. 8-9 (1984)).

[75]

　　　　SAC ¶ 192.

[76]

　　　　*Id.* ¶ 188.

[77]

　　　　*Id.* ¶¶ 189, 191-92.

[78]

　　　　*Id.* ¶ 195.

BASL argues that these allegations are insufficient to subject it to personal jurisdiction in the United States. This Court, however, already has rejected BASL's objections to personal jurisdiction in one of the consolidated *Parmalat* actions, *Bondi v. Bank of America Corp.*[79] The *Bondi* plaintiffs, like plaintiffs here, had alleged control of BASL by BAC's North American headquarters and a lack of distinction between BoA's worldwide units.[80] The Court held that these allegations were sufficient to establish general jurisdiction, at this pleading stage, under *Perkins v. Benguet Mining Corp.,*[81] which held that an Ohio court had jurisdiction over a Philippines mining company because the company's president had conducted much of the company's business from his home in Ohio during the Javanese invasion of the Philippine Islands.

This analysis applies with equal force here. The fact that BAC allegedly controlled BASL from North Carolina, as opposed to New York, does not change the outcome because, as discussed above, the due process analysis looks to defendant's contacts with the United States as a whole, rather than with the forum state specifically.[82] Accordingly, this Court has personal jurisdiction over BASL based on plaintiffs' allegations that BASL was controlled by various BoA entities in the United States and that BoA acted as an integrated, global organization.

---

[79]

381 F.Supp.2d 283 (2005).

[80]

*Id.* at 290.

[81]

342 U.S. 437 (1952).

[82]

*ATSI Comm., Inc. v. The Shaar Fund,* 02 Civ. 8726, 2004 WL 909173, at *2 (S.D.N.Y. Apr. 28, 2004).

*VII. Conclusion*

In conclusion, the Court wishes to comment on the extraordinary burden that plaintiffs have placed on the Court and all of the parties to this case.

The SAC is 389 pages and 1,323 paragraphs long – certainly the very antithesis of the "short and plain statement of the claim"[83] that the authors of the Federal Rules of Civil Procedure had in mind. Naturally, the Court is well aware of the fact that the PSLRA and Rule 9(b) require particularity in pleading some aspects of plaintiffs' claims, thus requiring a more expansive complaint than the one- and two-page form complaints appended to the Federal Rules. It is quite aware also that this is a particularly complicated case. Nevertheless, having struggled through this brontosaurus of a pleading, the Court doubts that a complaint even approaching this length was needed. Indeed, it is concerned that the complexity and length of the pleading may not serve the interests of the alleged class. It already has delayed, and may continue to delay, resolution of the action. It may well multiply the extent and cost of discovery. It has required, and may continue to require, attention to claims against defendants who may be unlikely ever to make any meaningful contribution to settlement or payment of any judgment. And if this case ever were tried to a jury, the potential for confusion and the difficulties of comprehension would be epic in proportions. If indeed the grievous and extensive fraud alleged by plaintiffs actually occurred, there doubtless are ways to focus more on the forest and less on every single tree.

Should there ever be a fee application in this case, the efficiency and dispatch with which counsel have handled the case are likely to be prominent considerations.

---

[83] FED. R. CIV. P. 8(a).

BoA's motions to dismiss [04 Civ. 0030, docket items 334 and 335] are granted to the extent that the SAC is dismissed for failure to state a claim upon which relief may be granted, except insofar as it asserts claims under Rule 10b-5(a) and (c) and Section 20(a) based upon the PA transaction and the 2001 change in the political risk insurance policy associated with the PV loan. The motions are denied in those respects and insofar as BASL seeks dismissal for lack of personal jurisdiction.

SO ORDERED.

Dated: February 9, 2006

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)