UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PARMALAT SECURITIES LITIGATION | : MASTER DOCKET |
| | : |
| | : 04 Civ. 0030 (LAK) ECF Case |
| This document relates to: All Cases | : |
| | : THIRD AMENDED CONSOLIDATED |
| | : CLASS ACTION COMPLAINT FOR |
| | : VIOLATION OF THE |
| | : FEDERAL SECURITIES LAWS |
| | : |
| | : ELECTRONICALLY FILED |
| | : |
| | : **REDACTED COPY** |
| | : |
| | : DEMAND FOR JURY TRIAL |

GRANT & EISENHOFER P.A.

Stuart M. Grant (SG-8157)
John C. Kairis (JK-2240)
James J. Sabella (JS-5454)
Diane Zilka (DZ-9452)
45 Rockefeller Center, 15th Floor
630 Fifth Avenue
New York, NY 10111
Tel: 646-722-8500
Fax: 646-722-8501
*Co-Lead Counsel for Plaintiffs*

Of Counsel:
SPECTOR ROSEMAN & KODROFF, P.C.
Robert M. Roseman
Andrew D. Abramowitz
Daniel J. Mirarchi
Rachel E. Kopp
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611

COHEN, MILSTEIN, HAUSFELD &
   TOLL, P.L.L.C.
Steven J. Toll
Lisa M. Mezzetti (LM-5105)
Mark S. Willis
Julie Goldsmith Reiser
Joshua S. Devore
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005-3964
Tel: 202-408-4600
Fax: 202-408-4699
*Co-Lead Counsel for Plaintiffs*

## TABLE OF CONTENTS

I.      SOURCE OF THE ALLEGATIONS ............................................................................1

II.     INTRODUCTION ....................................................................................................4

        A.      Overview of the Fraud ...............................................................................4

        B.      The Fraud in Action ...................................................................................7

                1.      The Creation of Offshore Shell Companies ....................................7

                2.      The Creation of Bonlat and Epicurum ............................................8

                3.      The Double Billing Scheme ..........................................................10

                4.      Recycling Old Invoices in Factoring Arrangements ......................11

                5.      Hiding Debt ..................................................................................12

        C.      The "Professionals" .................................................................................15

                1.      The Law Firms .............................................................................15

                2.      The Banks .....................................................................................16

                3.      The Auditors .................................................................................19

        D.      The Endgame  21

III.    JURISDICTION AND VENUE ..................................................................................24

IV.     THE PARTIES .......................................................................................................43

        A.      The Parmalat Group .................................................................................43

        B.      Plaintiffs ...................................................................................................45

        C.      Defendants ................................................................................................47

V.      DEFENDANTS' FRAUDULENT SCHEME AND WRONGFUL COURSE OF
        CONDUCT ............................................................................................................81

        A.      Use of Special Purpose Entities to Record Fictitious Sales – the Evolution of
                Bonlat .......................................................................................................83

                1.      The Scheme and Its Affect on the Financial Statements ................83

                2.      The Fictitious Bank of America Bonlat Account ...........................93

i

B.   Fictitious Sales of Powdered Milk to Cuba ................................................................ 95

C.   Buconero – The Black Hole .................................................................................... 99

D.   Parmalat's and Citigroup's Double Billing And Securitization Scheme ............ 103

E.   Stale Invoices Used In Factoring Scheme With BNL ...................................... 108

F.   Improper Reclassification of Debts as Inter-Company Debts Which Were
     Eliminated in the Consolidated Financial Statements .................................... 112

G.   Fictitious Bond Repurchases .................................................................................. 116

H.   Illegal Money Transfers to Tanzi Family Companies ...................................... 118

I.   Epicurum ...................................................................................................................... 125

J.   Fraudulent Classification of Debt as Equity ..................................................... 129

K.   Manipulation of Goodwill ...................................................................................... 133

L.   Bank of America's Scheme To Create And Implement Deceptive Transactions
     Involving Parmalat's South America Operations, Including A Phony $300
     Million "Outside" Investment In Parmalat's Brazilian Operations ................ 135

M.   The Credit Suisse Entities' Scheme for Parmalat to Issue Bonds Through its
     Wholly-Owned Brazilian Affiliate But Never Report That Affiliate's Debt on
     Parmalat's Consolidated Financial Statements ................................................. 147

N.   The Misrepresentations in the Sale of Bonds to Nextra .................................. 150

O.   Banca Intesa Committed Deceptive Practices By Providing Financing To
     Wishaw Backed By Product Sales The Bank Knew Were Fictitious ............ 154

P.   Fictitious Sales of Trademarks and Other Intellectual Property .................... 156

VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE
     CLASS PERIOD ...................................................................................................... 159

A.   Overview .................................................................................................................... 159

B.   Parmalat's Statements to the Press Regarding 1998 Results, the 1998 Annual
     Report and the March 1999 Notes Offering ..................................................... 160

C.   First Quarter 1999 Results ..................................................................................... 170

D.   The June 1999 Notes Offering .............................................................................. 170

E.    The August 1999 Notes Offering .................................................... 170

F.    The 1999 Six Month Report ........................................................... 171

G.    The September 1999 Notes Offering ............................................... 173

H.    The November 1999 Notes Offering ............................................... 174

I     The December 1999 Notes Offering ................................................ 174

J.    The February 2000 Notes Offerings ............................................... 175

K.    The March 2000 Notes Offering ..................................................... 176

L.    The 1999 Annual Report ............................................................... 176

M.    The 2000 First Quarter Report ...................................................... 184

N.    The June 2000 Notes Offerings ..................................................... 186

O.    The September 2000 Offering ........................................................ 187

P.    The 2000 Six Month Report .......................................................... 187

Q.    2000 Third Quarter Report ........................................................... 189

R.    The October 2000 Notes Offering ................................................... 189

S.    The February 2001 Notes And Bond Offerings ................................. 191

T.    The 2000 Annual Report .............................................................. 192

U.    The 2001 First Quarter Report ...................................................... 198

V.    The June 2001 Notes Offering ....................................................... 200

W.    The July 2001 Notes Offerings ...................................................... 200

X.    The August 2001 Offering ............................................................ 201

Y.    The 2001 First Half Report ........................................................... 201

Z     The September 2001 Notes Offering ............................................... 204

AA.   The 2001 Third Quarter Report ..................................................... 204

BB.   The December 2001 Notes Offering ............................................... 206

CC.   The January 2002 Notes Offering ................................................... 207

DD.   The February 2002 Notes Offering .................................................... 207

EE.   The 2001 Annual Report ................................................................. 208

FF.   The 2002 First Quarter Report ....................................................... 213

GG.   The May 2002 Debenture Offering ................................................ 214

HH.   The August 2002 Notes Offering ................................................... 215

II.   The 2002 Half-Year Report ............................................................ 215

JJ.   The 2002 Third Quarter Report ...................................................... 219

KK.   The December 2002 Notes and Bond Offerings .............................. 221

LL.   The December 2002 Note Offering ................................................ 221

MM.   Parmalat's Statements In February 2003 ....................................... 222

NN.   The 2002 Annual Report ................................................................ 224

OO.   The 2003 First Quarter Report ....................................................... 233

PP.   The July 2003 Notes Offerings ....................................................... 237

QQ.   The August 2003 Notes Offering .................................................... 238

RR.   The 2003 Half Year Report ............................................................ 238

SS.   The September 2003 Notes Offering ............................................... 251

TT.   The 2003 Third Quarter Report ...................................................... 252

UU.   The November 2003 Offering ......................................................... 257

VV.   The Fraud Begins to Unravel .......................................................... 258

VII.   THE TRUTH IS FINALLY REVEALED ................................................... 262

A.   The Revelations of Fraud Drive The Company Into Bankruptcy ............ 262

B.   PwC's Investigation and Reconstruction of Parmalat's Financial Statements .. 264

VIII.   THE BANK DEFENDANTS' ROLE IN THE FRAUDULENT SCHEME AND THEIR SCIENTER .................................................................................... 272

A.   Citigroup's Participation in the Fraudulent Scheme and its Scienter ......... 273

1.   Citigroup's Relationship with Parmalat .......................................... 273

iv

2. Citigroup's Role In Creating Off-Shore Special Purpose Entities .........275

3. Citigroup's Role In The Double Billing and Securitization Scheme .....278

4 Citigroup's Role In Falsely Characterizing Debt As Equity .................284

5. Citigroup Knew Or Was Reckless In Not Knowing Of Parmalat's Fraudulent Scheme ...............................................................................286

B. Bank of America's Participation In The Fraudulent Scheme And Its Scienter...287

1. Bank of America's Relationship With Parmalat .............................287

2. Bank of America's Involvement In Parmalat's Issuance Of Private Placement Offerings ....................................................................289

3. Bank Of America's Role In Falsely Characterizing Debt as Equity in Parmalat's South America Operations ............................................294

4. Bank Of America Knew Or Was Extremely Reckless In Not Knowing Of Parmalat's Fraudulent Scheme ....................................................296

C. The Credit Suisse Entities' Participation In The Fraudulent Scheme And Their Scienter ..........................................................................................297

1 The Credit Suisse Entities' Relationship with Parmalat.....................297

2. The Credit Suisse Entities' Role As Bond Underwriters ...................298

3. The Credit Suisse Entities Knew Or Were Extremely Reckless In Not Knowing Of Parmalat's Fraudulent Schemes ............................298

D BNL's Participation In The Fraudulent Scheme And Its Scienter .............300

E. Banca Intesa's Participation In The Fraudulent Scheme And Its Scienter......302

IX. ZINI'S AND THE LAW FIRM DEFENDANTS' PARTICIPATION IN THE FRAUDULENT SCHEME AND SCIENTER ..............................................303

A. Zini's Complex Scheme to Circumvent Italy's Antitrust Laws .................303

B. Zini As Agent For The Law Firm Defendants Controlled Companies That Engaged In Sham Transactions with Parmalat And Its Affiliates..................305

C. Epicurum Fund .....................................................................................306

D. The Use Of Bonlat to Divert Funds .........................................................307

E.   The Role of Zini and The Law Firm Defendants in Diverting Funds for
Executive Bonuses.................................................................................308

X.   PARMALAT AND THE INDIVIDUAL DEFENDANTS' PARTICIPATION IN THE
FRAUDULENT SCHEME AND SCIENTER...............................................309

A.   Tanzi....................................................................................................309

B.   Tonna...................................................................................................311

C.   Del Soldato...........................................................................................314

D.   G. Tanzi................................................................................................316

E.   S. Tanzi................................................................................................317

F.   Ferraris.................................................................................................318

G.   Board Of Directors................................................................................319

H.   Board Of Statutory Auditors..................................................................320

I.   New Parmalat.......................................................................................323

XI.   DELOITTE'S AND GRANT THORNTON'S KNOWING PARTICIPATION
IN THE FRAUDULENT SCHEME.............................................................324

A.   Introduction And Overview.....................................................................324

B.   The Auditor Defendants Assist Or Deliberately Ignore Parmalat's
Fraudulent Acts....................................................................................325

1.   Grant Thornton And Deloitte Both Knew About The Fraudulent
Transactions Involving Bonlat And Its Predecessor Shell Companies ...325

2.   Grant Thornton And Deloitte Knew About The Fictitious Powdered
Milk Sales To Cuba.......................................................................326

3   Grant Thornton And Deloitte Recklessly Ignored Or Failed To
Investigate The Transactions With Buconero ...................................327

4   Grant Thornton And Deloitte Knew Or Recklessly Disregarded The
Double Billing And Securitization Scheme.......................................329

5.   Deloitte Knew Or Recklessly Disregarded The Fraudulent Factoring
Scheme..........................................................................................329

6   Deloitte And Grant Thornton Knew About The Improper
Reclassification And Elimination Of Company Debt .........................330

vi

7. Deloitte And Grant Thornton Both Knew About The Fictitious Bond Repurchases .......................................................................331

8. Grant Thornton And Deloitte Knew Or Recklessly Disregarded Fraudulent Diversions Of Parmalat Funds To Tanzi And Tanzi Family Entities ...............................................................332

9. Grant Thornton And Deloitte Knew About The Fraud Involving Epicurum ..........................................................................333

10. Grant Thornton And Deloitte Knew Or Recklessly Failed To Discover That Parmalat Improperly Classified Its Debt As Equity .........334

11. Deloitte Knew, Recklessly Disregarded Or Recklessly Failed To Discovery The Company's Fraudulent Accounting Of Goodwill ........335

12. Deloitte Knew About The Improper Overvaluation Of Parmalat's Brazilian Affiliate ..................................................................335

13. Deloitte Knew Or Recklessly Failed To Discovery The Fraudulent Failure To Properly Account For Parmalat's Issuance Of Bonds To A Brazilian Affiliate ....................................................................336

14. Deloitte Knew Or Should Have Discovered The Fraud Regarding The Sale Of Bonds To Nextra ..............................................339

15. Grant Thornton And Deloitte Knew About The Fictitious Sales Of Trademarks And Other Intellectual Property ..........................339

C. Additional Indicators of the Auditor Defendants' Scienter..........................340

1. Deloitte Identifies But Ignores "Red Flags" ....................................340

2. The Auditor Defendants Were Extremely Reckless In Failing To Question A $7 Billion Loan ....................................................................342

3. Deloitte Repeatedly Bows To Parmalat's Demands .............................343

4. Deloitte and Grant Thornton Fail To Question Parmalat's Derivative Accounting Practices ...................................................................345

5. Deloitte's Failure To Act On Prompting from CONSOB, the Italian Securities Regulator ..................................................................346

6. Chiaruttini's Conclusions Regarding The Auditors Scienter ............347

XII. CLASS ACTION ALLEGATIONS ..................................................................350

XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE ..................................351

XIV. INAPPLICABILITY OF STATUTORY SAFE HARBOR ..................................... 353

COUNT I Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) Promulgated Thereunder (Against New Parmalat, Tanzi, Del Soldato, Ferraris, G. Tanzi, S. Tanzi, Tonna, Brughera, Ferretti, Nuti, Martellini and Bocchi). ..................................... 354

COUNT II Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder (Against New Parmalat, Tanzi, Del Soldato, Ferraris, G. Tanzi, S. Tanzi, Tonna, Brughera, Ferretti, Nuti and Martellini) ..................................... 356

COUNT III Violation of Section 20(a) of the Exchange Act (Against Tanzi, Del Soldato, Ferraris, G Tanzi, S. Tanzi, Tonna, Brughera, Ferretti, Nuti, Martellini and Bocchi) ............... 359

COUNT IV Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) Promulgated Thereunder (Against Deloitte Touche Tohmatsu, Deloitte & Touche LLP, Deloitte & Touche USA LLP, Grant Thornton International, Grant Thornton LLP and Grant Thornton S p A.) ..................................... 360

COUNT V Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder (Against Deloitte Touche Tohmatsu, Deloitte & Touche LLP, Deloitte & Touche USA LLP, Grant Thornton International, Grant Thornton LLP and Grant Thornton S.p.A.) ... 363

COUNT VI Violation of Section 20(a) of the Exchange Act (Against Deloitte Touche Tohmatsu) ..................................... 365

COUNT VII Violation of Section 20(a) of the Exchange Action (Against Deloitte & Touche LLP) ..................................... 367

COUNT VIII Violation of Section 20(a) of the Exchange Act (Against James E. Copeland) ..................................... 368

COUNT IX Violation of Section 20(a) of the Exchange Act (Against Grant Thornton International) ..................................... 370

COUNT X Violation of Section 20(a) of the Exchange Act (Against Grant Thornton LLP) ..................................... 371

COUNT XI Violation of Section 20(a) of the Exchange Act (Against Grant Thornton S p A ) ..................................... 373

COUNT XII Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) Promulgated Thereunder (Against Citigroup Inc., Citibank N.A., Eureka Plc, Vialattea LLC, Buconero LLC, Bank of America Corp, Bank of America N.A., Banc of America Securities Ltd, Credit Suisse, Credit Suisse Securities (Europe) Limited, Credit Suisse International and Banca Nazionale Del Lavoro S.p A ) ..................................... 374

COUNT XIII Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) Promulgated Thereunder (Against Banca Intesa) ..................................... 377

COUNT XIV Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder (Against Citigroup Inc., Citibank N.A., Bank of America Corp., Bank of America N.A. and Banc of America Securities Ltd.) ................................................................................ 379

COUNT XV Violation of Section 20(a) of the Exchange Act (Against Citigroup Inc.) ...........381

COUNT XVI Violation of Section 20(a) of the Exchange Act (Against Citibank N.A.) ............ 383

COUNT XVII Violation of Section 20(a) of the Exchange Act
(Against Bank of America Corp.) ............................................................................................... 384

COUNT XVIII Violation of Section 20(a) of the Exchange Act
(Against Bank of America N.A.) ................................................................................................. 385

COUNT XIX Violation of Section 20(a) of the Exchange Act
(Against Banc of America Securities Ltd.) .................................................................................. 387

COUNT XX Violation of Section 20(a) of the Exchange Act (Against Bank of America Corp.,
Bank of America N.A., and Banc of America Securities Ltd.) ..................................................388

COUNT XXI Violation of Section 20(a) of the Exchange Act
(Against Banca Nazionale del Lavoro S.p.A.) ............................................................................ 390

COUNT XXII Violation of Section 20(a) of the Exchange Act
(Against Credit Suisse Group and Credit Suisse) ....................................................................... 391

COUNT XXIII Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)
Promulgated Thereunder (Against BBLP Pavia e Ansaldo, Zini & Associates P.C.
and Gian Paolo Zini) ................................................................................................................... 392

COUNT XXIV Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder (Against BBLP Pavia e Ansaldo, Zini & Associates and Gian Paolo Zini) ...........394

COUNT XXV Violation of Section 20(a) of the Exchange Act (Against Zini) ........................397

COUNT XXVI Violation of Section 20(a) of the Exchange Act
(Against BBLP Pavia e Ansaldo) ............................................................................................... 398

COUNT XXVII Violation of Section 20(a) of the Exchange Act
(Against Zini & Associates, P.C.) ............................................................................................... 399

## I.      SOURCE OF THE ALLEGATIONS

1.      Plaintiffs Hermes Focus Asset Management Europe, Ltd., Hermes European Focus Fund I, Hermes European Focus Fund II, Hermes European Focus Fund III, Cattolica Partecipazioni, S.p.A., Capital & Finance Asset Management, Societe Moderne des Terrassements Parisiens, Solotrat, Laura J. Sturaitis and Arch Angelus Sturaitis and Margery Louise Kronengold (collectively, the "Plaintiffs"), on their own behalf and on behalf of all other purchasers of securities of Parmalat Finanziaria S.p.A. and its subsidiaries and affiliates ("Parmalat" or the "Company") (such purchasers, along with Plaintiffs, are referred to collectively herein as the "Class") between and including January 5, 1999 and December 18, 2003 (the "Class Period"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, their investigation, through their counsel, including without limitation:

(a)      the unequivocal admissions and confessions of wrongdoing by members of Parmalat's Board of Directors and top level of senior management including, but not limited to, former Parmalat Chief Executive Officer Calisto Tanzi ("Tanzi"), his son Stefano Tanzi ("S. Tanzi"), former Parmalat Chief Financial Officers Fausto Tonna ("Tonna") and Luciano Del Soldato ("Del Soldato"), former Parmalat internal accountants Gianfranco Bocchi ("Bocchi") and Claudio Pessina ("Pessina"), and former Bank of America bankers Luca Sala ("Sala") and Luis Moncada ("Moncada");

(b)      Plaintiffs' review of internal Parmalat documents including, but not limited to, communications and other documents relating to Parmalat's relationship to and business dealings with the auditors and banks named as defendants herein and other third parties;

(c)      the First Amended Complaint filed by the United States Securities and Exchange Commission ("SEC") against Parmalat in the United States District Court for the Southern District of New York, styled as *Securities and Exchange Commission v. Parmalat Finanziaria*

*S.p.A.*, Civil Action No. 03 CV10266 (PKC), alleging violations of Section 10(b) of the Securities Exchange Act of 1934;[1]

(d)    the complaint originally filed in the Superior Court of New Jersey by Dr. Enrico Bondi ("Bondi"), the court-appointed Extraordinary Commissioner of Parmalat, on behalf of Parmalat, Parmalat S.p.A. and their subsidiaries and affiliated companies against Citigroup, Inc. and certain of its affiliates, styled as *Bondi v. Citigroup, Inc., et al.*, and removed to the United States District Court for the District of New Jersey, Docket No. 2:04-CV-04373-DMC-MF (the "New Jersey Complaint");

(e)    the complaint originally filed in the Circuit Court of Cook County, Illinois by Bondi as Extraordinary Commissioner of and on behalf of Parmalat, Parmalat S.p.A. and other Parmalat subsidiaries and affiliated entities against Parmalat's former auditors, Grant Thornton International, Grant Thornton LLP, Grant Thornton S.p.A., Deloitte Touche Tohmatsu, Deloitte & Touche USA LLP, Deloitte & Touche LLP and Deloitte & Touche S.p.A., styled as *Bondi v. Grant Thornton International, et al.*, removed to the United States District Court for the Northern District of Illinois, Docket No. 04-CV-6031 (the "Illinois Complaint") and transferred to this Court for purposes of pre-trial proceedings and subsequently amended;

(f)    the complaint filed by Bondi as Extraordinary Commissioner of Parmalat, Parmalat S.p.A. and other affiliated entities against Bank of America Corporation, Bank of America National Trust & Savings Association, Banc of America Securities, LLC, Banc of America Securities Limited, Bank of America International, Ltd. and Bank of America, N.A., styled as *Bondi v. Bank of America Corp. et al.*, originally filed in the United States District Court for the Western District of North Carolina, Docket No. 1:04-cv-215 (the "North Carolina Complaint") and transferred to this Court for purposes of pre-trial proceedings;

(g)    the Proposal of Composition with Creditors pursuant to Article 4 *bis* of Legislative Decree No. 347 of December 23, 2003 converted with amendments into Law No. 39 of February 18, 2004, as later amended;

---

[1]    According to testimony Ethiopis Tafara of SEC Director, Office of International Affairs, given before the House Financial Services Committee on May 13, 2004, "the SEC has worked closely with the Italian securities regulator (the Commissione Nazionale per le Società e la Borsa, or 'CONSOB') and certain Italian prosecutors' offices in an investigation into matters surrounding the collapse of Parmalat S.p.A."

(h)   Plaintiffs' review and analysis of filings, reports and other documents and information concerning Parmalat and its various subsidiaries and affiliates (as described herein) filed with or on record with government agencies and tribunals including, but not limited to, Italian securities regulator Commissione Nazionale per le Società e la Borsa ("CONSOB") (the Italian counterpart to the SEC), the Criminal Court of Milan, Italy, the Criminal Court of Parma, Italy, the Civil Court of Parma – Bankruptcy Division, and the documents and information obtained from parties in this litigation and third parties;

(i)   a Writ of Attachment issued by the Court of Parma on June 21, 2004;

(j)   the Indictment filed in the Milan Criminal Court on May 26, 2004;

(k)   the reports of the Ufficio Italiano Cambi, the arm of Banca d'Italia with oversight over financial transactions;

(l)   the review and analysis of reports prepared by PricewaterhouseCoopers LLP ("PwC") in connection with PwC's engagement by Bondi to review Parmalat's accounts;

(m)   the review and analysis of expert reports prepared by Dr. Stefania Chiaruttini ("Chiaruttini"), consultant to Milan prosecutors, that are based upon, *inter alia*, her review of transcripts of interrogations[2] of numerous individuals by investigators and prosecutors in Italy, documents produced by or seized from Parmalat and its numerous affiliates and subsidiaries, and documents and information seized from the offices of Grant Thornton S.p.A., Deloitte & Touche S.p.A. and others;

(n)   the report by Bondi, dated June 19, 2004 and titled "On the Causes for the Insolvency of Parmalat Finanziaria S.p.A. and its Holdings," filed with the prosecutors in Milan on June 21, 2004 (the "Bondi Report");

(o)   the review and analysis of securities analysts' reports concerning Parmalat;

(p)   the review and analysis of press releases, news articles and other publications disseminated by or concerning Parmalat and the defendants named herein; and

---

[2]   The interrogations were conducted in Italian and Plaintiffs have translated the transcripts from Italian to English. Also, certain other documents quoted herein, including Chiaruttini's reports, have likewise been translated from Italian to English. Quotations to those transcripts and reports herein refer to their English translations.

        (q)     other publicly available information about Parmalat and each of the defendants named herein

2. Plaintiffs obtained, reviewed and analyzed copies of the critical documents, transcripts and reports which support Plaintiffs' claims as described herein. In addition to these documents and the other sources of information listed above, additional facts concerning the defendants' massive fraud continue to be revealed as investigations conducted by U.S and Italian criminal authorities progress. However, as noted in the Bondi Report, in presenting an analysis of the fraud which caused Parmalat's sensational demise, "it is necessary to keep in mind that numerous documents disappeared or were destroyed." Indeed, several individual defendants have already confessed to destroying evidence of the fraud, even taking a hammer to a laptop containing incriminating information.

## II.    INTRODUCTION

### A.    Overview of the Fraud

3. Plaintiffs bring this action on their own behalf and as the representatives of all other persons and entities that purchased or otherwise acquired securities of Parmalat in reliance on the Company's materially false and misleading financial statements and other public statements during the Class Period.

4. This is a federal securities class action alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"). It involves the stunning collapse of international dairy conglomerate Parmalat and the loss of billions of dollars by investors in the United States and elsewhere as a result of what the SEC has aptly described as "one of the largest and most brazen corporate financial frauds in history."[3] As widely reported in the news and financial media, and as described in detail herein, the outrageous scheme orchestrated by the defendants

---

[3]    Emphasis added throughout unless noted otherwise.

named below culminated in Parmalat's sudden financial collapse when it was revealed that substantial operating losses by the Company had been concealed for over a decade and that Parmalat's consolidated total debt, as reported in the Company's audited financial statements, was understated by nearly $10 billion and its consolidated total net assets (or shareholder equity), had been overstated by $16.4 billion.

5.      Although Parmalat itself was based in Italy, this was hardly an Italian or even a European fraud. Indeed, much of the core infrastructure of the scheme was built in the United States by American-based bankers, auditors and lawyers. In a very real way, the U.S. acted as the nerve center for the Parmalat fraud that ultimately resulted in the falsification of the Company's financial statements during the Class Period.

6.      The origin of the scheme began with Parmalat itself. An international food and dairy company founded in 1961 by defendant Calisto Tanzi and controlled by the Tanzi family, Parmalat sought throughout the 1990s to grow its business globally through an aggressive acquisition program. Dozens of food service business were bought in Europe, the United States, and South America so that by 1999 the Company was generating fully 76% of its sales outside Italy. Much of this expansion was increasingly focused on the huge United States market. By 2001 Parmalat was describing itself as "a U.S. $7 billion company" with its important dairy "sector ... concentrated on the East Coast and . . . especially strong in New York's metropolitan area, where it holds 50% of the market." By 2003, Parmalat's U.S. operations had over 3,100 employees and generated $5 billion in annual sales, with facilities in Alabama, Georgia, Michigan, New Jersey, New York and Ohio.

7.      Parmalat's acquisition spree was expensive. Tanzi also knew he needed cash to salvage the various failing businesses owned by the Tanzi family. To feed these dual objectives

of finding acquisition capital and bailout money for the Tanzi family, Parmalat was forced to go to the capital markets again and again for continuous infusions of cash from bond and stock offerings. Moreover, to attract global investors, Parmalat knew it would have to show that it was a good risk – that its businesses were sound and its long term health secure. The problem was that many of the Company's operations were in significant financial trouble, especially its South American businesses. Parmalat knew that investors would show little interest if they understood the Company's true financial picture. So, the defendants put honesty and accuracy aside and concocted a scheme to deceive investors by grossly falsifying Parmalat's financial statements and portraying the Company as strong and profitable when it was anything but strong and profitable.

8       With false financial statements in hand, Parmalat repeatedly went to the capital markets to service its needs. Consistent with its global acquisition efforts, Parmalat raised capital on both sides of the Atlantic, including billions of dollars of stocks and bonds sold to American investors. Parmalat securities are traded in countries and markets around the world, including on the Luxembourg Stock Exchange, the Milan Stock Exchange, the Mercato Telematico Azionario, the Uruguayan stock exchange and in the United States.

9.      As a cash-raising venture, Parmalat's securities sales were a resounding success – at least $7 billion in new debt capital alone was raised through various offerings from 1998 through late 2003.   The trouble was, Parmalat's global operations had significantly underperformed and suffered substantial losses during this period. With insufficient cash from operations, the only way it could pay off older bonds when they came due was to issue new bonds and use the proceeds to pay off the older bonds – thus, Parmalat's scheme was born.

10.     To keep investors interested in the new securities sales, the Company had to find ways to artificially boost the consolidated revenues and earnings of Parmalat and its subsidiaries while somehow hiding its massive, and still accumulating, level of debt. To this end, and with the direct participation of its auditors, bankers and lawyers, among others, Parmalat and its top management concocted a series of transactions whose aim was to show the investing public that the Company had profits and assets that, in fact, did not exist. This web of deceit involved the creation of bogus bank accounts, the use of forged financial records, and the manipulation of Parmalat's balance sheet and income statement through fictitious investment assets and sham transactions.

## B.     The Fraud in Action

### 1.     The Creation of Offshore Shell Companies

11.     One of the central components of the fraud was using offshore, Enron-like Special Purpose Entities ("SPE"s) to artificially generate revenues and inflate the assets recorded on Parmalat's consolidated balance sheet. Parmalat's former CFO Fausto Tonna has admitted that this enabled the Company to artificially maintain the stock's listed value and ensure access to the capital markets through continued bond sales.

12.     To secure capital, Parmalat knew it needed to camouflage the Company's mounting losses and somehow hide or remove the growing debt on its consolidated financial statements. With this in mind, key Parmalat insiders (including Tanzi, its CEO, and Tonna, its CFO) – along with two partners from Parmalat's auditor Grant Thornton – created three offshore shell companies to act as repositories for these illicit transactions. The process would begin with Parmalat issuing false invoices to these three consolidated shells, even though there was no real sale of products because the shells had no commercial activities or purpose. The shells would "pay" for the products via a loan from Parmalat (which it had obtained by assigning the invoices

-7-

to various banks, including Citibank and Bank of America). Parmalat would then assign the shell companies' liability to pay the invoice to an off-balance sheet entity (removing it from its own books) and treat the loan to the shells as an asset – an investment in a consolidated subsidiary. Through this scheme, Parmalat was able to record substantial false sales from these shell subsidiaries, obtain huge amounts of cash from various banks, and record millions of dollars of additional assets through its "investments" in these subsidiaries.

13.     Italian accounting rules, similar to those in the United States, required Parmalat to switch auditors after a certain number of years. Thus, beginning in 1999, Grant Thornton could not be Parmalat's independent outside auditor. This forced Tanzi, Tonna, Zini and Grant Thornton, the chief architects of this facet of the scheme, to modify its operation. Knowing the existing scheme would not be acquiesced to by a new auditor, they agreed that Grant Thornton would audit Parmalat's various consolidated subsidiaries, off-shore entities and SPEs central to the fraud, while Deloitte would audit and certify Parmalat's consolidated financial statements. In auditing Parmalat's books, Deloitte would rely on the audits and certifications of Grant Thornton relating to the various Parmalat subsidiaries involved in the fraud.

## 2.     The Creation of Bonlat and Epicurum

14.     The previously-used shell companies were phased out in favor of one central offshore entity -- Bonlat – which became one of the key vehicles to execute in the Parmalat fraud. Bonlat was formed to hide accounting entries that could not be justified, and to hide losses that, if reported, would have prevented the Company from obtaining funds in the capital markets through bond offerings. Grant Thornton's role in Bonlat's creation was critical. Tonna admitted that "Bonlat . . . had its origins in colloquies with the auditors of Grant Thornton" who "asked us to give them authority to audit Bonlat . . . so they could continue to certify the balance sheets notwithstanding their knowledge of the falsifications in them." Zini and the two law firms that

-8-

he ran were also directly involved in Bonlat's creation and the on-going efforts to hide Parmalat's losses.

15.     One of the many notorious scams funneled through Bonlat was a purported "sale" of hundreds of millions of dollars worth of powdered milk to a company in Cuba, although those sales never actually occurred. In 1999, Parmalat used a Singapore-based shell company called Camfield Pte. Ltd. ("Camfield"), which just happened to occupy Grant Thornton's Singapore offices and shared Grant Thornton employees, to "sell" 300,000 tons of milk worth $620 million to Bonlat which then "sold" the milk to a Cuban state-owned importer. A Parmalat insider later confirmed to Italian prosecutors that the gigantic milk sale never occurred and that had it purchased the 300,000 tons of milk claimed by Parmalat, Cuba would be "swimming in milk," as it would have purchased almost 60 gallons of milk annually for every person in Cuba.

16.     By the end of 2002, Bonlat's fictitious assets had swollen to massive proportions – approximately $7 billion, from $2 billion at the end of 2001. Thus, as the SEC explained, "during 2002 alone, approximately $5.0 billion in operating losses and worthless assets were hidden in this fraudulent structure alone and Parmalat S.p.A.'s pretax net earnings were overstated by a like amount. By September 2003, Bonlat's unsubstantiated assets had risen even higher and totaled €8.6 billion ($9.97 billion)."

17.     Parmalat insiders have admitted that "the Bonlat bank statements were systematically falsified" and that "non-existent credits" were transferred to Bonlat and, as a result, "[a]ll of Bonlat's assets and liabilities are non-existent" and "all of the transactions on the Bank of America account are false." That Bank of America account purportedly contained, by the end of 2002, $4.9 billion. In reality, the account (and the $4.9 billion) was pure fiction.

18.    By 2002, Grant Thornton pointed out that should anyone review Bonlat's books, it would be apparent that (1) the promissory notes held by Bonlat were created through phony transactions; and (2) no interest had been paid on any of the notes held by Bonlat. Thus, anyone who looked at Bonlat carefully would realize that Bonlat's assets were ficticious. Accordingly, Grant Thornton suggested that the fictitious promissory notes be transformed into a new equity investment. Zini created this new investment vehicle – Epicurum Limited – nominally an investment fund but actually a shell entity without any activities or operations. Operated out of Zini & Associates' New York office, Epicurum was designed to act as an additional account in which to continue to hide fictitious credits generated by purported sales of Parmalat's products. By the end of 2002, Epicurum had "grown" into a $625 million "investment fund" with "transfers" of monies from several shell companies run by Zini out of New York. The result was that Bonlat reflected a nonexistent "asset" of $625 million which was incorporated into Parmalat's consolidated balance sheets.

19.    For its part, Grant Thornton knew Epicurum was a sham -- its own accountant was involved in discussions about the need to find a Bonlat alternative. It also accepted oral assurances from Zini, Tonna and Tanzi – never attempting to verify on its own – that the $625 million "investment" in Epicurum was made on an arm's-length basis. Indeed, Grant Thornton reportedly "agreed" that Epicurum was a legitimate independent investment fund because, when the names of the directors of Epicurum were read to Grant Thornton, they "did not sound Italian."

### 3.    The Double Billing Scheme

20.    In order to conceal its weakening financial condition, Parmalat used a variety of other transactions to book phony receivables, disguise debt as equity and secure new financing. One example was a double billing scheme by which Parmalat would issue duplicate invoices to

its distributors and franchisees and record "sales" on both. Parmalat then used these duplicate invoices as backing to obtain liquidity (in the form of credit) from banks. Citigroup, through Citibank, stepped in as a direct participant by structuring a securitization program for these double-billed receivables, which allowed Parmalat to materially overstate its assets. It did so through its subsidiary Eureka Securitization Plc and two of its wholly-owned subsidiaries, including one incorporated in Delaware which issued securities in the United States. Citigroup not only structured the securitization scheme and controlled parties who were direct participants, it also actively managed the scheme and had ongoing knowledge of the nature of the double billing. Indeed, Citigroup, acting through its affiliates, including Citibank, installed its own proprietary software on Parmalat's computer network, allowing it to determine which receivables were eligible for the securitization program and to regularly audit Parmalat's sales. Citigroup then expanded the securitization program, which then included receivables from operations in the United States and Canada.

### 4. Recycling Old Invoices in Factoring Arrangements

21. Parmalat also used old or stale invoices which had been paid long ago to raise additional funds. This involved quite literally recycling old invoices for non-existent receivables in factoring arrangements. These invoices would be assigned to Banca Nazionale del Lavoro S.p.A. ("BNL") one of the hundred largest banks in the world through its Ifitalia S.p.A. ("Ifitalia") subsidiary, in exchange for cash. Since the receivables were non-existent, BNL was not paid by third parties as one would normally expect in factoring transactions. Instead, the entire amount due directly to BNL was paid at the expiration date by NYTE, a Delaware corporation, with funds provided by (and wired from) Parmalat. Because of its close ties and common directors with Parmalat, BNL knew the receivables did not in fact exist and that Parmalat was using "stale" invoices again and again to obtain financing. Moreover, when

-11-

payment on a set of invoices became due, BNL was provided with a new list of stale invoices to receive additional cash, which was exactly the same as the prior lists provided to BNL, except that at BNL's request and instruction, Parmalat changed a single digit on each invoice's number in order to ensure that BNL's software would not flag any of the duplicate invoices.

### 5.   Hiding Debt

22.     As a component to Parmalat's scheme to mask its growing debts to third parties, the Company began improperly reclassifying these debts as intra-company debt – obligations owed by one Parmalat entity to another – so that in the consolidation process these reclassified debts effectively vanished from the Company's consolidated financial statements. So pervasive was this process that near the end of the Class Period, Parmalat had falsely underreported its debt by at least $4.49 billion.

23.     Parmalat used what is recorded as "Account 999" – a veritable "trash bin" for the fake revenues, assets and profits that Parmalat had accumulated over the years -- to effectuate and track these debt reclassifications. Account 999 was no secret at Parmalat or among its outside professionals. Parmalat accounting staff members explained Account 999 in detail to the Deloitte & Touche auditors, who also verified all the Bonlat papers because they had requested them from Grant Thornton. As defendant Gianfranco Bocchi testified on February 6, 2004: "I know that the auditors [GT and D&T] met several times. We explained to them that the inter-company debts were based upon the participation agreements. They never requested the details of the debts to banks." Account 999 was so active that by the end of 2002 it showed a debit of over €8 billion.

24.     In addition to reclassifying its debt to third parties as intra-company debt, Parmalat also improperly recorded large portions of its debt as equity – with the direct participation of Citigroup, Bank of America and certain Credit Suisse entities. Citigroup's role

was pervasive. One of its most significant contributions to the scheme was through the SPE Buconero, an Italian word whose English translation is, aptly, "black hole." Buconero was a Delaware limited liability company created in 1999 by Citigroup and Zini, and owned and controlled by Citigroup. Its specific purpose, along with Vialattea LLC, another Citigroup subsidiary, was to enable Parmalat to hide debt by improperly treating incoming loans as equity investments. In this scheme, Buconero and Vialattea ventured with the Parmalat subsidiary Gestione Centrale Latte S r l ("Geslat"). Parmalat would make contributions to Geslat and then transfer its interest to Buconero for the same amount. Geslat would then lend that money to other companies within the Parmalat Group, which Parmalat would record as equity. In reality, of course, these "investments" by Buconero (made on behalf of Citibank) were a Citibank loan to Parmalat. Citigroup profited handsomely from the deal, reaping millions for its role in structuring transactions with Buconero.

25. In the late 1990s, Parmalat acquired three Canadian companies with money borrowed from Citibank. Instead of calling it a loan, however, Citibank structured the payment to appear as an equity investment -- thus. Citigroup "purchased" a 24.9% stake in Parmalat Canada. In reality, Parmalat and Citigroup had executed a "put agreement" obligating Parmalat to repurchase the "equity" owned by Citigroup at a purchase price equal to the "investment" by Citigroup plus a spread if certain events occurred. Thus, the "investments" by Citigroup were really high interest loans. With Grant Thornton, Parmalat recorded each of these "investments" by Citigroup as equity on its consolidated financial statements, which enabled it to overstate its assets and understate its debt.

26. In another example, Bank of America, through Sala (head of the Corporate Finance and Relationship Management Team), Antonio Luzi (a member of the Corporate

Finance and Relationship Management Team), and Moncada (who was in charge of the credit portfolio of the Milan branch of Bank of America), orchestrated and carried out a scheme to prop up Parmalat's ailing South American operations through infusions of capital generated in sham transactions that, among other things, created the illusion of outside equity investment in Parmalat Brazil, when in fact there was none, as investors were concerned about the growing debt of the Brazilian operations. However, with full knowledge that the Brazilian entities were losing money and that raising capital would be difficult, Bank of America developed and facilitated U.S. private placements of debt in which it was the underwriter and the seller. These transactions were not (as represented) equity infusions but were in fact debt offerings, which generated high commissions for Bank of America, as Tonna has testified, and hid Parmalat's growing debt. Yet, this was only one element of the multifaceted scheme. Indeed, as revealed through recently translated and reviewed materials from, inter alia, proceedings in Italy, Bank of America concocted and employed in this scheme such deceptive facilities as fake swaps and round-tripping of money – conduct that reaches far beyond ordinary and legitimate banking services.

27.     In order to continue to hide its growing debt, Parmalat began issuing bonds that were never even reported on its consolidated financial statements. Credit Suisse International (formerly Credit Suisse First Boston International) ("CSFBi") directly participated in this scheme by preparing a prospectus for the issuance of bonds in the amount of €500 million by Parmalat Brasile, to be underwritten entirely by CSFBi. Importantly, Credit Suisse First Boston ("CSFB"), CSFBi and Credit Suisse Securities (Europe) (formerly Credit Suisse First Boston (Europe) Limited) ("Credit Suisse Europe") (collectively, the "Credit Suisse Entities") structured the transaction so that they would appear to offer liquidity to Parmalat Brasile for the payment of

its debts, notwithstanding that the debt was never reflected on Parmalat's consolidated financial statements. For their part in the scheme, Credit Suisse Entities received millions of dollars in commissions and fees.

## C.    The "Professionals"

### 1.    The Law Firms

28.    Defendant Zini and his New York law firms, BBLP Pavia e Ansaldo (from 1998 to 2001) ("Pavia") and Zini & Associates (from 2001-2004) (collectively, the "Law Firm Defendants") constituted the nerve center for many of Parmalat's financial schemes. As Tanzi's counsel and "right hand man," Zini was dispatched by Tanzi to New York to devise, orchestrate and execute extensive fraudulent activities for the benefit of Parmalat and Tanzi, for which Zini and his law firms received enormous compensation.

29.    Described by Tonna as one of the "masterminds" of the Parmalat fraud, Zini exploited his close proximity to the financial markets to structure and fund various offshore entities such as Epicurum, Camfield, Buconero and Bonlat. Through these and numerous other entities, Zini and the Law Firm Defendants devised fraudulent transactions, accompanied by false documentation and improper accounting, to divert funds to Parmalat, Tanzi personally, and other Tanzi-controlled entities.

30.    When the truth about the phony transactions that Zini had conceived or participated in was finally revealed, Zini ordered the destruction of evidence at his New York law firm's offices, including computer files related to Bonlat and Epicurum. Zini himself was arrested on or about December 31, 2003 for his role in the Parmalat fraud. As described in detail below, the Parmalat schemes could not have occurred without Zini's direction and direct participation.

## 2.    The Banks

31.    Citigroup, Bank of America, the Credit Suisse Entities and BNL (and their affiliates) played an indispensable role in the Parmalat fraud, ensuring that the Company was ultimately able to hide debt and boost its revenues and assets. Several of these banks also ensured the continuation of Parmalat's scheme through their involvement in the issuance of at least $7 billion of debt securities that provided a continuous infusion of cash in order to fund Parmalat's massive buying spree in the U.S. and elsewhere.

32.    Citigroup's role in the Parmalat fraud was pervasive, from creating Buconero to helping Parmalat hide debt to structuring loans to Parmalat as "investments" so Parmalat could report them as equity. Citigroup also underwrote or served as a dealer in offerings for billions of dollars worth of Parmalat debt securities based on completely false financial information, knowing that Parmalat desperately needed the capital to keep its scheme ongoing and undetected. Citigroup also maintained Parmalat accounts in New York and elsewhere, through which it facilitated the illicit transfer of Parmalat funds to accounts owned and controlled by Tanzi family members and/or Zini & Associates. Finally, Citigroup also participated with Parmalat to conceal Parmalat's deteriorating financial condition by using the Company's double billing scheme to structure and manage a securitization program for these double billed receivables.

33.    Citibank had an intimate knowledge of the Company's finances not only through its direct participation in the fraudulent activities, but also because of its close relationship with Parmalat. The Company's CFO has recently admitted that Citibank "knew, as insiders, the actual assets and the financial conditions of the [Parmalat] Group." A Parmalat insider has also acknowledged Citigroup's knowledge of the double-billing scheme, stating that "Citigroup did a due diligence that certified in detail the way [Parmalat's] billing system worked." Additionally, Chiaruttini, who was appointed by the Milan prosecutor's office in connection with its criminal

-16-

investigation into the Parmalat fraud, confirmed that Citibank "was aware of the mechanism of double billing," citing a study of the securitization transactions by Banca d'Italia on behalf of prosecutors.

34.     Like Citigroup, Bank of America's role in the Parmalat fraud was multi-faceted. It had extensive commercial and investment banking relationships with Parmalat; in fact, Parmalat was one of Bank of America's most lucrative relationships in Europe. Bank of America capitalized on this close relationship, particularly with respect to Parmalat's South American operations, and sought additional business and fees from Parmalat in a variety of ways, from lending Parmalat money, to structuring transactions that were integral to the manipulation and falsification of Parmalat's financial statements, to selling over $1 billion of Parmalat's private placements to U.S. investors based on what Bank of America knew were materially false and misleading statements about Parmalat.

35.     In selling huge amounts of Parmalat's private placements, Bank of America enabled Parmalat to maintain its good credit rating while its financial condition was rapidly deteriorating. This, in turn, allowed Parmalat to continue issuing debt at lower costs. In fact, many of these private placements were improperly characterized as "debt" when, in fact, they were used as loans to finance Parmalat entities in "at risk" or emerging countries. To sell these Parmalat securities in the U.S., Bank of America representatives arranged "road show" meetings with major U.S. institutional investors during which Bank of America representatives, together with Tanzi, Tonna and Zini, distributed false and misleading information about Parmalat that was reviewed and approved by Bank of America. Bank of America also helped disguise loans as equity in other ways, such as through the financial arrangement to increase the capital of Parmalat Administracao, the Company's Brazilian affiliate.

36      As Parmalat's senior management has testified, far from providing mere banking services, Bank of America – through Sala – conceived, proposed, and carried out numerous deceptive transactions in concert with Parmalat that generated enormous commissions for itself while concealing Parmalat's mounting debt in Brazil. These transactions not only included round-trip money transfers – through which entities actually controlled by Bank of America and Parmalat acquired an interest in the Brazilian operations – but they also involved swap deals that were complete shams. For instance, Andrea Ventura, Administrative and Financial Director of Parmalat Brazil, S A  and a Director of all of the Parmalat Brazilian entities, described in an e-mail to Ferraris on March 27, 2003, how one of the goals of these deals was "the reduction of our indebtedness (indebtedness that is publicly disclosed), by means of transfers of funds from Partecipacoes " Ventura then states: "I am in the process of transferring from Partecipacoes the currency exchange risk from a previous financial transaction (a five-year transaction worth $45 million) through a fake swap with BofA " Thus, Bank of America, through Sala, Luzi, Moncada and others, deliberately created the false public impression of sustainability and interest in Parmalat's Brazilian operations. The transactions orchestrated by Bank of America served no legitimate business or banking purpose other than to deceive the market, generate gratuitous fees for Bank of America, and divert funds for the personal enrichment of Sala, Moncada, and other Bank of America insiders

37.     Bank of America, through Sala, proposed a financial arrangement in 1999 that would enable Parmalat to improperly increase the purported value of Parmalat Administracao, a Brazilian affiliate. Bank of America purportedly arranged the sale of an 18.18% interest in the Brazilian entity to "outside" North American investors for $300 million with Parmalat retaining the remaining 81.82%. Bank of America, through Sala, also co-wrote with Parmalat a press

release which announced the transaction and misrepresented its terms. In fact, Bank of America told Parmalat's CFO how to describe the transaction without revealing that Parmalat would have to repurchase the 18.18% stake at a premium in the event the Brazilian entity did not obtain a public listing and without revealing that such public listing would never occur. Because it was a certainty that Parmalat's repurchase obligation would be triggered, instead of being an equity transaction, the deal involved a $300 million private debt placement partly secured by the Brazilian stake. This fact was concealed, however, and Sala and Bank of America also concealed that they controlled the two Cayman Islands-based SPEs – Food Holdings Limited and Dairy Holdings Limited – that acquired the 18.18% interest in the Brazilian entity to create the false appearance of an outside investment. The $300 million raised in the private placement was on the same day that it was received by the Brazilian entities paid out to Wishaw Trading, S.A., Parmalat's Uruguayan shell which was involved in other sham transactions with defendant Banca Intesa. Not surprisingly, these deceptive transactions caused the market to overvalue the Brazilian subsidiary by hundreds of millions of dollars.

38.     The Credit Suisse Entities also played an important role by helping to hide Parmalat's growing debt. CSFBi and Credit Suisse Europe acted as underwriters for Parmalat securities and directly participated in a complex financial transaction with Parmalat (through Parmalat Brasile) which was designed to artificially inflate Parmalat's assets, while appearing to provide the Company with financing through the issuance of bonds by Parmalat Brasile. Likewise, BNL was also an eager participant in the Parmalat fraud – specifically in the factoring scheme whereby Parmalat used previously-paid invoices to raise additional capital.

### 3.     The Auditors

39.     Among the most notorious participants in the Parmalat fraud were its outside auditors, Grant Thornton and Deloitte. For more than a decade the Company was able to conceal

massive losses and huge accumulations of debt.   Yet, Parmalat was not flying solo in constructing the way its financial health was presented to investors.  Its auditors, Grant Thornton and Deloitte, did far more than turn a blind eye to the misconduct:  they directly participated in it.  Indeed, when forced to choose between their professional responsibilities as auditors and alienating the Parmalat insiders who controlled their fees, they repeatedly placed their own interests ahead of those of the Company's shareholders, investors and other creditors.  Even after Parmalat's collapse, Deloitte and Grant Thornton continued to keep the truth from coming out, going so far as to hinder the Company's efforts to obtain copies of audit workpapers that might reveal their own malfeasance.

40.    Grant Thornton's participation began early on.  It was one of the creators of Bonlat and its predecessors, and audited Parmalat's consolidated financial statements until 1999 and, thereafter, the financial statements of Bonlat, Epicurum and other conduits of the fraud. Deloitte then stepped in to join Grant Thornton in Parmalat's illicit venture.

41.    To say that Deloitte and Grant Thornton failed to follow generally accepted accounting or auditing principles in their auditing work is a massive understatement.  Indeed, Chiaruttini concluded that had Deloitte or Grant Thornton followed such principles, or at least had they even remotely followed the minimum requirements of due diligence to which they were bound, they would have been in a position to flag both the anomalies and structural weaknesses within Parmalat and the Parmalat Group.4

42.    When Deloitte's own employees raised concerns about improprieties at Parmalat, senior auditors at Deloitte, including its U.S.-based CEO Jim Copeland, opted to participate in the fraud rather than warn investors of it.  Chiaruttini concluded that "Deloitte did not pay

---

4       The "Parmalat Group" refers to subsidiaries, entities and affiliates whose results of operations are reported by Parmalat on a consolidated basis

attention . . to the observations that its field auditors made in the Early Warning Reports and Summary Audit Pleadings" that were sent to Deloitte's lead partners in the U.S. and other personnel in charge of the Parmalat audit. Instead, Deloitte ultimately removed its own regional auditors who insisted on raising problems with Parmalat's accounting.

43.    Toward the end of 2002 when Grant Thornton and Deloitte were "verifying" assets in preparation of the year-end audit, they took the unprecedented step of letting Parmalat itself take over the verification process for the single largest asset on its books: $4.9 billion maintained by Bonlat that was supposedly held by Bank of America. With this freedom, Parmalat insiders forged the necessary documents to "authenticate" the existence of the Bonlat account (which did not, in fact, exist) and passed those along to the outside auditors. This crude forgery involved Parmalat insiders cutting out Bank of America's logo, scanning it into a computer, printing it out and passing it through a fax machine multiple times.

44.    Both Deloitte and Grant Thornton utterly failed to identify even one of the numerous financial schemes and frauds perpetrated despite the existence of a sea of red flags, including those noted above. This effectively meant that no true audit of Parmalat was ever performed. Thus, the Company's actual financial status continued to be concealed from the investing public and the Parmalat fraud was able to be perpetuated for many years.

### D.    The Endgame

45.    In December 2003, rumors began to swirl publicly that Parmalat would be unable to make a required payment of $400 million to repurchase a minority interest in its Brazilian operation or extinguish $187 million of outstanding bond debt which came due on December 8, 2003, even though Parmalat purportedly had billions of dollars of liquid assets on hand. Parmalat was able to extinguish the bond debt on the very last day of the grace period, but it was

-21-

unable to meet its other commitments because it could not obtain any money from its purported $625 million Epicurum "investment" or from the non-existent $4.9 billion Bonlat bank account.

46.     On December 19, 2003, Parmalat issued a shocking press release admitting that Bonlat did not, in fact, have $4.9 billion in a Bank of America account as previously represented. The very next day, Italian prosecutors initiated a fraud investigation. Four days later, on December 24, 2003, Parmalat filed for bankruptcy protection with a court in Parma, Italy, and on December 27, 2003, the Parma court declared Parmalat insolvent.

47.     Calisto Tanzi, Parmalat's former Chairman, was arrested in Milan and taken to prison on December 27, 2003. On December 31, 2003, seven more executives were arrested, including Parmalat's CFO, Zini, and two partners of Grant Thornton's Italian operations (on October 5, 2004, these two Grant Thornton partners were ordered by the Milan court to stand trial on January 27, 2005 in an expedited schedule skipping any preliminary hearings). To date, over 32 Parmalat executives or outside consultants have been arrested, notwithstanding the documented last-minute frantic efforts by some to destroy financial records and other evidence to hide their complicity in the scheme. Alessandro Bassi, former aide to CFO Tonna, committed suicide on January 23, 2004.

48.     At least six Parmalat insiders have confessed to their direct participation in the fraud (as have two former Bank of America bankers). Former CEO Tanzi bluntly stated: "I recognize my mistakes. I know I broke the law." According to a January 12, 2004 article in The Wall Street Journal, "[p]rosecutors believe Mr. Tanzi may have diverted as much as 1.5 billion euros from Parmalat to help make up for losses over the years at Parmatour," a family owned travel business that was run by his daughter Francesca.

49.     On January 13, 2004, Dr. Stefania Chiaruttini was appointed by the Milan prosecutor's office to analyze various Company documents and other information and to prepare a report describing the falsification of Parmalat's financial statements and other aspects of the fraud. On February 3, 2004, the Milan prosecutors further engaged Chiaruttini to study and document her findings on the auditing activities of Deloitte and its role in the fraud. Moreover, PriceWaterhouseCoopers LLP ("PwC") was appointed by Enrico Bondi (the court-appointed Extraordinary Commissioner of Parmalat) to perform a forensic audit and evaluate the effect of the fraud on the Company's financial statements.

50.     In the investigations and prosecutions conducted in Italy, Tanzi, Tonna and others have admitted, and PwC, Bondi and Chiaruttini have found, that the consolidated balance sheets of Parmalat and its Parmalat S.p.A. operating subsidiary were falsified at all relevant times during the Class Period. As revealed by certain defendants' admissions and the results of reports prepared by Chiaruttini, Bondi and PwC, Parmalat had significant operating losses in each year of the Class Period (and earlier), particularly as a result of the Parmalat Group's South American operations, but the Company always posted a profit and concealed its losses with the active participation of its auditors, bankers and attorneys named as defendants in this action, by manipulating and falsifying its financial statements every single quarter.

51.     The scale and scope of the falsification is staggering. As Parmalat first acknowledged in a press release dated December 19, 2003, the assets reported in its 2002 audited financial statements were overstated by at least $4.9 billion. According to the preliminary report issued by PwC on or about February 9, 2004, Parmalat's actual consolidated debt as of September 30, 2003 was at least €14.3 billion, or more than two times the €6.4 billion amount that Parmalat reported for that period, and total consolidated shareholders' equity should have

-23-

been reported as no more than negative €11.4 billion, not the positive €2.1 billion figure that Parmalat reported for that period.

52.     As Bondi concluded in his June 2004 report, the responsibility for Parmalat's demise rests on Parmalat's top executives and trusted consultants, including Parmalat's United States counsel – Zini (and his two law firms:  Pavia and Zini & Associates); the Company's auditors – Deloitte and Grant Thornton; and various banks – Citigroup, Bank of America, the Credit Suisse Entities and BNL, among others.  Indeed, the various confessions and the reports prepared by Chiaruttini, Bondi and PwC, as well as the ongoing investigations conducted by U.S. and Italian criminal and regulatory authorities, have clearly implicated these entities.  Through their participation in the fraudulent transactions, the various Parmalat defendants enriched themselves at the expense of investors who ultimately lost almost the entire value of their investment in Parmalat.

## III.   JURISDICTION AND VENUE

53.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §§1391(b), (c) and (d), because offers and sales of Parmalat securities at issue in this action occurred in this District.  In addition, many of the acts and practices made in furtherance of defendants' scheme and complained of herein occurred in substantial part and/or had an effect in this District, including the creation and implementation of the manipulative devices and contrivances and the sale of Parmalat securities.   Further, defendants Zini, Pavia, Zini & Associates, Grant Thornton, Deloitte, Citigroup, Bank of America, the Credit Suisse Entities and Buconero are, and defendant Pavia was, located in, conduct (or conducted) substantial business in, and/or have (or had) substantial contacts with this District.

-24-

54.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. §240.10b-5

55.     In connection with the acts alleged in this Complaint, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mail and interstate telephone communications

56.     Pursuant to the judicially prescribed "effects test" for asserting extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over the claims for Parmalat securities traded on both U.S. markets and/or purchased in the U.S. and in European markets   This Court has subject matter jurisdiction over domestic and foreign members of the class because the defendants' fraudulent conduct had an impact upon the United States' markets and upon United States investors.   The interests of all investors were adversely affected by the defendants' misconduct   Defendants' fraudulent conduct, including that which was performed in the United States, artificially inflated the price of the Company's securities during the Class Period and affected the integrity of the prices paid for Parmalat securities in the United States and on other markets and in other countries around the world.

57.     This Court may also properly exercise subject matter jurisdiction under the "conduct test," articulated by the Second Circuit (and other courts), which provides that a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States "directly caused" the claimed losses

The facts alleged herein show that substantial activity in furtherance of the defendants' fraud occurred within the United States and damaged members of the Class worldwide. As described herein, the "nerve center" of the fraud was the law offices of Pavia and Zini & Associates in New York, a site chosen by Tanzi as a base from which to orchestrate the legal and financial aspects of the fraud.

58.     Defendants' fraud-related conduct in the U.S. was part of a single fraudulent scheme spanning the U.S. and other countries around the world. The domestic conduct was instrumental in causing the losses of Plaintiffs and the other members of the Class.

59.     There was but a single worldwide market for Parmalat securities. Parmalat securities were priced based on trades reported from various exchanges throughout the world. That worldwide market was defrauded by defendants' conduct, causing extensive effects on domestic purchasers of Parmalat securities, as well as on securities markets abroad.

60.     In the United States, Parmalat sold artificially inflated securities by means of false and misleading statements in financial reports, offering memoranda, and press releases. Parmalat actively marketed and sold these securities in the United States despite its false reporting of its financial condition as alleged herein.

61.     Parmalat's ordinary shares were traded in the United States in the over-the-counter market throughout the Class Period. Additionally, the Company's ADRs (each of which represented a proportional interest in twenty shares of Parmalat common shares) were issued and were traded in the United States since 1996. Parmalat's records of shareholders entitled to vote at annual meetings held during the Class Period reflect that numerous United States institutional investors bought Parmalat ordinary shares including among others: Bankers Trust Company New York, Walden/BBI Funds, Fifth Third Citizens Funds, UMB Trust/UMB Bank, Union

Bank of California N.A., STI Classic Funds, Vontobel International Equity Fund, Connecticut General Life Insurance Company, Chancellor LGT Asset Management, Inc., the Cosmopolitan Fund, the Cosmopolitan Investment Fund, the Commonwealth of Pennsylvania Public School Employees Retirement Fund, Massachusetts Health Care Security Trust, Sempra Energy, Dreyfus International Stock Index Fund, Dreyfus Founders Worldwide Growth Fund, Dreyfus Founders International Equity Fund, Houston Firefighters' Relief and Retirement Fund, PanAgora Group Trust, Pension Reserves Investment Board, Public Employee Retirement System of Idaho, Sierra Pacific Resources Defined Benefit Master Trust, the William and Flora Hewlett Foundation, Barclay Global Investors, Dupont Pension Trust, Brown & Williamson Tobacco Master Retirement Trust. The Prudential Insurance Company of America, Bellsouth Corporation Master Pension Trust, California State Teachers Retirement System, California Public Employees' Retirement System, National Rural Electric Co-op Association, Frank Russell Investment Company International Fund, Mercator International Fund, State of Minnesota State Employees Retirement Plan, College Retirement Equities Fund, TIAA-CREF International Equity Fund, the Common Trust Fund, State of Connecticut Retirement Fund, Strong Overseas Fund, and Utah State Retirement Systems Benefits Plan.

62.     Parmalat also sold nearly $1.5 billion in notes and bonds to United States investors, with defendant Bank of America having placed over $1 billion in Parmalat debt in the United States. More than 50% of the Company's outstanding bonds were sold to American investors, including such large and well known U.S. financial institutions as American International Group, Inc., Allstate Life Insurance Corporation, Bear Stearns & Co., Inc., Metropolitan Life Insurance Company and New York Life Insurance Company, among others All of these institutional bond purchasers have a significant presence in this District   Bank of

America's United States offices were directly involved in marketing and selling Parmalat's debt securities to U.S. investors. Bank of America employees from the United States helped prepare offering materials, and at least one of the bank's United States-based managers from its Private Placements Group traveled to Italy to work with senior managers of Parmalat on the preparation of the offering memoranda and prospectuses. Bank of America executives and Parmalat executives traveled together in the United States to market Parmalat debt securities to U.S. investors. Luca Sala, who was Bank of America's former client relationship manager for the Parmalat account and thereafter a "senior advisor" to Parmalat, also attended road shows in the United States. In addition, in or about October 2002 and July 2003, representatives of Parmalat, including Tonna, met with prospective investors in the United States to discuss on-going offerings and answer questions about Parmalat's financial performance and offerings, where they misrepresented the true financial condition of Parmalat and the Parmalat Group. For the October 2002 road shows, Tonna met with potential investors in Massachusetts, Connecticut, New York, Indiana, and Illinois, often in one-on-one meetings that lasted for approximately two hours. Kenneth Lewis, Bank of America's Chief Executive Officer, traveled to Italy in early June 2003 to meet with senior Parmalat executives to solicit even more business for the bank from Parmalat.

63. The offering material for the bonds sold in the United States included audited consolidated financial statements of Parmalat S.p.A., which represented approximately 70% of the reported sales of the consolidated entity, and whose financial information reflected the majority of the fraudulent conduct. The offering materials incorporated by reference financial information from Parmalat S.p.A.'s parent, Parmalat. The financial statements used in

-28-

connection with these offerings were audited by Deloitte and Grant Thornton who knew that the financial statements would be part of these offerings and that they were materially false.

64.     Throughout the Class Period, Parmalat regularly filed false and misleading reports with CONSOB (the Italian equivalent of the SEC), including quarterly, six-month and annual reports which were relied upon by investors in the United States in making investment decisions concerning Parmalat securities.  Parmalat posted copies of all of these filings in English on Parmalat's web site to ensure that United States investors would be able to review those documents.  Also during the Class Period, false and misleading statements made outside the United States were disseminated, in English, into the United States and internationally through the means and instrumentalities of international and interstate commerce including, but not limited to, the mails, interstate telephone (and related internet) communications, and other electronic media.  Further, Ferraris, one of Parmalat's former Chief Financial Officers, organized meetings, including one in New York, with the financial community to review the reported results.

65.     Defendants also engaged in extensive activities in the United States to further their fraud.  As described below, among other things: (i) Parmalat formed United States entities and subsidiaries to illicitly transfer money and to raise additional capital through debt offerings; (ii) the Law Firm Defendants from their New York offices created numerous, key shell companies and false transaction documents and funneled illicitly gained money through various bank and trust accounts maintained at New York banks; (iii) several of the Individual Defendants, including Tanzi and G Tanzi, opened bank accounts in New York into which Parmalat funds were improperly diverted; and (iv) United States based auditors and banks had direct roles in the fraudulent scheme.

-29-

66.    The SEC has already stopped the transfer of $1 million from Tanzi's New York bank account to a Citibank (Milan) account and the transfer of $50,000 into G. Tanzi's New York Citibank account, and is investigating a further transfer of $2.3 million from Sata S.r.l. (a Tanzi company) to the New York Citibank account of PGB (Nassau), another suspected Tanzi family entity.

67.    Parmalat's fraudulent scheme as alleged herein was centralized in large part in this District, where defendants Zini, Pavia and Zini & Associates orchestrated the fraud. Tonna, Parmalat's CFO for many years, told criminal investigators in Italy that Zini was "at the center of Parmalat's financial scheme" and was one of its "masterminds."

68    Tanzi ensured that the fraudulent schemes and improper accounting that he and other defendants orchestrated from outside of the United States would have an effect in the United States. Tanzi sent Zini, who had been Parmalat's lawyer at Pavia, a Milan, based law firm, to the United States in 1997 to open a law office in New York City to control and implement the scheme out of New York. At that time, Zini, a partner in Pavia, established Pavia's New York office. This location was selected because New York is the world's financial center (which would provide great credibility to Parmalat's money-raising plans) and because the location's proximity to the headquarters of Citigroup and important offices of Bank of America, Credit Suisse and other financial institutions enabled Zini to meet with officials of those banks in person and on short notice. By February 2001, Zini established Zini & Associates, and all 20 Pavia lawyers and all of its staff became employees or partners of Zini & Associates.

69.    The major, if not only, clients of any significance of Pavia's New York office and of Zini & Associates were Parmalat and the entities that Zini and other defendants created to implement and facilitate Parmalat's fraudulent scheme    In the words of several former

employees, the New York offices of the Law Firm Defendants served as a "legal factory to produce documents and manage offshore transactions for Parmalat."

70.     Tanzi approved each and every bond sale in the United States knowing that they were offered based on materially false information, and he was in constant communication with Zini throughout the Class Period about Parmalat's fraudulent transactions and its securities offerings in the United States and abroad. Zini and other attorneys in the New York offices of the Law Firm Defendants, acting as agents of those law firms, drafted, negotiated and reviewed many of the legal documents that were necessary to effectuate the fraudulent transactions described below. In fact, Giorgia Bocchi, an assistant to Tonna involved in preparing offering materials, explained to Italian prosecutors that each time a financial transaction took place, she had to get approval of the documents from the Zini law firm. Ms. Bocchi also testified that lawyers from Zini & Associates also made revisions to, and signed, the documents for various private placements sold to United States investors.

71.     Further, offering memoranda often included Pavia or Zini & Associates as one of the entities to whom communications associated with the offerings should be sent. For example, a Deed of Guarantee incorporated into each of two prospectuses issued by Parmalat Soparfi S.A on or about May 22, 2002 and December 11, 2002, directed that a copy of "all notices, requests, demands and other communications" relating to those offerings be addressed to the New York offices of Zini & Associates. Each Deed of Guarantee further stated that any notice to the Guarantor which is not sent also to "Zini & Associates in the manner and to the address or telefax number set out above, shall be deemed not to have been validly sent to such party." Similarly, the Deed of Guarantee incorporated into a prospectus issued by Parmalat Netherlands B.V. on or about February 27, 2001 directed that a copy of "all notices, requests, demands and

other communications" be sent to, among others, Zini & Associates at its New York offices  The Deed of Guarantee further stated: "For the purposes of this Deed of Guarantee, any notice to the Guarantor or Parmalat Finanziaria which is not sent also to Zini & Associates in the manner and to the address or telefax number set out above, shall be deemed not to have been validly sent to such party." Numerous offering documents identified Pavia as the "legal advisor" to Parmalat, Parmalat S p.A. or other Parmalat entities.

72.    In addition, Zini and the other attorneys at the Law Firm Defendants from their New York offices directly participated in the creation and operation of the Cayman Islands investment fund Epicurum, a fictitious entity that fraudulently was reported to hold over €500 million invested by Parmalat through Bonlat.  According to Tonna and a report from the Financial Reporting Unit Cayfin (a Cayman Islands Reporting Authority for the Attorney General of the Cayman Islands) dated January 9, 2004, setting forth information on the incorporation and directors of entities established in the Cayman Islands, a Delaware corporation "managed" Epicurum  The management entity was run by four individuals, two of whom were from the United States

73.    The Law Firm Defendants also established a Delaware entity, Web Holdings, Inc , which had offices in Dover, Delaware and a Delaware telephone number, as well as the same telephone number as that of Zini & Associates in New York.

74.    Bonlat supposedly transferred to Web Holdings, Inc  liabilities that, in actuality, did not exist. Purportedly in return, Web Holdings issued millions of dollars in promissory notes to Bonlat, helping to increase Bonlat's alleged assets that were consolidated with Parmalat's reported financial results during the Class Period. In addition, as Zini and Tonna both explained during their interrogations. Web Holdings had also been used to channel funds from Parmalat

entities to Tanzi family-owned tourism entities. For example, in 1999, Parmalat Finance Corporation paid €150 million to HIT, one of the Tanzi family controlled travel companies, and then masked the disbursement as a credit owed by Web Holdings. Thereafter, the purported credit owed by Web Holdings was transferred to Bonlat.

75. Further, when Epicurum was incorporated it was "given" a $100 million receivable from Boston Holdings Inc., another fake company incorporated in Delaware and run by the Law Firm Defendants in New York. According to a Writ of Attachment filed in the Court of Parma on June 21, 2004, Boston Holdings appears to be related to Steven White, Zini's brother in law. Both Web Holdings and Boston Holdings issued millions of euros in fake promissory notes in furtherance of the fraud.

76. The Law Firm Defendants also helped form Findairy Corporation ("Findairy"), a Delaware corporation that had the same telephone number as the New York offices of the Law Firm Defendants. Findairy is part of the Boston Holding Inc. group, which attorneys at the Law Firm Defendants established to buy from Bonlat millions of dollars of trademarks and other intellectual property. In reality, those transactions never took place. Moreover, as Ghiringhelli of PwC stated to Italian prosecutors, Zini was part of the management at Findairy.

77. The Law Firm Defendants also set up Newlat S.r.l., an Italian corporation, to which certain trademarks that Parmalat S.p.A. had acquired from another company in 1999 were transferred (to comply with restrictions by the Italian antitrust authority on trademark transfers). The Law Firm Defendants, on behalf of Parmalat S.p.A., arranged for another entity, Nulait Ltd., to acquire Newlat S.r.l. for $56 million, in a deal in which Nulait issued two promissory notes to Parmalat S.p.A. Nulait Ltd. was owned by Louis Caiola, a United States citizen. On December 18, 2001, the promissory notes were replaced by a new "promissory note" for $59 million issued

by Findairy Corporation and signed by Zini. The payment was never received by Parmalat S.p.A. However, the credit was assigned to Bonlat. On January 11, 2002, ECM Euro Italia Acquisition Corporation, a Connecticut entity wholly-owned by the venture capital company Endeavor Capital Management LLC (a United States entity owned by Anthony F. Buffa, a United States citizen), acquired 100% of the Nulait equity (and therefore Newlat). Then on June 11, 2003, Boston Holdings acquired the entire equity participation in Newlat from ECM Euro Italia Acquisition Corporation. Thereafter, Newlat became a wholly owned subsidiary of the Latitalia Group S.r.l., to which Steven White, Zini's brother-in-law, is connected. Specifically, on September 15, 2003, Boston Holdings sold its equity participation in Newlat to Boston Dairies International Holding Corporation which in turn transferred the participation to Latitalia Group S.r.l. In a similar transaction, Parmalat S.p.A. sold an equity position held in Carnini S.p.A. to Bonlat. Bonlat in turn transferred the equity to Boston Holdings. Boston Holdings never actually acquired Newlat or Carnini. Rather, Boston Holdings merely executed promissory notes.

78.     Zini, acting on behalf of the Law Firm Defendants, also established for Parmalat another entity used in the fraud — Nyte Investments Group Inc., a Delaware corporation and one of the holding companies (along with Agis S.r.l.) that controlled Parmalat's chain of at least thirty three distributors that were part of the double billing/securitization fraudulent scheme described below.

79.     In addition, the Law Firm Defendants set up other non-operating finance entities in Delaware and New York, among other U.S. locations, and caused certain Maltese corporations to be formed, to facilitate the improper transfer of funds to off-shore entities to hide Parmalat's

debt, to inflate its assets and to benefit the Tanzi family at the expense of Parmalat's investors.

Such entities include:

- Western Alps, Inc., a now inactive Delaware corporation incorporated in 2000 which, together with Zini, was a director of Western Alps Foundation, a Maltese company. In early 2001, Italian anti-competition authorities ruled that Parmalat's acquisition of shares of Carnini S.p.A. (a competitor) violated Italian laws and ordered Parmalat to divest itself of a percentage of those shareholdings. During the period June through July 2001, Parmalat Capital Finance provided funds to Western Alps Foundation which were then paid to Boston Holdings which used the funds to acquire Carnini shares. Zini acted as U.S. counsel on the transaction and improperly orchestrated the purchase by Boston Holdings in violation of Italian anti-competition rules as Boston Holdings was actually "warehousing" the Carnini shareholdings for Parmalat;

- Bonlat Financing LLC, a Delaware limited liability company which was first formed as Parmalat Cap-Fin, LLC and later changed to Bonlat LLC. Giovanni Bonici, Tonna, Claudio Pessina and Thomas M. Brattvet of the United States are affiliated with it;

- Cottonwood Management Services, Inc, a New York company with a business address as Heather Lee Scott-Zini at the same address as the Law Firm Defendants;

- Epicurum Capital Management LLC, a Delaware company which, with Thomas Brattvet, Cottonwood Management Services Inc., and others, was a director of Epicurum Limited;

- Epicurum Limited, a company incorporated in the Cayman Islands on instructions from the Law Firm Defendants. Epicurum Limited was formed as an investment fund but there is no evidence of any non-Parmalat related entity ever making an investment in it. It did, apparently, issue 3,859,305 ordinary shares to Bonlat Financing Corporation at an issue price of $100 per share;

- Epinyte XVCAP Limited and Epinyteist Limited, both incorporated in the Cayman Islands on instructions from the Law Firm Defendants and designed to be investment funds structured in the same way as Epicurum Limited;

- Queen's Holdings LLC, a Delaware company, which was the off-shore corporation designated as the "external auditor" of certain Luxembourg corporations linked to the Tanzi family, including Food and Drink, Acqua Holding S.A., Otranto Holding S.A and Never Holding S.A. This designation of the Delaware entity as "external auditor" enabled the Tanzi family to avoid actual auditing of the Luxembourg entities which, under Luxembourg law, were otherwise required to be fully audited;

- Barrington Ventures LLC, a New York limited liability company, which maintained at least one bank account in Luxembourg tied to Parmalat, Tanzi and Tonna that Luxembourg anti-money laundering authority investigated as a suspicious account; and

- New York Solutions, LLC, a Delaware limited liability company, which maintained at least one bank account in Luxembourg tied to Parmalat, Tanzi and Tonna that Luxembourg anti-money laundering authority investigated as a suspicious account.

80.     The Citibank accounts of the Law Firm Defendants in the U.S. were used to transfer huge sums of money to key Parmalat insiders, to pay bribes to other Parmalat employees, to transfer funds between Parmalat accounts and companies, and to pay the Law Firm Defendants (and Zini) for their role in the fraudulent scheme. Further, in at least one instance in 2003, after Tonna told Zini that Parmalat needed to divert more funds, the two set up fiduciary trusts under U.S. law, which Zini managed, to which Parmalat Capital Finance (Malta) disbursed between €8 million to €10 million, which then was disbursed among various bank accounts for Zini, Tonna and others.

81.     When Zini learned that criminal authorities and securities regulators were investigating Parmalat and others in connection with the fraudulent scheme alleged herein, he ordered and then oversaw a massive effort in New York to destroy evidence of the fraudulent scheme and his participation in it. According to information provided to investigators, a massive document shredding and destruction operation was carried out, and electronically stored data was erased or transferred to storage devices which were then removed and hidden or destroyed.

82.     In addition, other U.S. based entities created by the various defendants were key participants in the fraud. As described in detail below, in late 1999, defendant Citigroup formed Buconero LLC, a Delaware limited liability company, to enable Citigroup to funnel money to Parmalat by disguising what were essentially loans as investments in Parmalat subsidiaries.

Vialattea LLC, a Delaware limited liability company, Buconero's direct parent, had its principal place of business in New York.

83.     Further, as described more fully below, beginning in 1995 and continuing throughout the Class Period, Citigroup ran the "Eureka" securitization program for Parmalat through which Citigroup helped Parmalat obtain hundreds of millions of dollars in financing based on what Citigroup knew were phony, duplicate supermarket invoices. Citigroup raked in lucrative fees for structuring the syndications of these sham receivables. Parmalat's U.S. subsidiary, Farmland Dairies, LLC, was an integral participant in the securitization program. Citibank securitized its receivables and sold those securitized assets to United States investors.

84     Citigroup, Bank of America and other financial institutions provided extensive banking services to Parmalat that furthered and concealed the fraudulent and manipulative accounting practices of Parmalat, by channeling hundreds of millions of dollars through United States bank accounts, and siphoning off hundreds of millions of dollars from Parmalat through various U.S. bank accounts.

85.     The Ufficio Italiano Cambi ("UIC") is an arm of Bank of Italy that, among other things, monitors transactions for anti-money laundering purposes and provides financial data to various Italian law enforcement agencies for further investigation. The UIC conducted an in-depth fact-gathering effort concerning Parmalat transactions and suspicious transfers of funds involving Zini, Tonna and members of Tanzi's family, among others. That investigation extended to Nyte Investments, a Delaware entity. In one report, the UIC highlighted several suspicious transactions relating to Wishaw Trading S.A., a Parmalat shell company set up as the Uruguayan subsidiary of Parmalat whose balance sheets were manipulated to artificially inflate profits and eliminate inter-company debts. The suspect transactions involved transfers of

-37-

millions of dollars to a Wishaw Trading S.A. bank account at Standard Charter Bank of New York. In another report, the UIC identified for further investigation the transfer of more than $2 million to a Citibank account in New York held by Sata S.r.l., an entity linked to the Tanzi family. UIC also reported that over $2.7 million in payments by Parmalat on a supposed "political risk" insurance policy were diverted to an entity beneficially owned by Sala. PwC similarly reported that Wishaw paid over $5.8 million to the New York Bank of America account of a company called Tansy S.A., an entity apparently connected to Tanzi (but with a respelling of his last name in a clumsy attempt to conceal the fraud).

86.    PwC, in its investigation, reported on several transfers of funds to United States entities made by Wishaw Trading. The transfers were often made through bank accounts located in the United States. According to PwC, the transfers did not appear justified by any underlying transactions. Additionally, a fictitious transaction of sales of raw materials executed with a United States entity generated $256 million in profits for Wishaw. Wishaw issued a promissory note based on the fictitious sales which was presented to the New York branch of the Bank Intesa, Italy's largest bank, which granted advance cash payments to Wishaw without the bank conducting any of its customary due diligence to determine whether the purported sales were ever made, a fact which was apparent on the face of the notes, as they were not properly notarized, executed or dated and lacked customary headings.

87.    A primary objective of Parmalat's expansion plan during the late 1990s and early 2000s was to expand into the United States by acquiring businesses. To do so, however, Parmalat had to go to the financial markets to raise the money needed for its acquisitions strategy. Thus, defendants perpetrated their fraudulent scheme and course of conduct during the Class Period using Parmalat's falsified financial statements to raise billions of dollars of new

-38-

capital in the United States and elsewhere. With this new capital, Parmalat was able to acquire and conduct significant operations and activities in the United States. For example, the Company purchased the following United States entities:  Farmland, New Atlanta, and Sunnydale Farms Dairies (milk, ice cream and other dairy products), Black Diamond Cheese (cheeses) and MA Holdings (Archway, animal and private label cookies).

88.     Grant Thornton and Deloitte routinely performed auditing services for various Parmalat entities in the United States, including Parmalat USA Corporation and other affiliated Parmalat entities, and their U.S. offices provided non-audit services, including providing "comfort letters" in connection with certain Parmalat U.S. acquisitions.

89.     By 2001, Parmalat was describing itself as a "U.S. $7 billion company," and stated that "the Company's strategic development in this [dairy] sector is thus concentrated on the East Coast and it is especially strong in New York's metropolitan area, where it holds 50% of the market." According to the Company's Annual Report for the fiscal year ended December 30, 2002, net sales in North America accounted for 35% of fiscal 2002 total net sales, the same amount of the Company's total net sales in Europe. By 2003, Parmalat (operating in the United States through Parmalat USA Corporation and Parmalat North America) had over 3,100 employees in the United States and $5 billion in annual business here, with plants in Alabama, Georgia, Michigan, New Jersey, New York and Ohio.

90.     Upon the collapse of the Parmalat empire, Parmalat filed for bankruptcy protection in Italy and also filed a case ancillary to the foreign bankruptcy in the Bankruptcy Court for this District. Several major United States-based Parmalat entities and subsidiaries, including Parmalat USA Corporation, Milk Products of Alabama LLC and Farmland Dairies LLC, filed for bankruptcy protection in this District.

-39-

91.     The SEC sued Parmalat in this District for violations of United States securities laws, alleging substantial illegal conduct here in the United States, including the sale of billions of dollars of Parmalat bonds to investors in the United States. The SEC called the fraudulent scheme "one of the largest and most brazen corporate financial frauds in history."

92.     Bondi, serving as the Extraordinary Commissioner of Parmalat, Parmalat S.p.A. and their subsidiary and affiliated companies, filed the New Jersey Complaint against Citigroup, Inc., Citibank, N.A., and three Citibank special purpose entities (named as defendants herein) for the "crucial" and "integral" parts they played in the Parmalat fraudulent scheme that "resulted in billions of dollars of losses to Parmalat and to thousands of innocent shareholders and creditors in the U.S. and elsewhere." The New Jersey Complaint asserts that key parts of the fraud allegedly perpetrated against Parmalat and its subsidiaries occurred in the United States.

93.     Bondi also filed the Illinois Complaint against Parmalat's United States-based auditors, Grant Thornton and Deloitte, which was later removed to the United States District Court for the Northern District of Illinois and transferred to this Court for purposes of pre-trial proceedings. Bondi sued the auditors for the "crucial parts they played in the theft and disappearance of over $14 billion ... from Parmalat, resulting in billions of dollars of losses in the United States and elsewhere." Parmalat (through Bondi) alleged in the Illinois Complaint that a large part of the fraud was accomplished through fictitious companies that were created and managed in the United States. Bondi asserted that numerous fraudulent transactions were executed by U.S. entities as counterparties, and included numerous transactions emanating from the United States involving Parmalat's substantial operations in South America, Mexico and Canada. As Bondi makes clear in the complaints filed on behalf of Parmalat, the center of the

fraud in the United States makes this country the most logical and appropriate venue for resolving claims against the defendants.

94.     On October 7, 2004, Bondi, in his capacity as the Extraordinary Commissioner of Parmalat, Parmalat S.p.A. and affiliated companies in Extraordinary Administration in Italy, filed the North Carolina Complaint against Bank of America (as defined below) for the central role that it played in the Parmalat fraudulent scheme. The North Carolina Complaint asserts, among other things, that Bank of America knew and intended that the true nature of the improper and fraudulent transactions that it orchestrated would not be disclosed to the Company's investors, many of whom were in the United States. In the North Carolina Complaint, Bondi also alleges that North Carolina was the locus of the control, domination and direction of the finances, policies and business practices of all of the Bank of America defendants in the North Carolina Complaint. The North Carolina Complaint further notes that Bank of America alone placed some $1.3 billion in Parmalat debt in the United States, the holders of which were damaged by Bank of America's fraudulent transactions.

95.     In fact, the Citigroup affiliates named in the New Jersey Complaint and the auditing firm affiliates named in the Illinois Complaint, affirmatively sought to have the claims against them heard in this Court. On September 9, 2004, Citigroup, Inc., Citibank, N.A., Vialattea LLC, Buconero LLC and Eureka Plc (collectively, as defined below, "Citigroup"), all of whom are defendants in the New Jersey Action and in the instant case, filed a Notice of Removal to remove Bondi's complaint from the New Jersey state court, where it was initially filed, to the United States District Court for the District of New Jersey. In support of removal, Citigroup stated that the United States federal court has jurisdiction over Bondi's claims against them because the claims are related to bankruptcy proceedings pending in this District, and

-41-

specifically stated that the New Jersey Action should be heard by this Court    Citigroup emphasized that the New Jersey Action alleges fraud, pointing to allegations that Citigroup (1) knew and intended to defraud investors who purchased Parmalat securities and (2) were involved in Parmalat's fraud in part through the program of securitizing receivables of various Parmalat U.S.-based subsidiaries and other Parmalat companies

96.    On September 16, 2004, Grant Thornton International, Grant Thornton LLP, Grant Thornton S.p.A., Deloitte Touche Tohmatsu, Deloitte & Touche USA LLP, Deloitte & Touche LLP and Deloitte & Touche S.p.A. filed a Notice of Removal to remove Bondi's complaint against them from the Illinois state court, where it was initially filed, to the United States District Court for the Northern District of Illinois.  In support of removal, the auditors maintained that the U.S. federal court has jurisdiction over Bondi's claims against them because the claims are related to bankruptcy proceedings pending in this District.  The auditors noted that the Illinois Action alleges fraud.  They also emphasized that the Illinois Action has been brought on behalf of Parmalat's U.S.-based subsidiaries, among others, and pointed out that Bondi's allegations concerned, in part, the auditors' work performed for Parmalat's U.S. subsidiaries. They also highlighted Bondi's allegations that Parmalat had substantial ties to. and conducted substantial business in, the United States

97.    In their respective Motions to Transfer the Illinois Action and the New Jersey Action to this District, both filed on September 17, 2004, Deloitte Touche Tohmatsu and Grant Thornton International, joined by the other auditors named in the Illinois Action, argued that the Southern District of New York is the appropriate forum to hear all Parmalat related litigation currently pending in the United States, in part, because:  (a) the fraud-based allegations in the Illinois and New Jersey Actions are similar to the fraud claims in this action; (b) the non-existent

-42-

$5 billion Bonlat account was purportedly held in a Bank of America branch in New York; and (c) Citigroup, Deloitte Touche Tohmatsu, Deloitte & Touche USA LLP, Deloitte & Touche LLP and Grant Thornton LLP all have offices in New York.

## IV.     THE PARTIES

### A.     The Parmalat Group

98.     Parmalat is one of the world's largest food and dairy companies, conducting business through almost 200 operating and financing subsidiaries, including at least 22 wholly owned subsidiaries which are incorporated in and/or located in the United States.

99.     Coloniale S.p.A. ("Coloniale") is Parmalat's holding company owned and controlled by defendant Tanzi and his family.  Coloniale is the controlling shareholder of Parmalat, owning 50.5% of the equity of Parmalat.  Coloniale and its affiliates were participants in the defendants' fraudulent scheme and wrongful course of business and were the recipients of hundreds of million of dollars diverted from Parmalat.

100.     Certain companies of the Parmalat Group are currently undergoing extraordinary administration proceedings ("Extraordinary Administration"), akin to bankruptcy, pursuant to new rules recently adopted by decree as a matter of urgency by the Italian government on December 23, 2003, in response to the Parmalat financial crisis, which were ratified with significant amendments by the Italian Parliament on February 18, 2004 (the "Marzano Decree").5   On December 24, 2003, Parmalat S.p.A. (the Parmalat Group's main Italian operating company) was admitted to Extraordinary Administration.  The Minister appointed Bondi as Extraordinary Trustee.

---

5       *See* Decree-law No. 347 of December 23, 2003, published in the Italian Official Gazette No. 298 on December 24, 2003, ratified by the Italian Parliament with Law No. 39 of February 18, 2004, published in the Italian Official Gazette No. 42 on February 20, 2004.

101.     Pursuant to the Marzano Decree, and at the request of Bondi, the Extraordinary Administration proceedings have been extended to Parmalat and other entities in the Parmalat Group, including Eurolat S.p.A., Lactis S.p.A., Parmatour S.p.A. (a company outside the Parmalat Group but controlled by the Tanzi family), Coloniale S.p.A., Hit S.p.A., Hit International S.p.A., Nuova Holding S.p.A., Geslat Srl, Parmengineering Srl, Contal Srl, Parma Food Corporation BV, Dairies Holding International BV, Parmalat Capital Netherlands BV, Parmalat Finance Corporation BV, Parmalat Netherlands BV, Olex SA, Parmalat Soparfi SA, Eurofood IFSC Limited, Eliair Srl, Newco Srl, Panna Elena C.P.C Srl, Centro Latte Centallo Srl, Taurolat Srl, G.F.A Srl, SAF Srl, PARMA A.C. S.p.A., F.lli Strini Srl, Parmalat Molkerei GMBH, Deutsche Parmalat GMBH, Streglio S.p.A., Hit.com S.p.A., Going Tour Operator S.p.A., Emmegi Agro Industriale Srl, Parmalat Malta Holding Ltd, Parmalat Trading Limited, and Boschi Luigi & Figli S.p.A.

102.     Bonlat Financing Corporation ("Bonlat") is a Cayman Islands financing subsidiary of Parmalat formed and organized in 1998 by Grant Thornton, Parmalat and Zini. Bonlat is presently in provisional liquidation proceedings. Bonlat was controlled by Grant Thornton, Parmalat and the Individual Defendants, and was used by them in the scheme as a vehicle to hide Parmalat's losses.

103.     Camfield Pte. Ltd. ("Camfield") is a Singapore-based holding and shell company organized by Zini, Grant Thornton and Parmalat. Camfield was controlled by Grant Thornton, Parmalat and the Individual Defendants, and was used by them as a vehicle to overstate Parmalat's revenues and assets.

104.     Pursuant to a preliminary injunction order issued by the United States Bankruptcy Court for the Southern District of New York, a stay of proceedings against Parmalat and its

-44-

affiliates is in effect. But for that order, Bonlat and Camfield would be named as defendants in this lawsuit.

**B.    Plaintiffs**

105.    Hermes Focus Asset Management Europe, Ltd ("HFAME") is a fund management company organized under the laws of England and Wales. It is owned (51%) by the BT Pension Scheme, the United Kingdom's largest corporate pension fund and (49%) by Hermes Focus Asset Management, Ltd. HFAME invests on behalf of pension funds, insurance companies, government entities and financial institutions, as well as charities and endowments. It is the general partner and manager of plaintiffs Hermes European Focus Fund I, Hermes European Focus Fund II and Hermes European Focus Fund III (collectively, the "HFAME Funds"). HFAME caused the HFAME Funds to purchase Parmalat ordinary shares during the Class Period, as set forth in the Certification previously filed with the Court.

106.    Hermes European Focus Fund I ("HEFF I") is a limited partnership whose general partner and manager is HFAME. HFAME manages HEFF I, including making all investment decisions on its behalf. During the Class Period, HEFF I bought Parmalat ordinary shares, as set forth in the Certification filed herewith, at artificially inflated prices and has been damaged thereby.

107    Hermes European Focus Fund II ("HEFF II") is a limited partnership whose general partner and manager is HFAME. HFAME manages HEFF II, including making all investment decisions on its behalf. During the Class Period, HEFF II bought Parmalat ordinary shares, as set forth in the Certification filed herewith, at artificially inflated prices and has been damaged thereby.

108.    Hermes European Focus Fund III ("HEFF III") is a limited partnership whose general partner and manager is HFAME. HFAME manages HEFF III, including making all

-45-

investment decisions on its behalf. The limited partner of HEFF III is California Public Employees Retirement System ("CalPERS"). Any recovery by HEFF III will ultimately inure to the benefit of CalPERS. During the Class Period, HEFF III bought Parmalat ordinary shares, as set forth in the Certification filed herewith, at artificially inflated prices and has been damaged thereby.

109.    Cattolica Partecipazioni, S.p.A. purchased Parmalat bonds during the Class Period, as set forth in the Certification previously filed with the Court, at artificially inflated prices, and has been damaged thereby.

110.    Capital & Finance Asset Management S.A. purchased Parmalat bonds during the Class Period, as set forth in the Certification previously filed with the Court, at artificially inflated prices, and has been damaged thereby.

111.    Societe Moderne des Terrassements Parisiens purchased Parmalat bonds during the Class Period, as set forth in the Certification previously filed with the Court, at artificially inflated prices, and has been damaged thereby.

112.    Solotrat purchased Parmalat bonds during the Class Period, as set forth in the Certification previously filed with the Court, at artificially inflated prices, and has been damaged thereby.

113.    Plaintiffs Laura J. Sturaitis, a United States citizen, and Arch Angelus Sturaitis, a permanent United States resident alien, as joint tenants with right of survivorship, purchased Parmalat ordinary shares in the United States during the Class Period as set forth in the Certification filed herewith, at artificially inflated prices, and have been damaged thereby.

114.    Plaintiff Margery Louise Kronengold, a United States citizen, purchased Parmalat bonds during the Class Period as set forth in her Certification previously filed with the Court

(attached to the declaration of Jeffrey A. Barrack in support of a lead plaintiff motion), at artificially inflated prices and has been damaged thereby.

115. By Order of the Court dated May 25, 2004, Hermes, Cattolica Partecipazioni, S.p.A, Capital & Finance Asset Management S.A., Societe Moderne des Terrassements Parisiens and Solotrat were appointed Co-Lead Plaintiffs in this action in accordance with §27(a)(3) of the Securities Act, 15 U.S.C. §77z-1(a)(3), and §21D(a)(3)(B) of the Exchange Act, 15 U.S.C. §78u-4(a)(3)(B).

## C.   **Defendants**

116. Defendant Parmalat S.p.A ("New Parmalat") succeeded Parmalat Finanziaria S.p.A., Parmalat S.p.A., Eurolat S.p.A., Lactis S.p.A., Geslat S.p.A., Parmengineering Srl, Contal Srl, Dairies Holding International BV, Parmalat Capital Netherlands BV, Parmalat Finance Corporation BV, Parmalat Netherlands BV, Olex S.A., Parmalat Soparfi S.A., Newco Srl, Panna Elena C.P.C. Srl, and Centro Latte Centallo Srl (collectively, "Old Parmalat," "Parmalat" or the "Company"), having assumed all of the assets and liabilities of these entities of Old Parmalat (that became part of New Parmalat) that were not discharged in the Extraordinary Administration. Such assumption took place pursuant to an agreement between New Parmalat, Old Parmalat and Old Parmalat's creditors, known as the Proposal of Composition with Creditors, as provided in Article 4-bis, and approved by decree issued on October 1, 2005 by the Court of Parma.

117. Defendant Calisto Tanzi ("Tanzi") served at all relevant times prior to his December 16, 2003 "resignation" as Chairman, Chief Executive Officer (referred to as "Managing Director" in Italy) and a member of Parmalat's Executive Committee. Tanzi is a controlling shareholder of Coloniale, which owns 50.5% of the equity of Parmalat. Until recently, Tanzi had been incarcerated on charges of market rigging, fraudulent accounting and

financial reporting, obstructing a market regulator and conspiring to issue false information to investors on May 26, 2004. A court in Parma ordered the seizure of Tanzi's assets on June 21, 2004. The order of seizure of assets noted that Tanzi did not deny any of the charges.

118. Defendant Fausto Tonna ("Tonna") served at relevant times prior to his February 2003 resignation from the Board as the Chief Financial Officer, Director and a member of the Executive and Audit Committees of the Company. Tonna is a Director of Bonlat and the Chairman of the Board of Coloniale. Tonna was jailed and indicted on May 26, 2004 and charged with the market rigging, fraudulent accounting and financial reporting, obstructing a market regulator and conspiring to issue false information to investors. A court in Parma ordered the seizure of Tonna's assets on June 21, 2004.

119. Defendant Stefano Tanzi ("S. Tanzi") served at all relevant times as a Director of Parmalat and was a member of Parmalat's Executive Committee. S. Tanzi also was a Director of Coloniale, the Tanzi family's holding company, at all relevant times. He is Calisto Tanzi's son. Until recently, S. Tanzi had been incarcerated on charges of market rigging, fraudulent accounting and financial reporting, obstructing a market regulator and conspiring to issue false information to investors. S. Tanzi's assets were seized by a court in Parma on June 21, 2004.

120. Defendant Luciano Del Soldato ("Del Soldato") served from February 2003 until October 2003 as Parmalat's Chief Accounting Officer. He also took over the duties of Chief Financial Officer from October 2003 to December 2003. Del Soldato was a Parmalat Director in 2002 and 2003. Del Soldato was arrested and indicted on May 26, 2004 for market rigging, fraudulent accounting and financial reporting, obstructing a market regulator and conspiring to issue false information to investors. A court in Parma ordered the seizure of Del Soldato's assets on June 21, 2004.

121    Defendant Giovanni Tanzi ("G. Tanzi") served at all relevant times as a Director of Parmalat and was a member of Parmalat's Executive Committee until his resignation on December 15, 2003. G. Tanzi is Tanzi's brother and also served, at all relevant times, as a Director of Coloniale. G. Tanzi was arrested on February 17, 2004 and, on May 26, 2004, was charged with market rigging, fraudulent accounting and financial reporting, obstructing a market regulator and conspiring to issue false information to investors. A court in Parma ordered the seizure of G. Tanzi's assets on June 21, 2004.

122.   Defendant Alberto Ferraris ("Ferraris") served at all relevant times, prior to his November 14, 2003 resignation, as a Director of Parmalat. Ferraris also served as Parmalat's Chief Financial Officer from March 2003 to October 2003. Prior to joining Parmalat in 1997, Ferraris had been in Citibank's Corporate Banking Unit. Ferraris also spent a year in charge of Parmalat's Canadian operations and as Chief Executive of Parmalat's Australian Operations. Ferraris was indicted on May 26, 2004, and charged with market rigging, fraudulent accounting and financial reporting, obstructing a market regulator and conspiring to issue false information to investors. Ferraris's assets have been seized pursuant to a court order.

123    Defendants Tanzi, Tonna, G. Tanzi, S. Tanzi, Del Soldato and Ferraris are referred to collectively herein as the "Director Defendants."

124    Defendant Mario Brughera ("Brughera") served at all relevant times as Chairman of Parmalat's Board of Statutory Auditors and President of the Committee of Administrative Oversight. Brughera was indicted by prosecutors in Milan on May 26, 2004 for market rigging, fraudulent accounting and financial reporting, obstructing a market regulator and conspiring to issue false information to investors. Brughera's assets have been seized pursuant to a court order.

125     Defendant Oreste Ferretti ("Ferretti") served at all relevant times on the Board of Statutory Auditors. Ferretti was indicted by prosecutors in Milan on May 26, 2004, for market rigging, fraudulent accounting and financial reporting, obstructing a market regulator and conspiring to issue false information to investors. Ferretti's assets have been seized pursuant to a court order.

126.    Defendant Massimo Nuti ("Nuti") served on the Board of Statutory Auditors in 1998, and again from 2002 until the end of the Class Period. Nuti was indicted by prosecutors in Milan on May 26, 2004 for market rigging, fraudulent accounting and financial reporting, obstructing a market regulator and conspiring to issue false information to investors. Nuti's assets have been seized pursuant to a court order.

127.    Defendant Maria Martellini ("Martellini") served, from the 1999 Half-Year Report through the 2001 Annual Report, on Parmalat's Board of Statutory Auditors.

128     Defendants Brughera, Ferretti, Nuti and Martinellini are referred to collectively herein as the "Statutory Auditor Defendants."

129.    Defendant Gianfranco Bocchi ("Bocchi") served at all relevant times as an internal accountant in charge of Bonlat's accounting department and was responsible for, among other things, the entries made to Bonlat's financial statements, including purported sales in the United States of trademarks and other intellectual property, purported sales recorded for a sale of powdered milk by a Parmalat subsidiary to a Cuban state-owned importer, purported assets held by Bonlat in the Epicurum Fund, and entries to Bonlat's "Account 999," all of which are described in detail below. Bocchi also facilitated the illicit flow of Parmalat funds to Tanzi family members and Tanzi controlled entities. Bocchi was indicted by prosecutors in Milan on May 26, 2004 for market rigging, fraudulent accounting and financial reporting, obstructing a