..........UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PARMALAT<br>SECURITIES LITIGATION | MASTER DOCKET<br><br>04 CIV. 0030 (LAK) ECF Case |

**DECLARATION OF BERNARD AUDIT IN SUPPORT OF
CITIGROUP'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION**

BERNARD AUDIT, hereby declares as follows:

TABLE OF CONTENTS

Page

I.    Personal Qualifications ............................................................................. 2

II.   Questions Asked and Basis for Opinion .................................................. 4

    A.    The Issue ............................................................................. 4

    B.    Documents Read .......................................................................... 5

    C.    Assumptions ................................................................................ 7

III.  A Decision on the Class Action Will Have No Res Judicata Effect in France As Against
the Non Opting Out Plaintiffs ................................................................... 7

    A.    Lack of "Identity of the Parties" ...................................... 7

        1. "No One May Claim In court By Proxy" ......................... 8

        2. Limited or Apparent Encroachments on the Principle ......................... 10

    B. Lack of Identity of the Causes of Action ................................. 14

IV.   The Recognition or Enforcement in France of a Decision or Judgment in the Parmalat
Securities Class Action Litigation in the U.S ................................. 17

A.    Relevant French Law Concerning the Enforcement or Recognition of a Decision or Judgment of a U.S. Court ............................................. 17

B.    Enforcement or Recognition in France of a Decision or Judgment in a U.S. "Class Action" Specifically ........................................................ 19

    1.    Lack of Jurisdiction of the Originating Court in the U.S. ............... 20

        (a)    With Respect to Plaintiffs: Article 14 of the French Civil Code  21

        (b)    Other Rules of Jurisdiction for Recognition Purposes ........... 23

    2.    Application of the Correct Law Under French Choice-of-Law Principles ..................................................................................... 13

    3.    Violation of International Procedural Public Policy (Lack of Due Process) .................................................................... 16

        (a)    *"Nul ne plaide par procureur"* ............................................. 16

        (b)    Deprivation of Property

        (b)    *"Le principe du contradictoire"* ........................................... 19

        (c)    Contingency Fees for Plaintiffs' Lawyers in the U.S. ........... 20

V.    *Res    Judicata*    Effect in France of a Settlement of the Securities Class Action in the U.S. (including any Release Provided on Behalf of the Class ................................................. 25

VI.    Conclusions............................................................................................. 26

## I.    **PERSONAL QUALIFICATIONS**

1.    I am a Professor of Law at the University of Paris (Sorbonne).  I currently teach courses in Conflicts of Laws and International Business Transactions.  My educational background and qualifications for opining on matters of French law, and more specifically on aspects of French private international law in connection with a case pending before a U.S. Court, are as follows.

2.     I earned an LL.B. at the University of Paris (Sorbonne) in 1965, where I graduated *cum laude*, and an LL.M. at Harvard Law School in 1969. I earned a diploma at The Hague Academy of International Law in 1970. The next year, 1971, I earned a Doctorate of Law at the University of Paris (Sorbonne). The same year, I passed the *Agrégation de droit*, the national exam in France to become a law professor in the French University system. I have been teaching Law at the Sorbonne since 1987.

3.     I have been a Visiting Professor of Law at the Louisiana State University Law Center (1975, 1977); the Tulane University School of Law (1980); the Boston University School of Law (1991); and the Duke University School of Law (1995). I served on the Faculty of the New York University Global Law School in 1997 and 1999.

4.     I am on the Board of Editors of the *Revue critique de droit international privé* (Criticial Review of Private International Law); a member of the *Comité français de droit international privé* (French Committee of Private International Law); a Corresponding Member of the International Institute for the Unification of Private Law (UNIDROIT, Rome) and a member of the American Law Institute. In August 2005, I was elected as an Associate Member of the Institute of International Law.

5.     I have served as arbitrator in some forty international business disputes, and have previously provided expert legal opinions in numerous other cases before courts or arbitration panels.

6.     I sat on the United Nations Compensation Commission as Panel Chairman from 1996 to 2003. During that period, the Panel issued recommendations on about eleven hundred claims relating to damages suffered by non-Kuwaiti corporations and other entities as a consequence of the Gulf War in 1990.

7.    I have published numerous articles, case notes, and book reviews in the major French law reviews. In addition, I have published the following books, articles and studies relating to various international law topics:

In French:

- *Droit international privé* (a treatise on Private International Law), 4th ed., 2006 (930 pages);

- *Le droit international privé en quête d'universalité* (General course on Private International Law), The Hague Academy of International Law, Collected Courses, vol. 305, 2003 (pp. 9-488);

- *La vente internationale de marchandises*, Paris, 1991 [a Commentary on the UN Convention on the International Sale of Goods ("CISG")], (244 pages);

- *Le caractère fonctionnel de la règle de conflit (sur la crise des conflits de lois)*, The Hague Academy of International Law, Collected Courses, vol. 186 (1984-III, p. 219); and

- *La fraude à la loi*, Paris, 1974 (reviewed in 69 AJIL 472, 1975, and 25 AJCL 420, 1977).

In English:

- "The Application of Private International Law Norms to 'Third Countries': The Jurisdiction and Judgment Example", in *International Litigation in Europe and Relations with Third States*, Bruylant, Brussels, 2005, pp. 55-82 (G. Bermann co-author);

- "Arbitration and the Brussels Convention", 9 Arbitration International 1 (1993);

- *Transnational Arbitration and State Contracts*, M.Nijhoff, 1988; and

- "A Civil Lawyer Looks at American Contemporary Choice-of-Law Principles" 27 AJCL 599 (1979).

## II.    QUESTION ASKED AND BASIS FOR OPINION

### A. The Issue

8.    In connection with this case, I have been asked to answer the following question: *To what extent would a judgment in, or court-approved settlement of, a class action*

4

*brought before a federal court in the United States preclude a plaintiff resident in France, who was included within such a class but who did not opt out of the U.S. class action, from bringing an action in France based upon the same set of facts?*

9.      The fundamental issue is whether the defendants could raise *res judicata* as a defense with a reasonable chance of success.  For the reasons explained below, my opinion is that the potential plaintiff's action will *not* be barred by virtue of *res judicata*, notably, but not exclusively, because a French court will not accept that the "non opting out" plaintiff be regarded as having been a party to the American litigation (see below under III).  This makes it irrelevant whether the American judgment otherwise meets the conditions for recognition in France under case law.  For the sake of completeness, however, I will nevertheless consider that issue, as an alternative, in order to show that, independently from *res judicata*, the judgment rendered in the U.S. would *not* be recognized in France (see below under IV). The same goes for the recognition of the court-approved settlement that I will briefly consider as a final point (see below under V).

**B.**    **Documents Read**

10.     I have been provided with, and have read, the following documents relevant to the Parmalat securities class action litigation in the U.S.:

> (a)    Judge Kaplan's Opinion dated July 13, 2005, disposing of the motions of the defendant financial institutions to dismiss the complaints;
>
> (b)    The Second Amended Consolidated Class Action Complaint, dated August 22, 2005.

**C.**    **Assumptions**

5

11.    For purposes of my opinion, I have been asked to make the following assumptions with respect to the U.S. class action against the various defendants described in the Second Amended Consolidated Class Action Complaint ("the Defendants") :

(a)    that the federal court in the U.S. has determined that it has both personal and subject matter jurisdiction over the Defendants and the class action;

(b)    that the plaintiffs will attempt to provide notice of the pendency of the U.S. class action – in English, French and/or any other applicable language – to the members of the proposed "class" in the U.S. litigation who live in Europe and who purchased common stock in any of the Parmalat group entities, presumably by publication in an appropriate local newspaper[1];

(c)    that the notice would give the French/European shareholders the opportunity to "opt out" of the U.S. class action or to elect not to participate in or be bound by the result of the case; and

(d)    that the notice would advise the French/European shareholders that if they did not opt out of the U.S. class action by a certain date, they would automatically be considered part of the "class" of plaintiffs in the U.S. action and that (i) their rights against any of the Defendants would be determined by the results in the U.S. class action ; and (ii) they would be forever bound by the results of the U.S. class action (regardless of whether that case is won, lost or settled by the plaintiffs in the U.S.).

---

[1] According to the Second Amended Complaint, the Parmalat group includes almost 200 operating and financing subsidiaries; about one tenth only are incorporated in and/or located in the United States (at par. 98). The controlling company appears to be Italian. Unless otherwise indicated, the reference to "Parmalat shares" hereafter will refer to stock in any of the entities controlled by the Parmalat group.

III.        **A DECISION ON THE CLASS ACTION WILL HAVE NO RES JUDICATA EFFECT IN FRANCE AS AGAINST THE 'NON OPTING OUT ' PLAINTIFFS**

12.    Under Article 1351 of the French Civil Code (a copy of which is annexed as Exhibit 1):

> "*Res judicata* applies only to that which was the object of the judgment. The thing claimed must be the same; the claim must be based on the same cause; the claim must be between the same parties and brought by and against them in the same capacity".

Three conditions therefore must be met: the identity of the parties, that of the cause of action, and that of the relief sought in the respective suits. Assuming, for the sake of argument, that the third condition be met in the present situation, inasmuch as the relief sought in the French action would be similar to that pursued in the action leading to the U.S. judgment (monetary compensation for the loss allegedly suffered), the first condition will undoubtedly fail because the "non-opting out" investors will successfully argue that they were *not even parties* to the action in the U.S. For the sake of completeness, I will also discus the second condition, which will likely fail because the resident plaintiffs could raise causes of action under French law against the Defendants, or some of them, which are markedly different from the ones upon which the action in the U.S. proceedings was based.

A. **Lack of identity of the parties**

13.    The salient features of the American class action, at least from the perspective of French law, are : that those individuals who qualify as members of a class of plaintiffs, as defined, are invited to opt out of the class by way of a constructive notice ; that if they fail to opt out, for whatever reason, they are nevertheless bound by whatever is decided on the merits of the action, or by any court-approved settlement ; and, consequently, that they may not bring a claim of their own anywhere toward the same end. Those features makes it simply impossible, under

7

French law, that such individuals be regarded as "parties" to the decision rendered in a class action. As a matter of principle, no one under French law may bring an action on behalf of another person (hereafter under 1): A limited number of statutory actions under French law which may be regarded as encroaching on the principle are very clearly distinct in their characteristics from an American type class action (hereafter under 2).

## 1. "No one may claim in court by proxy"

14.      Under French law, a decision of a court cannot have the effect of a ruling on behalf of those who, not being duly and individually represented in the proceedings, have not had an opportunity personally to present their claim and arguments. Specifically, the theory that a person could be represented as a plaintiff in a lawsuit without having consented to it – be it expressly or impliedly - runs against an ancient principle of French procedural law (originally expressed in a royal ordinance of 1528), namely that "no one may claim in court by proxy" ("*Nul ne plaide par procureur*"). The rule originally meant what it literally says, namely that a litigant could not be represented in court and had to appear in person. Although the rule has long been changed in that respect, in that a duly-authorized attorney is now able to represent a litigant, it has endured with a different meaning or rather two, the latter being particularly relevant in the present context.

15.      a) The rule first means that no-one can properly be a party to a court action without appearing by name. In the case of the American class action, all of the members of the class are not identified by name.[2] That fact alone is inconsistent with the rule "*Nul ne plaide par*

---

[2] Even under the limited type of "collective" actions open under French law to investors (*infra* at §§ 19, 20), the plaintiffs must be identified individually and they act under their own name and in their own capacity.

*procureur*". Holding a constructive plaintiff – such as a "non opting out" French resident – as bound by the proceedings having taken place in the U.S. would be an outright violation of Article 1351 of the Civil Code. It follows that – *even if* the U.S. judgment or order would otherwise be entitled to recognition in France (which it is not, for reasons explained below under IV) – the class members who purportedly would be forbidden under the U.S. judgment or order to bring any further claim against the Defendants based on their purchase of Parmalat shares or bonds could not be considered in France as so bound ; the doctrine of *res judicata* simply would not apply.

16.       b) The rule under consideration also means that a litigant cannot be held to represent others unless duly authorized by them (as understood under French law) to do so. In the U.S. class action, the so-called "class representatives" - let alone their attorneys – will not have been properly authorized, as understood under French law, to represent the "non-opting out" Parmalat shareholders residing in France or Europe. Consequently, in the eyes of a French court, the class representatives will be held to lack the necessary "quality" (a notion akin to those of capacity or standing) to have represented the rights of others. Under French procedural law, the lack of capacity of a claimant (or plaintiff) is a primary cause for the dismissal of an action. A plea to that effect is regarded as 'peremptory' – a concept similar to that of summary judgment in American law – meaning that the claim must be dismissed by the court without an examination on the merits.[3] A peremptory plea such as lack of capacity may be raised at any

---

[3]    New Code of Civil Procedure ("NCPC"), Article 122 : "A peremptory plea is any ground which may cause the adversary's demand to be dismissed, without examination on the merits, because of lack of the right to sue, such as not being a proper party [*défaut de qualité*], lacking interest, prescription, fixed time-limit, or *res judicata*".

stage of the proceedings.[4]  When raised, it must be admitted by the court automatically, without requiring the person raising it to prove harm or prejudice.  This is evidence of the importance, under French law, that a party purporting to act in the name or for the benefit of another be duly authorized.  The principle has indeed been sanctioned at the constitutional level: the French Constitutional Council has ruled that an individual action may not be instituted against the will of the person concerned.[5]

## 2.  Limited or apparent encroachments on the principle

17.     French law does not permit class actions.  In recent years, the law has allowed a few types of "collective" actions in limited circumstances, thereby introducing limited statutory exceptions to the "no claims by proxy" rule.  Their characteristics, however, make them definitely distinct from of a class action as understood in the United States, notably with respect to *res judicata*.

18.     a) *Law n° 89-421 of 23 June 1989* has instituted a new type of non-profit organizations, *Investors' Defense Associations* (« Association de défense des investisseurs »), expressly allowing them "to bring an action in any court to claim compensation in relation to facts of a nature to harm, directly or indirectly, the collective interest of investors or of some categories thereof ".[6]  A statute was necessary because under ordinary French law, a non-profit

---

[4]  NCPC, Article 123 : "Peremptory pleas may be raised at any stage of the proceeding, without prejudice to the judge's discretion to order payment of damages by those who have abstained, with dilatory intent, from raising them earlier".

[5] Decision of 25 July 1989, *Actualité juridique du droit administratif* 1989, p. 789, infra at footnote 34.  The Constitutional Council is the body entrusted with the power of constitutional review in France (the judiciary does not enjoy such power).  It is exercised, as the case may be, in between the vote of a bill by the Parliament and its promulgation by the President.

[6] Code monétaire et financier, Article L. 452-1.

organization (*association*) is not entitled to bring an action for the defense of an interest beyond its own, notably that of an indistinct group of people. A first consequence is that Investors' defense associations are heavily regulated: in particular, they must be approved by public authority and registered .[7] Another one, which must be stressed for the present discussion, is that such an association does not and could not obtain damages for a loss that it did not personally suffer .  What it will normally seek is the enforcement of the law as a general matter and the prevention of future similar objectionable conduct by the defendant, e.g. by way of an injunction. Should an investors association ever obtain damages, those will normally be for the expenses it incurred, not the addition of individual damages ; under no circumstance the damages obtained by the association could distributed to its members.

19.    b) A further statute of *8 August 1994*, however, has expressly allowed Investors' defense associations to bring a joint action on behalf of several of their members from which it has received an express mandate to that effect. But this is subject to strict conditions.[8]  Under Article L. 452-2 of the Monetary and Financial Code:

> "If, in their capacity as investors, several natural persons have suffered individual damage having a common origin through the actions of the same person, any association referred to in Article L. 452-1 may, *if it has been instructed by at least two of the investors concerned*, sue for damages before any court *on behalf of those investors*.
>
> The power so to act cannot be solicited via a public appeal on television or radio, nor via a poster campaign, tracts or personalized letters. *It must be given in writing by each investor.*
>
> However, if an approved association brings an action for damages before the civil

---

[7] Approval is by the Ministry of Economy and Finance, after consultation with the Ministry of Justice and the Commission equivalent to the SEC. Approval is given for three years and renewable. Only a handful of such associations have been incorporated.

[8] To begin with, the organization must have been in existence for more than six months (formerly two years) and include at least two hundred fee-paying members (formerly one thousand).

or commercial courts pursuant to the third paragraph of Article L. 452-1, the presiding judge of the [District court] or the Commercial Court, as applicable, may issue a summary order authorizing it to solicit a power of attorney from the shareholders empowering it, at its own expense, to act on their behalf and have recourse to the advertising channels referred to in the previous paragraph. [...]."[9]

For the purpose of the present discussion, it is sufficient to stress that the power of attorney must be given in writing by each investor. That only makes it impossible to equate the action in question to an American class action. One commentator indeed expressly concludes: "[i]n any event, the court decisions are *res judicata* only as regards the organization itself and its principals, not as regards other individuals, which distinguishes the French system from the American system".[10]

      20.    c) Another type of "collective action" made available under French law concerns actions in tort against the officers of a corporation based on individual damage suffered by a shareholder.[11] Any shareholder can bring such an action individually. The law, in addition, allows several shareholders having suffered individual damages based on the same facts to give one or more of them a mandate to pursue their claim; here again, however, the law carefully sees

---

[9] Translation from the "Legifrance" website; emphasis added. Legal persons are excluded in order to prevent the use of the statute as a weapon in a 'capitalistic battle' between corporations. Investors include purchasers of shares and debt securities. The members of the organization may be investors in a variety of firms, not in the same one.

[10] P. Le Cannu, "Attributions et responsabilités des associations de défense des actionnaires et des investisseurs" ["Prerogatives And Liabilities Of The Organizations For The Protection Of Shareholders And Investors", *Revue des Sociétés*, 1995, p. 239, at 254.

[11] The cause of action is based on Article L. 225-251 of the Commercial Code : « The directors and managing director shall be individually or jointly and severally liable to the company or third parties either for infringements of the laws or regulations applicable to public limited companies, or for breaches of the memorandum and articles of association, or for tortious or negligent acts of management.

If more than one director, or more than one director and the managing director, have participated in the same acts, the Court shall determine the share to be contributed by each of them to the compensation awarded." [translation taken from the Legifrance Website]

to it that no shareholder who did not expressly agreed to be represented be bound by the decision ultimately rendered.  Under *Article 199 of the Decree of 23 March 1967* implementing the  24 July 1966 Law on Corporations (a statute today merged into the Code de commerce) :

> " Shareholders which, on the basis of the provisions of the provisions of Article 244 of Law n° 66-537 of 24 July 1966 [today Article L. 225-251 of the Commercial Code, footnote 11] wish to claim compensation from the executive officers and/or directors for damages they individually suffered as a consequence of the same facts may give one or several them a power of attorney to bring the claim in their names before the civil court, under the following conditions :
>
> 1° *The power of attorney must be in writing* and must expressly specify whether it gives the agent or not the power to take all procedural steps regarding the litigation in the name of the principal ; it specifies, as the case may be, that it carries the power to bring an appeal ;
>
> 2° *The petition filed in court must indicate the surnames, given names and addresses of each one of the principals, as well as the number of shares they hold.  It specifies the amount of compensation that each one of them claims*." [my translation, emphasis added]

Here again, the kind of joint action opened by the law is totally different from a class action, notably in that no individual who did not expressly give a power of attorney detailing the mandate of the agent shall be bound by the judgment rendered : there is no *res judicata* as regards such a person.  As commentators again note: "The investors must be identified: the action is not a "class action", American type".[12]

21.     d) *Law n° 94-679 of 8 August 1994* has also allowed shareholders in a given public limited company whose shares are traded on the stock market to group into an organization (*association*) "in order to represent their interests" within the company.[13]  Under the

---

[12] T. Bonneau et F. Drummond, *Droit des marchés financiers*, Paris, Economica, 2001, at § 484, p. 396.

[13] Such associations are also heavily regulated by law in order to avoid speculative attacks and a distortion of the value of the shares on the stock exchange.

provision, today Article L. 225-120 of the Commercial Code, the members must be shareholders nominally registered for more than two years and must hold together at least 5% of the voting capital. Subject to further conditions, the association set up by them may bring suit against the directors for mismanagement of the company under Article L. 225-252 of the Commercial Code. However, such action is *for the benefit of the company*, not of the individual shareholders, and therefore totally distinct from a class action[14]. Indeed, the spirit of the statute is not to compensate the shareholders individually as investors, but to improve the protection of minority shareholders in a corporation.

22.    In view of the features presented by the types of "collective" actions exceptionally allowed under French corporate law, it is very clear that a French court could not accept, notably for the purpose of *res judicata*, that all individuals defined as "members of the class" in the U.S. class action – including all those persons residing in Europe who simply did not "opt out" – be regarded as parties to the U.S. suit. The principle of *Res judicata*, as understood under French law, would quite simply not be applicable.

## B. Lack of Identity of Causes of Action

23.    It also follows from Article 1351 of the Civil Code that the doctrine of *res judicata* under French law does not apply where the subsequent claim is based on a different cause of action than the one upon which the prior decision was rendered. I will assume, for the sake of discussion, that the French-resident plaintiff (involuntarily) included in the class and wishing to

---

[14] See also *infra* at § 25.

14

bring an action in France would base its claim on French law[15].  Under French law, two main

types of action could be brought against the various Defendants.  Inasmuch as the first one could

be regarded as equivalent to the cause of action in the United States, it would remain that there

could be no *res judicata* for lack of identity of the parties, as has just been explained.  As regards

the second one, there is no question that it is clearly distinct in substance from the action filed

against Parmalat under the U.S. federal statute.[16]

24.  a) The plaintiffs in France could bring an ordinary action in tort.  Against those of the

Defendants who were not officers in the Parmalat entity of which the plaintiffs became

shareholders, the action would be based on Article 1382 of the Civil Code, the fundamental tort

provision under French law.[17]  Against those of the Defendants which acted in their capacity as

directors of any of the Parmalat entity concerned, the action in France would be based on Article

---

[15] Under French Conflict of Laws principles, the claim would rather have to be based on the
law of the corporation involved (see e.g. Cass. Civ. I, 1 July 1997, *Sté Africatours c. Diop*,
Revue critique de droit international privé 1998, p. 292, annexed as Exhibit 2).  The law of a
corporation (its 'nationality') is determined by the test of "*siège social réel*", that is its actual
corporate seat, rather than by its place of incorporation when the two do not coincide.  No
corporation of which claimants in the Parmalat class action were shareholders appears to be
based in France.  However, if the situation at hand has a sufficient connection to France (e.g. the
shares were purchased on the French market...), French law on the liability of corporate officers
might be found to apply as a « mandatory » law in the international sense, although this by no
means sure.  What is absolutely certain, however, is that under no conceivable reasoning would a
French court adjudicate the claims of shareholders resident in France having purchased their
shares in a non-US corporation on a European stock market under the U.S. *Exchange Act*, and
this would be ground for the non-recognition of the U.S. judgment (see below at § 38).

[16] An important point is that even if the U.S. action were found to be "equivalent", the U.S.
judgment or order would of course still have to meet the requirements for recognition or
enforcement in France.  For the reasons detailed below in this Declaration under IV, I do not
believe that an order or judgment in the U.S. class action could meet those requirements – even
if, for the sake of argument, the U.S. action was found to be "equivalent".

[17] Article 1382, French Civil Code : « Every act of a person causing injury to another
obligates the one by whose fault it occurred to give redress ».

L. 225-251 of the Commercial Code, already described.[18]  There is no need to distinguish between those two causes of action under French law inasmuch as the latter is considered to be an implementation of the former.  Assuming, however, for the sake of discussion, that the causes of action upon which the U.S. class action is based, such as Sections 10(b) or 20(a) of the U.S. Exchange Act, could be regarded as equivalent to the French causes of actions in tort under the two above provisions (an issue on which I do not purport to opine), it would remain that *res judicata* would fail under the prior test concerning the identity of the parties.

25.    b) Against the directors of the corporations of the Parmalat entity concerned (that in which the plaintiffs purchased stock), the French resident plaintiffs could also bring a particular action based on alleged of mismanagement of the corporation, described as "action sociale *ut singuli*"[19].  As the name indicates, however, this is not an individual action of the shareholders, but one on behalf of the corporation itself.[20]  In order to be admissible, the action must be filed by shareholders holding together at least five percent of the stock (or less if the capital is above 750,000 Euros).  In the case of a public limited company whose shares are traded on a regulated stock market, the action may also be brought by an association of shareholders, as authorized by the statute of 8 August 1994, as already indicated[21].  In any event, if the action succeeds, compensation is awarded *to the company*.  Obviously, therefore, the class action filed in the United States against the Defendants under a U.S. federal statute could not be regarded as "equivalent" to this type of action under French law.  Consequently, the U.S. decision would not

---

[18] Text at footnote 11.

[19] The action is provided by Article 225-252 of the French Commercial Code.

[20] A corporation, in French, is a "société"; hence the characterization of « action sociale » (action on behalf of the company).

[21] See § 19 above.

16

be *res judicata* as regards an action brought in France under French law, based on allegations of mismanagement of the corporation.

26.     To sum up, and as all commentators in France point out, there are significant differences between the U.S. class action and the kind of actions that can be filed in France by dissatisfied investors or shareholders.  Even though some of these actions aim at obtaining a similar result as the U.S. class action – namely, monetary damages for losses allegedly suffered by investors personally as a result of corporate mismanagement or the deeds of third parties – this is not enough to allow a plea of *res judicata* to be successfully raised in France.  An action brought under French law by a number of claimants will have to be filed in their own names ; and only those persons will be affected – for better or worse – by the decision rendered.  That decision will have no legal effect whatsoever regarding all those other investors in a Parmalat entity (in France or Europe) purportedly encompassed in the U.S. class action as members of the class and who did not expressly agreed to be parties to the action (a vast number or whom, presumably, were not even aware of it).   In addition, even assuming that the issue of "equivalence" of the respective causes of action would be discussed at all in this context, it would be rejected on the basis of the substantial differences in form, procedure, purpose and result as between the U.S. class action and the actions open under French law.

## IV.    THE RECOGNITION OR ENFORCEMENT IN FRANCE OF A DECISION OR JUDGMENT IN THE PARMALAT SECURITIES CLASS ACTION LITIGATION IN THE U.S.

### A.    Relevant French Law Concerning the Enforcement or Recognition of a Decision or Judgment of a U.S. Court

27.  As an initial point, there is no treaty or other international agreement in force between France and the U.S. concerning the enforcement or recognition of each other's

judgments. Consequently, the question of whether a French court will recognize or enforce a decision or judgment of a U.S. Court must be decided as a matter of French law.

28.    The conditions for the recognition and enforcement in France of foreign (non-European Community) decisions have been laid out by the *Cour de cassation* (the highest court in France for civil and criminal matters) in 1964 in the landmark case of *Munzer v. Jacoby*.[22] Those conditions were expressed as follows:

- the jurisdiction of the rendering court (the foreign court must be deemed as having had proper international jurisdiction under French principles on the matter);

- the regularity of the procedure followed in the foreign court;[23]

- the application of the law that governs, according to French conflict-of-law rules;

- the foreign decision must not contravene international public policy; and

- there must not be an "evasion of the law" (*fraude à la loi*).[24]

---

[22] Cass. Civ. I, 7 January 1964, *Grands arrêts de la jurisprudence de droit international privé* [Major cases of French PIL, hereafter *Grands arrêts*], Dalloz, 4th ed., 2001, n° 41, p. 367. For an English translation of the relevant part of the *Munzer* decision, *see* H. Steiner & D. Vagts, *Transnational Legal Problems*, University Casebook Series, 1968, p. 716 (annexed as Exhibit 3, together with full original).

[23] In *Bachir*, a decision subsequent to *Munzer*, that condition has been interpreted as referring to compliance with "*droits de la défense*" (an adversarial process) – a concept akin to that of procedural due process in the United States : "[A]lthough the French judge deciding upon the petition for *exequatur* must verify the regularity of the proceedings before the foreign court, that condition needs be assessed only with reference to the French standard of international public policy and to procedural due process (*droits de la défense*)." (Cass. Civ. I, *Bachir*, 4 October 1967, *Grands arrêts*, n° 45 ; a copy of the *Bachir* decision is annexed as Exhibit 4). Consequently, that second condition is practically merged with the fourth one stated below (absence of contravention to international public policy), although, within the latter, one must distinguish between what French law describes as "procedural public policy" and "substantive public policy" (see below at §§ 40 ff).

[24] In the present context, another condition must be mentioned: the decision must not contradict a prior decision rendered by a court of a European Union Member State.  Although I will not develop this point for lack of sufficient information on the actions instituted in Italy in

18

29.     Those conditions notably apply whenever a party wishes to enforce a foreign judgment against persons or property in France. In that situation, execution must be authorized by a French court following the procedure of *exequatur*.  That procedure is different from an action on the merits, in that the French court only verifies the "international validity" of the foreign judgment under the above conditions, to the exclusion of any review of the merits. Those conditions similarly apply where a party prevailing itself of a foreign judgment in France does not seek its enforcement but its mere recognition for *res judicata* purposes.  For instance, if a claimant's action abroad was dismissed, and that same claimant subsequently sought to recommence the action in France, the defendant will raise the foreign judgment as a defense ; whereupon the court will apply the same tests as above to decide whether the foreign judgment must be granted "recognition" in France (and therefore preclusive effect) or not.

In any event, therefore, to be effective as such in France, a foreign judgment must satisfy the above requirements.

### B.     Enforcement or Recognition in France of a Decision or Judgment in a U.S. "Class Action" Specifically

30.     Applying the above principles, it is my opinion that a French court will not recognize or enforce a judgment or order of the U.S. Court in the Parmalat class action litigation, for the following reasons.

### 1.     Lack of Jurisdiction of the Originating Court in the U.S.

---

the Parmalat case, it should be noted that any decision rendered in Italy on a civil action prior to the U.S. decision could be a bar to the recognition of the latter if it is irreconcilable with it, pursuant to EU Regulation 44/2001 on the Jurisdiction Of Courts And The Recognition Of Judgments In Civil And Commercial Matters (the functional equivalent to the Full Faith and Credit Clause under the U.S. Constitution).

31.    As indicated above, a foreign judgment or order will only be recognized in France if the originating court is considered as having had proper international jurisdiction under French jurisdictional rules.   There are two sets of such rules, depending upon the nationalities of the parties involved, due to specific jurisdictional rules concerning French parties; in the present case, they will concern any French plaintiff involved in the "class".

### a) With Respect to Plaintiffs: Article 14 of the French Civil Code

32.    Under Article 14 of the French Civil Code, litigants of French nationality possess the privilege to always be able to bring an action before French courts, unless they have consciously and unequivocally waived the jurisdiction of French courts.[25] Articles 14 applies to legal as well as natural persons.   Regarding the former, "nationality", as already indicated, is normally determined by the test of actual corporate seat, or head office.

33.    As regards the named plaintiffs in the present action[26], in addition to parties from the United Sates, the United Kingdom (Hermes), Italy (Cattolica), one identifies one *Société Moderne de Terrassements Parisiens,* that appears to be a French firm.   Moreover, the class action will, by definition, involve a number of other participants, and it may reasonably be anticipated that some French citizens will be among them.  The question then is whether Article 14, which grants jurisdiction to French courts in the case of a French plaintiff, could be raised a bar to the recognition of a decision on the merits in the American class action.  That is definitely

---

[25]  Similarly, under Article 15 of the Civil Code, a claimant can always sue a French defendant before French courts.  A copy of Articles 14 and 15 of the French Civil Code is annexed as Exhibit 5.

[26] Second Amended Complaint, at §106.

the case for all the non-opting out French claimants; and it might even be the case for the one actual French claimant.

34.    i) By having brought suit before a foreign court (the U.S federal court, in the present instance), a French plaintiff will normally be regarded as having waived the jurisdiction of French courts under Article 14.  This, however, is only true of a *willing and conscious* plaintiff.  It is my understanding, again, that all of the shareholders or investors in entities of the Parmalat group that fall within the definition of the "class" specified by the U.S. plaintiffs' lawyers will be regarded as bound by any order or judgment rendered in that action, unless they expressly and formally decline, at the correct time, to be parties to the class action in the United States by "opting out" of it.  If that understanding is correct, there cannot be the slightest doubt that those French individuals who would find themselves in that situation would *not* be regarded by a French court as having renounced the right to seek redress before the French courts under Article 14.  To begin with, as already explained, they will not even be regarded as having been parties to the U.S. action at all.[27]  If need be, the *Cour de cassation* has ruled that renunciation of Article 14 may only result from conscious, affirmative acts or behavior incompatible with the intention to prevail oneself of the right afforded by those provisions.[28]  Therefore, mere silence on the part of the French investors in entities of the Parmalat group, even following notice of the U.S. class action, by whatever means the notice purports to be communicated, would *not* be regarded as a sufficient waiver of the jurisdiction of French courts.   More generally, as a matter of principle under French law, "silence" cannot be held as implying consent.

---

[27] Section II, A, above.

[28] *See*, *e.g.*, Cass. Civ. I, 16 June 1981, *Sté continentale de promotion immobilière*, Revue critique de droit international privé 1981, p. 721 (annexed as Exhibit 6).

35.     ii) Even in the case of a genuine plaintiff in the United Sates action such as, presumably, *Société Moderne de Terrassements Parisiens*, moreover, bringing suit before a foreign forum is only a *rebuttable* presumption of a renunciation to the jurisdiction of French courts under Article 14 of the French Civil Code.   In certain circumstances, a French plaintiff having brought an action before a foreign court will be allowed bring a new action in France based on Article 14.   Such is for instance the case, according to several rulings by the *Cour de cassation*, where it can be shown that "the plaintiff did not act consciously and freely".[29]   Among the circumstances where a plaintiff was allowed to bring a new action in France are : where the plaintiff had been seeking protective measures in the foreign court ; or where the plaintiff had had reason to believe that the defendant's only attachable assets were in the foreign country where it brought suit ; or where the defendant was in a state of bankruptcy and the plaintiff acted in order to protect its rights under the local procedural law.   Moreover, even if the French plaintiff is deemed to have brought suit before the foreign forum "freely and consciously", it may bring a new action in France based on a different cause of action.   As has been seen earlier, French law allows types of actions that are markedly different from the one on which the US. decision would be rendered.[30]

36.     To sum up on this issue, it is my opinion that a French national who would find himself included in the "class" simply by virtue of the fact that he or she did not opt out would not be deemed to have waived to right to bring suit before a French court under Article 14 of the Civil Code.   This is even true of the one corporate claimant which appears to qualify as a French

_____

[29] See, e.g., Cour de cassation, 1st Chamber, 30 June 1992, *Sté Verdol*, Bulletin Civil, I, n° 203, p. 136 (annexed as Exhibit 7).

[30] At § 25.

national, as regards a cause of action under French law that would be found distinct from the one raised in the U.S. proceedings.

### b) Other Rules of Jurisdiction for Recognition Purposes

37.    In the case of non-French parties, a foreign court will be deemed to have jurisdiction, for the purpose of recognition of a foreign judgment in France, if there was a "characterized link" between the originating court and the underlying controversy, namely the parties and the subject-matter of the dispute, and if the choice of court was not prompted by *forum shopping*.[31]   In my opinion, such a link will likely be found to exist in the case of U.S resident claimants who invested in one or more of the twenty or so U.S. based entities of the Parmalat group on the U.S. stock market.  But it will equally be found *not* to exist in the case of foreign-based shareholders having invested in non-US based companies on a non-U.S. stock market, based on information communicated in their home States or in third countries. Therefore, the U.S. judgment will be denied recognition in that it purports to bind those individuals, and they will be allowed to bring suit in France if they wish to.

### 2.    Application of the Correct Law Under French Choice-of-Law Principles

38.    Following the holding in the *Munzer* case, the originating court (the U.S. court, in the present case) must have applied on the merits the law that a French court would have applied under French choice-of-law principles.  According to the Second Amended Consolidated Class Action complaint, the U.S. class action currently pending for certification in federal court is

---

[31] Cour de cassation, 1st Chamber, 6 February 1985, *Simitch v. Fairhurst*, *Grands arrêts*, n° 70, p. 638 (annexed as Exhibit 8).

based upon various provisions of the U.S. Exchange Act.[32]  I also understand that a number of "plaintiffs" purportedly bound by the definition of the "class" are, in fact, shareholders resident in Europe, including France, who purchased their shares in Parmalat entities, most of which neither are incorporated in the U.S. nor have their principal place of business in the U.S., on European stock markets.  Based on such facts, it is, in my opinion, simply impossible that a French court could find that the U.S. Exchange Act could validly apply to the purchase of common stock in a non U.S. based company on a European stock market by a European resident, be it in France, in Italy or anywhere else; or to an alleged tort or wrong committed predominantly in Italy, to the detriment of European shareholders, by way of the alleged mismanagement of a non U.S. registered company with its main place of business outside of the United States.  Not only would a contrary finding run against ordinary principles of conflict of laws, but the foreign (U.S.) law could even be regarded as lacking "title", or jurisdiction to prescribe, with respect to the factual situation considered, under international law.[33]

3.    **Violation of International Public Policy (Lack of Due Process)**

39.    Without purporting to pass any judgment on the propriety of the U.S. type "class action", the fact is that several of its features run against fundamental principles of French procedural and substantive law, to the extent that a decision rendered on such an action will most probably be denied recognition as contravening to international public policy as enforced be French courts.

---

[32] At Pages 344 ff.

[33] The issue at hand is known as that of the "extra-territorial application" of a given national law.  For an American authority supporting the opinion set forth above, *see Rest. 3rd, Restatement of the Foreign Relations Law of the United States* §§ 402 (Bases of Jurisdiction to Prescribe) and 403 (Limitations on Jurisdiction to Prescribe) (annexed as Exhibit 9).

40.    a) On the procedural ground, as has been explained earlier, under French law no one can be held to be a party to a court action without appearing by name, and a decision of a court cannot have the effect of a ruling on behalf of those who, not being duly and individually represented in the proceedings, have not had an opportunity personally to present their claim and arguments. In contrast, the U.S. action purports to bind individuals who did not expressly - and, in the likely opinion of a French court, not even impliedly - agreed to be parties to (or plaintiffs in) the action. That a person would be portrayed as a claimant or plaintiff in a lawsuit without having consented to it, particularly without even being aware of it, will be regarded in France as a violation of international procedural public policy, and will warrant the denial of recognition of a decision purporting to bind such a person. As already mentioned, it is a constitutional principle in France that an action in court may not be introduced or pursued against the will of a person concerned.[34] Specifically, a French court will be seriously concerned that French residents might not have had knowledge of the notice or, even if they had, could not comprehend its impact (that they would be bound by the results of the class action unless they "opted out" or elected not to be apart of the class action, and that they would be barred to pursue whatever claim they may

_____

[34]  See § 5 above. In the quoted decision, the challenged bill allowed a trade union to bring an action in court for the benefit of one or more workers after having advised them individually by registered letter with acknowledgement of receipt, if the worker had not opposed the action within fifteen days after notification. The Council held that such provision could only be constitutional if the interested party was in a position *to give an enlightened consent, to maintain its freedom to act on its own for the protection of its interests and to put an end to the action on its behalf once introduced*. Therefore, the Council went on, the letter addressed to the worker should include all necessary details on the nature and purpose of the projected action in court, the impact of the worker's consent, and the worker's right at all time to put an end to the action. The Constitutional Council added that the trade union could only introduce the action if it could establish that the worker had had *personal knowledge* of the letter including all the mentions above.

have).[35]  Even regarding the tiny minority of individuals who might be presumed to have had both an opportunity to read the notice and the ability to fully catch its meaning, many of them could successfully argue that they were not compelled to answer an unsolicited offer that intruded into their affairs, moreover one threatening to deprive them of the right to pursue a claim, pursuant to a foreign law to which they had no relationship whatsoever.

41.    b) With respect to *substance*, the determination of a person's monetary claim against another, without its express authorization or participation, will also likely be regarded by a French court as a potential deprivation of property.  Consequently, if in the U.S. class action litigation a French resident shareholder's claim against Parmalat is dismissed on the merits, or if the U.S. class is awarded monetary damages that are somehow found not to fully satisfy that shareholder's individual claim, such a result will be held in France to be an actual deprivation of property, or expropriation, in violation of public policy (the functional equivalent, in the present context, of lack of due process of law).  Such conclusion will today find additional support, if

---

[35]  Under the modern practice of *exequatur* (enforcement of foreign judgments), the impact of French public policy is assessed with reference to the degree of connection to France of the situation that gave rise to the foreign judgment at issue (commentators use the expression *ordre public de proximité*).  Therefore, while the plea of violation of public policy will most certainly be raised, with success, against a decision of the U.S. Court inasmuch as it purports to be binding on foreign "claimants" (most of whom never agreed to be placed in that role) who are neither citizens nor residents of the United States and who purchased their stock outside of the United States (see § 38), the U.S. decision might pass the test of compliance with public policy with respect to those purported claimants under American law who are American nationals or residents and who purchased their shares in the United States, given the genuine connection ("proximity") of their circumstances to the United States and the validity under U.S. law of the "non-opting out" practice.  This is, however, by no means certain and is only mentioned here out of caution.

need be, in the provisions of the European Convention on Human Rights ("ECHR") regarding the protection of property.[36]

42.    c) Reverting to procedure, the fact that persons in France, or anywhere outside of the United States, falling within the definition of the U.S. "class" will automatically be included in that group – and thus will be bound by any result in the U.S. class action litigation, unless they decide actively and affirmatively to "opt-out" of the class and notify the U.S. Court and lawyers accordingly within the time period specified by the U.S. Court for doing so – is also inconsistent with another fundamental principle of French law, that of adversarial proceedings ("*le principe du contradictoire*").  Under the principle, every litigant has a right to appear and be heard during any proceedings that affect his or her rights.  This long-standing principle is today somehow embodied in the definition of an action in court by the French NCPC (New Code of Civil Procedure), enacted in 1975.  Under Article 30, paragraph 1, of the Code, "[an] action [in court] is the right of one bringing a claim to be heard on the merits of the claim, so that the judge may declare if founded or unfounded."  In the present situation, not only are the alleged plaintiffs in the U.S. proceedings not called to appear but, unbeknown to most of them, they are "represented" by someone whose existence they are not even aware of.  There is little doubt, in my opinion, that the fundamental right of the "non-opting out" individual to be heard on the merits of their claim would be regarded by a French court as denied by the mechanics of the class action; and, therefore, that a finding directly affecting the rights of such individual, in whatever way, will not be recognized by French courts.  Here again, the applicable principle – long recognized by French law – finds additional support in the provisions of the ECHR,

---

[36] ECHR, 1st Protocol, Article 1 (annexed as Exhibit 10).  The provisions of the Convention apply even against the law of a State that is not a party to the Convention.

specifically Article 6.[37]  Consequently, the U.S. judgment will be denied recognition in France on that ground too .

     43.    *Le principe du contradictoire* equally applies to defendants.  Indeed, under Article 30, paragraph 2,  of the NCPC, "[f]or the adversary, the action is the right to contest the merits of this claim".  In that respect, the present Defendants will be entitled to argue before a French court that, as a result of the U.S. class action procedure, they were not in a position to either know or address the claim of any individual claimant or plaintiff in the class, including some against whom they might have raised a specific defense (such as contributory negligence, or a statute of limitations applicable under the law governing their relationship).  That fact is also contrary to *le principe de contradictoire*, and, therefore, yet another ground upon which, in my opinion, a French court will refuse to recognize or enforce a judgment of the U.S. Court.

     44.    d) Even if the U.S. class action were to result in a judgment on the merits in favor of the plaintiffs, including an award of damages, the "non-opting-out" shareholders in France (or Europe) could attack the judgment as contravening French public policy on another ground.  That is because the total amount of compensation awarded by the U.S. Court will be significantly diminished by attorneys' fees, before payment to the "class" members, based upon payment to the U.S. lawyers of a contingency fee agreement that the Parmalat shareholders unconsciously or unwillingly included in the "class" never subscribed to or approved.  Contingency fees for attorneys are prohibited under French law *per se*.  In addition, the payment of contingency fees – with the effect of significantly reducing the compensation available to be received by the

---

[37] ECHR Article 6.1: "In the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law . . . ."

shareholders, in contrast with the amount actually awarded by the Court – will likely be regarded as a deprivation of property in violation of French public policy.

45.   For all the reasons above, I believe it is virtually impossible that the decision rendered on the merits in the U.S. class action be successfully raised as a bar to a subsequent action in France by a member of the class action. It is all the more so if the member of the class was not a named plaintiff in the U.S. class action and if the cause of action is different from the one adjudicated in the U.S. litigation.

V.   *Res    Judicata    Effect    in    France    of    a    Settlement    of the    Securities    Class    Action    in    the    U.S.    (including    any    Release Provided on Behalf of the Class)?*

46.   I am told that that the U.S. class action could lead to a settlement agreement in the U.S., a part of which requires the Defendants to establish or participate in a fund to be used to pay members of the U.S. class (whether in the U.S. or France/Europe) who submit a claim form in the U.S. seeking a pro rata share of that fund. The question arises again whether a French Court would subsequently preclude any member of the U.S. class – including, specifically, any persons residing in France or Europe who fell within the definition of the U.S. class and who did not "opt-out" and who also did not submit a claim form for payment of a share of that fund – from suing any of the Defendants in France with respect to such matters.

47.   The answer is emphatically in the negative. As an initial matter, I understand that as part of the settlement, the "class" will provide the Defendants with a worldwide release of all potential claims relating to the same facts and time period involved in the U.S. action. From a French law perspective, such a release – as part of a settlement agreement – is a variety of contract, and it is a fundamental principle of the French law of contracts that an agreement is

only binding upon those individuals who subscribed to it or were validly represented.[38]  By definition, the members of the U.S. class who are designated as such by the sole virtue of the fact that they did not opt out of the class action would not be regarded in France as validly represented to the action, let alone as parties to the settlement agreement purporting to put an end to it.  Barring those individuals from pursuing a claim in France on the ground that they are bound by the settlement agreement would also be regarded as a deprivation of property, or expropriation, without due process of law.

48.    In addition, I understand that any settlement in the U.S. class action must be approved by the U.S. Court and will only be implemented following an order from the U.S. Court.  For the same reasons discussed above, a French court will not view that U.S. order as binding against French and European shareholders who fell within the definition of the "class" and who were included only because they did nothing and did not "opt out".

49.    For the preceding reasons, it is nearly certain that a settlement of the U.S. class action, including any release provided on behalf of the "class", will not be recognized or enforced in France.

## VI.    CONCLUSIONS

50.    Under the present state of the law in France, any decision rendered by a U.S. court in a class action against the Defendants will not be regarded as *res judicata*.  For one thing, the "non-opting out" plaintiffs, who are thereby included in the class as members, will not be considered by a French court to have been parties to the proceedings leading to the U.S. decision.

---

[38]  Article 1165 of the French Civil Code: "Agreements are effective only between the contracting parties . . . .".

For another, several causes of action could be raised in France which are markedly different from those upon which the U.S. decision will have passed judgment.

51.     Independently from the preceding, the decision rendered in the U.S. will not be granted recognition for a number of reasons. First, as regards all those plaintiffs purportedly included in the class who are not American residents having invested in a Parmalat entity on the American market, the originating court will be regarded as without jurisdiction for lack of a reasonable connection with the underlying dispute. This is not, however, the sole ground upon which a judgment or order rendered by a U.S. court in the Parmalat class action would be denied recognition in France. Second, application by the U.S. Court of American federal law to the relations between residents in a European country who invested in an Italian corporation on the Italian – or any non-U.S., for that matter -   stock market and the said corporation would be regarded as unwarranted under international law by a French court. Third, the fact that a number of individuals in France or Europe who never actively participated in the U.S. class action would nevertheless be regarded as parties to that action and therefore bound by its results – including being precluded from bringing any claim against the Defendants in France or anywhere else on whatever ground related to the U.S. class action – will almost undoubtedly be regarded as a violation of procedural public policy by a French court. A French court would almost certainly hold that considering those investors bound by the U.S. class action specifically because of a mere lack of reaction to constructive notice of the U.S. action – most likely incomprehensible even to those individuals who would happen to have had actual knowledge of it – is a violation of *les droits de la défense*. Fourth, it will also be regarded as a violation of substantive public policy, tantamount to a deprivation of property (*expropriation*) without due process of law. It is most ulikely that a French court would bar those French or European investors who were

31

included in the U.S. class action simply because they did not "opt out", from bringing a separate action against the Defendants in France.

52.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 25, 2006

_____
Bernard Audit