UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PARMALAT SECURITIES LITIGATION<br><br>This document relates to:  04 Civ. 0030 (Cons.) | Master Docket No.<br>04 MD 1653 (LAK)<br><br>ECF Case |

## SURREPLY MEMORANDUM OF LAW OF CITIGROUP INC., CITIBANK, N.A., VIALATTEA LLC, BUCONERO LLC AND EUREKA SECURITISATION PLC IN <u>OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

CLIFFORD CHANCE US LLP
31 W. 52nd Street
New York, New York 10019
(212) 878-8000

*Attorneys for Defendants Citigroup Inc.,
Citibank, N.A., Vialattea LLC, Buconero
LLC and Eureka Securitisation plc*

NYA 817227.1

Defendants Citigroup Inc., Citibank, N.A. ("Citibank"), Vialattea LLC, Buconero LLC (collectively, "Citigroup")[1] and Eureka Securitization plc ("Eureka," and together with Citigroup, "Defendants")  respectfully submit this Surreply Memorandum in response to Plaintiffs' reply memorandum in support of their motion for class certification.

## Argument

It is now plain that in order to obtain class certification in the Second Circuit, Plaintiffs must put forward evidence in support of the Rule 23 requirements, and it is equally plain that Plaintiffs have failed entirely to meet their evidentiary burden with respect to a number of those requirements, two of which are discussed here.

In its recent opinion in In re Initial Public Offering Sec. Litig., No. 05-3349-cv, __ F.3d __, 2006 WL 3499937 (2d Cir. Dec. 5, 2006) ("IPO"), the Second Circuit held that in adjudicating class certification, "[a] district judge is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit." Id. at *15 (emphasis added). The IPO court explicitly "disavowed" the "some showing" standard that Plaintiffs relied on in their moving brief, and required district courts to weigh the factual evidence adduced and make determinations as to each of the Rule 23 requirements. Id. Plaintiffs conceded as much in their reply papers. (Pl. Rep. Mem. at 6.) Although Plaintiffs may have now acknowledged the greater weight of their evidentiary burden at the class certification stage, they have done nothing to meet it.

---

[1] The court previously granted the motion to dismiss all counts in which claims had been made against Vialattea LLC and Buconero LLC. See In re Parmalat Sec. Litig., 376 F. Supp. 2d 472 (S.D.N.Y. 2005) ("Parmalat III").

## I.

## PLAINTIFFS HAVE FAILED TO SATISFY THE PREDOMINANCE REQUIREMENT WITH RESPECT TO RELIANCE.

Plaintiffs' sole remaining claim against Citigroup and Eureka alleges "scheme" liability in violation of SEC Rules 10b-5 (a) and (c). See Parmalat III, 376 F. Supp. 2d at 481. IPO also involved claims for scheme liability under Rule 10b-5(a) and (c). See IPO, 2006 WL 3499937, at *2-3. In IPO, the Second Circuit reiterated the longstanding principle that reliance is an essential element for scheme liability under Rule 10b-5, and held that the IPO plaintiffs' claims were inappropriate for class certification because they could not satisfy Rule 23's predominance requirement with respect to the issue of reliance. Id. at *16-17.

Here, too, Plaintiffs cannot meet the predominance requirement with respect to reliance. They neither can offer common proof of actual reliance on Defendants' statements, nor can they bring their claims within the scope of either the "fraud on the market" presumption applicable to cases involving alleged misstatements, or the Affiliated Ute presumption applicable to cases involving alleged omissions.

Plaintiffs do not even try to offer proof of actual reliance on a class-wide basis. As this Court previously noted, "[t]he plaintiffs do not claim to have relied on particular actions" of Citigroup and Eureka. Parmalat III, 376 F. Supp. 2d at 508. Instead, Plaintiffs "argue that the defendants committed a fraud on the market." Id. Plaintiffs now attempt to invoke that presumption to satisfy the predominance requirement of Rule 23 for all defendants. (Pl. Mem. at 55-69.)

2

As more fully discussed in the surreply memoranda being submitted by the Deloitte, Bank of America, and Grant Thornton International Defendants, in which Citigroup and Eureka join, the fraud on the market presumption does not apply here.[2] The market for Parmalat bonds, for example, was clearly lacking in liquidity, transparency, and other key criteria of market efficiency. In the interests of brevity, we adopt those arguments, incorporate them by reference, and will not repeat them here. However, even if this Court were to find that some Parmalat securities traded on an efficient market, Plaintiffs still would not have made the necessary showing under IPO to avail themselves of the fraud on the market presumption, so to obtain class certification of their claims against Citigroup and Eureka.

The fraud on the market doctrine "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." IPO, 2006 WL 3499937, at *16 (citing Basic, Inc. v. Levinson, 485 U.S 224, 245-47 (1988)). Citigroup and Eureka, of course, were not the issuers of Parmalat securities, nor are they alleged to have made any misrepresentations to the market about those securities. As this Court previously has noted, the doctrine "permits a presumption that the plaintiffs relied on the misstatements of Parmalat in connection with the relevant schemes involving the banks. The bank defendants, however, made no misrepresentations in connection with those schemes, at

---

[2]    The Defendants' joint surreply memoranda further explain that Plaintiffs also fail to meet the superiority requirement, because they are admittedly unable to demonstrate that a class action judgment or settlement would have preclusive effect as to foreign purchasers of Parmalat securities. It is revealing that Plaintiffs' own experts do no more than assert that "good arguments" can be made that such a judgment or settlement "should" be recognized abroad, a "showing" that clearly falls far short of the IPO standard.

3

NYA 817227.1

least none relevant here. *The plaintiffs therefore cannot be said to have relied on the banks.*" Parmalat III, 376 F. Supp. 2d at 509 (emphasis added).

Further, to invoke the fraud on the market presumption of reliance, a plaintiff must show that the alleged misrepresentation actually affected the price of the relevant security. Basic, 485 U.S. at 245-47. When a court is asked to presume that a market relied on a misrepresentation, it must receive evidence that the misrepresentation actually impacted the price of the relevant security. Unlike actual reliance, which can be shown through the testimony of the relying party, there is no other way to ascertain market reliance absent a material movement in price. See Greenberg v. Crossroads Sys., Inc., 364 F.3d 657, 663 (5th Cir. 2004) ("actual movement of stock price" is required to apply fraud on the market presumption (emphasis original)); West v. Prudential Sec., Inc., 282 F.3d 935 (7th Cir. 2002) (fraud on the market presumption is not available absent proof the information was injected into the marketplace and affected the price of the stock.) Plaintiffs here have not attempted to make any showing -- let alone introduce sufficient evidence from which this Court could make the findings required by IPO – that the alleged conduct of Citigroup and Eureka had any effect on the market prices of Parmalat securities. They have not shown any increase in price when the allegedly false revenues or assets based upon the purported securitization scheme were reported, nor any downward movement in price when the "truth" about that scheme was revealed.[3] For this reason, as well, Plaintiffs cannot satisfy the predominance requirement of Rule 23 with respect to reliance by invoking the fraud on the market presumption against Citigroup and Eureka.

---

[3]    This issue clearly foreshadows the impossible task plaintiffs would face in establishing the essential element of loss causation. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005).

4

Implicitly recognizing the weakness of their fraud on the market argument as to Citigroup and Eureka, Plaintiffs argue for the first time in their reply that they can satisfy the predominance requirement as to Defendants by invoking the Affiliated Ute presumption with respect to nondisclosures and omissions. (Pl. Rep. Mem. 76.)  This contention is equally without merit. Quite simply, this is not an omissions case—or else, every Rule 10b-5 case would be an omissions case.

It is well settled that the Affiliated Ute presumption is limited to claims founded exclusively or primarily on nondisclosure, and has no application to affirmative misrepresentations or other affirmative efforts at deception. See, e.g., Starr v. Georgeson S'holder, Inc., 412 F.3d 103, 109 n.5 (2d Cir. 2005) (presumption not applicable to statements and conduct which intentionally left shareholders with an "overall false impression"); Wilson v. Comtech Telecomms. Corp., 648 F.2d 88, 93 (2d Cir. 1981) ("[w]hat is important is to understand the rationale for a presumption of causation in fact in cases like Affiliated Ute, *in which no positive statements exist*:  reliance as a practical matter is impossible to prove [emphasis supplied]"); Titan Group, Inc. v. Faggen, 513 F.2d 234, 238-39 (2d Cir. 1975).

With respect to the sole remaining claim against these Defendants, the Third Amended Complaint ("TAC") alleges a fraudulent scheme or device intended to create an affirmatively false impression, upon which investors were intended to rely.  For example, the TAC alleges that through the securitization program Parmalat "materially overstated its assets, revenue and income" (¶ 312), that it used the securitization program "to book non-existent sales and to record bogus receivables" (¶ 314), and that through double billing Parmalat "falsely represented and overstated its cash flow from operations" (¶ 335) – all allegations of affirmative deception.  It was on this basis that the Court upheld the facial sufficiency of the claim against the Defendants'

5

Rule 12(b)(6) motion, noting that the complaint alleged the securitization of "worthless invoices" which "created the appearance of a conventional factoring or securitization operation when, in fact, the reality was quite different." Parmalat III, 376 F. Supp. 2d at 504.

Under these circumstances, the Affiliated Ute presumption can not apply. By definition, a fraudulent or deceptive scheme or device under subsection (a) or (c) of Rule 10b-5 is intended to create a deceptive appearance, and such a claim of affirmative deception can not be transformed into a nondisclosure claim simply by alleging that its fraudulent nature was not disclosed. For example, in Joseph v. Wiles, 223 F.3d 1155, 1162-63 (10th Cir. 2000), the plaintiff, in addition to alleging "a pattern of deception which involved manipulating financial data," also accused defendants of "concealing the truth about the company's true financial outlook, and hiding the existence of the fraudulent scheme itself." On the basis of the latter accusations, plaintiff sought to invoke the Affiliated Ute presumption. In rejecting plaintiff's contention, the Court of Appeals declared:

> Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself. We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the Affiliated Ute presumption to swallow the reliance requirement almost completely. Moreover, it would fail to serve the Affiliated Ute presumption's purpose since this is not a case where reliance would be difficult to prove because it was based on a negative. We therefore hold the Affiliated Ute presumption of reliance inapplicable here.

Id. at 1163.

Two judges of this Court have recently reiterated the essential wisdom of this observation. See In re Salomon Analyst Metromedia Litig., 236 F.R.D. 208, 218-19 (S.D.N.Y. 2006) (noting that "[t]o some extent, every fraud case is an omissions case, because every misleading statement omits the truth," but refusing to apply the presumption because "[t]he

6

NYA 817227.1

complaint is rife with allegations of affirmative misstatements that do not on their face suggest any of the evidentiary problems with which the Supreme Court was concerned in Affiliated Ute."); Titan Pharms. & Nutrition, Inc. v. Medicine Shoppe Int'l, Inc. No. 05 Civ. 10580 (SAS), 2006 WL 708552, at *2 (S.D.N.Y. Mar. 20, 2006) (same).

Similarly here, the TAC alleges that the securitization program was intended to book non-existent sales and receivables, and to overstate Parmalat's assets, revenues, income, and cash flow from operations. This is not a case where, because "no positive statements exist," "reliance as a practical matter is impossible to prove." See Wilson, 648 F.2d at 93; see also Teamsters Local 445 v. Bombardier, Inc., No. 05 Civ. 1898 (SAS), 2006 WL 2161887, at *9 (S.D.N.Y. Aug. 1, 2006).[4] Instead, to meet their burden under Rule 23, Plaintiffs must establish, through common proof, that the putative class relied upon the affirmative misrepresentations by Defendants alleged in the TAC. See IPO, 2006 WL 3499937, at *16 – 17.

Because they have not done so and cannot do so, Plaintiffs' motion for class certification as against Citigroup and Eureka must be denied.

## II.

### PLAINTIFFS HAVE PROVIDED NO BASIS FOR CERTIFYING A CLASS BEGINNING BEFORE JULY 21, 2000

In Defendants' opposition to class certification, we demonstrated that if the Court ultimately does certify some limited class of plaintiffs to assert claims against Citigroup and Eureka – and Defendants respectfully submit that no class should be certified at all – that class should be strictly limited to plaintiffs who purchased Parmalat securities on or after July 21,

---

[4]    The Affiliated Ute presumption also is inapplicable for the reasons stated in the principal surreply memoranda, in which the undersigned defendants have previously joined.

NYA 817227.1

2000, and not January 5, 1999, as Plaintiffs propose. (Opp. Mem. at 7-9.)   That is, quite simply, because although Plaintiffs' claim against Defendants concerns the alleged double-counting of dealer invoices in Defendants' securitization program, the securitization of the dealer invoices at issue did not even begin until July 2000 at the earliest.   Accordingly, even assuming Plaintiffs' allegations to be true – which Defendants emphatically do not – it is nevertheless impossible for plaintiffs to state a claim before July 21, 2000, and the class definition should reflect that.

Although Plaintiffs had the benefit of the IPO decision (and its clarion holding that evidence in support of each Rule 23 requirement is necessary to support class certification) in preparing their reply papers in support of their class certification motion, Plaintiffs continue to simply contest – with no evidentiary support – Defendants' showing that the securitization of dealer invoices in Italy did not begin until July 21, 2000.

Plaintiffs assert, in conclusory fashion, that "[t]he facts here *are* disputed," and cite their complaint for that proposition  (Pl. Rep. Mem. 93) (emphasis in original).   Simply because Plaintiffs allege a fact to be in dispute, however – even if alleged with emphasis – does not mean that it is so.   Plaintiffs cite no facts in support of their position.   Moreover, Plaintiffs' unsupported allegations of a factual dispute stand in contrast to the undisputed evidence adduced in discovery, none of which has revealed the securitization of dealer invoices prior to July 21, 2000.

The only support Plaintiffs cite for the existence of this supposed factual "dispute" is their demonstrably false statement that Peter Davies of Citibank "unequivocally testified that Parmalat's dealer invoices were securitized in Italy as early as 1995 [emphasis in original]." (Id. at 94.) But the record indisputably is to the contrary.   In fact, Mr. Davies never testified that dealer receivables were purchased in the 1995 securitization program.   Indeed,

NYA 817227.1

Plaintiffs never even asked him that question. Mr. Davies merely noted that the 1995 securitization agreement did not <u>bar</u> the purchase of dealer receivables. (See Exh. A to the Declaration of Timothy J. Casey dated December 28, 2006 ("Casey Decl."), submitted herewith.) And, in a declaration submitted with these papers, Mr. Davies explicitly confirms that he "is not aware of any actual dealer receivables being securitized . . . during the existence" of the 1995 program, which is entirely consistent with his deposition testimony. (See Declaration of Peter Davies, dated December 27, 2006). Moreover, the fact that dealer receivables were not purchased in the 1995 program is expressly confirmed by Bondi's auditors, PriceWaterhouseCoopers, whose report Plaintiffs themselves rely upon in their complaint (<u>See</u>, <u>e.g.</u>, ¶ TAC 336).[5]

Claudio Pessina, Parmalat's Chief Accounting Officer during the relevant time, also confirmed in his deposition testimony that no dealer receivables were purchased in the 1995 program. Mr. Pessina was asked by Plaintiffs' counsel: "what you're trying to tell me is that in the first securitization program Parmalat only sold supermarket receivables [i.e., not dealer receivables] to Citibank in the securitization; is that what you're saying?" Mr. Pessina responded simply: "Yes; and also the scope of the program was quite limited because it was not all supermarkets, it was just some of the supermarkets." (Pessina Tr. 215:22-216:4; Casey Declaration, Exh. B).

Plaintiffs' allegations that the class period should begin as early as July 5, 1999, are thus belied by the facts. The <u>IPO</u> decision makes clear that this Court is obligated to assess those

---

[5]    As previously noted, we are aware that the PWC report has been criticized for factual errors, and we do not vouch for its general accuracy. On this specific point, however, its accuracy has not been challenged.

9

facts in making determinations about class certification.  Applying the analysis prescribed by the IPO court, it is plain that there exists no basis to certify a class against Defendants for any period prior to July 21, 2000.

Plaintiffs also appear to argue, alternatively, that a longer class period is justified by the mere fact that dealer receivables were "eligible for securitization" as early as 1995.  (Pl. Rep. Mem. at 94.)  This is patent nonsense.  Obviously no putative class member could have sustained any injury because dealer receivables could have been, but actually were not, included in the 1995 program. See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 176 (2d Cir. 2005).

Accordingly, the class period, if any, should not begin until July 21, 2000.

## CONCLUSION

For all the reasons assigned, Plaintiffs' renewed motion for class certification of their claim against Citigroup and Eureka should be denied.

Dated:  December 28, 2006

Respectfully submitted,

CLIFFORD CHANCE US LLP

By: _____
George A. Schieren (GS-9016)
Mark A. Kirsch (MK-7806)
Joel M. Cohen (JC-9162)
Guy C. Quinlan (GC-2613)

31 West 52nd Street
New York, New York  10019
Telephone:  212-878-8000
Fax:  212-878-8375

Attorneys for Defendants Citigroup Inc.,
Citibank N.A., Vialattea LLC, Buconero LLC,
and Eureka Securitization plc.

10

NYA 817227.1