UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
        :

In re: PARMALAT SECURITIES LITIGATION    :   Master Docket

      :   04 MD 1653 (LAK) ECF Case

      :

      :   <u>ELECTRONICALLY FILED</u>

This document relates to: 04 Civ. 0030 (LAK)   :

      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## JOINT SURREPLY MEMORANDUM OF LAW OF DELOITTE & TOUCHE LLP, DELOITTE TOUCHE TOHMATSU, JAMES E. COPELAND AND GRANT THORNTON INTERNATIONAL IN FURTHER OPPOSITION TO LEAD <u>PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION</u>

| | |
|---|---|
| KRAMER LEVIN NAFTALIS & FRANKEL | DAVIS POLK & WARDWELL |
| 1177 Avenue of the Americas | 450 Lexington Avenue |
| New York, NY 10036 | New York, NY 10017 |
| Tel.: 212-715-9129 | Tel.: 212-450-4508 |
| | |
| *Attorneys for Defendants* | *Attorneys for Defendant* |
| *Deloitte Touche Tohmatsu and* | *Deloitte & Touche LLP* |
| *James E. Copeland* | |

STROOCK, STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
Tel.: 212-806-5400

*Attorneys for Defendants*
*Grant Thornton International*

Dated: December 28, 2006

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ........................................................................................................ii

I.      Plaintiffs Remain Unable to Demonstrate that They Meet Rule 23(b)(3)'s
        Superiority Requirement ................................................................................................ 1

II.     Plaintiffs Remain Unable to Demonstrate that They Meet Rule 23(b)(3)'s
        Predominance Requirement ........................................................................................... 8

        A.     Plaintiffs Fail to Demonstrate That There Was an Efficient Market for Trading
               Parmalat Bonds .................................................................................................... 8

        B.     Plaintiffs Fail to Demonstrate That There Was an Efficient Market as to Privately
               Placed Parmalat Securities ................................................................................. 15

        C.     Plaintiffs Fail to Demonstrate That There Was an Efficient Market in Parmalat
               Equity in the U.S. ............................................................................................... 16

        D.     Reliance Cannot Be Presumed Under the Fraud-Created-the-Market Doctrine ..... 17

III.    Plaintiffs Cannot Demonstrate That the Representative Plaintiffs Are Either
        Adequate or Typical .................................................................................................... 19

CONCLUSION ....................................................................................................................... 19

## TABLE OF AUTHORITIES

### CASES

PAGE

Abell v. Potomac Insurance Co.,
  858 F.2d 1104 (5th Cir. 1988).......................................................................................... 17

Ansari v. New York University,
  179 F.R.D. 112 (S.D.N.Y. 1998) ......................................................................................5

Arduini/Messina P'ship v. National Med. Fin. Servs. Corp.,
  74 F. Supp. 2d 352 (S.D.N.Y. 1999)............................................................................... 18

Bell v. Ascendant Solutions, Inc.,
  422 F.3d 307 (5th Cir. 2005)........................................................................................... 15

Bersch v. Drexel Firestone, Inc.,
  519 F.2d 974 (2d Cir. 1975).........................................................................................5,6

In re Bexar County Health Facility Dev. Corp. Sec. Litig.,
  130 F.R.D. 602 (E.D. Pa. 1990) ...................................................................................... 17

CL-Alexanders Laing & Cruickshank v. Goldfeld,
  127 F.R.D. 454 (S.D.N.Y. 1989) ......................................................................................5

Cammer v. Bloom,
  711 F. Supp. 1264 (D.N.J. 1989) ...................................................................................9,15

Cromer Finance Ltd. v. Berger,
  205 F.R.D. 113 (S.D.N.Y. 2001)………………… ..........................................................4

Gruber v. Price Waterhouse,
  776 F. Supp. 1044 (E.D. Pa. 1991) .................................................................................. 17

Heerwagen v. Clear Channel Communications,
  435 F.3d 219 (2d Cir. 2006)..............................................................................................5

In re Hibbard Brown Secs. Litig.,
  Civ. No. 93-1150 (AET), 1994 U.S. Dist. LEXIS 21500 (D.N.J. Mar. 25, 1994)................... 18

In re Initial Public Offering Sec. Litig.,
  --- F.3d ---, No. 05-3349-CV, 2006 WL 3499937 (2d Cir. Dec. 5, 2006) ...........................1,6

<u>C</u>ASES

<u>P</u>AGE

Joseph v. Wiles,
   223 F.3d 1155 (10th Cir. 2000).......................................................................................... 17

Kern v. Siemens Corp.,
   393 F.3d 120 (2d Cir. 2004),
   <u>cert. denied</u>, 544 U.S. 1034, 125 S. Ct. 2272 (2005) ......................................................... 3,5

In re Livent, Inc. Noteholders Secs. Litig.,
   211 F.R.D. 219 (S.D.N.Y. 2002) ......................................................................................... 12

Ockerman v. May Zima & Co.,
   27 F.3d 1151 (6th Cir. 1994)................................................................................................ 17

Ross v. Bank S., N.A.,
   885 F.2d 723 (11th Cir. 1989).............................................................................................. 18

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,
   No. 05-1898, 2006 WL 2161887 (S.D.N.Y. 2006)................................................................ 10

Unger v. Amedisys, Inc.,
   401 F.3d 316 (5th Cir. 2005)................................................................................................ 15

Wiley v. Hughes Capital Corp.,
   746 F. Supp. 1264 (D.N.J. 1990) ......................................................................................... 18

<u>S</u>TATUTES & <u>R</u>ULES

Fed. R. Civ. P. 23 .............................................................................................................. <u>passim</u>

Fed. R. Civ. P. 23(c)(3) ....................................................................................................... 1,6

Under the Second Circuit's decisions in <u>Heerwagen</u> and <u>IPO</u>, in order for the Court to certify a worldwide class encompassing purchases during the class period of all Parmalat securities, plaintiffs must demonstrate "by affidavits, documents, or testimony" "that each Rule 23 requirement has been met."  (Pls.' Reply Br. at 6 (quoting <u>In re Initial Public Offering Sec. Litig.</u>, --- F.3d ---, No. 05-3349-CV, 2006 WL 3499937, at *14, *15 (2d Cir. Dec. 5, 2006)).)  As plaintiffs have acknowledged by letter to the Court, the "old" "some showing" standard argued for by plaintiffs in their moving papers is not applicable.  (Letter from James J. Sabella to Honorable Lewis A. Kaplan (Dec. 6, 2006).)

**I.      Plaintiffs Remain Unable to Demonstrate that They Meet
          Rule 23(b)(3)'s Superiority Requirement**

Under the applicable standard, certification of the proposed class would be inappropriate first because plaintiffs have not demonstrated that they meet Rule 23(b)(3)'s superiority requirement. That is the case because they have not produced evidence that a U.S. class action judgment or settlement would, as to absent class members outside the U.S., be given preclusive effect in any of the countries in which such foreign purchasers of Parmalat securities are located.

Although plaintiffs suggest that for a U.S. class action to be a superior method of adjudicating the claims of foreign purchasers, foreign class members may not need to be bound by a judgment (Pls.' Reply Br. at 83), it is the very purpose of the class action mechanism provided by Rule 23 to bind those in the purported class so that a judgment involving the class may be final, and proceedings before this Court not be merely advisory.  <u>See</u> Fed. R. Civ. P. 23(c)(3) 1966 amendment advisory committee's note ("The judgment in a class action maintained as such to the end will embrace the class . . . whether it is favorable or unfavorable to the class.").  The Rule expressly requires that notice be sent to class members informing them of

"the binding effect of a class judgment on class members under Rule 23(c)(3)."  To the extent that they will not be bound, the class mechanism simply cannot be "superior" and the Court could not authorize the notice required by the Rule.[1]

The best plaintiffs can do is to urge that there is "uncertainty as to whether and to what extent a U.S. class action judgment will be influential or preclusive in . . . foreign jurisdictions," an argument that is undisguisedly far short of the necessary showing that foreign class members would be bound by a class action judgment of this Court.  (Pls.' Reply Br. at 82.)  Plaintiffs can go no further because their foreign law experts are unable to opine that courts outside the U.S. would give preclusive effect to a U.S. class action judgment against non-U.S. class members. They can do no better because an absent class member from outside the U.S. would not have submitted to this Court's jurisdiction as required for a U.S. judgment to be binding.  Plaintiffs imply that because U.S. court judgments generally are respected in Europe, a class action judgment here as to foreign purchasers could be respected (Pls.' Reply Br. at 82); but the U.S. judgments that are respected are those where the parties to the judgment were each subject to the U.S. court's jurisdiction and thus were bound by its decision.[2]

---

[1] While plaintiffs have submitted an elaborate plan for providing worldwide notice to purported foreign class members, the model notices submitted by plaintiffs' expert are defective on their face because they purport to inform class members outside of the U.S. of the binding nature of the Court's judgment (or any settlement), when it would not be binding.  (Decl. of Todd B. Hilsee, Exs. 3, 8.)

[2] Plaintiffs claim that there is "ample support" for the argument that a U.S. class action judgment will be enforced in all European Union ("EU") countries if it is enforced in one.  (Pls.' Reply Br. at 82.)  Putting aside that plaintiffs have not demonstrated that a U.S. class action judgment would be enforced in a single one of those countries, plaintiffs are plainly wrong.  They cite two (of the six) European experts whose opinions they have submitted as their "ample support."  Yet one, their Italian law expert, acknowledges that enforcement in Italy of a judgment from an EU country must not violate fundamental principles of Italian law.  (Decl. of Dario Trevisan ¶ 20.) And the other, their Dutch law expert, states no more than that a judgment from an EU country would be binding in all other European countries "if, under concepts prevailing in those countries," this Court could bind absent class members.  (Decl. of Hans Smit ¶ 36 (emphasis added).)  Of course, it is precisely because Rule 23's opt-out mechanism as applied to absent foreign class members violates fundamental principles of foreign law that a U.S. class action judgment would not itself be enforced in any of the European countries where Parmalat investors are (…continued)

2

Plaintiffs' Italian law expert opines only that a U.S. class action judgment or settlement "<u>could be</u> enforceable in Italy," not that it would be enforceable or even would probably be enforced. (Decl. of Dario Trevisan ¶ 32 (emphasis added).) Plaintiffs' Luxembourg law expert says that a U.S. class action judgment "will under certain circumstances pass the test," but keys his analysis to an assumption that "the US Court will have applied the law which is applicable following Luxembourg rules governing conflicts of law." (Decl. of Andrea Sabbatini ¶¶ 6-7 (emphasis added).) Plaintiffs' German law expert admits that on the only occasion in which a German court has spoken on this issue, the court expressed the view that German courts would <u>not</u> recognize a U.S. class action judgment, and their expert thus is able only to opine that "there are good arguments to support recognition," not that a judgment would be recognized. (Decl. of Kristian J. Heiser at 2, 10.)[3] Plaintiffs' Brazilian law expert concludes "that all class members who willingly opt to be a member of the class would be bound" by a decision of this Court, thus confining his opinion to those who opt in and saying nothing about those who fail to opt out. (Decl. of Fabiano Deffenti ¶¶ 20, 30 (emphasis added).)[4] Plaintiffs' Dutch law expert cites as primary authority an article he himself wrote in 1966 (which makes no mention of class actions or the enforceability of judgments in that context), and ultimately opines that "it is for this Court

(continued…)

located. Thus, even if an EU country were to enforce a U.S. class action judgment – a result entirely at odds with the evidence – it would in no way change the analysis for recognition in any other EU country.

[3] Mr. Heiser further concedes that notice to known class members must comply with the Hague Convention (Decl. of Kristian J. Heiser at 17.) While Mr. Heiser opines that publication notice would suffice for unknown class members, he disregards the fact, established by Professor Stürner, that in Germany, notice by publication is a public act of state and would require cooperation by the German courts. (Decl. of Rolf Stürner ¶ 8.)

[4] Thus, Mr. Deffenti's opinion is that Brazilian courts would only enforce a U.S. class action judgment as to absent Brazilian class members under an opt-in mechanism that the Second Circuit has expressly rejected as impermissible under Rule 23. See Kern v. Siemens Corp., 393 F.3d 120 (2d Cir. 2004), cert. denied, 544 U.S. 1034, 125 S. Ct. 2272 (2005).

to determine the likelihood that [his] conclusion[– that this Court's judgment would be – or 'should be' recognized –] would be shared by the Dutch courts."  (Decl. of Hans Smit ¶¶ 16, 41(d) (emphasis added).)  Plaintiffs' British law expert concludes that "a good case can be made for the recognition and enforcement" of a U.S. class action judgment in England, not that it is probable of enforcement or that any such judgment has ever been enforced as to absent non-U.S. class members.   (Decl. of Jonathan Harris ¶ 8.)  While plaintiffs' French law expert opines that a Rule 23 class action judgment would not, in his opinion, be incompatible with fundamental values and principles of French law, he not only acknowledges that France has no class action procedure, but admits that the opt-out mechanism that was included in a recent draft legislative proposal on collective actions in France was removed from the final draft and replaced with an opt-in mechanism.  (Decl. of Alexis Mourre ¶¶ 46, 54.)

By contrast, each of defendants' foreign law experts has unequivocally concluded that a U.S. class action judgment or settlement as to foreign purchasers would not be given preclusive effect in their various home countries.  Given both sets of declarations, plaintiffs have not demonstrated by a preponderance – as required by Heerwagen and IPO – that this Court's judgment would bind foreign class members unless they elected to voluntarily submit to this Court's jurisdiction.

Notwithstanding IPO, plaintiffs argue that to demonstrate the superiority of a U.S. class action all they need to show is uncertainty as to whether a U.S. class action judgment will be preclusive or "influential."  They urge that IPO notwithstanding, defendants – not plaintiffs – bear the burden of demonstrating by a "near certainty" that a class-wide judgment would not be recognized by foreign courts.  They refer to Judge Cote's decision in Cromer Finance Ltd. v. Berger, 205 F.R.D. 113 (S.D.N.Y. 2001), as precedent because there plaintiffs were not required

4

to demonstrate that a decision would in fact be binding on absent foreign class members.  (Pls.'

Reply Br. at 83.)  Those arguments are, of course, directly at odds with IPO, Heerwagen v. Clear

Channel Communications, 435 F.3d 219 (2d Cir. 2006), and the 2003 amendments to Rule 23

that require plaintiffs – not defendants – to demonstrate that each of Rule 23's requirements are

met, not that they might be met.

As set out in our responsive brief, all of the cases that plaintiffs cite for their "near

certainty" argument, including Cromer, pre-date IPO, Heerwagen, and the 2003 amendments to

Rule 23 (see Pls.' Reply Br. at 83-85 and cases cited therein), which have squarely placed the

burden of making the requisite showing on plaintiffs.  Such decisions reflect application of the

"some showing" standard, not the standard now applicable.

On top of that, the pre-Heerwagen, IPO "near certainty" concept on which plaintiffs rely

itself resulted from an incorrect reading of the Second Circuit's decision in Bersch v. Drexel

Firestone, Inc., 519 F.2d 974 (2d Cir. 1975).[5]  In Bersch, the defendant's expert affidavits

opining that a U.S. class action judgment would not be given preclusive effect abroad were

---

[5] Plaintiffs argue that defendants' reliance on Bersch is misplaced because there the Second Circuit excluded foreign purchasers from the class on subject matter jurisdiction grounds, rather than superiority grounds. (Pls.' Reply Br. at 86.)  Not only does Bersch unquestionably support defendants' argument that this Court should refuse to certify a class that includes foreign purchasers, but the Second Circuit very recently expressed its "significant doubts" that a U.S. class action that includes foreign members is "'superior to other available methods for the fair and efficient adjudication of the controversy,' as Rule 23(b)(3) would require it to be" where foreign courts would "not [be] bound by judgments of American courts." Kern, 393 F.3d at 129 n.8.  Plaintiffs ignore Kern. Plaintiffs also mischaracterize two cases cited by defendants when they argue that the fact that a U.S. class action judgment would not be enforceable overseas does not, by itself, violate Rule 23 (b)(3)'s superiority requirement. (Pls.' Reply Br. at 86-87.)  Contrary to plaintiffs' argument, both of those cases did conclude that the lack of preclusive effect a U.S. class action judgment would have abroad ran afoul of Rule 23(b)(3)'s superiority requirement.  However, in each case, the court did not deny class certification only because of lack of superiority under Rule 23(b)(3).  Instead, the court based its denial on that deficiency coupled with additional deficiencies under Rule 23(a) (that is, lack of numerosity and/or typicality).  See CL-Alexanders Laing & Cruickshank v. Goldfeld, 127 F.R.D. 454, 455, 460 (S.D.N.Y. 1989) (lack of numerosity and typicality); Ansari v. New York University, 179 F.R.D. 112, 116, 117 (S.D.N.Y. 1998) (numerosity).  After IPO, there is no room to argue that a class can be certified if plaintiffs fail to meet Rule 23(b)(3)'s superiority requirement.  They must demonstrate that each requirement is met.

uncontradicted and thus the Second Circuit observed that that result was a "near certainty." Bersch, 519 F.2d at 996. That did not mean that the Second Circuit in Bersch was requiring defendants in all cases to demonstrate "near certainty" in order to show that a class should not be certified.[6] And that is certainly not the requirement after Heerwagen and IPO.

Contrary to plaintiffs' argument, "the possibilities that the defendants will be found liable or that the case will settle" (Pls.' Reply Br. at 85) in no way change the superiority analysis. Not being bound by the judgment as contemplated by Rule 23, foreign class members dissatisfied with a judgment or settlement could simply bring suit outside the U.S. without regard to either a judgment or settlement.[7] That is contrary to the very idea of a Rule 23 class action, which is to bind the class through the opt-out mechanism. See Fed. R. Civ. P. 23(c)(3) 1966 amendment advisory committee's note.[8]

Plaintiffs urge that this Court should consider the benefits of bringing as many claimants as possible into the class so that they need not bring individual actions. They suggest that if that is not done purchasers outside the U.S. may not have a suitable remedy for the Parmalat fraud.

---

[6] In IPO, the Second Circuit cautioned against precisely such a misinterpretation. The court there explained that "the fact that an expert's report was rejected as admissible evidence in [one case] because it was fatally flawed was not a sufficient basis for saying in [a later case] that a report suffices to establish a Rule 23 requirement as long as it is not fatally flawed." IPO, 2006 WL 3499937, at *10 (emphases in original).

[7] Nor does plaintiffs' footnote argument that many foreign investors would not be able to obtain jurisdiction over defendants not domiciled in their respective countries cure the superiority defect. (Pls.' Reply Br. at 85 n.58.) As an initial matter, plaintiffs offer no authority for this proposition. More importantly, no one can deny the risk that defendants face of being subjected to jurisdiction in any or all of the jurisdictions in which the foreign class members reside. Indeed, prior to this case, Deloitte US and DTT would not have expected they could be called to defend against a claim under the U.S. securities laws for the acts of a foreign member firm in a foreign country. Yet the same (or similar) novel theories of "group" liability might be attempted to establish jurisdiction abroad. Plaintiffs cannot dispute this risk.

[8] Plaintiffs contend that this Court's (as well as others') appointment of foreign investors as lead plaintiffs "undercuts" defendants' argument that absent foreign purchasers – who have not submitted to the Court's jurisdiction – cannot be members of the class. But, of course, the fact that a representative party has submitted to the Court's jurisdiction does not mean that that plaintiff can represent absent foreign purchasers who have not.

(Pls.' Reply Br. at 85 n.58.)  Plaintiffs would thereby have the Court disregard the fact that in Europe, the center of the Parmalat fraud, the Italian court procedure has allowed for tens of thousands of securities purchasers to join in claims for damages in which they – as with class plaintiffs here – are represented by experienced lead counsel.  The number of plaintiffs in the proceedings in Italy dwarfs the at most "hundreds" of Parmalat securities purchasers plaintiffs themselves suggest are the total present in the U.S.  (Declaration of Scott D. Hakala (hereinafter "Hakala Decl.") ¶ 13.)  Recently, courts in Milan and Parma have both affirmed that bondholders have such claims.  See Ordinanza Questioni Relative Alle Parti Civili, RG. Trib. n. 12473/04 + 9538/05, Tribunale di Milano (Il Presidente Ponti); Ordinanza Sulle Questioni Relative Al Responsabile Civile, Proc. Pen. n. 2395/05 r.n.r. / Proc. pen. n. 2198/05 r.g.g.i.p., Tribunale di Parma (Il Giudice, dr. Domenico Truppa).

Not only is there no reason for this Court to exceed its jurisdiction in the hope of providing a remedy for such foreign purchasers, there is also the risk that a non-binding notice of a U.S. class action could discourage investors with rights in Europe from pursuing those rights.

**II.    Plaintiffs Remain Unable to Demonstrate that They Meet Rule 23(b)(3)'s Predominance Requirement**

Plaintiffs also cannot demonstrate that their proposed worldwide class would meet the predominance requirement of Rule 23(b)(3).  While plaintiffs spend much time seeking to demonstrate that trading in Parmalat equity securities on the Milan Stock Exchange was efficient – a point defendants have not challenged – plaintiffs fail in their effort to demonstrate market efficiency for the 75 different Parmalat debt securities (bonds and private placements) they have identified and they fail to show that an efficient market existed for any Parmalat security in the U.S., including common stock.

A.    Plaintiffs Fail to Demonstrate That There Is an Efficient Market for Trading Parmalat Bonds

Defendants, through the expert report of Professor Paul A. Gompers, have demonstrated that (1) Parmalat bonds traded exclusively outside the United States in inefficient markets; (2) there was no cause-and-effect relationship between unexpected events and an immediate response in the price for such bonds sufficient to demonstrate market efficiency; (3) the market for Parmalat bonds lacked the transparency that is critical to market efficiency; (4) volume and trading activity for Parmalat bonds were low, so that liquidity was poor; (5) high bid-ask spreads for Parmalat bonds raised trading costs and impeded efficiency; and (6) market makers that promote market efficiency did not exist for Parmalat debt.  (Declaration of Paul A. Gompers dated October 9, 2006 (hereinafter, "Gompers Decl.").)

Plaintiffs' market expert, Dr. Hakala, and plaintiffs' counsel have tried to rebut that detailed showing by referring to total trading volume of Parmalat securities, the number of market analysts and market makers for Parmalat securities and the fact that there was considerable information publicly available as to Parmalat.  They suggest further that it is "dishonest" for defendants to look at individual bonds to determine whether there is any evidence they traded efficiently.  (Pls.' Reply Br. at 61-67.)  All that is a rather obvious effort to use volume of total trading and the presence of general information as to the business as a substitute for the required market efficiency analysis.  The bottom line is that, however extensive and efficient trading in Parmalat stock in Milan may have been, that did not render efficient the trading in each of the 75 publicly traded bonds and private placements identified by plaintiffs. As set out in Professor Gompers' first report, bond investors tend to trade rarely, but transact in high amounts when they do trade.  (Gompers Decl. ¶¶ 22-23, 26.)  Thus, a significant total dollar

8

value of securities traded – even if it could be demonstrated – is not the same thing as a market with the frequency of trading or liquidity necessary to support efficiency.  (Id. ¶ 26.)  As demonstrated in our opposition brief, there were literally hundreds of days during the class period when the bonds did not trade at all; and also countless examples of trading that was erratic. This indicates that often, Parmalat bond investors were not "executing trades on the basis of newly available or disseminated corporate information," which is what the volume factor of the market efficiency analysis is intended to measure.  Cammer v. Bloom, 711 F. Supp. 1264, 1286 (D.N.J. 1989).

To the extent that plaintiffs rely on Dr. Hakala's analyses – in which he does not consider the majority of the bonds plaintiffs originally alleged were traded during the class period – they fail to establish efficiency for any bond.[9]  Although Dr. Hakala's points have been given impressive rhetorical dress – including charts and graphs – his analyses are very obviously skewed to get a result and, for the most part, are supported by no data.  Simply put, they ultimately tell the Court nothing about "the essence of an efficient market and the foundation for the fraud on the market theory" – whether or not new information caused price changes in bonds that fully incorporated that new information into bond prices.  Cammer, 711 F. Supp. at 1287.

Among other failings, (1) Dr. Hakala's analyses are skewed by obvious selection bias in the bonds studied; (2) he averages data to minimize the indicators of efficiency or inefficiency;

---

[9] In their opening brief, Plaintiffs purported to introduce "evidence" – unsupported by any analysis, expert or otherwise – showing efficient trading in only eighteen of forty-two publicly traded Parmalat bonds.  They now, in reply, have submitted an expert report, but their expert has excluded three of those eighteen bonds – those with some of the lowest trading volumes – from his analysis.  (Pls.' Reply Br. at 62; Hakala Decl. ¶ 30; Gompers Rebuttal Decl. ¶ 35.)  In fact, Dr. Hakala appears to concede that only "certain registered debt and preferred securities of Parmalat traded in an efficient market."  (Hakala Decl. ¶ 17 (emphasis added).)  This Court lacks any basis for judging the market for the twenty-seven un-analyzed publicly traded bonds efficient, and thus cannot allow the fraud-on-the-market presumption for these bonds.

(3) he substitutes artificial figures for actual data and (4) his claims are often applicable only to the Eurobond market as a whole, not to trading in Parmalat bonds specifically, which is the issue.

Instead of individually analyzing all of the forty-two bonds the plaintiffs had originally alleged were traded efficiently during the class period, Dr. Hakala confines the bulk of his analysis to only two bonds, and what he styles a "Composite Parmalat Bond" that purportedly represents an average of the price changes for fifteen different bonds.  (Hakala Decl. ¶ 30.)  His analysis says nothing about the remaining bonds, and there is nothing to support a notion that the bonds he looks at are representative of the bonds generally.

The two bonds he chooses are by no means typical, being among the most frequently traded.  (Rebuttal Declaration of Paul A. Gompers dated December 28, 2006 (hereinafter, "Gompers Rebuttal Decl.") ¶ 34.)  The averaging technique Dr. Hakala employs for the composite bond has the effect of artificially cancelling out (masking) inefficiencies, thus skewing his results.  (Gompers Rebuttal Decl. ¶ 40.)  Dr. Hakala's studies rely on prices from only one bank, "with the Bloomberg bid-ask data to fill in missing prices," thus, inexplicably taking no account of actual price data available as a result of plaintiffs' discovery from at least ten other banks, and the International Capital Markets Association ("ICMA").  (Hakala Decl. ¶ 29.)  In Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc., Judge Scheindlin wisely rejected an event study such as Dr. Hakala's precisely because it used Bloomberg data as a proxy for actual prices.  No. 05-1898, 2006 WL 2161887, at *11 (S.D.N.Y. 2006), Rule 23(f) petition granted, 06-3794 (2d Cir. Sep. 26, 2006).

Although they are presented as definitive evidence of market efficiency, because of the way they were performed, Dr. Hakala's event studies cannot be a source for any useful conclusions concerning market efficiency.  Dr. Hakala analyzes 290 days "when potentially

10

material information specific to Parmalat came into the market." (Hakala Decl. ¶ 19.) Dr. Hakala finds what he contends are statistically significant changes in both individual bonds and the composite bond on twenty-three of the 290 days analyzed. (Hakala Decl. Exs. C-1, D-1, H; Gompers Rebuttal Decl. ¶ 20.) However, he has done nothing to show either that the twenty-three days are the days that would produce the types of statistically significant changes one would expect to find if the market were efficient, or that the movements are even generally consistent with expected market reaction. (Id. ¶¶ 20-23.) Consequently, the price changes he finds could be no more than the normal fluctuations that take place in an inefficient market due to misperceptions of value or random swings in prices. (Id. ¶ 20.) Indeed, on several days when positive news about Parmalat entered the market and Dr. Hakala finds the change in equity prices to be statistically significant, bond prices did not rise. They declined. (Id. ¶ 30, Ex. 3.) Essentially, Dr. Hakala's bond event "studies" amount to collecting 290 days in which the word "Parmalat" was mentioned in a news report, and concluding that bond prices changed significantly on twenty-three of those days—an outcome that could be purely random and thus reflects nothing of relevance.

Plaintiffs assert that Dr. Hakala has shown that Parmalat bonds "all moved in tandem over time and in reaction to the news events leading up to the end of the Class Period." (Pls.' Reply Br. at 61.) However, on 83.5% of the days Dr. Hakala identifies as "material event" days, bonds moved in opposite directions. (Gompers Rebuttal Decl. ¶ 28.) Supplementing his previous bond pairs analysis, Professor Gompers has analyzed three additional pairs of bonds whose characteristics were so similar to each others' that in an efficient market, they would be expected to trade in tandem. (Id. ¶ 38, Ex. 2.) He finds that the prices of the bonds in each pair diverged substantially and over extended periods of time. (Id.) Given this divergence, one

11

cannot conclude that the "new" market information Dr. Hakala points to was fully incorporated in the market price.

Dr. Hakala does not challenge the evidence presented by Professor Gompers concerning the lack of transparency in the Eurobond market, due to the absence of 1) a central source for public, binding quotes and 2) public information as to post-trade prices.[10]  Instead, he refers to a study that suggests that in 2003 the Eurobond market actually had greater pre-trade transparency than the U.S. and London bond markets.  (Hakala Decl. ¶ 38.)  The issue, however, is not how the Eurobond market's features compared to other markets – whether during the final year of the class period or throughout – but whether the characteristics that fuel market efficiency were present in the market.

Dr. Hakala separately argues that the lack of transparency is of no concern, because investors could simply rely on bid and ask quotes from Bloomberg, which he insists tracked actual trading prices effectively.  (Hakala Decl. ¶¶ 39, 46.)  However, he only arrives at this conclusion by looking at <u>average</u> prices from a single bank, not the actual spreads.  (<u>Id.</u>, Exs. C-2, D-2.)  Examining the range of actual prices from multiple banks shows that 85% of bank trading prices were outside the range of Bloomberg quotes used by Dr. Hakala, and 38% of such prices were outside the range by more than 2%.  (Gompers Rebuttal Decl. ¶¶ 24-26, Ex. 1.)[11]  By averaging actual bank prices, Dr. Hakala masks those differences.

---

[10] This lack of centralized, binding quotes meant that bonds were traded "through an informal net of contacts among institutional investors and brokers who would exchange bids and negotiate prices privately," so that there was "no fixed or consistent price for the [bonds] at any given time," which "resulted in great variation in the [bonds'] sale prices from day to day."  In re Livent, Inc. Noteholders Sec. Litig., 211 F.R.D. 219, 222 (S.D.N.Y. 2002) (rejecting fraud-on-the-market presumption).

[11] Dr. Hakala attempts to undercut Professor Gompers' use of the bank data subpoenaed by plaintiffs by suggesting that the price figures in this data are distorted due to the inclusion of fees or commissions.  (Hakala Decl. (…continued)

In response to Professor Gompers' showing that the very low levels of trading activity for Parmalat bonds demonstrated a lack of market liquidity – which would significantly limit efficiency by delaying investor response when new information was available (Gompers Decl. ¶¶ 19, 22, 26-28.) – Dr. Hakala asserts that Professor Gompers has failed to take due account of significant retail trading. At the same time, he makes no attempt to actually quantify that trading or show its purported effect. (Hakala Decl. ¶ 44; Pls.' Reply Br. at 63.) He just asserts it was significant and counts on the Court to assume that shows efficiency.

In fact, because retail purchasers cannot readily negotiate bond prices, it is institutional, and not retail, trading that creates the kind of liquidity that promotes efficiency by conveying new information into securities prices. (Pls.' Reply Br. at 68.) Thus, even if there were significant retail bond trading, that would not indicate efficiency. (Gompers Rebuttal Decl. ¶ 32 & n.8.)

Dr. Hakala offers no data comparing how institutional participation in Parmalat securities trading compared to that for other securities, but plaintiffs still assert that as to Parmalat debt there was much "institutional interest." (Pls.' Reply Br. at 68.) What the "interested" institutions were doing is not spelled out, leaving the Court to speculate as to what the institutions did.[12]

---

(continued…)

¶¶ 29, 34, 46, 56.) However, again, Dr. Hakala offers no evidence to support this contention. In fact, a close examination of the bank data suggests that several banks, including Banca IMA, BMPS, Bear Stearns, and Merrill Lynch, are excluding fees from the reported price. (Gompers Rebuttal Decl. ¶ 25.) Moreover, prices varied significantly from Bloomberg quotes even if one assumes that fees are included in bank prices. Thirty-eight percent of bank prices were outside the range of Bloomberg bids and asks by more than 2%, a margin that easily allows for fees. (Id. ¶ 26, Ex. 1.)

[12] Perhaps plaintiffs mean to suggest that institutional trading in Parmalat bonds was high in proportion to other forms of trading. If so, their assertion is undercut by their claim elsewhere that retail investors, essentially the only other type of investor, actively participated in the market for Parmalat bonds. (Pls.' Reply Br. at 63.)

13

Elsewhere, Dr. Hakala claims that "greater dealer competition," fueled by the introduction of the Euro currency, increased trading volumes and turnover in Parmalat securities. (Hakala Decl. ¶¶ 17(e), 34(a), 37.)  However, he makes no attempt to quantify this impact for bonds, and ultimately cannot deny that most Parmalat bonds went for significant stretches with no trading at all.

As Professor Gompers explains, wide bid-ask spreads tend to make investors "spend" more to trade, in that they are more often forced to accept a lower bid or a higher ask, and these higher trading costs tend to delay the incorporation of news into securities prices.  (Gompers Decl. ¶ 16 & n.3, ¶ 35; Gompers Rebuttal Decl. ¶ 39 & n.4.)  Professor Gompers – looking at all available market data from the ICMA – has shown that the average 100-basis point spreads for Parmalat bonds were more than twice as high as the average quoted spread for Eurobonds in 2003.  (Id.)  As a counter, plaintiffs proffer data from Bloomberg suggesting that such data is preferable, and that it shows narrower spreads.  (Pls.' Reply Br. at 63; Hakala Decl. ¶¶ 34(b)(v), 39, 46.)  What plaintiffs do not mention is that Bloomberg's bid and ask quotes always exclude the top and bottom ten percent of quotes, and therefore potentially diminish the reported spread.

In opposing class certification, defendants and Professor Gompers have noted that the types of market makers that would best promote efficiency, those that would offer publicly available binding quotes, were not participants in Parmalat bond trading.  (D&T Br. Opp. at 29, Gompers Decl. ¶¶ 18-19, 21.)  Plaintiffs complain that defendants' definition of market makers is too narrow, but noticeably they introduce no credible evidence that any "market makers" (under any definition) supported trading in Parmalat bonds as opposed to equity.  They rely on an obviously non-specific list of "Parmalat Underwriters and Market Makers" for which no source is given.  (Pls.' Reply Br. at 66.)  This Court has no basis for accepting the list, nor any way of

14

determining which entities were underwriters and which were market makers, or what exactly it meant for each entity to be a "market maker" with respect to particular Parmalat securities.[13] There is nothing to suggest the listed entities made markets in <u>any</u> of the bonds.  If they made markets in equity, that would say nothing as to bond trading.[14]

Dr. Hakala's remaining arguments are generalizations concerning the overall characteristics of the Eurobond market – not trading in individual Parmalat bonds.  Of course, the fact that there is an overall "market" says nothing about the efficiency of trading for particular securities, especially securities that had no trades at all on many days.  As the court said in <u>Cammer</u>, "[i]t would be illogical to apply a presumption of reliance merely because a security is traded within a certain 'whole market,' without considering the trading characteristics of the individual [bond] itself."  711 F. Supp. at 1281; <u>see also</u> <u>Bell v. Ascendant Solutions, Inc.</u>, 422 F.3d 307, 313 (5th Cir. 2005).

    B.    <u>Plaintiffs Fail to Demonstrate That There Was an Efficient Market as to Privately Placed Parmalat Securities</u>

As to private placements of debt securities, plaintiffs advance only the most limited of arguments.  Plaintiffs' own expert is willing to say only that such securities "would ordinarily be

---

[13] In <u>Unger v. Amedisys, Inc.</u>, 401 F.3d 316 (5th Cir. 2005), plaintiffs supplemented an Internet printout of twenty-two alleged market makers with two witness affidavits, but the Fifth Circuit still reversed the market efficiency finding and class certification grant, noting that "[a]t the class certification stage, reliance on unverifiable evidence is hardly better than relying on bare allegations."  (<u>Id.</u> at 324.)

[14] Throughout his declaration, Dr. Hakala asserts that a number of factors that hindered efficiency for Parmalat bonds – the lack of market makers offering public, binding quotes; the absence of post-trade transparency – are mitigated by the development of the credit default swaps market.  (Hakala Decl. ¶¶ 8(b), 17, 34, 42.)  However, Dr. Hakala acknowledges that this hedging tool only "became quoted actively beginning in May 2003," near the end of the class period.  (<u>Id.</u> ¶ 8(b).)  Moreover, an actual empirical analysis of the Parmalat bond market before and after the introduction of credit default swaps shows that bonds moved in opposite directions and were priced well outside the range of Bloomberg bids and asks <u>more</u> frequently after these instruments came into use.  (Gompers Decl. ¶ 42, Ex. 4.)

priced efficiently," not that there is actual data showing they were in this case.  (Hakala Decl. ¶¶ 8(b), 17.)  He cites no specific data concerning Parmalat private placement "trading" to support his very general statement, such data being unavailable.  There being no such data, such privately placed securities could not possibly have traded efficiently.  (D&T Br. Opp. at 32-33.)

C.       Plaintiffs Fail to Demonstrate That There Was an Efficient Market in Parmalat Equity in the U.S.

With respect to whether there was an efficient equity market in the U.S., little need be added to the concessions in plaintiffs' brief.  Plaintiffs admit that there were no ADRs traded in the U.S.  Dr. Hakala effectively concedes that there could be no efficiency in the U.S. gray market when the Milan market was closed because the information needed for efficient trading did not exist.  (Hakala Decl. ¶ 61.)  According to Dr. Hakala, no U.S. purchasers would seriously rely on NASD data, the only possible data publicly available as to Parmalat equity prices when the Milan stock exchange was closed.  To the extent Dr. Hakala urges that trades in the gray market were really on the Milan exchange, he is obviously speculating and his speculation is inconsistent with the time stamps for those trades (at times when the Milan exchange was closed) and with the fact that those trades were at different prices from those in Milan.

Thus effectively conceding that the gray market purchasers acquired their shares in a separate inefficient market, Dr. Hakala is left with what he suggests are at most, "hundreds" of purchases made by persons in the U.S., executed on the Milan Exchange by foreign brokers while the Milan market was open.  Those – at most – "hundreds" of U.S. purchasers are to be compared to the tens of thousands of purchasers outside the U.S. (Hakala Decl. ¶ 13.)  There is nothing to suggest that those very few purchasers on a foreign exchange should be constituted as

16

a separate class of equity purchasers in the U.S., let alone that the Court should rely on such foreign purchases as a basis for declaring a U.S. class action for the world.

D.      Reliance Cannot Be Presumed Under the Fraud-Created-the-Market Doctrine

Unable to demonstrate market efficiency, plaintiffs assert that the so-called "fraud-created-the-market" theory of indirect reliance should apply here, arguing that "if Parmalat's true financial condition had been known, it would have been impossible for it to issue securities at any price" (Pls.' Reply Br. at 72).  In advancing the argument, plaintiffs ignore the fact that even those courts accepting the doctrine hold that it "cannot apply to real businesses." Gruber v. Price Waterhouse, 776 F. Supp. 1044, 1053 (E.D. Pa. 1991) (defendant's securities did not fall within the fraud created the market doctrine because the defendant was an operating airline with planes, hangers, and runway space which carried passengers).  Here, by plaintiffs' own admission, Parmalat was a 40-year-old company with over 3,100 employees and $5 billion in annual sales. While a significant fraud was perpetrated, plaintiffs cannot demonstrate that Parmalat was a complete sham and worthless from the beginning.[15]

Nor can the fraud-created-the-market doctrine apply to new issuances of Parmalat's debt securities, as plaintiffs suggest.  As Judge Chin has noted, even "[w]here permitted, the doctrine is used by plaintiffs unable to allege a fraud on the market theory of reliance due to the novelty

---

[15] Nor is it significant that Parmalat allegedly had negative equity.  (Pls.' Reply Br. at 73.)  Even after bankruptcy, investors receive some return on their original investment, however minimal.  In such a situation, the investment is not patently worthless.  Abell v. Potomac Insurance Co., 858 F.2d 1104, 1122 (5th Cir. 1988); see also Joseph v. Wiles, 223 F.3d 1155, 1164 (10th Cir. 2000) (even though the company had a negative net worth of $88 million and filed for bankruptcy, and the plaintiff suffered a "substantial loss" when he sold his debentures, he did receive some value for them); Ockerman v. May Zima & Co., 27 F.3d 1151, 1160 (6th Cir. 1994) (rejecting argument that security was economically worthless where, after filing for bankruptcy, assets were sold for a significant loss and investors received a small portion of their investment); In re Bexar County Health Facility Dev. Corp. Sec. Litig., 130 F.R.D. 602, 611 (E.D. Pa. 1990) (holding that despite the fact that the project underlying the bonds went bankruptcy, it still had some value and would return at least a minimal amount to investors).

17

of the security or the undeveloped nature of the market on which the securities are traded."

Arduini/Messina P'ship v. National Med. Fin. Servs. Corp., 74 F. Supp. 2d 352, 363 (S.D.N.Y.

1999).  "It is almost universally recognized" that the doctrine only "applies in the context of

newly-issued securities for which there is no established market."  Wiley v. Hughes Capital

Corp., 746 F. Supp. 1264, 1291 (D.N.J. 1990) (cited by plaintiffs).[16]

### III.    Plaintiffs Cannot Demonstrate That the Representative Plaintiffs Are Either Adequate or Typical

With respect to the alleged adequacy and typicality of the "representative" plaintiffs – to

which plaintiffs devote more than 50 pages in their reply brief (Pls.' Reply Br. at 11-53) –

plaintiffs simply cannot get away from the following facts that demonstrate that the

"representative" plaintiffs are neither adequate nor typical:  (1) unlike any other investor,

HFAME had access to the highest echelons of Parmalat management and had multiple

conversations with key Parmalat insiders, to which no one else was privy, about critical issues in

this litigation regarding Parmalat's financial condition; (2) unlike virtually every other investor

who looks to invest in financially healthy companies, CFAM and Cattolica seek investment

opportunities in companies in financially dire straits, the worse the situation the better the

investment opportunity; (3) despite the implausible testimony Class Plaintiffs rely upon

concerning the so-called "Enron fax," it is clear that when the Setti Plaintiffs began investing in

---

[16] Recognizing they do not meet the well-established standard for economic unmarketability, plaintiffs ask this court to adopt the so-called "factual unmarketability" standard.  (Pls.' Reply Br. at 72) (citing Wiley, 746 F. Supp. at 1293).  This standard is "more lenient," Gruber, 776 F. Supp. at 1053, and has had little recognition.  See, e.g., Ross v. Bank S., N.A., 885 F.2d 723, 736 (11th Cir. 1989) (Tjoflat, J., concurring) (noting that the majority only adopted the economic unmarketability standard).  Regardless, even Wiley does not support plaintiffs' position. In that case, unlike here, the defendant corporation had "no legitimate business purpose" and "contain[ed] no assets."  Wiley, 746 F. Supp. at 1294; see In re Hibbard Brown Secs. Litig., Civ. No. 93-1150 (AET), 1994 U.S. Dist. LEXIS 21500, at *25-*26 (D.N.J. Mar. 25, 1994) (noting that "in utilizing the factual unmarketability interpretation" Wiley held that "where a corporation has no legitimate business purpose and contains no assets, the fraud created-the-market theory is applicable").

18

Parmalat on December 11, 2003, it was only after news hit on December 8 that Parmalat was facing a liquidity crisis; (4) Mr. Sturaitis, on December 15, 2003, increased his holdings in Parmalat after the same public disclosure of problems at Parmalat, and admits that he does not "supervise" class counsel; and (5) Ms. Kronengold, who resides in Italy and was joined as a plaintiff at the last minute, professes a similar lack of interest in overseeing counsel in this case.

In short, lead plaintiffs are inadequate to serve as class representatives and their claims are atypical.

## CONCLUSION

For all of these reasons, Deloitte & Touche LLP, Deloitte Touche Tohmatsu, James E. Copeland and Grant Thornton International respectfully request that this Court deny Lead Plaintiffs' Renewed Motion for Class Certification.

Respectfully submitted,

Dated:  New York, New York
        December 28, 2006

DAVIS POLK & WARDWELL
By:  /s/ Daniel F. Kolb
     Daniel F. Kolb (DK 3793)
     Sharon Katz (SK 4911)
     Frances E. Bivens (FB 2676)
     Gina Caruso (GC 8611)
     Justin Goodyear (JG 8869)
     *Attorneys for Defendant Deloitte & Touche LLP*

KRAMER LEVIN NAFTALIS & FRANKEL
By:  /s/ Michael J. Dell
     Michael J. Dell (MD 7714)
     Jeffrey W. Davis (JD 7170)
     *Attorneys for Defendants Deloitte Touche Tohmatsu and James E. Copeland*

19

STROOCK, STROOCK &
LAVAN LLP

By:    /s/ James L. Bernard

James L. Bernard (JLB-4273)
*Attorneys for Defendants*
*Grant Thornton International*