UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION     :

                                     :

                                     :

                                     :     Master Docket

                                     :     04-MD-1653 (LAK) ECF Case

                                     :

This document relates to: 04 Civ. 0030 (LAK)     :

                                     :

- - -- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REBUTTAL DECLARATION OF PAUL A. GOMPERS IN SUPPORT OF JOINT
SURREPLY MEMORANDUM OF LAW OF DELOITTE & TOUCHE LLP, DELOITTE
TOUCHE TOHMATSU, JAMES E. COPELAND AND GRANT THORNTON
INTERNATIONAL IN FURTHER OPPOSITION TO LEAD PLAINTIFFS' RENEWED
MOTION FOR CLASS CERTIFICATION**

       I, Paul A. Gompers, under penalty of perjury under the laws of the United States, hereby

declare as follows:

## I.    SUMMARY OF OPINIONS

       1.      I have reviewed the report of Dr. Hakala and replicated several of his models.[1]  I

believe his conclusions are wrong in several important respects, specifically:

       2.      Dr. Hakala's view of an efficient worldwide market is not supported by his

analyses.

       3.      Dr. Hakala does not provide evidence of trading of any Parmalat security in the

U.S., let alone efficient markets in the U.S. for Parmalat securities.  In particular, Dr. Hakala's

---

[1] Because of the limited time available to address Dr. Hakala's report, and because I have been outside the United States since the day after Dr. Hakala's report was filed, I have been unable to replicate all of his analyses.  Thus, if I fail to address a particular point in this rebuttal, that should not be construed as a concession on my part.  Calculations in the report are based on the data I used in my original declaration, supplemented with Bear Stearns and Banca Intesa data provided by Dr. Hakala.

conclusion regarding trading in Parmalat common stock is tantamount to a concession that any trading of Parmalat equity in the U.S. when the Milan market was closed occurred in an inefficient market.

4.      Dr. Hakala does not provide any analysis to demonstrate market efficiency for Parmalat private placements.

5.      Dr. Hakala's analysis of market efficiency for Parmalat bonds is flawed and erroneously concludes that the market for Parmalat bonds was efficient.

6.      In particular, Dr. Hakala's event studies do not prove market efficiency.  He fails to establish that the days associated with statistically significant price changes are days with news that one would expect to cause changes in the prices of Parmalat securities in an efficient market.  Nor does the existence of a significant correlation between Parmalat securities and market or industry indices prove that Parmalat securities traded in efficient markets.

7.      Dr. Hakala's report is based on speculation, generalization, and assertion with little or no evidence specific to Parmalat to support his opinions.

## II.    DR. HAKALA'S VIEW OF AN EFFICIENT WORLDWIDE MARKET IS NOT SUPPORTED BY HIS OWN ANALYSES.

8.      Dr. Hakala argues that an efficient worldwide market is one in which securities trade around the world in several locations, and "movements of security prices in different geographical markets were correlated globally."  (Hakala Report ¶ 35.)  While it may be the case that Parmalat securities traded in more than one physical location, and that investors from various countries invested in Parmalat securities, this does not mean that Parmalat securities traded efficiently in all of those venues.  Dr. Hakala does not offer any definition from the literature to support his notion of an efficient worldwide market, nor does he offer any testable hypotheses with which to analyze the existence of an efficient worldwide market.

9.      As demonstrated in my original declaration, distinct geographic markets existed for Parmalat securities.  For example, the market for Parmalat equity while the Milan market was closed did not contribute to the price discovery process in the Milan market, with U.S. overnight prices systematically reverting back to the previous day's Milan closing price.  Dr. Hakala suggests that, in fact, these trades were being executed in Milan.  (Hakala Report ¶ 58.)

However, he cannot deny that the data produced by the NASD show these trades to have been executed at times when the Milan market was closed.

10.     Dr. Hakala apparently backs away from Plaintiffs' initial suggestion that a single "worldwide market" existed for Parmalat's equity, publicly traded bonds, and privately placed debt.[2]  He analyzes these types of securities separately, and specifically acknowledges that "[d]ebt and preferred securities (fixed income securities) trade differently from equity securities due to their lower volatility and greater security."  (Hakala Report ¶ 17.)  My own analysis, presented below and in my initial declaration, confirms that these different types of securities traded differently, and even shows that individual bonds traded separately and often moved in opposite directions from each other.

### III.     DR. HAKALA DOES NOT PROVIDE EVIDENCE OF EFFICIENT TRADING OF PARMALAT SECURITIES IN THE U.S.

11.     Dr. Hakala does not provide evidence of trading of any Parmalat security in the U.S., let alone efficient markets in the U.S. for Parmalat securities.

12.     Dr. Hakala offers no evidence that bond trades occurred in the U.S. or were made by U.S. investors.

13.     Dr. Hakala's efficiency analysis for Parmalat equity is based entirely on the European market.

14.     In paragraph 58 of his report, Dr. Hakala states that the "grey market" trades of Parmalat equity were really trades executed in Europe.

15.     According to Dr. Hakala, "No one would rely on the NASD prices."  (Hakala Report ¶ 61.)  This conclusion is tantamount to a concession that any trading of Parmalat equity in the U.S. when the Milan market was closed occurred in an inefficient market because it means that investors would not have access to prices other than, at most, "unreliable" NASD prices during such time.  Notably, more than half of the trading in Parmalat equity reported to the NASD occurred when the Milan market was closed.

---

[2] "There was a single worldwide market for Parmalat securities, which were priced based on trades reported from various exchanges throughout the world." (Lead Plaintiffs' Memorandum of Law in Support of Their Renewed Motion for Class Certification, September 21, 2006, p. 22.)

## IV.    DR. HAKALA DOES NOT PROVIDE ANY ANALYSIS TO DEMONSTRATE MARKET EFFICIENCY FOR PARMALAT PRIVATE PLACEMENTS

16.    Dr. Hakala does not dispute that there was no market for Parmalat private placements.  Given the absence of a market for Parmalat private placements, it is unclear on what basis Dr. Hakala claims that the market for Parmalat private placements was efficient.

17.    Dr. Hakala claims that Parmalat private placements were priced based on a benchmark bond and the credit default swap ("CDS") market.  (Hakala Report ¶ 17.)  He refers to the Steil study to support his statements about market efficiency of Parmalat private placements.[3]  However, Steil did not specifically study Parmalat securities, and Dr. Hakala does not provide any evidence to support his comparison.  Notably, the first evidence of trading of Parmalat CDSs from Bloomberg was on May 19, 2003, so that CDS trading could not have impacted Parmalat bond trading during the majority of the class period.  Further, as discussed below, there is no evidence to conclude that the presence of Parmalat CDSs improved the efficiency of the markets for Parmalat bonds.

18.    Most important, Dr. Hakala does not present affirmative evidence of trading in private placements, or the availability of potential trading prices for Parmalat private placements.  Therefore, he does not provide any evidence to demonstrate market efficiency for Parmalat private placements.

## III.    DR. HAKALA'S ANALYSIS OF MARKET EFFICIENCY FOR PARMALAT BONDS IS FLAWED AND ERRONEOUSLY CONCLUDES THAT THE MARKET FOR PARMALAT BONDS WAS EFFICIENT

### A. Dr. Hakala's Event Studies Are Fundamentally Flawed, and Ultimately Fail to Demonstrate That Unexpected News Caused Significant Price Movements

19.    Dr. Hakala uses event studies to demonstrate that his selected events had a statistically significant impact on the prices of Parmalat securities, including bonds.  Using this methodology, he concludes in paragraph 25 that, "…the events one might suspect as being important proved to be extremely significant."  However, Dr. Hakala's event studies only demonstrate that some of his selected days were correlated with significant price movements.  His analysis does not prove that these events were the cause of the price movements.  Indeed, the

---

[3] Steil, Benn, "Building a Transatlantic Securities Market," International Securities Market Association in Cooperation with the Council of Foreign Relations, 2002.

most he can say is that some of his results are consistent with market efficiency.  However, a careful review of his analysis shows that his results may actually demonstrate inefficiency.

20.    For Dr. Hakala's bond event studies (Exhibits C, D, and H), he analyzed 290 days on which, according to him, potentially material information specific to Parmalat was released. Twenty-three of these 290 events were associated with statistically significant returns across the two individual bonds studied and the composite bond.  For the twenty-three days on which he found statistical significance, Dr. Hakala failed to demonstrate that these are days with news that one would expect to cause changes in the prices of Parmalat securities in an efficient market. Consequently, whatever correlation he has established between these days and securities price changes does not demonstrate efficiency.  In an inefficient market, it would not be surprising to find some statistically significant returns from an event study caused by misperceptions of the company's value or other random fluctuations.

21.    Moreover, Dr. Hakala failed to analyze whether the significant returns he found make economic sense.  Some of the significant returns in Exhibit B-1 appear to be in the opposite direction from what one would expect given the information released to the market.  For example, according to Dr. Hakala, on August 10, 2000, Morgan Stanley raised its target price and earnings estimates for Parmalat.  However, on that day, Dr. Hakala calculates that Parmalat's stock price experienced a statistically significant decline.  Similarly, Dr. Hakala's Exhibit B-1 shows that on January 18, 2001 and March 22, 2001, Parmalat announced positive news regarding earnings.  On both days according to Dr. Hakala, Parmalat's stock experienced statistically significant declines.  On the other hand, Dr. Hakala shows that on May 15, 2003, Parmalat announced a decline in EBITDA, yet he concludes that the stock price experienced a statistically significant increase.  Dr. Hakala does not explain why this would make economic sense.

22.    As I described in my original declaration, Parmalat bonds did not trade at all on an average of 45% of potential trading days.  For many bonds, trading was similarly sparse on Dr. Hakala's 290 "material event" days, with no trading taking place for at least one of the

eighteen bonds plaintiffs have identified on all but two of these days.[4]  Significantly, Dr. Hakala does not explain why bonds did not appear to trade at these allegedly important times.

23.    Not only is Dr. Hakala unable to demonstrate a meaningful correlation between company-specific news and securities price changes, he is also wrong when he says in paragraph 20 that a significant relationship between Parmalat securities prices and market indexes, standing alone, provides strong evidence of market efficiency.  Consider the following example.  Suppose a company's stock price moved exactly in tandem with the S&P 500, regardless of the information revealed about the company.  One would find a statistically significant relationship between the stock and the S&P 500.  However, since the stock did not react to firm-specific news, it clearly was not trading in an efficient market.  Thus, the presence of a statistically significant correlation between a security's returns and a market index does not prove market efficiency.

### B. Dr. Hakala's Method of Averaging Prices Masks Inefficiencies, and Does Not Change the Fact That the Parmalat Bond Market Lacked Price Transparency and Liquidity

24.    Dr. Hakala's other, and primary, evidence of bond market efficiency appears to be that the average trading price of Parmalat bonds was comparable to Bloomberg bid-ask quotes, which he seems to suggest mitigates the lack of price transparency and liquidity in the market for Parmalat bonds.  (Hakala Report ¶¶ 17, 46).  This analysis is simply wrong.  No investor trades at the average price.  Purchasers generally buy at a price above the midpoint of the bid-ask spread, and sellers generally sell at a price below the midpoint of the bid-ask spread.  Therefore, average price is irrelevant for an analysis of market efficiency.  When one averages across trading prices, the deviations of the prices from the average cancel out by construction.  Thus, no matter how inefficiently a security trades, the inefficiency would be concealed in the average price.  A close examination of the data reveals that there were large variations in the actual trading prices of Parmalat bonds, even though the average trading price was close to the bid-ask midpoint.  For example, Exhibit 1 shows that throughout the Class Period, 85.1% of bank trading prices were outside of Bloomberg historical bid and ask quotes (25.8% of prices below Bloomberg bid, and 59.3% of prices above Bloomberg ask).

---

[4] According to bank data, including Dr. Hakala's Bear Stearns data as well as the data Dr. Hakala provides from Banca Intesa (XS0106583577 and XS0123321068).  Excludes Bond 8 from 12/8/03 to 12/18/03, because the bond matured on 12/8/03.

25.     Dr. Hakala suggests that fees and commissions caused the large dispersion of bank and ICMA prices relative to Bloomberg quotes. (Hakala Report ¶¶ 29, 34.) However, he does not present evidence to support his claim; he merely says this can happen with bank data. In fact, certain bank data demonstrate that at least some fees and commissions are not included in the reported price. For example, in the data from Banca IMA, BMPS, Bear Stearns, and Merrill Lynch, price multiplied by quantity is lower than the net amount traded, suggesting that at least some fees are not included in the price. Moreover, a close inspection of the bank data reveals many examples of prices far outside the Bloomberg bid-ask quotes. For example, on March 11, 2003, BMPS executed two trades of Bond 9 (XS0118659688) at a price of 89.00, 6% lower than the Bloomberg bid of 95.16. On December 14, 2000, BMPS executed a trade of Bond 5 (XS0095639620) at 82.50, 5% lower than the Bloomberg bid of 86.66. On October 25, 1999, Merrill Lynch executed a purchase of Bond 5 (XS0095639620) at a price of 94.82, 6% higher than the Bloomberg ask price of 89.23. And on April 22, 2003 Bear Stearns executed three matching sales/purchases of Bond 4 (XS008955365) at a price of 92.00, 8% lower than the Bloomberg bid price of 100.42. There was no new information on any of these days that could explain these discrepancies. Thus, the data clearly indicate that transaction costs cannot explain the wide variation in observed prices.

26.     Finally, contrary to Dr. Hakala's assertion, Exhibit 1 shows that many transaction prices are outside the bid-ask spread even including plausible transaction costs. Dr. Hakala claims that typical transaction costs can add up to 1% to 2%. (Hakala Report ¶ 29.) I analyzed how bank prices compared to bid and ask spreads assuming that, in instances where the bank was selling, the stated price was lower than the actual price because it did not include a commission of this magnitude, and in instances where the bank was buying, the stated price was higher than the actual price because it included such a commission. Even if this were the case, prices from the bank data that were more than 1% to 2% outside the range of Bloomberg historical bid and ask quotes would still indicate that transaction prices were not within the band of bid and ask quotes based on their actual prices. Notably, 55.7% of bank trading prices were more than 1% outside of Bloomberg historical bid and ask quotes, and 38.2% were more than 2% outside of Bloomberg historical bid and ask quotes. Furthermore, during November and December 2003, the percentage of trades with prices at least 2% higher than Bloomberg ask or 2% lower than Bloomberg bid increased to 48.8%.

27.    Dr. Hakala's conclusion that the average trading prices of Parmalat bonds were comparable to Bloomberg bid-ask quotes is based primarily on a comparison of Bloomberg quotes with data from Banca Intesa.  In paragraph 29, Dr. Hakala claims, "I tested the *Bloomberg* mid-price (average of the bid and ask) and found it to match the Banca Intesa and bank trade data over time and to be more reliable in that the *Bloomberg* mid-price avoided the errors-in-variables problems present in the trade data."  But use of the Banca Intesa data does not change the fact that the comparison of the average trading price with the Bloomberg mid-price is irrelevant for testing market efficiency.  In reality, Banca Intesa trading prices deviated considerably from Bloomberg quotes.  For example, on November 13, 2002, I found that the high and low prices in Banca Intesa data for Bond 7 (XS0106583577) were 100.04 and 94.36, respectively, a difference of 6%.  The low price from the Banca Intesa data was nearly 5% lower than the Bloomberg bid price (98.81).  I did not find any news released during the trading day that could explain the large differences between the Banca Intesa and Bloomberg prices.[5]  Similarly, on October 28, 2002, Bond 5 (XS0095639620) had high and low prices in Banca Intesa data of 92.31 and 87.98, respectively, a difference of nearly 5%.  The low price from the Banca Intesa data was nearly 4% lower than the Bloomberg bid price (91.26).  Again, I did not find any news released during the trading day that could explain the large differences between the Banca Intesa and Bloomberg prices.[6]  Dr. Hakala claims that a delay in the timing of trade reporting data may cause some of these discrepancies.  However, the bid and ask quotes from Bloomberg for these bonds did not change dramatically over the days surrounding these examples, making delayed reporting an unlikely cause.  These examples refute Dr. Hakala's assertion in paragraph 55 that "[t]he *Bloomberg* quote data is an excellent proxy for the true price of Parmalat bonds over time."

### C. Empirical Data Disproves Dr. Hakala's Generalization That Bond Prices Moved in Tandem During the Class Period

28.    Dr. Hakala claims that Parmalat bond prices moved in tandem during the class period.  (Hakala Report ¶ 30.)  Similarly, in paragraph 14, Dr. Hakala states that "[t]he relevant events affected the fixed income securities and Parmalat's common shares in the same manner and direction over time."  This is simply not correct.  Exhibit 9 in my original declaration

---

[5] Between November 11, 2002 and November 15, 2002, the Bloomberg historical bid quotes ranged from 98.81 to 100.46.  Over the same period, the Bloomberg historical ask quotes ranged from 99.31 to 100.95.

[6] Between October 24, 2002 and October 30, 2002, the Bloomberg historical bid quotes ranged from 90.52 to 91.26.  Over the same period, the Bloomberg historical ask quotes ranged from 90.89 to 91.60.

demonstrates that bonds often moved in the opposite direction from other bonds. Moreover, on 83.5% of the days that Dr. Hakala has identified as "material event" days, a bond moved in the opposite direction from that of at least one other bond. Similarly, on 80.3% of Dr. Hakala's "material event" days, at least one bond moved in the direction opposite to equity.[7] Finally, the bond pairs shown in Exhibit 2 of this declaration clearly demonstrate that similar bonds did not always move in tandem.

29.     Similarly, in paragraph 27 of his report, Dr. Hakala states: "Exhibit E demonstrates that the prices of the publicly traded Parmalat fixed income securities moved together in response to the corrective events in November and December 2003 consistent with an Informationally Efficient and Relatively Efficient market." This statement is unsupported by the data. On 85.2% of "material event" days identified by Dr. Hakala during November and December 2003, bonds moved in the opposite direction from at least one other bond.

30.     Finally, in paragraphs 9 and 25 of his report, Dr. Hakala claims that on several days (November 14, 2002, November 19, 2002, December 5, 2002, March 18, 2003, March 21, 2003, March 26, 2003, March 28, 2003), prices of Parmalat securities "reacted quickly" to new information. Yet Exhibit 3 shows that on each of these days, at least one bond moved in the opposite direction as at least one other bond or equity. Further, on each of those days at least one bond had zero or no return.

> D. Many of Dr. Hakala's Assertions Concerning Market Efficiency Are Either Generalizations Whose Applicability to Parmalat Bonds Has Not Been Demonstrated, or Are Unsupported by Any Evidence, or Both

31.     Another problem with Dr. Hakala's report is that most of the information Dr. Hakala cites supporting bond market efficiency is not specific to Parmalat, but instead general information about European bond markets. This is not enough to demonstrate the efficiency of Parmalat bond trading. For example, in paragraph 17, Dr. Hakala opines that European bond market efficiency has improved and that it may be more efficient than the bond market in the U.S. Even if Dr. Hakala is correct, these points do not demonstrate that the market for Parmalat bonds in Europe was efficient.

---

[7] These averages only consider one-day returns. Bonds that experienced a 0% return are not considered to have moved in the opposite direction as another bond.

32.      In addition, many of Dr. Hakala's statements are simply assertions with little or no support.  For example, in paragraphs 34 and 44, Dr. Hakala asserts that significant trading in Parmalat bonds occurred at the retail level and that bond quotes were disseminated to retail investors in Italy.  However, he does not provide any evidence to support these statements.  Indeed, as discussed in my original declaration, pre-trade transparency for both institutional and retail investors in bonds was severely limited in Europe.  Moreover, even if it were true that significant trading occurred at the retail level, retail investors were likely not contributing to price formation of Parmalat securities.[8]  Thus, their impact on market efficiency would be limited, at best.  While Dr. Hakala criticizes my analysis, claiming that I did not include retail trades, he admits that most trading volume came from institutional investors and dealers.  (Hakala Report ¶17).  Therefore, including these unknown retail trades should not affect conclusions regarding market efficiency.

33.      Likewise, in paragraphs 17 and 43, Dr. Hakala asserts that Parmalat bonds were priced based on benchmark bonds, and that the effective spreads for Parmalat bonds were much lower than quoted spreads.  However, these assertions appear to be based on generalizations of the Biais report, which does not specifically reference Parmalat bonds.  Dr. Hakala fails to provide any affirmative evidence to show that these alleged facts were true for Parmalat bonds.

34.      Similarly, in paragraph 17, Dr. Hakala generalizes as follows:  "… many of the Parmalat bonds reported trading nearly every day when the Banca Intesa trade information is included in the analysis (such as XS0123321068 and XS0106583577)".  (Emphasis added.)  While this statement is correct for the two bonds that Dr. Hakala chooses to analyze, he does not present any evidence that it is true for other Parmalat bonds.  In fact, for several of the bonds, there is very little evidence of trading according to hard copy data produced by Banca Intesa.  For example, for Bond 11 (XS0124248922), there are only four transactions in the entire class period, all on February 2, 2001.[9]  Thus, Dr. Hakala has not, in fact, demonstrated that many (let alone all) Parmalat bonds traded frequently during the class period.

---

[8] Retail investors are typically price-takers, in that they do not have the ability to affect the price of the securities they are trading.  Institutional investors, on the other hand, may be able to negotiate prices.

[9] A close inspection of the data suggests that this might be only two customer transactions and two corresponding transactions on behalf of Banca Intesa.  In particular, for each buy transaction, there is a matching sell transaction.  In my experience with internal bank data, this pattern is typical in situations where the bank acts as an intermediary for one of its customers.

35.     Moreover, Dr. Hakala's composite bond analysis is based on only 15 of the 18 bonds cited by Plaintiffs.  The three bonds that Dr. Hakala chose to exclude were among the least frequently traded Parmalat bonds, with the lowest total volume during the class period.

36.     In paragraph 17, Dr. Hakala claims that "[u]nless the debtor defaults, the bondholder largely knows what to expect and can more easily evaluate the bond's value in comparison with common shares."  While this statement is generally correct, it makes it even harder to understand why Parmalat bonds often moved in opposite directions, bank and ICMA prices significantly diverged from Bloomberg quotes, and ICMA and Bloomberg quotes did not cross on many occasions.  These differences between various pricing sources for Parmalat bonds are well documented in my original declaration.  Thus, this statement by Dr. Hakala does not help him in making his case for proving market efficiency for Parmalat bonds.

37.     Dr. Hakala also claims that "investors in Parmalat's fixed income securities could reasonably and did generally rely on the quoted prices as reasonably reflecting the public information regarding Parmalat throughout the Class Period."  (Hakala Report ¶ 8.)  He makes a similar argument in paragraph 17 that "retail investors typically relied on the quoted prices consistent with an efficient market."  Dr. Hakala's claims are unfounded, because he could not possibly know whether investors in Parmalat's securities relied on the quoted prices.  He could not know the state of mind of different investors, nor what they knew and used as a basis for their decision to trade Parmalat's securities.

E. Dr. Hakala's Criticism of My Bond Pairs Analysis is Completely Incorrect, and In Any Event, Additional Bond Pairs Confirm My Initial Conclusions

38.     In my original declaration, I demonstrated that the prices of two bonds with similar maturities, interest rates, and other features diverged substantially from each other for an extended period of time.  This phenomenon is inconsistent with efficiency.  Dr. Hakala criticizes this analysis, suggesting that it was inappropriate to compare a bond with a private placement.  Dr. Hakala is simply wrong that one of the bonds in Exhibit 5 was privately placed.  In fact, both bonds were publicly traded.[10]  In any event, as further evidence of the inefficiency of Parmalat bonds, Exhibit 2 of this declaration contains additional bond pairs, all publicly traded, that experienced unexplained divergences.

---

[10] This is evidenced by their listing on the Luxembourg Stock Exchange.  Source:  Thomson DataStream.

F. Dr. Hakala's Criticism of My Use of ICMA Bid-Ask Quotes is Unfounded and Incorrect

39.    Dr. Hakala argues that Bloomberg historical quotes are superior to ICMA historical quotes because bond traders use Bloomberg screens to disseminate quotes, and ICMA quotes reflect the average of all bids and asks, instead of the best bids and asks.  (Hakala Report ¶¶ 34, 46.)[11]  Dr. Hakala's assertion is wrong for the following reasons.  First, the Biais study that Dr. Hakala cites indicates that traders used real-time data from Bloomberg.  Real-time quotes are different from historical bid-ask quotes from Bloomberg obtained years later.  In particular, the historical Bloomberg quotes obtained today are similar to the ICMA quotes in that Bloomberg reports the average of dealer bids and the average of dealer asks reported throughout the day.  Notably, Bloomberg drops the top and bottom 10 percent of dealer bids and asks in its calculation of historical quotes.  ICMA, on the other hand, drops only the highest quote and the lowest quote.  Second, the Biais study does not suggest that historical quotes from Bloomberg are superior to historical quotes from ICMA.  Third, the spread between the best bid and the best ask may not be an appropriate measure, as bonds do not necessarily trade at the best bid and ask.  Because of the market structure for European bonds, different traders may receive different quotes depending on which dealers they contact, and on the desired quantity of the bond.  Moreover, as both ICMA and Bloomberg indicate, the quotes are non-binding; consequently, there is no guarantee that any institution or retail investor could trade at the best bid or ask on any particular day.  Finally, as demonstrated above, many actual trades occurred far outside the Bloomberg historical bid-ask quotes.

G. Dr. Hakala's Criticism of My Bond Returns Predictability Analysis Is Flawed

40.    In Exhibit 6 of my original declaration, I presented evidence that using the Bloomberg data provided by Plaintiffs, prices of Parmalat bonds were predictable using the bonds' past prices.  If a market is efficient, securities prices reflect all available information.  Since future information is unknown, one should not be able to predict future prices based solely on prior prices in an efficient market.  Therefore, a finding of predictability is inconsistent with market efficiency.  Dr. Hakala attempts to rebut this showing with his own analysis of predictability, but his approach is flawed since he aggregates bonds into a composite bond.

---

[11] As explained in my original declaration, higher bid-ask spreads increase an investor's cost of trading, which tends to impede market efficiency.  For example, as the bid-ask spreads increase, investors must pay more to purchase a security, or accept less to sell a security.

Aggregating individual bonds to a composite bond tends to result in canceling out inefficiencies rather than making inefficiencies more obvious, contrary to Dr. Hakala's assertion in paragraph 32. The composite bond averages returns across several bonds, effectively hiding inefficiencies. For example, if two bonds moved in equal and opposite directions for no apparent reason, a composite bond consisting of those two bonds will show zero price change. Furthermore, Dr. Hakala's composite bond excludes data for three of the most illiquid Parmalat bonds.

41.     In paragraph 31, Dr. Hakala claims that "a two-day lag should be sufficient to avoid the bid-ask bounce and non-synchronous trading problems with the data and, yet, capture any systematic tendencies of Parmalat's fixed income securities to present arbitrage opportunities or to adjust slowly over time to significant prior events," and refers to pp. 99 – 103 of Campbell, Lo, and MacKinlay (1997).[12]  I reviewed these pages in Campbell, Lo and MacKinlay and did not find any support for Dr. Hakala's assertion. On the pages referred to by Dr. Hakala, Campbell, Lo and MacKinlay simply explain the nature of non-synchronous trading and bid-ask bounce issues. Moreover, as discussed above, my analysis was based on bid-ask midpoints and therefore not affected by bid-ask bounce.

## H. The Credit Default Swap Market Only Emerged Late in the Class Period, and In Any Event, Empirical Data Indicates It Did Not Fuel Efficiency

42.     In paragraph 8, Dr. Hakala claims that the presence of credit default swaps (CDSs) is an indicator of market efficiency for Parmalat bonds and private placements. However, the first evidence of Parmalat CDSs from Bloomberg occurs on May 19, 2003, so that these instruments had no effect on Parmalat bond trading for the majority of the class period. Thus, even if Dr. Hakala were correct about the impact of CDSs, for much of the class period this would be irrelevant. Moreover, Dr. Hakala does not offer any evidence to support his claim that the existence of a CDS market played a significant role in pricing Parmalat bonds. To assess Dr. Hakala's assertion that the presence of CDSs increased market efficiency of Parmalat securities, I analyzed trading in Parmalat bonds over the two months before and two months after May 19, 2003. Exhibit 4 shows that indicators of efficiency stayed the same or became worse after May 19, 2003. For example, the average percentage of days on which bonds moved in opposite directions of at least one other bond increased from 83.2% for the period before May

---

[12] Campbell, Lo and MacKinlay, *The Econometrics of Financial Markets*, 1997, pp. 99-103.

19, 2003, to 91.0% for the period after May 19, 2003.  The average percentage of trades with prices of at least 2% higher than Bloomberg ask or 2% lower than Bloomberg bid increased from 30.9% to 46.0%.  The average percentage of days when Bloomberg and ICMA quotes do not cross increased from 42.4% to 45.0%.  This is hardly evidence of improvement in market efficiency for Parmalat bonds after CDSs began trading.

## IV.    CONCLUSION

43.    In summary, Dr. Hakala's analysis of market efficiency for Parmalat bonds is flawed and based primarily on assertion without supporting evidence.  In both this report and my original declaration, I provide ample evidence to demonstrate the inefficiency of the markets for Parmalat bonds.

44.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___Dec 28___, 2006

_____
Paul A. Gompers