UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re PARMALAT SECURITIES LITIGATION

This document relates to:    05 Civ. 9934, 06 Civ. 0704

MASTER DOCKET
04 MD 1653 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FOOD HOLDINGS LIMITED, et al.,

                    Plaintiffs,

                    -against-                                    05 Civ. 9934

BANK OF AMERICA CORPORATION, et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PARMALAT CAPITAL FINANCE LIMITED,

                    Plaintiff,

                    -against-                                    06 Civ. 0704

BANK OF AMERICA CORPORATION, et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


           Appearances:

     Allan B. Diamond                          *Attorneys for Plaintiffs*
     J. Gregory Taylor
     J. Benjamin King
     P. Jason Collins                          A. Robert Pietrzak
     DIAMOND, MCCARTHY, TAYLOR,                Thomas McC. Souther
     FINLEY & LEE, LLP                         Daniel A. McLaughlin
                                               Joseph B. Tompkins, Jr.
     Richard I. Janvey                         Alan C. Geolot
     Joan M. Secofsky                          Mark P. Guerrera
     JANVEY, GORDON, HERLANDS,                 SIDLEY AUSTIN LLP
     RANDOLPH & COX, LLP                       *Attorneys for Defendants Bank of*

*America Corporation, Bank of America,*
*N.A., and Banc of America Securities*
*LLC*
Michael J. Dell
Michael S. Oberman
Timothy P. Harkness
KRAMER LEVIN NAFTALIS & FRANKEL
LLP
*Attorneys for Defendant Deloitte*
*Touche Tohmatsu*


Richard A. Martin
Kevin J. Toner
Zakiyyah Salim
Jean-David Barnea
HELLER EHRMAN LLP
*Attorneys for Defendant Deloitte &*
*Touche S.p.A.*

William R. Maguire
David W. Wiltenburg
Beatrice A. Hamza-Bassey
Lewis D. Zirogiannis
HUGHES HUBBARD & REED LLP
*Attorneys for Defendant Deloitte*
*Touche Tohmatsu Auditores*
*Independentes (Brazil)*


Brian M. Cogan
James L. Bernard
Katherine I. Puzone
Michele S. Carino
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Defendant Grant*
*Thornton International*


LEWIS A. KAPLAN, *District Judge.*

   After the collapse in scandal of Parmalat Finanziaria S.p.A. and affiliated entities

(collectively, "Parmalat") in December 2003, a multitude of plaintiffs brought lawsuits against an

array of defendants.  Case number 05 Civ. 9934 involves one specific set of transactions in which

Parmalat and the BoA Defendants[1] allegedly created plaintiffs Food Holdings Limited ("FHL") and

Dairy Holdings Limited ("DHL") (collectively, the "Companies") in furtherance of the Parmalat

fraud.  Plaintiffs bring various claims against BoA and Parmalat's former auditors, the Deloitte

---

[1]    The "Bank of America Defendants" includes Bank of America Corp., Bank of America, N.A., Banc of America Securities, LLC, and the so-called "Bank of America 'Does' 1-20." *See* Complaint ("Cpt.") ¶¶ 18-25.

Defendants and the Grant Thornton Defendants.[2]  All defendants have moved to dismiss the claims, and some have moved also to join parties or, alternatively, dismiss pursuant to Federal Rule of Civil Procedure 19.

In case number 06 Civ. 0704, BoA's pending motion makes a comparable Rule 19 argument.  A separate order issuing today dispenses with other aspects of that motion, but for convenience the Court deals with the Rule 19 aspect in this opinion.

## I.      The Complaint

The Court assumes general familiarity with the Parmalat scandal, as described in its prior opinions.[3]  It sets forth here only those facts alleged in the complaint that are relevant to the instant motions.

## A.      BoA Creates the Companies and Implements Its Plan

In the late 1990s, while Parmalat's financial condition deteriorated, its corrupt insiders, with key help from BoA, were seeking to hide this fact through various transactions.[4]

---

[2]

   Plaintiffs use "Deloitte" to refer to Deloitte Touche Tohmatsu, Deloitte & Touche S.p.A., Deloitte Touche Tohmatsu Auditores Independentes (Brazil), and, theoretically, any other Deloitte Touche Tohmatsu member firm that participated in an audit of Parmalat, *see id.* ¶ 39, and "Grant Thornton" to refer to Grant Thornton International, Grant Thornton S.p.A., and all other Grant Thornton International member firms that participated in Parmalat audits, *see id.* ¶ 44.

[3]

   *E.g.*, *In re Parmalat Secs. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005); *In re Parmalat Secs. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005).

[4]

   Complaint ("Cpt.") ¶¶ 58-59.

4

According to the complaint, these transactions "served primarily, if not exclusively, to enrich various Bank of America entities (and certain Bank of America personnel and Parmalat insiders) while creating the illusion that Parmalat was a profitable company and an attractive credit risk."[5]   The result allegedly was that Parmalat's financial statements prior to December 2003 greatly exaggerated its financial health and value, which permitted the corrupt Parmalat insiders and their allies, including BoA, to loot the companies.[6]

As one part of this fraudulent scheme, the Bank solicited investments purportedly for Parmalat's Brazilian operations.[7]   The plan was to create and use plaintiffs FHL and DHL, two special-purpose entities, as vehicles for the investment.  Each would each issue notes (the "Notes"), sell the Notes to various institutional investors (the "Noteholders"), and then use the proceeds to purchase stock in Parmalat Administracao S.A. ("Parmalat Administracao"), a holding company for Parmalat's Brazilian operations.[8]  When the Notes came due, repayment purportedly was to come from a public offering of the Parmalat Administracao shares.[9]   To provide assurances to the prospective Noteholders, a Parmalat subsidiary called Parmalat Capital Finance Limited ("PCFL") would provide the Companies with a Put Agreement, guaranteeing that it would buy the shares if

---

[5]   *Id.* ¶ 59.

[6]   *See id.*

[7]   *Id.* ¶ 72.

[8]   *See id.* ¶¶ 72-73.

[9]   *See id.* ¶ 73.

5

Parmalat Administracao were unable to.[10]   Further, Parmalat S.p.A. would guarantee PCFL's performance on the Put Agreement.[11]

Pursuant to this plan, BoA arranged for the Companies' creation in late 1999.[12] Shortly after their formation, the Companies each issued $150 million in Notes and purchased $150 million of Parmalat Administracao's shares.[13]   The Companies entered into swap agreements pursuant to which BoA agreed to provide FHL with the funds needed to pay the interest on the FHL Notes in exchange for a fee, payable when the Notes matured in 2003.[14]   Finally, the Companies entered into Security and Trust Agreements and Stock Pledge Agreements with Wells Fargo Bank, N.A., pursuant to which they pledged their Parmalat Administracao stock to the trust, and a trustee was appointed to act for the Noteholders' benefit.[15]

Although both FHL and DHL had boards of directors made up of persons who were not BoA personnel,[16] the complaint alleges that BoA played a substantial role in the Companies' operation.   BoA arranged for their incorporation, directed the preparation of the formative legal

---

[10]     *Id.*

[11]     *Id.*

[12]     *See id.* ¶ 78.

[13]     *See id.* ¶¶ 4, 103-04.

[14]     *See id.* ¶¶ 106, 114.

[15]     *See id.* ¶¶ 107, 113.

[16]     *See id.* ¶¶ 80-82.

documents, and "thereafter control[ed] the information available to them regarding the pre-planned Note Transactions."[17]   The Bank presented all of the documents and agreements relating to the Note transactions to the Companies' boards of directors very shortly after the Companies' formal creation.[18]   The Companies' directors granted the Bank full powers of attorney to carry out the Note transactions on the Companies' behalf and approved management agreements with BoA that delegated to it broad powers over the management of the Companies' day to day affairs.[19]   The complaint claims that, as a result of the powers of attorney and management agreements, BoA was the Companies' agent.[20]

The complaint further alleges that the Bank's plan was a sham from the beginning and that the formation of the Companies and the solicitation of the Noteholders' investment in fact were parts of the scheme to hide Parmalat's true financial condition.[21]   It asserts that BoA never made the directors of FHL and DHL aware of Parmalat's true financial condition or the risks facing their companies.[22]   It alleges that the directors, had they known the true facts, would not have

---

[17]

     *Id.* ¶ 82.

[18]

     *See id.* ¶ 83.

[19]

     *See id.* ¶¶ 85-86.

[20]

     *See id.* ¶ 88.

[21]

     *Id.* ¶ 5.

[22]

     *See id.* ¶¶ 89-102, 115-18.

consented to the issuance of the Notes or the investment in Parmalat Administracao.[23]

B.     *The Deloitte Defendants' Role in the Scheme*

The complaint alleges that the Deloitte Defendants assisted in two ways.  First, Deloitte audited the financial statements of Parmalat and its principal subsidiaries for fiscal years 1999 to 2002 and allegedly knew that Parmalat S.p.A. and/or Finanziaria were required to provide those statements and Deloitte's audit opinions to the Companies pursuant to documents relating to the Note transactions.[24]  It alleges that the Companies relied upon those audit opinions for their belief that they were in no danger of being unable to meet their commitments to the Noteholders.[25]  Second, a consulting arm of Deloitte prepared a valuation of Parmalat's Brazilian operations that BoA in turn used as the basis for pricing the Parmalat Administracao stock sold to the Companies – a valuation that Deloitte allegedly knew or should have known was used inaccurately.[26]

C.     *The Grant Thornton Defendants' Role in the Scheme*

The complaint alleges that the Grant Thornton Defendants "played a direct role in Parmalat's efforts to conceal its financial problems and lure new innocent investors such as FHL and DHL to invest in Parmalat" by helping Parmalat's corrupt insiders "create corporate structures that

---

[23]
  *See id.* ¶¶ 91, 102, 118.

[24]
  *See id.* ¶¶ 148-49.

[25]
  *See id.* ¶¶ 151-55.

[26]
  *See id.* ¶¶ 150, 160-62.

8

they used to disguise massive global losses."[27]  It alleges that, but for the unqualified audit opinions issued by Grant Thornton for Parmalat S.p.A. for fiscal years 1997 and 1998, the Companies would not have issued the Notes or invested in Parmalat Administracao.[28]  Like the Deloitte Defendants, the Grant Thornton Defendants allegedly knew that "investors like FHL and DHL would rely on their unqualified audit opinions in determining whether to invest in Parmalat."[29]

D.    *The Broader Parmalat Scheme Collapses and the Companies Enter Liquidation*

From December 1999 through 2003, Parmalat's financial condition allegedly continued to worsen, though BoA did not inform the Companies of their impending doom.[30]  Finally, in December 2003 – just as the Notes matured – the truth about Parmalat's finances was revealed and Parmalat entered extraordinary administration in Italy.[31]

Since Parmalat Administracao had not gone public and was not able to purchase its stock from the Companies, the Companies attempted to enforce the Put Agreement with PCFL and the guarantee of PCFL's performance by Parmalat S.p.A.[32]  Neither company was able to perform,

---

[27]
    *Id.* ¶¶ 163, 166.

[28]
    *Id.* ¶¶ 170, 172-73.

[29]
    *Id.* ¶ 168.

[30]
    *See id.* ¶ 121.

[31]
    *See id.* ¶¶ 63, 136, 147.

[32]
    *See id.* ¶¶ 136, 143.

9

and the Companies were unable to pay the amounts due under the Note Agreements.  After the

Noteholders filed "winding up" petitions in a Cayman Islands court, both FHL and DHL were placed

into provisional liquidation on December 24, 2003 and into official liquidation on April 1, 2005.[33]

## II.     The Standard

As a general rule, a court deciding a Rule 12(b)(1) or 12(b)(6) motion accepts as true

all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the

plaintiffs' favor.[34]  Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff[s]

can prove no set of facts in support of [their] claim which would entitle [them] to relief."[35]

## III.     Standing

### A.     Injury in Fact

Article III courts have subject matter jurisdiction only over actual cases or

controversies.[36]  In order to demonstrate that an actual case or controversy exists, a plaintiff must

allege, among other things, a personal injury in fact as a result of the putatively illegal conduct of

---

[33]

*See id.* ¶¶ 14, 16.

[34]

*See, e.g.*, *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988); *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 237 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[35]

*Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)) (internal quotation marks omitted).

[36]

*See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

the defendant.  This injury must be distinct and concrete.[37]

Defendants contend that the complaint does not allege that plaintiffs have suffered injury because the Companies were no more than sham entities participating in a Ponzi scheme.[38] As pass-through entities, they argue, the Companies existed only to allow the Noteholders a means of investing in Parmalat Administracao – if defendants' conduct caused any harm, it was to the Noteholders.  In other words, defendants argue, plaintiffs are trying to bring claims that really belong to their creditors.

Plaintiffs respond that they have alleged sufficiently a particularized injury to the Companies – the "over $400 million" in outstanding debt, interest, and fees, which they assert they would not have incurred but for defendants' misconduct.[39]  They argue that their claims are their own and not those of their creditors.

If the transactions had taken place as planned, the Companies clearly would have been merely "pass-through" entities, in existence solely to provide benefits to other entities.  However, events took a different turn, and the Companies allegedly have been left with significant legal

---

[37]

     *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also, e.g., Ctr. for Reproductive Law & Policy v. Bush*, 304 F.3d 183, 188 (2d Cir. 2002); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 69-70 (2d Cir. 2001).

[38]

     A Ponzi scheme "is a scheme whereby a corporation operates and continues to operate at a loss.  The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors.  The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995) (quoting *In re Huff (McHale v. Huff)*, 109 B.R. 506, 512 (S.D. Fla. 1989)).

[39]

     Cpt. ¶ 6.

obligations – hundreds of millions of dollars of debt.  Although the Noteholders allegedly have been injured from the loss of their investments, this does not eliminate the Companies' injury of incurring a legal obligation they are unable to meet.  In addition, the Companies have alleged some debt owed to BoA pursuant to the Swap Agreement signed by the parties.[40]  This is the Companies' injury alone.  Naturally, BoA would be entitled to prove any recovery the Noteholders may recover from others, based upon the nonpayment of the Notes, in mitigation of any damages for which it may be responsible.

Accordingly, the Companies have alleged sufficiently injury in fact.  The Court notes, however, that the complaint makes allegations about injuries to the Noteholders and the general public.[41]  Any allegations about injuries to parties other than the Companies cannot be the basis of the instant action.

B.      *The* Wagoner *Rule*

That plaintiffs have alleged injury in fact does not end the standing inquiry.  Under New York law,[42] when the trustee of a bankrupt estate sues on behalf of the estate, "the Article III 'case or controversy' requirement coincides with the scope of the powers the Bankruptcy Code gives

---

[40]

See id. ¶¶ 106, 114, 256.

[41]

E.g., id. ¶¶ 74, 118, 124-29.

[42]

The parties all either expressly assert that New York law governs or cite to and rely on New York law.  This implied consent to the application of New York is sufficient to establish choice of law.  *Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001) (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).

a trustee."[43]  In *Shearson Lehman Hutton, Inc. v. Wagoner*,[44] the Second Circuit, applying New York law, held that "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors."[45]  In such a case, the trustee would not have standing to sue because of the limitation on asserting the rights of others.[46]  Under the *Wagoner* rule, then, a court must dismiss a trustee's claim against a third-party professional when the debtor itself participated in the alleged wrongdoing.

The complaint, of course, describes the Companies as innocent victims manipulated without their knowledge.  The Deloitte and Grant Thornton Defendants argue, however, that the Companies should be deemed to have participated in the alleged misconduct surrounding the Note transactions because of the activities of BoA, the Companies' agent.  The complaint alleges that "Bank of America purposefully assumed responsibility for acting in the Companies' best interests

---

[43]

> *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 99 (2d Cir. 2003) (quoting *Hirsch*, 72 F.3d at 1091) (internal quotation marks omitted).

[44]

> 944 F.2d 114 (2d Cir. 1991).

[45]

> *Id.* at 118.
>
> The *Wagoner* rule "derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation."  *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000).  The doctrine is thus quite similar to that of *in pari delicto*, but *Wagoner* is a rule of standing, rather than a defense to liability.  *See, e.g.*, *In re Grumman Olson Indus. Inc.*, 329 B.R. 411, 424 n.5 (S.D.N.Y. 2005).

[46]

> *See Wagoner*, 944 F.2d at 118 ("[I]f a trustee has no power to assert a claim because it is not one belonging to the bankrupt estate, then he also fails to meet the prudential limitation [on standing] that the legal rights asserted must be his own."); *see also Warth*, 422 U.S. at 499; *Wight*, 219 F.3d at 86.

with respect to [the Note Transactions] – as agent, manager, and otherwise."[47]   It further describes BoA as the Companies' "agent with broad powers and authority," its "placement agent," its "attorney/agent with respect to the Note Transactions," and "the manage[r of] the day-to-day affairs of the Companies."[48]

Under New York law, "[t]he general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal."[49]  As the crux of the complaint is that BoA orchestrated and executed the massive scheme to defraud,[50] the imputation of its knowledge and misconduct to the Companies would bar their claims against it and other defendants.

The Companies counter that the adverse interest rule, which provides that an agent's knowledge and actions are not imputed to the principal where the agent has abandoned totally the principal's interests,[51] prevents the application of *Wagoner*.  But even if the adverse interest rule applies here, there is a relevant exception.

Under the sole actor exception to the adverse interest rule, the agent's knowledge and actions are imputed to the principal despite the agent's abandonment of the principal's interests

---

[47]
Cpt. ¶ 7.

[48]
*Id.* ¶¶ 88, 101.

[49]
*Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 899 (1985).

[50]
*See* Cpt. ¶¶ 3-7.

[51]
*See, e.g.*, *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997).

where the "principal and agent are one and the same."[52]  Thus, where a principal is "completely

dominated by [the agent] and habitually [does] whatever he request[s]," such that the agent has been

permitted to act without meaningful oversight or control, the principal is deemed to have abdicated

its control of its agents and will be held accountable for the agents' actions.[53]

Here, the allegations in the complaint make it clear that BoA had unfettered discretion

to conduct the Note transactions on behalf of the Companies.  The complaint paints a picture of the

Companies as puppet entities with nominal boards of directors (but, apparently, no officers) who

delegated everything to BoA, their "placement agent," "attorney/agent with respect to the Note

Transactions," and manager of "day-to-day affairs."[54]  BoA allegedly controlled everything about

the Note transactions, from the solicitation of investors, to the mechanics of the Notes, to the timing

of the placements.  While the complaint makes nominal references to the Companies' directors

approving the Note transactions,[55] such cursory references, unsupported by alleged facts, cannot shift

the overwhelming tenor of the complaint's story – that BoA had "broad powers and authority and

correspondingly broad responsibility" as plaintiffs' agent.[56]  Accordingly, the sole actor exception

to the adverse interest exception applies and plaintiffs are barred from bringing claims against third

---

[52]

    *Id.*

[53]

    *Munroe v. Harriman*, 85 F.2d 493, 494 (2d Cir. 1936); *see also In re Mediators*, 105 F.3d at 827.

[54]

    Cpt. ¶ 101.

[55]

    *See, e.g.*, *id.* ¶ 10.

[56]

    *Id.* ¶ 88.

15

parties for defrauding them.

All of plaintiffs' claims against the Deloitte and Grant Thornton Defendants sound in fraud.[57] Thus, the *Wagoner* doctrine bars plaintiffs from bringing their claims against the Deloitte and Grant Thornton Defendants.[58] These claims are dismissed. However, since BoA allegedly was the Companies' agent and fiduciary, it cannot also be a third party covered under the *Wagoner* doctrine.[59] *Wagoner* thus does not bar plaintiffs' claims against the BoA Defendants.

IV.    *Sufficiency of the Claims*

The Bank challenges the sufficiency of plaintiffs' claims for fraud, negligent misrepresentation, aiding and abetting breach of fiduciary duty, unjust enrichment, civil conspiracy, and a declaratory judgment.

A.    *Counts One and Two: Fraud and Negligent Misrepresentation*

BoA argues that the Companies' allegations of reliance are conclusory. The

---

[57]
       See *In re Daou Systems, Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (claim sounds in fraud where plaintiff alleges "a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim"); *see also Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004).

[58]
       See *Hirsch*, 72 F.3d at 1094 (*Wagoner* bars professional malpractice claim based on allegations of fraud); *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 709 (S.D.N.Y. 2001) (same).

[59]
       See *In re Mediators*, 105 F.3d at 826-27 ("[A] bankruptcy trustee, suing on behalf of the debtor under New York law, may pursue an action for breach of fiduciary duty against the debtor's fiduciaries."); *see also Global Crossing Estate Representative v. Winnick*, No. 04 Civ. 2558 (GEL), 2006 WL 2212776, at *15 & n.20 (S.D.N.Y. Aug 03, 2006) (citing cases).

Companies allege that BoA directed their incorporation, "control[led] the information available to them regarding the pre-planned Note Transactions," prepared documents relating to the transactions, and undertook power of attorney and management duties for the Companies.[60]  They further allege that their directors "rel[ied] on Bank of America's sponsorship of the transactions and on the representations contained in those documents regarding the nature of the transactions, the safeguards involved, [and] the checks on Parmalat's financial condition."[61]  The allegations are sufficient to permit an inference that, but for BoA's statements about the circumstances surrounding the transactions, the Companies would not have entered into the Note transactions and incurred the debt obligations.[62]

Similarly, the Companies have alleged reliance sufficiently with respect to a July 2000 email from a former BoA employee to an agent of FHL that allegedly grossly misrepresented the value of Parmalat Administracao shares.[63]  Although this statement was made after the Companies entered into the Note Transactions, they allege that "[h]ad [they] learned of Parmalat's

---

[60]

Cpt. ¶¶ 82-83, 85-86.

[61]

*Id.* ¶ 84.

[62]

"The reliance element of fraud is essentially causation in fact.  Thus, defendant's conduct need not have been *the* 'exclusive inducing cause' of plaintiff's actions, but only *an* 'essential or inducing cause.'"  *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 278 (2d Cir. 1992) (quoting RESTATEMENT (SECOND) TORTS § 546) (citation omitted), *abrogated on other grounds as recognized in Gerosa v. Savasta & Co.*, 329 F.3d 317, 322-23 (2d Cir. 2003).

Since the Court finds the Companies' allegations of reliance sufficient, BoA's challenge to the Companies' claim of constructive fraud, based solely on failure to allege reliance sufficiently, *see* BoA Mem. 12 n.7, is rejected.

[63]

*See* Cpt. ¶¶ 97-99.

financial condition and intended use of the funds raised by the Note Transactions after their investments in [Parmalat Administracao], [they] could have taken action to expose the scheme and attempt to recoup some portion of the funds invested."[64]

Justifiable reliance, needed to support a claim that fraud induced an investor to retain securities, can be proven by "direct communication" between the parties.[65] Here, the email – a direct communication made in response to the Companies' inquiry – is sufficient to support an inference of justifiable reliance.[66]

Finally, BoA argues that the allegations are not pled with sufficient particularity as required by Federal Rule of Civil Procedure 9(b) because, according to BoA, the identity of the speaker must be alleged.   The specificity requirements of Rule 9(b) serve three purposes: "(1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits."[67] Specific pieces of information, such as the identity of the speaker, are required under Rule 9(b) only

---

[64]

      *Id.* ¶ 135.

[65]

      *See In re WorldCom, Inc. Secs. Litig.*, 382 F. Supp. 2d 549, 559-60 (S.D.N.Y. 2005); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Secs., LLC*, 446 F. Supp. 2d 163, 204-05 (S.D.N.Y. 2006).

[66]

      BoA argues that the valuation of Parmalat Administracao could not have induced reliance because it was insignificant, considering the protections of the Put Agreement with PCFL and Parmalat S.p.A.'s guarantee of that Put Agreement.   Since, as noted above, the misrepresentation need not be the exclusive factor inducing action or inaction, this argument is not persuasive.

[67]

      *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *see also Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990).

as necessary to serve its underlying purposes.[68]

The complaint identifies several specific documents allegedly containing misrepresentations and provides dates for their creation or use, thus putting BoA on fair notice.[69] Although the Companies allege only that "Bank of America" made these statements rather than a distinct BoA entity, the allegations are sufficiently specific to satisfy the purposes of Rule 9(b)'s particularity requirements.

Accordingly, BoA's motion to dismiss the fraud and negligent misrepresentation claims is denied.

### B.       Count 4: Aiding and Abetting Breach of Fiduciary Duty

---

[68]

See Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000) ("[The purpose of Rule 9(b)] can be served without requiring plaintiffs to name their confidential sources as long as they supply sufficient specific facts to support their allegations."); In re Parmalat Secs. Litig., 377 F. Supp. 2d 390, 401 (S.D.N.Y. 2005) ("It is not necessary . . . that [a] plaintiff connect a particular insider or affiliate to an allegedly deceptive corporate statement.").

Cases cited by BoA noting the lack of speaker identification in dismissing a claim under Rule 9(b) are inapposite.  Granite Partners, L.P. v. Bear, Stearns & Co. Inc., 17 F. Supp. 2d 275, 287 (S.D.N.Y. 1998), involved minimal allegations where almost no specifics were provided: "[The allegation] not only fails to allege a statement by [defendant corporation], but it also fails to state the time and place the statement was made, as well as the identification of the speaker."  And while DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, noted, as BoA points out, that "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud," it immediately followed that statement with a proviso that "no specific connection between fraudulent representations in an Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question."  Id. at 1247 (internal quotations and alterations omitted).

[69]

See, e.g., Cpt. ¶¶ 177-78 (June 1999 PPM), 179-80 (December 1999 Note Purchase Agreements), 181-82 (December 1999 Support and Inducement Agreements), 183-84 (December 1999 Swap Agreement), 185-86 (March 2001 PPM).

After alleging repeatedly throughout the complaint that all of its directors were unaware of BoA's wrongdoing, the Companies claim in the alternative that the Bank aided and abetted a breach of fiduciary duty "if any of FHL's or DHL's Directors were aware of any of the facts known to Bank of America."[70]   The Bank argues that the Companies may not plead hypothetically and that the Companies have failed to plead sufficiently that the Bank had knowledge of the primary breach.

The Federal Rules allow a party to "set forth two or more statements of a claim or defense alternately or hypothetically."[71]   The alternative pleading thus does not appear to be barred on its face.   The Companies, however, have not alleged that the Bank had knowledge of any breach of fiduciary duty that a director may have committed.   The complaint sets forth a theory that the Bank induced the Companies to enter into these transactions despite the innocence of the directors. Thus the allegations do not give rise to any inference that the Bank would have known had a director not been innocent after all.   As knowledge of the primary breach is an element of the claim,[72] it must be dismissed.

C.     *Count 6: Unjust Enrichment*

Plaintiffs assert a claim of unjust enrichment "[t]o the extent that the Bank of America Defendants benefitted . . . by obtaining some of the funds FHL and DHL were wrongfully induced

---

[70]     *Id.* ¶ 234.

[71]     FED. R. CIV. P. 8(e)(2).

[72]     *Kaufmann v. Cohen*, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dept. 2003).

20

to provide to [Parmalat Administracao] . . . and to the extent Bank of America's duties arose outside of their contractual relationships with FHL and DHL."[73]  BoA argues that the entire dispute between the parties is governed by valid contracts, specifically, the Management Agreement.

Under New York law, "the existence of a valid contract governing the subject matter generally precludes recovery in quasi contract for events arising out of the same subject matter."[74] The parties disagree about whether the contracts govern the entire dispute between them.  Neither the Management Agreement nor any other contract between BoA and plaintiffs is before the Court. Thus, the Court cannot conclude at this time that plaintiffs will be unable to state a claim for unjust enrichment.[75]  The Bank's motion to dismiss this claim is denied.

D.      *Count 7: Civil Conspiracy*

The Companies assert a claim of civil conspiracy to hold BoA liable for the acts of Parmalat insiders and the Auditor defendants pursuant to a conspiracy to defraud the Companies.[76]

---

[73]

       Cpt. ¶¶ 247-48.

[74]

       *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 33-34, 799 N.Y.S.2d 170, 177-78 (2005) (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656 (1987)).

[75]

       *See, e.g.*, *Bekhor v. Josephthal Group, Inc.*, No. 96 Civ. 4156 (LMM), 2000 WL 1521198, at *7 (S.D.N.Y. Oct. 13, 2000) (denying summary judgment on unjust enrichment claim where "the Court is unable to determine whether a written agreement governs the [subject matter of the dispute], and therefore is unable to determine whether plaintiffs are limited to a claim for breach of contract").

[76]

       *See* Pls.' BoA Mem. at 30 (asserting that an agreement "to defraud the Companies" can be inferred from the complaint, and stating that "[b]y the civil conspiracy count the Companies seek to hold Bank of America liable for the wrongful conduct of the ***Parmalat insiders*** and the ***Auditor Defendants*** that was perpetrated in furtherance of the conspiracy") (emphasis

The Companies allege that the purpose of the conspiracy was to commit the underlying torts described in the complaint.

Under New York law, a claim for civil conspiracy requires an independent actionable tort.[77]  The claims against the auditors have been dismissed as barred by the *Wagoner* rule, and claims against Parmalat insiders similarly would be barred.  With no underlying torts to support it, the claim for civil conspiracy cannot stand.[78]  BoA's motion to dismiss this claim is granted.

E.      *Count 8: Declaratory Judgment*

Plaintiffs ask the Court for a declaratory judgment that BoA cannot enforce various contracts between BoA and plaintiffs pursuant to which BoA currently is seeking repayment in plaintiffs' pending liquidation proceedings in the Cayman Islands.  BoA urges the Court to defer to the Caymans proceeding under the principle of international comity.[79]

The Second Circuit recently addressed this question in *J.P. Morgan Chase Bank v.*

---

in original).

[77]
See *Vasile v. Dean Witter Reynolds Inc.*, 20 F. Supp. 2d 465, 481 (E.D.N.Y. 1998), *aff'd*, 205 F.3d 1327 (2d Cir. 2000) ("[U]nder New York law, civil conspiracy to commit fraud, standing alone, is not actionable . . . if the underlying independent tort has not been adequately pleaded.") (internal quotation marks and citation omitted); *see also Crigger v. Fahnestock & Co.*, 443 F.3d 230, 237 (2d Cir. 2006) (citing *Vasile*).

[78]
See *Crigger*, 443 F.3d at 237 ("[B]ecause the jury found there was no fraud, it is a moot question whether the district court should have charged the jury on conspiracy to defraud.").

[79]
Plaintiffs argue that the correct term is international abstention, not international comity. In light of the Second Circuit's recent discussion of the principle using the phrase "international comity," *J.P. Morgan Chase Bank v. Altos Hornos de Mexico, S.A.*, 412 F.3d 418 (2d Cir. 2005), this Court will employ the Circuit's terminology.

*Altos Hornos de Mexico, S.A.*,[80] noting "[w]e have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding . . . so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States."[81]

Plaintiffs have not alleged that the Caymans proceedings are unfair or that they contravene U.S. policies.  Accordingly, the Court declines to consider plaintiffs' request for a declaratory judgment.  The Bank's motion to dismiss this count is granted.

### V.    Rule 19

Finally, BoA moves pursuant to Rule 19 to join PCFL and Bondi in this action as necessary parties or, in the alternative, to dismiss the case.  It makes the same argument in case number 06 Civ. 0704, in which PCFL sues it for damages relating to, *inter alia*, the Note transactions.

The structure of the Note transactions has left multiple parties with claims against BoA for what is essentially the same debt.  At the bottom of the chain, the Noteholders claim damages because the Notes were not repaid.[82]  The Companies, which issued the Notes, are liable

---

[80]    412 F.3d 418.

[81]    *Id.* at 424.  The fact that the question is one of New York law does not alter this conclusion. *See id.* at 429 ("[T]he fact that [New York choice of law] clauses are in an agreement between the parties does not preclude a court from deferring on grounds of international comity to a foreign tribunal where deference is otherwise warranted.").

[82]    Although BoA did not seek to join them in this motion, several Noteholders have actions seeking damages from BoA for this and other investments.  At least four such actions are before this Court for pretrial purposes as part of the multidistrict litigation. *Monumental*

to the Noteholders for payment due on the Notes.  PCFL, in turn, is liable to the Companies for the amount needed to pay the Notes pursuant to the Put Agreement.  Finally, Parmalat S.p.A. is liable to the Companies pursuant to its guarantee of PCFL's obligation to perform under the Put Agreement.  The Companies and PCFL sue the Bank in the instant cases.  In addition, Dr. Bondi[83] and several Noteholders[84] have sued the Bank for, *inter alia*, damages relating to these Notes.  Thus, the Bank faces multiple claims resulting from one debt – the roughly $400 million due on the Notes.

Although the Court does not decide the issue here, there appears to be no justifiable basis for exposing BoA to liability to multiple parties for what is essentially the same debt.  Rule 19(a) is thus implicated.[85]  Unfortunately, only the Companies and PCFL are before the Court on the present motions.  It would be inappropriate, however, for the Court to rule on the Rule 19 issue until all relevant parties are before it so that the potential liability problem can be examined fully and, if necessary, a comprehensive solution implemented.  The Bank's Rule 19 motions are denied without prejudice to renewal in all relevant cases so that all relevant parties will be before the Court at once.[86]

---

*Life Ins. Co. v. Bank of Am. Corp.*, No. 06 Civ. 1768; *Principal Global Investors, LLC v. Bank of Am. Corp.*, No. 06 Civ. 1769; *Prudential Ins. Co. of Am. v. Bank of Am. Corp.*, No. 06 Civ. 4449; *Allstate Life Ins. Co. v. Bank of Am. Corp.*, No. 06 Civ. 4453.

[83]

*Bondi v. Bank of Am.*, No. 05 Civ. 4015, 04 MD 1653 (LAK).

[84]

*See* supra note 82.

[85]

FED. R. CIV. P. 19(a) (a party is necessary where his absence "leave[s] any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistence obligations by reasons of the claimed interest").

[86]

In the event that a similar problem is posed with respect to other transactions, all such problems should be set forth in a new motion made in all relevant cases.

24

*VI.     Conclusion*

The Deloitte and Grant Thornton Defendants' motions to dismiss [04 MD 1653,

docket items 447, 451, 460, 449; 05 Civ. 9934, docket items 71, 76, 86, 74] are granted.  BoA's

motion to dismiss [04 MD 1653, docket item 445; 05 Civ. 9934, docket item 65] is granted with

respect to Counts Four, Seven, and Eight, and denied in all other respects.  The denial of so much

of the motions in 05 Civ. 9934 and 06 Civ. 0704 as seeks relief under Rule 19 is without prejudice

to the extent noted above.

SO ORDERED.

Dated:       February 28, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)