UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re PARMALAT SECURITIES LITIGATION

        MASTER DOCKET

This document relates to: 05 Civ. 4015        04 MD 1653 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ENRICO BONDI,

        Plaintiff,

        -against-        05 Civ. 4015 (LAK)

BANK OF AMERICA CORPORATION, et al.,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

      Appearances:

        John B. Quinn
        Peter E. Calamari
        Loren Kieve
        Johanna Y. Ong
        QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
        *Attorneys for Plaintiff*

        A. Robert Pietrzak
        Thomas McC. Souther
        Daniel A. McLaughlin
        Joseph B. Tompkins, Jr.
        Alan C. Geolot
        Mark P. Guerrera
        SIDLEY AUSTIN LLP
        *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

      Plaintiff Enrico Bondi is the Extraordinary Commissioner of Parmalat Finanziaria

S.p.A. ("Finanziaria"), Parmalat S.p.A. ("SpA"), and twenty-one affiliates (collectively, "Parmalat")

2

in Italian reorganization proceedings.   He sues Bank of America Corporation and affiliates (collectively, "BoA" or the "Bank"), alleging that they structured transactions that permitted corrupt Parmalat insiders to loot the companies with impunity.   The Bank has filed counterclaims against Finanziaria, SpA, and fourteen subsidiaries alleging, in essence, that Parmalat repeatedly misrepresented its financial status to BoA and others and that BoA consequently sustained significant damages.[1]   Bondi here moves to dismiss several of the Bank's counterclaims.

## I.     The Counterclaims

### A.     The Counterclaim Defendants

SpA was wholly owned by and the main operating company of Finanziaria.[2] Parmalat Netherlands B.V. ("Netherlands") was a wholly owned subsidiary of SpA.[3]   The counterclaims name thirteen additional entities headquartered in the Netherlands, Luxembourg, and Italy that were wholly or majority owned by SpA (the "Named Subsidiaries").[4]

The counterclaims refer to Finanziaria, SpA, Netherlands, and the Named

---

[1]   Pursuant to the Bank's express representations and a prior order of this Court, the Bank asserts these counterclaims only for the purpose of liquidating the amount, if any, due thereon.   The enforcement of any judgment will be sought only through appropriate courts in Italy.   *See* Order, Apr. 7, 2006 (05 Civ. 4015, docket item 99), Tr. 3/19/06 (05 Civ. 4015, docket item 100).

[2]   Ctrclm. ¶¶ 25-26.

[3]   *Id.* ¶ 27.

[4]   *Id.* ¶¶ 28-40.   The Named Subsidiaries are Parmalat Finance Corporation B.V., Parmalat Capital Netherlands B.V., Dairies Holding International B.V., Parmalat Soparfi S.A., Olex S.A., Eurolat S.p.A., Lactis S.p.A., Contal S.r.l., Geslat S.r.l., Newco S.r.l., Centro Latte Centallo S.r.l., Panna Elena S.r.l., and Parmengineering S.r.l.

Subsidiaries collectively as "Parmalat."[5]  Most of the allegations do not refer specifically to any of the Named Subsidiaries.  The counterclaims allege instead that SpA, Netherlands, and the Named Subsidiaries "functioned as one entity" and that:

> "Parmalat S.p.A. and its insiders used the subsidiaries . . . as conduits for their fraud by forcing the subsidiaries into financial transactions – often guaranteed by Parmalat S.p.A. – that were never properly reported on Parmalat's consolidated balance sheets.   Indeed, Parmalat used the subsidiaries to make intercompany transfers designed to hide losses and further the fraud, often in a manner that disregarded appropriate corporate formalities."[6]

The counterclaims allege further that "[m]any of Parmalat's corrupt insiders served as officers and directors of the subsidiaries."[7]

B.      *The Parmalat Fraud*

The counterclaims allege that from 1990 to 2003 Parmalat sold debt securities based on financial statements and representations of senior management that significantly overstated Parmalat's assets and financial health.[8]   The Bank, having "no access to Parmalat's underlying accounting books and records[,] . . . reasonably relied to its detriment on" this false information.[9]

---

[5]
*Id.* at 1.

[6]
*Id.* ¶ 41.

[7]
*Id.*  The counterclaims list six such individuals and discuss briefly their roles with the various Parmalat entities.  *Id.* ¶¶ 47-49, 53-54, 60.

[8]
*Id.* ¶¶ 65-67.  The Bank alleges several fraudulent transactions and misrepresentations that enabled Parmalat to dramatically overstate its financial health.  *See id.* ¶¶ 73-103.

[9]
*Id.* ¶ 68.

4

It alleges that from 1994, when its financial relationship with Parmalat began, until 2003, when the Parmalat fraud was exposed, it extended credit to Parmalat and acted as Parmalat's private placement agent.[10]  As a result of these transactions, the Bank "has taken a charge-off" of more than $400 million.[11]  It contends that it "did not know of Parmalat's fraud until December 2003."[12]

 1.   *BoA Loans to Parmalat*

The counterclaims list thirteen loans totaling hundreds of millions of dollars that BoA made either to SpA or to Parmalat affiliates not named as counterclaim defendants here.  With respect to each loan, the Bank alleges specific misrepresentations by SpA and the borrower about their financial health.  These misrepresentations include statements by SpA and the borrower that their financial statements gave a "true and fair view" of their financial condition, that they had no undisclosed material liabilities, and that they were not in breach of or default under any agreement that might have an adverse material effect on their financial conditions.[13]

 2.   *Private Placements In Which BoA Acted as Agent*

The counterclaims allege eight instances in which the Bank acted as Parmalat's

---

[10]

 *Id.* ¶ 133.

[11]

 *Id.* ¶ 134.

[12]

 *Id.* ¶ 128.

[13]

 *Id.* ¶¶ 136-38, 142-44, 148-50, 154-56, 161-63, 168-70, 174-76, 180-82, 186-88, 193-95, 200-01.

5

private placement agent, resulting in the sale of over $1 billion in bonds.[14]  The placements were for

SpA, Netherlands, and other Parmalat affiliates not named as defendants here.  The counterclaims

allege that SpA and the relevant affiliate falsely represented their financial health to investors and

the Bank in documents and at meetings.  The alleged misrepresentations included statements that

the proceeds of the investments would go toward legitimate business purposes, that Parmalat's

financial statements fairly presented the company's financial position, and that there were "no

[undisclosed] fact[s] . . . that could reasonably be expected to have a Material Adverse Effect."[15]

### 3.    Additional Misstatements and Omissions

In addition to these alleged misrepresentations made in connection with specific

transactions, the counterclaims allege misrepresentations by Parmalat and its subsidiaries about,

*inter alia*, Parmalat's debt level, available cash, assets, and liabilities "[t]hroughout the entire time

Parmalat had a business relationship with Bank of America."[16]

The Bank alleges that, from 1990 to 2002, Parmalat's annual financial statements,

which contained information about Finanziaria and SpA and its subsidiaries, contained material

misrepresentations and failed to comply with Italian law or generally accepted accounting

principles.[17]  The counterclaims allege also nine dates on which Parmalat issued press releases

---

[14]     *Id.* ¶ 225.

[15]     *E.g.*, *id.* ¶¶ 232, 234, 236.

[16]     *Id.* ¶ 341.

[17]     *Id.* ¶¶ 345-47.

6

containing false statements about its financial condition.[18]  Finally, the counterclaims provide a "sample" of allegedly false statements made by Parmalat and its subsidiaries directly to the Bank, including assurances of Parmalat's financial health by Parmalat management and consolidated financial statements sent to BoA employees.[19]

### 4.     The Benefit to Parmalat

The counterclaims allege that Parmalat itself benefitted from the fraud.[20]  In essence, they allege that most of the financing Parmalat obtained based on these false representations was used, for example, for "acquisitions of companies and capital expenditures for Parmalat" and "on interest payments, fees, and dividends."[21]  The Bank alleges that Parmalat therefore should be held liable for the fraud.[22]

### C.     The Claims for Relief

The counterclaims allege six claims for relief: (1) violations of Section 10(b) of the

---

[18]  *Id.* ¶ 348.

[19]  *Id.* ¶¶ 350-59.

[20]  *Id.* ¶¶ 360-64.

[21]  *Id.* ¶ 362.

[22]  *Id.* ¶ 364.

7

Securities Exchange Act of 1934[23] (the "Exchange Act") and Rule 10b-5,[24] (2) fraud, (3) negligent misrepresentation, (4) civil conspiracy, (5) violations of the federal Racketeer Influenced and Corrupt Organizations Act[25] ("RICO"), and (6) violations of the North Carolina Unfair and Deceptive Trade Practices Act.[26]

## II.    Discussion

### A.    Standard

On a Rule 12(b)(6) motion, a court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the alleging party's favor.[27]   Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[28]   Nevertheless, Federal Rule of Civil Procedure 9(b) requires that "averments of fraud" be stated with particularity.

---

[23]

15 U.S.C. § 78j(b).

[24]

17 C.F.R. § 240.10b-5.

[25]

18 U.S.C. § 1962(c).

[26]

N.C. GEN. STAT. § 75-1.1.

[27]

*E.g.*, *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 237 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[28]

*Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (internal quotation marks omitted)).

8

The entire thrust of the counterclaims is that Parmalat orchestrated a massive fraud.[29] As fraud is the sole basis of relief,[30] the Bank must comply with the requirements of Rule 9(b) and plead averments of fraud with particularity.  This means that the allegations must "(1) specify the [allegedly fraudulent] statements . . . , (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[31]  In addition, the counterclaims must "allege facts that give rise to a strong inference of fraudulent intent."[32]  Finally, where, as here, "multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his [or her] alleged participation in the fraud."[33]

---

[29]

> *E.g.*, Ctrclm. ¶¶ 14 ("Over many years and in many ways, Bank of America was lied to and deceived by Parmalat . . . in Parmalat's effort to sustain the fraud."), 17-19 ("The allegations below will first describe some of the various individuals and entities involved in the worldwide Parmalat fraud . . . then outline the extent of Parmalat's fraud, . . . [and f]inally . . . [highlight] the false statements and fraudulent documents on which Bank of America reasonably relied when engaging in [various] transactions [with Parmalat].").

[30]

> The Bank's claim for negligent misrepresentation "realleges and incorporates by reference" all prior allegations, including those alleging fraud.  Ctrclm. ¶ 388.  It thus alleges intentional, not negligent, misrepresentation and is subject to Rule 9(b).  *See Rombach v. Chang*, 355 F.3d 164, 171-72 (2d Cir. 2004); *see also In re Daou Sys., Inc.*, 411 F.3d 1006, 1028 (9th Cir. 2005).

[31]

> *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks omitted)); *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001).

[32]

> *Shields*, 25 F.3d at 1128.

[33]

> *In re Parmalat Sec. Litig.*, 377 F. Supp. 2d 390, 401 (S.D.N.Y. 2005) (internal quotation marks and footnotes omitted, alteration in original).

9

B.    *Choice of Law*

   As explained in a previous opinion,[34] the Judicial Panel on Multidistrict Litigation transferred this action here from the Western District of North Carolina pursuant to Section 1407 of Title 28 of the U.S. Code.  In such circumstances, a transferee court applies its own interpretation of federal law, not that of the transferor court.[35]  To the extent that the action involves issues of state law, this Court applies the choice of law rules that would govern in the transferor forum.[36]

C.    *Sufficiency of the Counterclaims*

   Bondi challenges all of the Bank's counterclaims against the Named Subsidiaries. He challenges also the sufficiency of each counterclaim and the claims for punitive and treble damages.

1.    *All Counterclaims Against the Named Subsidiaries*

   Bondi argues that the counterclaims are insufficient as to the Named Subsidiaries about which the counterclaims make no specific allegations.

---

[34]

  *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 587, 593 (S.D.N.Y. 2005).

[35]

  *Menowitz v. Brown*, 991 F.2d 36, 40-41 (2d Cir. 1993).

  The Fourth Circuit recognizes this rule.  *See Bradley v. United States*, 161 F.3d 777, 782 n.4 (4th Cir. 1998).

[36]

  *See Van Dusen v. Barrack*, 376 U.S. 612, 638-39 (1964).

*a.    Rule 9(b)*

The Bank alleges that the Named Subsidiaries "did not disclose their true financial condition to Bank of America" and that they "made repeated false statements in their public financial statements."[37]  These general allegations lack any particularity and thus are insufficient to meet Rule 9(b)'s standard.

The Bank alleges also specific misrepresentations that it attributes to "Parmalat."[38] Under the group pleading doctrine, plaintiffs can "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent" by "rely[ing] on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."[39]  Alleging direct involvement in the company's everyday business is critical to support the presumption.   Thus, allegations that a defendant was simply "an affiliate and contracted to perform work" or even that it "own[ed] and control[led]" the identified speaker will be insufficient.[40]  Here, the Bank does not allege that the Named Subsidiaries were directly involved in SpA's everyday business.   Thus, its specific allegations about Parmalat's corporate statements cannot be attributed to the Named Subsidiaries.

---

[37]

Ctrclm. ¶¶ 340, 343.

[38]

*E.g.*, *id.* ¶¶ 348, 359.

[39]

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (quoting *In re NTL Sec. Litig.*, 347 F. Supp. 2d 15, 22 n.26 (S.D.N.Y. 2004)).

[40]

*See Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990); *Yung v. Lee*, 160 Fed. Appx. 37, 42 (2d Cir. 2005).

Finally, the Bank argues that the Named Subsidiaries failed to reveal the Parmalat fraud.  Omissions constitute fraud only where there is a duty to disclose.[41]  Such a duty generally arises only from a fiduciary or other relationship of trust and confidence.[42]  Here, the counterclaims make no allegations of any such relationship between the Bank and any of the Named Subsidiaries.


      b.     *Vicarious liability*

The Bank argues, in the alternative, that the Named Subsidiaries should be held vicariously liable for the acts of their officers and directors and for the acts of SpA.

The counterclaims allege that several individuals were officers or directors of various of the Named Subsidiaries and that some of them made specific misrepresentations.[43]  It does not allege, however, that any of these statements was made while the individual was serving as officer or director of any subsidiary, much less that they acted in such a capacity.  Absent any allegations that the individuals were acting as agents for the Named Subsidiaries when they made the alleged misrepresentations, the Named Subsidiaries cannot be vicariously liable for their actions.

The Bank urges also that the Named Subsidiaries are liable under a theory of reverse veil-piercing because, it alleges, SpA used the Named Subsidiaries "as conduits for their fraud by forcing the subsidiaries into financial transactions – often guaranteed by Parmalat S.p.A. – that were

---

[41]

      *In re Parmalat Sec. Litig.*, 412 F. Supp. 2d 392, 403 (S.D.N.Y. 2006) (citing *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000)).

[42]

      *Id.* (citing *Autuori*, 212 F.3d at 119).

[43]

      Ctrclm. ¶¶ 46-64.

never properly reported on Parmalat's consolidated balance sheets."[44]  Although the North Carolina courts have not ruled on the law applicable to veil-piercing claims involving foreign corporations,[45] federal district courts in the state have determined that, if state courts considered the issue, they would apply the law of the state of incorporation.[46]  The Court finds the reasoning of these cases persuasive.[47]

The Named Subsidiaries all are incorporated in Italy, the Netherlands, or Luxembourg.  The laws of these countries do not provide for liability under a reverse veil-piercing theory.[48]  Hence, the Named Subsidiaries cannot be held vicariously liable for the acts of SpA.

## 2.   *Sufficiency of Each Counterclaim*

Bondi makes specific challenges to each counterclaim with respect to the remaining counterclaim defendants – Finanziaria, SpA and Netherlands.

---

[44]

*Id.* ¶ 41.

[45]

*Strategic Outsourcing, Inc. v. Stacks*, 625 S.E.2d 800, 804 (N.C. Ct. App. 2006) ("North Carolina courts have not ruled definitively" on the issue of choice of law for piercing the corporate veil).

[46]

*See Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 348-49 (M.D.N.C. 1995) (concluding that the state supreme court, if it had the opportunity to consider the question, would apply the law of the state of incorporation); *see also Mayes v. Moore*, 419 F. Supp. 2d 775, 781 n.5 (M.D.N.C. 2006) (same).

[47]

"A court sitting outside North Carolina owes some deference to the decisions of North Carolina district court judges regarding matters of North Carolina law."  *In re Parmalat*, 383 F. Supp. 2d at 604.

[48]

*See* 3d Frigessi Decl. ¶¶ 3-8 (Italian law); Fisch Decl. ¶¶ 7-11 (Luxembourg law); Hustinx Decl. ¶¶ 4-8 (Dutch law).

### a.      Securities Fraud (Count I)

The first claim for relief is for violations of Section 10(b) of the Exchange Act and Rule 10b-5.  The Bank alleges that, in 1999 and 2001 it purchased notes from Food Holdings and Dairy Holdings in reliance upon Parmalat's guarantees of a return on its investments.[49]  The structure was as follows: Food Holdings and Dairy Holdings issued $300 million worth of four year notes and used the proceeds to buy shares in a Parmalat affiliate, Parmalat Administracao ("Administracao").[50]  The notes were secured by a put agreement which required another Parmalat affiliate, Parmalat Capital Finance Limited ("PCFL"), to purchase Food Holdings' and Dairy Holdings' shares in Administracao if the shares were not sold through an initial public offering by the time the notes were due.[51]  PCFL's performance of the put agreement was guaranteed by SpA.[52]

The Bank alleges that Parmalat engaged in deceptive schemes, misrepresentations, and practices that were intended to and did deceive the Bank into purchasing the notes at "artificially inflated prices."[53]  It alleges further that the market price for these notes "declined materially upon, and as a result of, the public disclosure and the public revelation of the true facts which had been misrepresented or concealed."[54]

---

[49]      Ctrclm. ¶ 366.

[50]      *Id.* ¶¶ 280-81, 299.

[51]      *Id.* ¶¶ 282, 300.

[52]      *Id.*; *see also id.* ¶ 366.

[53]      *Id.* ¶¶ 367-77.

[54]      *Id.* ¶ 378.

>   i.      *Claim preclusion*

Bondi first argues that this claim is barred by claim preclusion because the Italian bankruptcy court allowed claims made by Wells Fargo Bank ("Wells Fargo") on behalf of the Food Holdings and Dairy Holdings noteholders.  The parties dispute whether American or Italian law governs the claim preclusion question and whether either law bars the claim.  The Court need not decide the choice of law question, however, because claim preclusion would not bar the Bank's claim under either American or Italian law.

Under American law, claim preclusion bars relitigation of a claim where the prior claim (1) resulted in a final judgment on the merits (2) by a court of competent jurisdiction and (3) the subsequent claim asserts the same cause of action (4) between the same parties or their privies.[55] Italian claim preclusion principles also require identity of parties.[56]  Hence, Bondi must show, *inter alia*, that Wells Fargo was in privity with BoA.

Bondi argues that since Wells Fargo was a trustee and the Bank was the beneficiary of the trust, they are in privity.  But the analysis is not that simple.  According to the claim submitted

---

[55]

>   *Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 639 (2d Cir. 1987).
>
>   "In deciding [the preclusive effect of] federal-question cases, there is no apparent reason to consult state law and federal courts routinely determine the res judicata effects of foreign judgments without any reference to state law."  18B WRIGHT & MILLER FED. PRAC. & PROC.: JURIS. 2D § 4473 (2002).

[56]

>   Cicconi 3d Decl. ¶ 4.  Neither party submitted expert testimony on the nuances of this requirement, and "[w]here, as here, there is a failure of proof of foreign law, the court may presume that it is the same as local law."  *In re Parmalat*, 383 F. Supp. 2d at 595 (citing *Fairmont Shipping Corp. v. Chevron Int'l Oil Co., Inc.*, 511 F.2d 1252, 1261 n.16 (2d Cir. 1975); *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 155 n. 3 (2d Cir.1968)).

15

by Wells Fargo in the Italian proceeding,[57] Food Holdings and Dairy Holdings "transferred every right regarding [SpA's] Guarantee [of the put agreement]" to Wells Fargo and Wells Fargo "was bound to exercise, in its capacity as 'trustee' said rights in its own interest and in the interest of [the noteholders] . . . for the purpose of guaranteeing the payments owed by" Food Holdings and Dairy Holdings.[58]   As noted above, SpA's guarantee was a contract with Food Holdings and Dairy Holdings providing that SpA would perform under the put agreement if PCFL failed to do so.

Wells Fargo, as trustee only of Food Holdings' and Dairy Holdings' interests in the SpA guarantee, likely lacked standing to bring the Bank's 10b-5 claim.  Although the contract itself is not before the Court, the contract rights apparently involved the put agreement alone and did not encompass the rights of the note purchasers themselves, even though the purchasers probably would have benefitted from any recovery on behalf of the contract.  Ultimately, however, the record on this issue is incomplete.  The burden lies with the party arguing that claim preclusion bars the present action,[59] and Bondi has not satisfied it.

Although Bondi argues also that the Bank has recovered fully these damages, the record before the Court is insufficient to resolve that issue as well.

---

[57]

On a motion to dismiss, a court may consider matters of which judicial notice may be taken. *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  "[C]ourts routinely take judicial notice of documents filed in other courts, . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

[58]

Frigessi 2d Decl., Ex. C at 4 (Food Holdings); *see also id.* Ex. D at 4 (Dairy Holdings).

[59]

*Computer Assocs. Int'l. Inc. v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir. 1997).

> ii.    *Economic loss*

Bondi argues next that the Bank fails to allege sufficiently that it suffered an economic loss.  This argument is without merit.

A party making a Rule 10b-5 claim "must show that the defendant's misrepresentations not only caused the plaintiff to engage in the transaction in question, but also that they caused the harm suffered."[60]  Contrary to Bondi's assertion, however, no allegation of the specific amount of loss is required.[61]

Here, the Bank alleges that "the price of Parmalat debt offerings was artificially inflated" and "[t]he market prices for Parmalat's debt securities declined materially upon, and as a result of, the public disclosure and the public revelation of the true facts which had been misrepresented or concealed."[62]  The Bank alleges sufficiently an economic loss.

> iii.    *Netherlands*

The Bank argues that Netherlands should be liable for its participation in "a fraudulent scheme . . . [that] involved misstatements and omissions that appeared on Parmalat's

---

[60]

*Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir. 1992).

[61]

*See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (assuming without deciding that Rule 8(a) applies to allegations of economic loss and indicating that a plaintiff need only "provide a defendant with some indication of the loss"); *see also Hunt v. Enzo Biochem, Inc.*, — F. Supp. 2d —, 2006 WL 3591431, at *11 n.120 (S.D.N.Y. 2006) (collecting post-*Dura* cases applying Rule 8 to allegations of loss causation).

[62]

Ctrclm. ¶¶ 375, 378.

consolidated financial statements."[63]

The sole misrepresentations made by Netherlands that are alleged with particularity were made in December 2002.[64]  The Bank purchased the securities at issue here in December 1999 and June 2001.[65]  Clearly any misrepresentations by Netherlands did not cause injury relating to the Bank's purchase of these securities.

b.      *Fraud and Negligent Misrepresentation (Counts II and III)*

Bondi moves to dismiss the fraud and negligent misrepresentation claims against Netherlands on the ground that the Bank alleges no injury directly arising from the transaction in which Netherlands allegedly made misrepresentations.

The Bank argues that it relied on Netherlands' misrepresentations in subsequent decisions to extend credit to other Parmalat entities.[66]  The Bank alleges, in essence, that Netherlands' misrepresentations about its own and Parmalat's financial health deceived the Bank into believing that the Parmalat empire was solid and that the Bank therefore extended credit to Parmalat entities and suffered damages when Parmalat became insolvent.  This sufficiently alleges a claim against Netherlands.

---

[63]

Bank Mem. 16.

[64]

Ctrclm. ¶¶ 321, 332-36.

[65]

*Id.* ¶ 366.

[66]

Bank Mem. 31 & n.19.

c.      *Civil Conspiracy (Count IV)*

The Bank alleges that the counterclaim defendants were active participants in a conspiracy with "corrupt Parmalat insiders and agents . . . and with outside advisors."[67]  Bondi argues that a corporation cannot conspire with its agents or subsidiaries to sustain liability for civil conspiracy and thus the counterclaim should be dismissed.

To bring a successful civil conspiracy claim under North Carolina law, a party must prove, among other elements, "an agreement between two or more individuals."[68]  In many jurisdictions, the intracorporate conspiracy doctrine forecloses conspiracy claims where the alleged agreement is between a corporation and its agent.[69]  This arises from the principle "in the law of conspiracy that you must have two persons or entities to have a conspiracy.  A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."[70]  The intracorporate conspiracy doctrine does not apply, however, where the conspiring insiders had an independent personal stake in achievement of the illegal objective.[71]

---

[67]

Ctrclm. ¶ 398.

[68]

*In re Parmalat*, 383 F. Supp. 2d at 602 (quoting *Privette v. Univ. of N.C. at Chapel Hill*, 385 S.E.2d 185, 193 (N.C. 1989)).

[69]

*See* Robin Miller, *Construction and Application of "Intracorporate Conspiracy Doctrine" as Applied to Corporation and Its Employees – State Cases*, 2 A.L.R. 6th 387 (2005).

[70]

*Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1953); *see also Garlock v. Hilliard*, 2000 WL 33914616, at *5 (N.C. Super. Aug. 22, 2000) ("Alleging that a corporation is conspiring with its agents, officers or employees is accusing a corporation of conspiring with itself.").

[71]

*Garlock*, 2000 WL 33914616, at *6.

North Carolina's appellate courts have not ruled yet on whether the intracorporate conspiracy doctrine applies in that state.[72]  Several recent lower state and federal courts, however, have applied the doctrine,[73] and the trend seems clear.  The Court therefore is persuaded that the North Carolina Supreme Court, when presented with the opportunity, will adopt the doctrine.

The parties dispute whether the counterclaims allege sufficiently that the individual co-conspirators had an independent personal stake in the conspiracy.[74]  Although the counterclaims emphasize that individual insiders "were acting in their capacity as employees,"[75] the Bank does allege that the "corrupt insiders each had an independent personal and financial stake in achieving

---

[72]

See *Lenzer v. Flaherty*, 418 S.E.2d 276, 285-86 (N.C. Ct. App. 1992) (noting "[o]ur research discloses no North Carolina case in which the doctrine has been adopted as a defense to civil conspiracy" but reversing summary judgment on the alternate ground that the if the doctrine were adopted, there were disputed facts regarding whether the independent personal stake exception barred its application).

[73]

See *Cloaninger v. McDevitt*, 2006 WL 2570586, at *8 & n.4 (W.D.N.C. Sept. 3, 2006); *Bear Hollow, L.L.C. v. Moberk, L.L.C.*, 2006 WL 1642126, at *13 (W.D.N.C. June 6, 2006); *McMahon v. Synthron, Inc.*, 2006 WL 149054, at *4 (W.D.N.C. Jan. 18, 2006); *Godfredson v. JBC Legal Group, P.C.*, 387 F. Supp. 2d 543, 550 (E.D.N.C. 2005); *Maurer v. SlickEdit, Inc.*, 2005 WL 1412496, at *12 (N.C. Super. May 16, 2005); *State ex rel. Cooper v. McClure*, 2004 WL 2965983, at *13 (N.C. Super. Dec. 14, 2004); *Garlock*, 2000 WL 33914616, at *5-6.

[74]

The Bank argues only that the intracorporate conspiracy doctrine is not North Carolina law or, in the alternative, that the exception applies.  It does not argue that the doctrine does not apply to the "outside advisors" alleged as co-conspirators.  In any event, the only identified outside advisor, Zini, served as outside counsel to Parmalat.  Ctrclm. ¶ 63.  Courts have generally held that outside counsel acting within the scope of their agency fall within the intracorporate conspiracy doctrine.  *See, e.g.*, *Stoner v. New York City Ballet Co.*, No. 99 Civ. 0196 (BSJ), 2002 WL 523270, at *9 (S.D.N.Y. Apr. 8, 2002) (dismissing § 1985 conspiracy claim).

[75]

Ctrclm. ¶ 14.

the corporation's illegal objective."[76]  Other allegations also indicate that insiders received personal benefits:

> "Parmalat, *as well as its corrupt insiders*, benefited from the fraudulent activities."[77]

> "Parmalat, and *not just the looting insiders*, benefited from the borrowing activity. . . . Parmalat managers were *not acting entirely outside the scope of their employment* in [fraudulently] arranging this financing . . . ."[78]

The allegations of an independent stake are thin.  On a motion to dismiss, however, the Bank is entitled to all reasonable inferences drawn from its allegations.  The inference reasonably may be drawn that the individuals were motivated by personal gain as well as the interests of the Parmalat entity.  The intracorporate conspiracy doctrine does not foreclose the conspiracy counterclaim at this stage of the litigation.

### d.    RICO (Count V)

The Bank counterclaims also for alleged violations of the federal RICO statute. Bondi argues that the Bank (1) fails to allege a distinct person and enterprise, (2) lacks standing with respect to transactions that caused it no loss, (3) insufficiently alleges predicate acts of money laundering, and (4) fails to allege that Netherlands engaged in a pattern of racketeering activity.  As the Court dismisses the counterclaim on the first ground, it is unnecessary to consider the others.

"[T]o establish liability under § 1962(c) one must allege and prove the existence of

---

[76]
      *Id.* ¶ 400.

[77]
      *Id.* ¶ 5 (emphasis added).

[78]
      *Id.* ¶ 362 (emphasis added).

two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."[79]  The entities are not distinct where the "person" is a corporation and the "enterprise" consists of the corporation associating either with "its own employees or agents carrying on the regular affairs of the [corporation]"[80] or with subsidiaries "operat[ing] within a unified corporate structure."[81]  As the Second Circuit has explained, "[b]ecause a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself.  Thus, where employees of a corporation associate together to commit a pattern of predicate acts *in the course of their employment and on behalf of the corporation*," there is no enterprise distinct from the corporation.[82]

Here, the Bank alleges that the person was "Parmalat," defined in the counterclaims as Finanziaria, SpA, Netherlands, and the Named Subsidiaries.  It alleges that the enterprise consisted of "Parmalat S.p.A., Parmalat Finanziaria S.p.A., Parmalat affiliates and subsidiaries located around the world, Parmalat's culpable employees, directors and officers, Parmalat's outside

---

[79]

> *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).

[80]

> *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 344 (2d Cir. 1994).

[81]

> *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *rev'd on other grounds*, 525 U.S. 128 (1998).
>
> The Bank argues that *Riverwoods* and *Discon* have been undermined by the Supreme Court's decision in *Kushner*.  But *Kushner* distinguished both cases on their facts – in *Kushner*, the person was an individual, whereas in *Riverwoods* and *Discon*, as here, the person was a corporation – and expressly declined to address their merits.  *Kushner*, 533 U.S. at 164.

[82]

> *Riverwoods*, 30 F.3d at 344 (emphasis added, citation omitted).

counsel, Zini & Associates and Pavia e Ansaldo P.C., and a variety of third-party entities [including] . . . Bonlat, Epicurum Ltd., Curcastle, Zilpa, Western Alps, Web Holdings and Boston Holdings."[83] Thus, the "person" and the "enterprise" do not completely overlap.   On closer examination, however, there is no substance to the distinction.

"[R]eference to unnamed 'attorneys, accountants and other agents' as part of the enterprise" cannot be the basis for the distinction between a corporate person and an enterprise.[84] Hence, the Bank's inclusion of "affiliates and subsidiaries located around the world," "culpable employees, directors and officers," and Parmalat's counsel Zini do not distinguish the enterprise from the person.[85]   Nor does the reference to the "variety of third-party entities" change anything. The counterclaims refer to them as "dummy entities" and explain how they were "used [by Parmalat] to conceal the losses generated by its operating subsidiaries."[86]   As they thus were instrumentalities of Parmalat, these entities do not render the enterprise distinct from the person.

The Bank attempts to overcome this identity by distinguishing the legitimate ends of the Parmalat person and the illegitimate ends of the enterprise.   In particular, it urges that the enterprise ultimately was not performing regular business operations:

---

[83]

Ctrclm. ¶ 406.

[84]

*Discon*, 93 F.3d at 1064.

[85]

Ctrclm. ¶¶ 82, 90; *Goldberg v. Merrill Lynch*, No. 97 Civ. 8779 (RPP), 1998 WL 321446, at *3 n.5 (S.D.N.Y. June 18, 1998) (finding no distinct enterprise between corporation and its lawyers where "[t]here are no allegations . . . that [the] lawyers were acting in any capacity other than as [the corporation's] agents").  There are no allegations about the other outside counsel listed as a member of the enterprise.

[86]

Ctrclm. ¶ 69.

> "The Enterprise . . . performed a series of financial transactions meant to raise money for Parmalat and conceal its losses and debt, [and thus] was engaged in activity outside the scope of Parmalat's normal business operations.  Parmalat is, at its core, a dairy company, whose profits were based on the sale of tangible products."[87]

This argument is unpersuasive.  The Bank concedes that part of the purpose of the enterprise was to support Parmalat's legitimate business:

> "The Enterprise's common purpose was to raise funds to support Parmalat's ongoing business activities – both legitimate and illegitimate.  At all relevant times, the association of entities that formed the Enterprise was also associated for the lawful purpose of raising money to support Parmalat's ongoing business operations and growth strategy."[88]

Moreover, any business, as part of its regular operations, must both carry out and finance its operations.

The Bank's argument that this conclusion "would essentially eviscerate the well-settled principle that a corporation can be both the RICO person and a member of the enterprise"[89] is unpersuasive.  Where the purpose of the enterprise is not solely the purpose of the corporate person, RICO liability will attach.  This is not such a case.[90]

---

[87]

   *Id.* ¶ 408.

[88]

   *Id.* ¶ 407.

[89]

   Bank Mem. 22.

[90]

   *See, e.g.*, *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 441 (5th Cir. 1987) (finding no distinction where there was "no evidence that the bank, its holding company, and the three employees were associated in any manner apart from the activities of the bank") (cited with approval in *Riverwoods*).

24

*e.      Unfair and Deceptive Trade Practices (Count VI)*

North Carolina General Statutes, section 75-1.1 prohibits "unfair or deceptive acts or practices in or affecting commerce."

As an initial matter, it is undisputed that "securities transactions are beyond the scope of [the statute]."[91]  Thus, the alleged transactions involving the Bank's purchase of securities or involvement as a private placement agent for third parties' purchases of securities cannot be a basis for this claim.

The remaining transactions are loans the Bank made to various Parmalat entities.  The counterclaims allege that all of the loans provided working capital for the entities.[92]  The parties dispute the application of the statute to such transactions.

In *HAJMM Co. v House of Raeford Farms, Inc.*,[93] the North Carolina Supreme Court held that the statute did not apply to revolving fund certificates issued to build up capital because "revolving fund certificates are, in essence, corporate securities."[94]  It noted that part of the rationale for excluding securities from the coverage of the act was that they were regulated extensively by other statutory schemes.  The court explained, however, that there was another reason to exclude

---

[91]

    *HAJMM Co. v House of Raeford Farms, Inc.*, 403 S.E.2d 483, 492 (N.C. 1991) (quoting *Skinner v E. F. Hutton & Co.*, 333 S.E.2d 236, 241 (N.C. 1985)).

[92]

    *See* Ctrclm. ¶¶ 135, 141, 147, 153, 160, 167, 173, 179, 185, 192, 199, 206, 212.

[93]

    403 S.E.2d 483.

[94]

    *Id.* at 493.

securities transactions.  The statute defines "commerce" to include "all business activities,"[95] and *HAJMM* found that the term "connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized."[96]  Since "[s]ecurities transactions are related to the creation, transfer, or retirement of capital," *HAJMM* held that, "[u]nlike regular purchase and sale of goods, or whatever else the enterprise was organized to do, they are not 'business activities' as that term is used in the Act."[97]

Subsequent cases have extended this reasoning beyond the traditional securities realm.  For example, one case held that the statute did not apply to a golf tournament organized and sponsored by the Jaycees "to raise the visibility of the Jaycees in the community and to raise the funds necessary to sustain the organization," because "raising money" did not constitute a business activity within the meaning of the statute.[98]  Another, in a factual context similar to this case, held that a loan to provide working capital was not covered by the statute because it was "primarily a capital-raising device."[99]

---

[95]

N.C. GEN. STAT. § 75-1.1(b).

[96]

403 S.E.2d at 493.

[97]

*Id.*

[98]

*Malone v. Topsail Area Jaycees, Inc.*, 439 S.E.2d 192, 194 (N.C. Ct. App. 1994) (internal quotations omitted).

[99]

*Oberlin Capital L.P. v. Slavin*, 554 S.E.2d 840, 848 (N.C. Ct. App. 2001) (loan terms included right to purchase stock in defendant corporation).

*State ex rel. Cooper v. NCCS Loans, Inc.*, 624 S.E.2d 371 (N.C. Ct. App. 2005), cited by the Bank for the proposition that the statute applies to loans, is inapposite.  In that case, the

Following the logic of these cases, the Bank's loans to Parmalat entities fall outside of the scope of the statute.  The loans were used to provide working capital for the functioning of their business activities and therefore did not constitute the "day-to-day" business of the entities. Bondi's motion to dismiss this counterclaim is granted.

3.    *Punitive and Treble Damages*

The only remaining claim for which the Bank seeks punitive or treble damages is the fraud claim.[100]  Bondi challenges the Bank's claims for such damages as unenforceable in Italy, where alone, the Bank has agreed, it will seek to enforce any judgment.

The Bank does not contradict Bondi's expert testimony that Italian courts would not enforce a judgment for punitive damages.  However, the extent to which courts in Italy will enforce any amount fixed in this case is unclear.  As the Bank intends to litigate these claims defensively as setoffs to any judgment entered against it, I have allowed it to assert them affirmatively also because liquidating any amount due will be a minor burden on U.S. courts and may prove a significant benefit to Italian courts.  It will be for the Italian courts to determine whether they will enforce any judgment for punitive or treble damages.

---

court found that the defendant was in the business of making short-term loans to consumers, thus the loans themselves were the company's day-to-day business.

[100]    Ctrclm. ¶ 387.

27

### III.   Conclusion

For the foregoing reasons, Bondi's motion to dismiss the Bank's counterclaims [05 Civ. 4015, docket item 101; 04 MD 1653, docket item 467] is granted to the extent that (1) Counts V and VI of the counterclaims are dismissed as to all defendants, (2) Count I is dismissed as to Parmalat Netherlands, B.V., and (3) all counterclaims are dismissed in all respects as to Parmalat Finance Corporation B.V., Parmalat Capital Netherlands B.V., Dairies Holding International B.V., Parmalat Soparfi S.A., Olex S.A., Eurolat S.p.A., Lactis S.p.A., Contal S.r.l., Geslat S.r.l., Newco S.r.l., Centro Latte Centallo S.r.l., Panna Elena S.r.l., and Parmengineering S.r.l.   The motion is denied in all other respects.

SO ORDERED.

Dated:  March 23, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)