UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re PARMALAT SECURITIES LITIGATION | : | |
| | : | |
| This document relates to: 04 Civ. 9771 | : | |
| 05 Civ. 4015 | : | |
| 06 Civ. 0704 | : | |
| 06 Civ. 2991 | : | |
| DR. ENRICO BONDI, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GRANT THORNTON INT'L, *et al.*, | : | MASTER DOCKET |
| Defendants. | : | |
| DR. ENRICO BONDI, | : | 04 MD 1653 (LAK) ECF Case |
| Plaintiff, | : | |
| | : | |
| v. | : | MEMORANDUM IN |
| | : | SUPPORT OF DEFENDANTS' |
| BANK OF AMERICA CORPORATION, *et al.*, | : | MOTION FOR SUMMARY |
| Defendants. | : | JUDGMENT |
| PARMALAT CAPITAL FINANCE LIMITED, | : | |
| Plaintiff, | : | **Electronically filed** |
| | : | |
| v. | : | |
| | : | |
| BANK OF AMERICA CORPORATION, *et al.*, | : | |
| Defendants. | : | |
| PARMALAT CAPITAL FINANCE LIMITED, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GRANT THORNTON INT'L, *et al.*, | : | |
| Defendants. | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON THE GROUNDS OF *IN PARI DELICTO***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

KEY TO CITATIONS TO THE RECORD ............................................................................ viii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF THE FACTS ............................................................................................... 4

    I.    PARMALAT'S ORIGINS AND MASSIVE FRAUD ............................................... 4

    II.   PARMALAT'S CORRUPT MANAGERS ................................................................. 8

    III.  PARMALAT'S MASSIVE, FRAUD-FUELED GROWTH FROM 1990 TO 2003 ............... 9

    IV.  GT-ITALY'S ALLEGED ROLE IN PARMALAT'S FALSE ACCOUNTING ................... 12

    V.   PARMALAT'S TRANSACTIONS WITH BANK OF AMERICA ...................................... 12

          A.   The Transactions Were Negotiated And Approved By Parmalat's Most Senior Officers And PCFL's Board Of Directors. ................................................................. 14

          B.   Parmalat Put The Proceeds Of Its Transactions With BoA To Parmalat's Ordinary Business Needs. ...................................................................................... 15

    VI.  THE ALLEGED "MISAPPROPRIATIONS" FROM PARMALAT ................................. 16

          A.   "Looting" Was Not The Sole Purpose Of Parmalat's Massive Fraud. ..................... 16

          B.   No Money Was Looted From Parmalat's Transactions With BoA. ........................... 18

          C.   No Money Was Looted From PCFL. ....................................................................... 20

SUMMARY JUDGMENT STANDARD ................................................................................. 20

ARGUMENT .......................................................................................................................... 21

    I.    BONDI STANDS IN PARMALAT'S SHOES ....................................................... 22

    II.   PARMALAT AND PCFL STAND *IN PARI DELICTO*. ....................................... 22

          A.   Parmalat's Managers Were Acting Within The Scope Of Their Authority. ............. 23

          B.   Parmalat's Managers Did Not Totally Abandon Its Interests. ................................. 25

              1.   The Fraud Was Not A "Total Abandonment" By Parmalat's Managers. ........... 25

                  a.   The Fraud Was Committed On Parmalat's Behalf. ................................. 27

b.    "Looting" Was Not The Sole Purpose Of The Fraud. ...............................28

c.    Parmalat's Managers Intended To Save Parmalat. ...................................31

2.    Parmalat's And PCFL's Transactions With BoA Were Also Not A Total Abandonment. ...................................................................................................32

a.    Refinancing Debt Was Not Adverse To Parmalat. ...................................33

b.    The Proceeds Of The BoA Transactions Were Not "Looted." .................33

3.    In Preparing Parmalat's Fraudulent Financial Statements, Allegedly With The Help Of GT-Italy, Parmalat's Management Did Not Totally Abandon The Corporate Interests. .............................................................................35

C.    Parmalat And PCFL Were Completely Dominated. ....................................................36

III.    PLAINTIFFS' CASES ARE ENTIRELY BARRED BY *IN PARI DELICTO*. .....................40

CONCLUSION ...................................................................................................................................40

## TABLE OF AUTHORITIES

### CASES

*Anderson* v. *Missouri State Life Ins.*,
69 F.2d 794 (6th Cir. 1934) ...........................................................................................................38

*Askanase* v. *Fatjo*,
1996 WL 33373364 (S.D. Tex. Apr. 1, 1996) ..............................................................................28

*Baena* v. *KPMG LLP*,
389 F. Supp. 2d 112 (D. Mass. 2005) ...........................................................................................40

*Baena* v. *KPMG LLP*,
453 F.3d 1 (1st Cir. 2006)............................................................................................21, 23, 29, 36

*Bankruptcy Services, Inc. v. Ernst & Young*,
529 F. 3d 432 (2d Cir. 2008)..........................................................................................................31

*Bledsoe* v. *Coxe Lumber Co.*,
48 S.E.2d 50 (N.C. 1948)................................................................................................................40

*Bondi* v. *BoA*, (*Bondi III*)
383 F. Supp. 2d 587 (S.D.N.Y. 2005)...................................................................................... *passim*

*Bondi* v. *BoA*, (*Bondi IV*)
412 F. Supp. 2d 392 (S.D.N.Y. 2006)..............................................................................1, 24, 32

*Bondi* v. *Citigroup*, (*Citi I*)
2008 WL 1772647 (N.J. Super. Ct. Law Div. Apr. 15, 2008).............................................. *passim*

*Bondi* v. *GTI*, (*Bondi V*)
421 F. Supp. 2d 703 (S.D.N.Y. 2006)...................................................................................... *passim*

*Breeden* v. *Kirkpatrick & Lockhart LLP*,
336 F.3d 94 (2d Cir. 2003)..............................................................................................................36

*Buchwald* v. *Renco Group*,
399 B.R. 722 (Bankr. S.D.N.Y. 2009).....................................................................................33, 38

*Cenco Inc.* v. *Seidman & Seidman*,
686 F.2d 449 (7th Cir. 1982) ..........................................................................................27, 33, 36, 38

*Claybrook* v. *Broad & Cassel, P.A.*,
364 B.R. 562 (Bankr. D. Del. 2007) ........................................................................................39, 40

*Cobalt Multifamily Investors I, LLC* v. *Shapiro*,
2008 WL 833237 (S.D.N.Y. Mar. 28, 2008) .................................................... *passim*

*Cohen* v. *Morgan Schiff & Co.*,
385 B.R. 381 (S.D. Ga 2008.) .................................................................................25

*DGM Invs, Inc.*. v. *N.Y. Futures Exch., Inc.*,
265 F. Supp. 2d 254 (S.D.N.Y. 2003) ...........................................................27, 28

*Devor* v. *Knauer*,
84 Ill. App. 184 (Ill. App. Ct. 1899) ......................................................................40

*Eng* v. *Scully*,
146 F.R.D. 74 (S.D.N.Y. 1993) ...............................................................................18

*FDIC* v. *Ernst & Young*,
967 F.2d 166 (5th Cir. 1992) ...................................................................................27

*FDIC* v. *Shrader & York*,
991 F.2d 216 (5th Cir. 1993) ............................................................................24, 27

*FHL* v. *BoA*,
477 F. Supp. 2d 602 (S.D.N.Y. 2007) .....................................................................38

*Fehribach* v. *Ernst & Young LLP*,
493 F.3d 905 (7th Cir. 2007) ............................................................................23, 28

*First Nat'l Bank of Cicero* v. *Lewco Sec. Corp.*,
860 F.2d 1407 (7th Cir. 1988) ................................................................................37

*First Nat'l Bank of Sullivan* v. *Brumleve & Dabbs*,
539 N.E.2d 877 (Ill. App. Ct. 1989) .......................................................................35

*Frye* v. *Chi. Burlington & Quincy R.R.*,
73 Ill. 399 (1874) ....................................................................................................23

*Grassmueck* v. *Am. Shorthorn Ass'n*,
402 F.3d 833 (8th Cir. 2005) ...................................................................................21

*Gray* v. *Evercore Restructuring*,
544 F.3d 320 (1st Cir. 2008) ...................................................................................21

*Grede* v. *Bank of N.Y.*,
2009 WL 188460 (N.D. Ill. Jan. 27, 2009) .............................................................32

*Grede* v. *McGladrey & Pullen LLP*, (*Grede I*)
2008 WL 4425447 (N.D. Ill. Sept. 26, 2008) ........................................................... *passim*

*Hartmann* v. *Prudential*,
9 F.3d 1207 (7th Cir. 1993) ...........................................................23, 25, 31

*Holland* v. *Arthur Andersen*,
469 N.E.2d 419 (Ill. App. Ct. 1984) ...........................................................35

*Holland* v. *Arthur Andersen*,
571 N.E.2d 777 (Ill. App. Ct. 1991) ...........................................................28

*James Ventures, L.P.* v. *TIMCO Aviation Servs.*,
2008 WL 190499 (S.D. Fla. Jan. 22, 2008) ...........................................................32, 33

*Kessinger* v. *Standard Oil Co.*,
245 Ill. App. 376 (Ill. App. Ct. 1925) ...........................................................40

*Kirschner* v. *Grant Thornton LLP*,
2009 WL 996417 (S.D.N.Y. Apr. 14, 2009) ........................................................... *passim*

*Konieczny* v. *Micciche*,
702 A.2d 831 (N.J. Super. Ct. App. Div. 1997) ...........................................................22

*Kreppel* v. *Guttman Breast Diag. Inst.*,
1999 WL 1243891 (S.D.N.Y. Dec. 21, 1999) ...........................................................10

*Ladd Furniture* v. *Ernst & Young*,
1998 WL 1093901 (M.D.N.C. Aug. 27, 1998) ...........................................................2, 23, 25

*MCA Fin. Corp.* v. *Thornton*,
687 N.W.2d 850 (Mich. Ct. App. 2004) ...........................................................33

*Mack* v. *Otis Elevator Co.*,
326 F.3d 116 (2d Cir. 2003) ...........................................................20

*Mediators, Inc.* v. *Manney*,
105 F.3d 822 (2d Cir. 1997) ...........................................................37

*Merrill Lynch* v. *Nickless*,
324 B.R. 10 (D. Mass. 2005) ...........................................................40

*Nisselson* v. *Lernout*,
469 F.3d 143 (1st Cir. 2006) ...........................................................21, 37

*Nisselson* v. *Lernout,*
568 F. Supp. 2d 137 (D. Mass. 2008) ........................................................................28

*O'Connell* v. *Arthur Andersen,*
383 B.R. 231 (Bankr. S.D.N.Y. 2008) ......................................................................38

*Official Comm. of Unsecured Creditors* v. *R.F. Lafferty & Co.,*
267 F.3d 340 (3d Cir. 2001).......................................................................................39

*Pappas* v. *BoA,* 501 F. Supp. 2d 560 (S.D.N.Y. 2007),
aff'd 2009 WL 382602 (2d Cir. Feb. 17, 2009).........................................28, 32, 33, 34

*In re Parmalat Sec. Litig.,*
2007 WL 1169217 (S.D.N.Y. Apr. 18, 2007)............................................................10

*In re Parmalat Sec. Litig.,* (*PCFL v. GTI*)
2007 WL 5008628 (S.D.N.Y. Feb. 21, 2007)..............................................................2

*In re Parmalat Sec. Litig.,* (*PCFL v. BoA*)
2007 WL 656845 (S.D.N.Y. Feb. 28, 2007).................................................................2

*In re Parmalat Sec. Litig.,*
477 F. Supp. 2d 637 (S.D.N.Y. 2007).......................................................................18

*In re Parmalat Sec. Litig.,*
598 F. Supp. 2d 569 (S.D.N.Y. 2009).................................................................21, 22

*Rogers* v. *McDorman,*
521 F.3d 381 (5th Cir. 2008) ...........................................................21, 27, 33, 40

*Travis* v. *Duckworth,*
75 S.E.2d 309 (N.C. 1953).........................................................................................25

*Turner* v. *Eford,*
58 N.C. 106 (N.C. 1859).............................................................................................40

*In re Tyco Int'l,*
2004 WL 2348315 (D.N.H. Oct. 14, 2004) ........................................25, 29, 31, 36

*U.S. Philips* v. *Iwasaki Elec.,*
2006 WL 2792693 (S.D.N.Y. Sept. 28, 2006)...........................................................34

*York* v. *Merritt,*
77 N.C. 213 (N.C. 1877).............................................................................................23

## STATUTES

N.C. Gen. Stat. § 75D-8(c) ............................................................................................40

## INTERNATIONAL STATUTES

Ital. Civil Code § 2403 ...................................................................................................23
     § 2423.............................................................................................................23

## SCHOLARLY AUTHORITY

Russell M. Robinson, II, *Robinson on N.C. Corp. Law* (7th ed. 2008) ...................................14, 37

# KEY TO CITATIONS TO THE RECORD

(in order of initial appearance below)

| **Short Form** | **First Appearance** | **Long Form** |
|---|---|---|
| *Guerrera Decl.* | viii | June 1, 2009 Declaration of Mark P. Guerrera In Support Of Defendants' Motion for Summary Judgment on the Grounds of In Pari Delicto |
| *PCFL-BoA Compl.* | 4 | Complaint in *Parmalat Capital Finance Limited v. Bank of America, et al*, filed Nov. 23, 2005 (submitted as *Guerrera Decl. Exh.* A) |
| *Bondi-NJ* | n.1 | *Bondi's Counter-Response to Citigroup's Statement of Material and Undisputed Facts*, filed Mar. 18, 2008, *Bondi v. Citigroup*, No. BER-L-10902-04 (N.J. Super. Ct. Law Div.) (submitted as *Guerrera Decl. Exh.* B) |
| *History of Products* | 5 | *Parmalat's History of Products*, available at: http://www.parmalat.com/en/about_us/history/history_of_products (submitted as *Guerrera Decl. Exh.* C) |
| *Bondi Parma Compl.* | 5 | *Summons and Complaint filed by Enrico Bondi* (Court of Parma Nov. 4, 2004) (pages 1-6, 31, 32, 43 and 53 submitted as *Guerrera Decl. Exh.* D) |
| *Bondi DCP Filing* | 5 | *Petition of Damaged Civil Parties filed by Enrico Bondi in Nos. 2395/05 and 2198/05* (Court of Parma, June 5, 2006) (pages 1-11, 16, 20 and 63-64 submitted as *Guerrera Decl. Exh.* E) |
| *2005 Insolvency Report* | 5 | Report of the Extraordinary Commissioner on the causes of insolvency of Parmalat Finanziaria S.p.A. and subsidiaries subject to the Agreement Proposal of June 21, 2004 – Addition at May 4, 2005 (pages 6, 13 and 34-35 submitted as *Guerrera Decl. Exh.* F) |
| *Exh. 20,169* | 5 | July 4, 2005 PricewaterhouseCoopers SpA Report entitled "Default of the Parmalat Group – Information on the increase in indebtedness and negative net equity" (page 14 submitted as *Guerrera Decl. Exh.* G) |

*Bondi-BoA Compl.* ..........................6..............Original Compl. in *Bondi v. Bank of America, et al.*, filed Oct. 7, 2004 (submitted as *Guerrera Decl. Exh.* H)

*Bondi-Auditor FAC* ..........................6..............First Am. Compl. in *Bondi* v. *Grant Thornton International*, filed under seal Sept. 30, 2005 (submitted as *Guerrera Decl. Exh.* I)

*PCFL 11/28/97 Minutes* .................7..............Minutes of PCFL Board of Directors Meeting held in Zurich, Switzerland on Nov. 28, 1997 (JL0007617-19) (submitted as *Guerrera Decl. Exh.* J)

*PCFL Circular 11/28/97* .................7..............Parmalat Capital Finance Limited Preference Share Offering Circular dated Nov. 28, 1997 (pages JL0007822, JL0007826, JL0007868-69 and JL0007930-73 submitted as *Guerrera Decl. Exh.* K)

*Bondi's Interrog. Resps. No. 1* .......8..............Plaintiff Dr. Enrico Bondi's Responses to Bank of America's First Set of Interrogatories dated Oct. 25, 2006 (submitted as *Guerrera Decl. Exh.* L)

*Exh. 4161* ........................................8..............Set of Lists Provided by Quinn Emanuel at Jan. 25, 2007 Rule 30(b)(6) Deposition of Francesco Gianni (submitted as *Guerrera Decl. Exh.* M)

*Gianni 30(b)(6) Tr.* .........................8..............Jan. 24 to Jan. 25, 2007 Rule 30(b)(6) Deposition of Francesco Gianni (pages 235-38, 264-65, 479-99 submitted as *Guerrera Decl. Exh.* N)

*Parmalat Plan* ................................9..............Restructuring Plan (English version) Filed at the Ministero Delle Attivita' Produttive ("Ministry of Productive Activities") By Extraordinary Commissioner Dott. Enrico Bondi (pages 16, 40-41, 45-54, 60, 116-17, 125, 133, 137-44 and 153-54 submitted as *Guerrera Decl. Exh.* O)

*2004 Insolvency Report* .................9..............A report on the causes of the insolvency of Parmalat Finanziaria S.p.A. and subsidiaries dated 6/19/2004 signed by the Special Commissioner, Dr. Enrico Bondi (page 4 submitted as *Guerrera Decl. Exh.* P)

*Bondi Tr.* ........................................9..............Feb. 5 to Feb. 8, 2007 Deposition of Enrico Bondi (pages 282-85, 295 and 622-25 submitted as *Guerrera Decl. Exh.* Q)

*Tonna Milan Tr.* ............................10.............May 9, 2006 Testimony of Fausto Tonna before the
Court of Milan (pages 42-43 and 181-83 submitted
as *Guerrera Decl. Exh.* R)

*Bondi 2/28/06 Milan Tr.* ...............10.............Feb. 28, 2006 Testimony of Enrico Bondi before the
Court of Milan (pages 22-23 submitted as *Guerrera
Decl. Exh.* S)

*Bondi 3/7/06 Milan Tr.* ................10.............Mar. 7, 2006 Testimony of Enrico Bondi before the
Court of Milan (pages 40-41 submitted as *Guerrera
Decl. Exh.* T)

*Bondi 1/13/09 Milan Tr.* ...............10.............Jan. 13, 2009 Testimony of Enrico Bondi before the
Court of Milan (pages 69-70 and 73 submitted as
*Guerrera Decl. Exh.* U)

*Lagro Expert Tr.* ...........................10.............Aug. 21 to Aug. 24, 2007 Expert Deposition of
Franco Lagro (pages 261, 474-77 submitted as
*Guerrera Decl. Exh.* V)

*Chiaruttini Report* .........................10.............Expert Report of Stefania Chiaruttini (pages T8 &
T9 at 143, T10 at 144a, & 45 submitted as *Guerrera
Decl. Exh.* W)

*Galea Report* ................................10.............Expert Report of Oliver Galea (pages 50-54, 256-61
and 277 submitted as *Guerrera Decl. Exh.* X)

*Parmalat 2005 Report* ...................11.............Parmalat Annual Report at December 31, 2005
(page 15 submitted as *Guerrera Decl. Exh.* Y)

*Parmalat 2004 Report* ...................11.............Parmalat Finanziaria S.p.A. in Extraordinary
Administration Report on Operations and Financial
Statements at December 31, 2004 (pages 2-4
submitted as *Guerrera Decl. Exh.* Z)

*Parmalat 2007 Report* ...................11.............Parmalat Annual Report 2007 (pages 36 and 293
submitted as *Guerrera Decl. Exh.* AA)

*Bondi's Welcome to Parmalat
Website* .........................................11.............*Welcome from the CEO*, available at:
http://www.parmalat.com/en/about_us/welcome/
(submitted as *Guerrera Decl. Exh.* BB)

*Sept. 29, 1998
Transfer Certificate* ......................13.............Sept. 29, 1998 Transfer Certificate relating to the
Sept. 29, 1998 Parmalat Participacoes Note
Purchase Agreement (BOFA-0001432-44)
(submitted as *Guerrera Decl. Exh.* CC)

*Exh. 4198* .......................................14.............Dec. 23, 1996 Parmalat Argentina S.A. Credit
Agreement (pages BOFA-0012266, BOFA-
0012272, BOFA-12284-87 and BOFA-0012353
submitted as *Guerrera Decl. Exh.* DD)

*Exh. 214* .........................................15.............Dec. 16, 1997 Parmalat De Venezuela C.A. Credit
Agreement (pages BOFA-1890564 and BOFA-
1890586-89 submitted as *Guerrera Decl. Exh.* EE)

*Exh. 470* .........................................15.............Sept. 29, 1998 Parmalat Participacoes Limitada
Note Purchase Agreement (pages BOFA-0001354
and BOFA-0001371-74 submitted as *Guerrera
Decl. Exh.* FF)

*Exh. 697* .........................................15.............Nov. 8, 2002 Parmalat Capital Finance Limited
Loan Agreement (pages BOFA-0003621 and
BOFA-0003631-37 submitted as *Guerrera Decl.
Exh.* GG)

*Curia Tr.* .........................................17.............Feb. 5, 2007 Deposition of Pietro Curia (pages 27-
30, 34-36, 59-60, 79, 82, 99, 106-07 and 143-45
submitted as *Guerrera Decl. Exh.* HH)

*Galea Fact Tr.* ...............................17.............Mar. 2 to Mar. 3, 2007 Fact Deposition of Oliver
Galea  (pages 95, 115, 208, 246-47 and 316-17
submitted as *Guerrera Decl. Exh.* II)

*Bondi-BoA SAC*.............................18.............Second Am. Compl. in *Bondi v. Bank of America, et
al.*, filed under seal May 24, 2007 (submitted as
*Guerrera Decl. Exh.* JJ)

*Lagro Fact Tr.*................................19.............Feb. 26 to Feb. 27, 2007 Fact Deposition of Franco
Lagro (pages 269-70, 274, 277 and 281-82
submitted as *Guerrera Decl. Exh.* KK)

*PwC Report on BoA* ......................19.............Mar. 14, 2005 PricewaterhouseCoopers SpA Report
entitled "Transactions with Bank of America" (pages
33, 39, 68, 78 and 107 submitted as *Guerrera Decl.
Exh.* LL)

*Galea Expert Tr.* ............................19.............Aug. 29 to Aug. 31, 2007 Expert Deposition of
Oliver Galea (pages 178-80 and 189-90 submitted
as *Guerrera Decl. Exh.* MM)

*Regan Tr.*......................................n.14...........Aug. 22, 2007 Deposition of D. Paul Regan (pages
138-40 submitted as *Guerrera Decl. Exh.* NN)

*Lagro 6/13/06 Milan Tr.* ...............19.............June 13, 2006 Testimony of Franco Lagro before the Court of Milan (page 221 submitted as *Guerrera Decl. Exh.* OO)

*Exh. 20,157* .................................n.15...........Mar. 18, 2004 PricewaterhouseCoopers SpA Draft Report entited "Wishaw Trading SA Uruguay" (pages P03365844 and P03365848 submitted as *Guerrera Decl. Exh.* PP)

*PCFL-Auditor Compl.*....................23.............Complaint in *Parmalat Capital Finance Limited v. Grant Thornton, et al.*, filed Dec. 9, 2005 (submitted as *Guerrera Decl. Exh.* QQ)

*PSPA Articles of Association*......n.18...........Parmalat S.p.A. Articles of Associations [sic] (pages BOFA-0001814-17 submitted as *Guerrera Decl. Exh.* RR)

*Bianchi Tr.* ....................................31.............Jan. 15 to Jan. 16, 2007 Deposition of Ugo Bianchi (pages 123-24 submitted as *Guerrera Decl. Exh.* SS)

*Pessina Tr.* ....................................31.............Oct. 30 to Nov. 3, 2006 and Feb. 21, 2007 Deposition of Claudio Pessina (pages 92-93 submitted as *Guerrera Decl. Exh.* TT)

*Del Soldato Milan Tr.* ...................31.............Apr. 9, 2006 Testimony of Luciano Del Soldato before the Court of Milan (page 228 submitted as *Guerrera Decl. Exh.* UU)

*Bocchi Milan Tr.* ...........................31.............Mar. 28, 2006 Testimony of Gianfranco Bocchi before the Court of Milan (pages 254-255 submitted as *Guerrera Decl. Exh.* VV)

## INTRODUCTION

*In pari delicto* embodies the principle that "[a] court will not aid a fraudfeasor who invokes the court's jurisdiction to relieve it of the consequences of its fraud." *Bondi* v. *GTI*, 421 F. Supp. 2d 703, 713 (S.D.N.Y. 2006) (*"Bondi V"*) (internal quotation marks omitted); *Bondi* v. *BoA*, 383 F. Supp. 2d 587, 596 (S.D.N.Y. 2005) (*"Bondi III"*). There is no question that the plaintiffs represented here – Parmalat and its financing vehicle, Parmalat Capital Finance Ltd. ("PCFL") – both committed massive fraud. From 1990 to 2003, Parmalat fraudulently held itself out as a thriving company, bilking investors and lenders out of tens of billions of dollars so that it could continue to survive and grow, when in truth it was insolvent by 1989 at the latest. PCFL furthered that fraud both by fraudulently raising capital to fund Parmalat's operations and by recording fake accounting entries that allowed Parmalat to hide its insolvency.

Parmalat and PCFL now seek to be relieved of the consequences of their fraud. Standing in the shoes of Parmalat, Enrico Bondi sues Grant Thornton International ("GTI") and Grant Thornton LLP ("GT-US") – and PCFL sues GTI – alleging vicarious liability relating to audits by Grant Thornton SpA ("GT-Italy") of Parmalat's financial statements. Bondi and PCFL also sue the Bank of America Defendants ("BoA") over a series of transactions with Parmalat that allegedly abetted Parmalat's wrongdoing. All four actions suffer from the same flaw: they are premised on fraud committed by Parmalat and PCFL and are therefore barred by *in pari delicto*.

Plaintiffs previously avoided dismissal through artful pleading. For example, Bondi pled that Parmalat's officers acted outside their authority, which the Court found sufficient to negate imputation at the pleading stage. *Bondi* v. *BoA*, 412 F. Supp. 2d 392, 400-01 (S.D.N.Y. 2006) (*"Bondi IV"*). But that allegation has been proven false. Parmalat's and PCFL's managers were doing exactly what Parmalat and PCFL had authorized them to do: keeping the books, issuing financial statements, entering into financing transactions, and otherwise operating the businesses.

– 1 –

As a result, this Court must presume that their acts and knowledge are imputed to the companies themselves.

Nor can plaintiffs survive summary judgment based on their allegation that the purpose behind the massive fraud was to facilitate "looting" by Parmalat's officers – an allegation that this Court found sufficient to invoke the adverse interest exception at the pleading stage. *See Bondi V*, 421 F. Supp. 2d at 714-15; *PCFL v. GTI*, 2007 WL 5008628, at *1 (S.D.N.Y. Feb. 21, 2007); *PCFL v. BoA*, 2007 WL 656845, at *1 (S.D.N.Y. Feb. 28, 2007). At the proof stage, to invoke the adverse interest exception, plaintiffs must prove that Parmalat's managers' *sole* purpose in conducting the fraud was to enrich themselves at the corporation's expense. *Kirschner v. Grant Thornton LLP*, 2009 WL 996417, at *5 (S.D.N.Y. Apr. 14, 2009) (Lynch, J.); *see also, e.g., Ladd Furniture v. Ernst & Young*, 1998 WL 1093901, at *7 (M.D.N.C. Aug. 27, 1998); *Grede v. McGladrey & Pullen LLP*, 2008 WL 4425447, at *5 (N.D. Ill. Sept. 26, 2008) (*"Grede I"*). Given plaintiffs' own admissions and the incontrovertible record developed through four years of discovery, plaintiffs cannot possibly carry that burden.

Bondi has conceded that Parmalat's fraud served at least two purposes that were undoubtedly for the corporation's benefit:  funding its acquisition campaign and keeping the group afloat amid massive losses.  For its part, PCFL's role in the fraud – and, indeed, its entire corporate mission – was to borrow and loan money on behalf of Parmalat entities, preserving the group's existence by raising additional funds and assuming intercompany receivables.  In total, Parmalat spent at least                                   on acquisitions and capital investments. "No rational trier of fact could reach a conclusion that over so many years, involving so many transactions, involving so many participants, the culpable managers were doing nothing for the company." *Bondi v. Citigroup*, 2008 WL 1772647, at 18 (N.J. Super. Ct. Law Div. Apr. 15,

2008) (*"Citi I"*).  Indeed, having lost this issue in his Citigroup litigation, Bondi is collaterally

estopped from making the argument again here.

Although plaintiffs still contend that "looting" occurred at Parmalat, they cannot

seriously deny that the purpose and effect of Parmalat's overall fraud was at least partly – if not

predominantly – to keep the Parmalat group alive and growing.  Parmalat raised

through its fraud, and even Bondi himself claims that insiders "misappropriated" only a fraction

of that amount.  In fact, even if these claims of misappropriation were properly substantiated –

and they are not – the amount Bondi admits that Parmalat spent on its acquisitions and other

investments

.  To the extent that any alleged misappropriation provided an

additional incentive for Parmalat's managers to implement the fraud, it was simply one

component part of an overall fraud committed to keep Parmalat afloat.  As for PCFL, it has not

even attempted to show that funds were actually stolen from it for the insiders' personal benefit;

it merely contends that any money it transferred to other corporate entities should be considered

"looting."  Under these circumstances, neither plaintiff can carry its burden of proving that

Parmalat's managers' sole purpose was to loot money for their own personal gain.

Furthermore, it is undeniable that plaintiffs participated in the very conduct alleged

against each defendant here.  The basis of plaintiffs' complaints against BoA is "a series of

specific transactions" with Parmalat and PCFL.  *See Bondi III*, 383 F. Supp. 2d at 598.  Those

transactions were negotiated and approved by Parmalat's highest officers.  They generated

.  Neither plaintiff can identify a

*single cent* from those transactions that was stolen by Parmalat's managers.  Similarly, the

allegedly fraudulent audits by GT-Italy were performed for Parmalat and with its participation,

resulting in unqualified audit opinions on financial statements that had been fraudulently issued

by Parmalat itself. And while Bondi alleges that GT-Italy advised Parmalat managers in the

creation of Bonlat, Parmalat itself was directly involved in that as well, proceeding to use Bonlat

as a tool to fuel the overall fraud that kept Parmalat alive. Thus, in all the conduct alleged

against these defendants, plaintiffs themselves were the primary participants.

Finally, even if plaintiffs could show that Parmalat's insiders had "totally abandoned"

Parmalat's or PCFL's interests in connection with a portion of their claims against these

defendants, their suits would remain barred because Parmalat's corrupt managers completely

dominated its financial affairs. Bondi himself contends that at

were complicit in Parmalat's fraud. PCFL's affairs were completely dominated

by two Italian directors who were indisputably corrupt. As a result, even those managers'

ostensibly "adverse" conduct must be imputed to the companies as a matter of law. A summary

judgment of dismissal with prejudice must follow.

## STATEMENT OF THE FACTS

## I.    PARMALAT'S ORIGINS AND MASSIVE FRAUD

Parmalat was founded by Calisto Tanzi in 1961 as a small dairy distributor in Parma,

Italy.                    ; *PCFL-BoA Compl.* ¶ 41.[1]

Parmalat's early

success was due to the introduction of milk that is shelf-stable at room temperature.

---

[1] Defendants will cite to Chapter A of the Statements of Undisputed Fact submitted in January 2008 as *BoA* ¶, to Chapter B as *IPD* ¶, to Chapter C as *FHL* ¶, to Chapter D as *Def. PCFL* ¶ or *Pl. PCFL* ¶, and to Chapter F-1 as *GTI* ¶. (The FHL/DHL statements were incorporated into the *PCFL* v. *BoA* case.) Defendants will also cite to Bondi's Counter-Response of Material and Undisputed Facts from the New Jersey action as *Bondi-NJ* ¶.

*PCFL-BoA Compl.* ¶ 42.  By 1990, Parmalat was a diversified, multi-national food company

*see also*

*History of Products*, http://www.parmalat.com/en/about_us/history/history_of_products.

Parmalat's fortunes turned during the 1980s, due in part to

Rather than disclosing its insolvency, Parmalat continued its fraud, up until its massive

collapse more than a decade later.

*Bondi-NJ* ¶¶ 86-91.  As summarized by Judge Harris of the New

Jersey Superior Court, who presided over Bondi's case against Citigroup:

> The magnitude and extent of [Parmalat's fraud] . . . is stupefying.  More than thirty high-ranking corporate officers controlling Parmalat's seats of power are accused of being involved in such antics as falsifying financial statements, lying about bank deposits, using two sets of accounting books, shifting assets and liabilities willy-nilly throughout a labyrinth of subsidiaries and affiliates in numerous countries, fabricating milk sales, and creating non-existent entities to participate in sham financial transactions – all for the purpose of fooling lenders and investors into thinking that Parmalat was a versatile and dynamic company. Over the thirteen-year existence of Parmalat's public listing, dozens (maybe hundreds) of financiers and investors were allegedly victimized by the arcane shell game emanating from Parmalat's home base in Collecchio, Italy.

*Citi I*, 2008 WL 1772647, at 4.  Parmalat's fraud allowed it to obtain at least

*Bondi-NJ* ¶¶ 112-118.  It used those ill-gotten gains to cover its

mounting losses and fund acquisitions and other investments around the world.
*Bondi-BoA Compl.* ¶ 204; *PCFL-BoA Compl.* ¶¶ 43-45.

The undisputed facts show that Parmalat engaged in a number of schemes designed to overstate its revenue, overstate its assets, and understate its liabilities. For example, Parmalat:

- 

- 

- 

- 

- 

and

- Used fake participation agreements to hide $600 million of debt, *Bondi-NJ* ¶¶ 121-27.

Those schemes were rolled into financial statements

all of which were materially misstated

*Bondi-NJ* ¶¶ 255-58.

Parmalat's creditors relied not only on those falsified financial statements, *Bondi-BoA Compl.* ¶ 245;                                   *PCFL-BoA Compl.* ¶ 50, but also on Parmalat's countless false press releases, its lies during road shows, its lies during investor presentations, its lies during due diligence presentations, and the lies it told directly to its lending banks.

*Bondi-NJ* ¶¶ 267, 450-58, 460-66, 468-70, 476-77, 480-84.

Parmalat exploited this reliance to inflict staggering damage on its creditors. Given the passage of time (and

it is not possible to reconstruct all of the

ways in which Parmalat defrauded its creditors.  At a minimum, though, Parmalat is known to

have conducted

*Bondi-NJ* ¶¶ 112-18.

PCFL played a key role in Parmalat's fraud.  From its inception, PCFL was

. It was incorporated in

. By August 1998

. PCFL's directors approved each of those securities

offerings, including the "representations contained" in PCFL's prospectuses.  *See, e.g., PCFL*

*11/28/97 Minutes* (JL0007617-19).  Those circulars incorporated financial statements for both

PCFL and Parmalat SpA ("PSPA").  *See, e.g., PCFL Circular 11/28/97* (JL0007822-979, at

JL0007868-69, JL0007930-73).  There is no dispute that

Beyond raising capital for Parmalat, PCFL

Bonlat was the entity that

## II.    PARMALAT'S CORRUPT MANAGERS

During the Rule 56.1 process, Bondi admitted that

Bondi has further admitted in New Jersey and in criminal and civil proceedings against

Parmalat insiders in Italy that

*Bondi-NJ* ¶¶ 189-254.  In total,

Bondi has labeled

PCFL's management was less numerous, but equally corrupt.  PCFL

---

[2] The 28 individuals to serve as PSPA and PFIN directors or statutory auditors from 1995-2003 are identified in the financial statements

### III.    PARMALAT'S MASSIVE, FRAUD-FUELED GROWTH FROM 1990 TO 2003

Parmalat's fraud

*Bondi-NJ* ¶¶ 51-54.  Through the

fraud, Parmalat obtained an enormous amount of capital –                                 – from the

debt and equity markets during that time.  *See supra* at 5.  Parmalat used the funds thus obtained

to expand.                                 *Bondi-NJ* ¶¶ 35-38.  From 1990 to 2003, Parmalat's

production facilities increased from                   , its workforce grew from

employees, its product line grew to include                        , and its production value increased

from                                   .                                *Parmalat Plan* at 16, 125;

                     .  As Bondi has put it, by 2003 Parmalat had become "the number two

brand franchise in the global food market."  *Parmalat Plan* at 116-17.

Bondi has admitted that Parmalat invested                      in its fixed capital from 1990 to

2003, including



                     .  Parmalat's investments allowed it to

                     that produced a constant stream of new products.                    *see*

*also History of Products*, http://www.parmalat.com/en/about_us/history/history_of_products.  In

Bondi's words, "[Parmalat] was able to develop leading-edge technologies in the segments that

are driving growth in the food market" and was able to gain "technological advantages" over its

competitors.  *Parmalat Plan* at 117.

In addition to funding investments in fixed assets, one of the admitted purposes of

Parmalat's fraud was to fund a massive acquisition campaign that began in the early 1990s and

continued throughout the decade.  *PCFL-BoA Compl.* ¶¶ 43-45; *Bondi-BoA Compl.* ¶ 204

. From 1992-1994, Parmalat made acquisitions in

. Parmalat conducted

.

Parmalat spent approximately **€4 billion** on its acquisitions.  Former Parmalat CFO

Fausto Tonna has confirmed that amount under oath, *see Tonna Milan Tr.* at 182-83,[3] and both

Bondi and                              support Tonna's representation.  For example, Bondi has

conceded                              that Parmalat spent **€3.8 billion** on acquisitions from 1990 to

2003.                                          *Bondi 2/28/06 Milan Tr.* at 22-

23; *Bondi 3/7/06 Milan Tr.* at 40-41; *Bondi 1/13/09 Milan Tr.* at 69-70;

. Similarly,                      has written that

Parmalat spent

while                              puts the figure at

According to Bondi, there is "a well-known rule of thumb" that 70% of acquisitions fail.

*Bondi 1/13/09 Milan Tr.* at 73.  By that standard, Parmalat's record is quite impressive.  Parmalat

Bondi's own website attests

to Parmalat's five-fold expansion from six countries in 1990 to thirty in 2003:

---

[3] Although admissible against Bondi, the Italian trial testimony is not admissible against GTI or GT-US because, among other reasons, GTI and GT-US were not parties to the Italian proceedings and have never had an opportunity to question Tonna.

[4] The Chiaruttini, Lagro, Galea and Megna reports are inadmissible hearsay as against defendants, *In re Parmalat*, 2007 WL 1169217, at *1 (S.D.N.Y. Apr. 18, 2007), and defendants contend that their proposed testimony is inadmissible under Rule 702 and/or *Daubert*.  However, statements in their reports are admissible against Bondi as party admissions.  *Kreppel* v. *Guttman Breast Diag. Inst.,* 1999 WL 1243891, at *1-3 (S.D.N.Y. Dec. 21, 1999).

[5] *See also Parmalat Plan* at 40-41 (Chile), 45-46 (Argentina), 47 (Ecuador), 48-49 (China), 49-50 (Mexico), 51 (Uruguay), 52-53 (Dominican Republic), 53-54 (United States bakery), 60 (Hungary), 133 (Eurolat), 137 (Spain), 138 (Portugal and Russia), 139 (Romania), 140 (Canada), 140-41 (Nicaragua), 141 (Cuba), 142 (Venezuela), 143 (Columbia), 143-44 (Australia), 144 (Africa), & 153-54 (Brazil).



**1990 - countries 6**
1962 – ITALY
1974 – BRASIL
1977 – GERMANY
1979 – FRANCE
1983 – SPAIN
1990 – PORTUGAL

**2003 - countries 30**
1992 – ARGENTINA – URUGUAY – USA
1993 – RUSSIA – HUNGARY
1994 – VENEZUELA – CHILE – PARAGUAY - COLUMBIA
1995 – MEXICO – ECUADOR – CHINA
1996 – RUMANIA [sic] – AUSTRALIA
1997 – CANADA – MOZAMBIQUE – DOMINICAN REP.
[sic] 1998 – CANADA – MOZAMBIQUE – DOMINICAN REP.
1999 – NICARAGUA – CUBA – SWAZILAND
2000 – UK – BOTSWANA
2001 – POLAND
2002 – THAILAND

http://194.185.163.49/en/popUp_Dat108.htm.  Further, when Parmalat emerged from

bankruptcy, it retained operations in 17 countries and a licensee presence in another nine.

*Parmalat 2005 Report* at 15.  Parmalat


.  Many of the companies and brands Parmalat acquired through fraud remain among

its "core" businesses and its "local jewels."  *Parmalat 2004 Report* at 2-4.  For example, in 2007,

Parmalat's Canadian operations represented about 33% of the value of all Parmalat brands and

36.3% of its revenue (an even higher share of revenue than that attributed to Parmalat's Italian

operations). *Parmalat 2007 Report* at 293, 36.  Parmalat's Australian operations represented

another 11.6% of its 2007 revenue, while its African and Venezuelan operations represented

9.2% and 5.3%, respectively.  *Id.* at 36.  Parmalat's acquisitions in just those four jurisdictions

thus contributed more than 62% of its 2007 revenue.  Absent the acquisitions made possible by

the fraud, Parmalat would not today be the "truly international player in the dairy and fruit-based

beverage Industry" that Bondi claims it to be. *See Bondi's Welcome to Parmalat's Website.*

– 11 –

## IV.    GT-ITALY'S ALLEGED ROLE IN PARMALAT'S FALSE ACCOUNTING

GT-Italy acted as

In 1999, DT-Italy

. Throughout this period, Parmalat

Plaintiffs also accuse GT-Italy of advising Parmalat regarding the use of sham entities and sham transactions to hide losses and raise money.  Specifically, two GT-Italy partners were

It is undisputed that

## V.    PARMALAT'S TRANSACTIONS WITH BANK OF AMERICA

Bondi and PCFL sue BoA over a total of ten transactions from 1996 through 2003.  First, plaintiffs complain about five transactions that were ultimately funded by private placement investors (including BoA) that raised                for Parmalat:

- 1996 Argentina $60mm Loan. BoA lent

- 1997 Venezuela $80mm Loan. BoA lent

- 1998 Participações $100mm Loan. BoA lent

- 1999 FHL/DHL $300mm Transaction. In November 1999
                                              . In December 1999

- 2001 $80mm PSPA Loan. BoA advanced

Second, plaintiffs complain about three loans from BoA to Parmalat totaling                    :

- 2001 Indulac $45mm Loan. BoA advanced

- 2001 $60mm Chile, et al. Loan. BoA advanced a total of

- 2002 Cur Transaction. BoA advanced $112.2 million to

Finally, plaintiffs complain about two transactions that restructured Parmalat's intercompany loans without generating any material increase in Parmalat's debt:

- December 1998 Venezuela Loan. In December 1998, BoA advanced

- <u>October 1999 Mexico Loan.</u>  In October 1999, BoA advanced

6

Those ten transactions are the basis for both Bondi's and PCFL's complaints against BoA.[7]

### A.    The Transactions Were Negotiated And Approved By Parmalat's Most Senior Officers And PCFL's Board Of Directors.

BoA and Parmalat (led by its CFO Tonna)

. The

documentation for each deal was executed by Parmalat's highest officers or their designees.  For

example,

A condition precedent to closing was

Tanzi's authority

. In

addition, PSPA

---

[6] Both of the original intercompany loans had


[7] Specifically, PCFL's claims against BoA are premised on three transactions.  While PCFL's complaint also includes allegations regarding another four purported "transactions," *see PCFL-BoA Compl.* ¶¶ 118-35, there is no dispute that

[8] A condition precedent requiring proof of corporate authority is a standard term in corporate lending.  *See Russell M. Robinson, II on N.C. Corp. Law* § 16.06 (7th Ed. 2008).  BoA

. Parmalat and PCFL

PCFL's roles in the December 1998 loan to PVen, the FHL/DHL transaction, and the 2002 Cur Holdings transaction were

. In each case, PCFL's directors specifically resolved that

### B. Parmalat Put The Proceeds Of Its Transactions With BoA To Parmalat's Ordinary Business Needs.

Two of the transactions at issue (the $25 million Mexico transaction and the $100 million PVen transaction) restructured Parmalat's intercompany loans.  The Bank's other transactions generated approximately                for the Parmalat group.[9]  Examples of Parmalat's use of those funds include:

- 1996 Argentina $60mm Loan.  Parmalat Argentina used

- 1997 Venezuela $80mm Loan.  PVen and Indulac used

- 1999 FHL/DHL $300mm Transaction.  This transaction generated

- 2001 Indulac $45mm Loan.  Indulac used the funds received from this transaction to

---

[9] Plaintiffs' allegations that

- <u>2001 $60mm Chile, *et al.* Loan.</u>  The proceeds of this loan were used as follows:


- <u>2001 $80mm PSPA Loan.</u>  PSPA used the proceeds of the 2001 $80 million loan from BoA to


- <u>2002 Cur Transaction.</u>  PCFL transferred the proceeds of the 2002 Cur deal to


It is undisputed that Parmalat received and used this           for general corporate purposes.

## VI.    THE ALLEGED "MISAPPROPRIATIONS" FROM PARMALAT

### A.    "Looting" Was Not The Sole Purpose Of Parmalat's Massive Fraud.

Even beyond its transactions with BoA, Parmalat obtained a tremendous benefit from the fraud in the form of massive capital infusions           from the debt and equity markets. *See supra* at 5.  Parmalat spent at least       of that capital on investments and acquisitions. *See supra* at 9-11.  In contrast, Bondi's most aggressive estimate of the purported "looting" at Parmalat



.  Thus, even if Bondi's claims are taken at face value, the allegedly misappropriated amount is less than      of what Parmalat gained in the fraud.  At the same time, Parmalat spent almost    times as much on investments and acquisitions.

Bondi's claims cannot, however, be taken at face value.  The only evidence Bondi can marshal in support of his allegations about Wishaw are

.  This Court has already ruled that those consultants' reports are inadmissible. *See supra* n.4.  Even if the Wishaw reports were admissible, however, the

conclusion that funds were looted simply does not follow from their analysis.  Lagro himself concedes that

*See Defs.' Mot.*

*in Limine*, at 14 (filed June 1, 2009).  The fact that Lagro could not

is not

equivalent to a showing that funds were actually stolen from Wishaw and/or Parmalat for the personal benefit of insiders.            .

Similarly, Bondi's primary evidence in support of the alleged "misappropriations" from PSPA is                                                                    .  But

More

specifically, the GdF,

Among

other things, the GdF

They made no effort to determine

.  What Bondi calls "misappropriations" is thus not the equivalent of money "looted" for the personal benefit of management.[10]

---

[10] In addition, the GdF's calculation includes

– 17 –

In any event, the GdF reports are inadmissible.  The reports are mere

They are not                    and given their heavy reliance    on "a

handful of former Parmalat insiders, all of whom have motives to minimize their own culpability

and to shift responsibility to others," the reports are also not admissible public records.  *In re*

*Parmalat Sec. Litig.*, 477 F. Supp. 2d 637, 641 (S.D.N.Y. 2007); *see also Eng* v. *Scully*, 146

F.R.D. 74, 79-80 (S.D.N.Y. 1993) (excluding Inspector General's report because it contained

hearsay statements made by third-parties).  Bondi thus has no admissible evidence to show that

"looting" even occurred, let alone that "looting" was the ***sole purpose*** of Parmalat's decades-

long, multi-billion-dollar fraud.

**B.**    **No Money Was Looted From Parmalat's Transactions With BoA.**

Plaintiffs claim that the proceeds of Parmalat's transactions with BoA

*see also PCFL-BoA Compl* ¶¶ 48, 137.  Such allegations

are demonstrably false, as admitted by

---

[11] *See*

[12] *See,*

[13] *See,*

As                        make clear, none of the proceeds of

Parmalat's or PCFL's transactions with BoA were stolen by Parmalat's managers.

In fact, the very hearsay documents underlying Bondi's "misappropriations" claims make

clear that the alleged diversions had nothing to do with BoA.  Bondi's expert

BoA never

transacted with PFC and played no role in any of its bond issuances or its decisions as to how the

proceeds of those bonds would be used.[15]

_____

[14] PCFL's purported expert on damages, Paul Regan

[15] As to Wishaw, PwC-Italy claims to have

*(Note Continued)*

**C.    No Money Was Looted From PCFL.**

PCFL was at all times nothing more than

. PCFL's status and its intention to distribute

the proceeds of its securities offerings to other Parmalat companies was specifically disclosed to

its investors. *See, e.g., PCFL 11/28/97 Circular* (JL0007822-979, at JL0007826).  PCFL's

distributions were also expressly and repeatedly

. In accordance with those resolutions,                of the

PCFL raised was distributed to                                        , while

was spent to cover

. Raising and distributing funds within the Parmalat umbrella was not

"looting" from PCFL within any plausible meaning of the word.  Rather, it was the fulfillment of

.

## SUMMARY JUDGMENT STANDARD

A district court must grant a motion for summary judgment if there is no genuine issue as

to any material fact and the moving party is entitled to a judgment as a matter of law. *Mack* v.

*Otis Elevator Co.*, 326 F.3d 116, 119-20 (2d Cir. 2003).  Summary judgment is properly granted

"where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party." *Id.* at 120 (alteration and internal quotation marks omitted).  When the issue

is one where the non-movants will bear the burden of proof at trial (such as the adverse interest

exception discussed *infra*), it is enough "for the movant to point to a lack of evidence," in which

---

The *only* connection between Wishaw and Parmalat's transactions with BoA is that

case the non-movants "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *In re Parmalat Sec. Litig.*, 598 F. Supp. 2d 569, 572 (S.D.N.Y. 2009).

## ARGUMENT

*In pari delicto* stands for the proposition that no plaintiff may premise a suit on its own fraud or wrongdoing. The paramount issue is whether the plaintiff participated in the wrongdoing of which the defendant is accused.[16] *See Bondi III*, 383 F. Supp. 2d at 595; *Bondi V*, 421 F. Supp. 2d at 713. Here, BoA is accused of having participated in a series of specific transactions with Parmalat and PCFL. *See Bondi III*, 383 F. Supp. 2d at 598. GTI and GT-US are not accused of any wrongdoing but are instead sued for vicarious liability arising from GT-Italy's audit of Parmalat financial statements. Because Parmalat and PCFL must be deemed participants in their transactions with BoA and in the preparation of their own financial statements, they stand *in pari delicto* with these defendants.

Indeed, Parmalat and PCFL were far more than mere participants in the fraud. From 1990 to 2003, Parmalat and its subsidiaries (including PCFL) perpetrated a massive fraud that misrepresented Parmalat's true financial condition, thereby allowing it to raise huge amounts of capital, conceal operational losses, and even fund a global acquisition campaign. In short, Parmalat and PCFL were the primary orchestrators and beneficiaries of the fraud. This Court should reject the invitation to relieve them of the consequences of their wrongdoing.

Defendants bear the initial burden to establish that Parmalat's and PCFL's managers were acting within the scope of their authority. The burden then shifts to plaintiffs to establish that Parmalat's managers ***totally abandoned*** Parmalat's interest and undertook this massive corporate

---

[16] The doctrine is routinely employed to bar claims brought by trustees overseeing the wind-up or reorganization of corporate frauds. *See, e.g., Gray* v. *Evercore Restructuring*, 544 F.3d 320 (1st Cir. 2008); *Rogers* v. *McDorman*, 521 F.3d 381 (5th Cir. 2008); *Nisselson* v. *Lernout*, 469 F.3d 143 (1st Cir. 2006); *Baena* v. *KPMG LLP*, 453 F.3d 1 (1st Cir. 2006); *Grassmueck* v. *Am. Shorthorn Ass'n*, 402 F.3d 833 (8th Cir. 2005).

fraud *entirely* for their own personal benefit.  Because neither plaintiff can make this showing, these cases must be dismissed in their entirety.

## I.    BONDI STANDS IN PARMALAT'S SHOES.

This Court has already ruled that Bondi is subject to any defenses that would have been available against Parmalat.  *Bondi III*, 383 F. Supp. 2d at 594-95; *cf. Grede I*, 2008 WL 4245477, at *4 & n.4.  Bondi has not contested that determination, and there is no need for the Court to revisit its ruling, which was correct in all respects.  Nor may Bondi ask the Court to reconsider. In April 2008, Judge Harris entered summary judgment against Bondi on *in pari delicto* grounds. *Citi I*, 2008 WL 1772647, at 17-19.  Judge Harris determined that Bondi stood as Parmalat:

> [N]othing in the [Italian] insolvency legislation, the insolvency final settlement (*Concordato*), or other aspects of Italian law persuades me that Bondi is anything more than a trustee of Parmalat, subject to successor liability, and vulnerable to [the] defense of imputation.  Italian law . . . does not cloak Bondi with status-shifting powers that enable him, chameleon-like, to be all things to all people (creditors, debtors, and stakeholders) and escape potential defenses by facilely changing roles.  . . .

> [Bondi] does not remove the stigma of the old company. . . .  He is simply the human incarnation of a corporation. . . .  No sound policies or economic principles cloak Bondi with a special shield against imputation of the wrongs of the same corporation whose interests he was appointed to champion.

*Citi I*, 2008 WL 1772647, at 10, 18.  This determination collaterally estops Bondi from contesting the applicability of *in pari delicto* based on his status as trustee.  *See Konieczny* v. *Micciche*, 702 A.2d 831, 836 (N.J. Super. Ct. App. Div. 1997).

## II.    PARMALAT AND PCFL STAND *IN PARI DELICTO*.

Plaintiffs contend that Parmalat's transactions with BoA

*PCFL-BoA Compl.* ¶ 2.

Plaintiffs also contend that GT-Italy

; *PCFL-Auditor*

*Compl.* ¶¶ 54-55, 67, 70-75. *In pari delicto* was created to bar precisely these sorts of claims. *York* v. *Merritt*, 77 N.C. 213, 215 (N.C. 1877) (per curiam) (parties are *in pari delicto* where they "have united in a transaction to defraud another, or others, or the public"); *accord Frye* v. *Chicago Burlington & Quincy R.R.*, 73 Ill. 399, 401 (1874). Given plaintiffs' indisputable participation in Parmalat's massive fraud, they cannot maintain these suits.

### A.    Parmalat's Managers Were Acting Within The Scope Of Their Authority.

Corporations are presumptively charged with the acts committed by their agents within the scope of the agents' authority. *Bondi III*, 383 F. Supp. 2d at 597.[17] "The approval and oversight of [assumed fraudulent financial] statements is an ordinary function of management that is done on the company's behalf, which is typically enough to attribute management's actions to the company itself." *Baena*, 453 F.3d at 7; *see also Fehribach* v. *Ernst & Young LLP*, 493 F.3d 905, 910 (7th Cir. 2007). In this case, moreover, Italian law specifically assigns responsibility for PFIN's and PSPA's financial statements to its directors and statutory auditors, *see* Italian Civil Code §§ 2423, 2403;          which is to say

. It is undisputed that those individuals

. Nor is there

any dispute that

In Bondi's case against BoA, this Court originally found that imputation properly applied because Parmalat's transactions with BoA "were obviously the business of . . . Parmalat and not just its agents." *Bondi III*, 383 F. Supp. 2d at 598-99. Bondi subsequently alleged that

---

[17] *See also Ladd Furniture*, 1998 WL 1093901, at *7; *Hartmann* v. *Prudential*, 9 F.3d 1207, 1210 (7th Cir. 1993).

. While the Court expressed serious doubt about Bondi's allegations, the Court was forced to credit his claim at the motion to dismiss stage. *See Bondi IV*, 412 F. Supp. 2d at 400-01. The Court's skepticism was well-warranted. Every transaction described in Bondi's and PCFL's complaints against BoA is either a loan or a private debt placement and was

. Bondi now admits that Parmalat's financings                                                                    .[18]

Similarly, there is no dispute that Tonna and Del Soldato

Because Parmalat's and PCFL's officers and directors were indisputably acting within their respective roles at each company, Parmalat and PCFL are presumptively charged with their conduct and knowledge.[19] As a result, the burden shifts to plaintiffs to show that Parmalat and PCFL should be excused from taking responsibility for their own fraudulent financial statements and transactions. *See FDIC* v. *Shrader & York*, 991 F.2d 216, 224 (5th Cir. 1993).

---

[18] Bondi's concession on this point is supported by indisputable evidence. Parmalat

[19] Notably, in Italy Bondi himself contends that

**B.    Parmalat's Managers Did Not Totally Abandon Its Interests.**

At the pleading stage, plaintiffs invoked the adverse interest exception to imputation, but that rule can no longer save their cases. It requires a showing that Parmalat's managers ***totally abandoned*** the corporation. *Ladd Furniture*, 1998 WL 1093901, at *7; *Kirschner*, 2009 WL 996417 at *5-6; *see also Hartmann*, 9 F.3d at 1210; *Travis v. Duckworth*, 75 S.E.2d 309, 311-12 (N.C. 1953). To establish a total abandonment, plaintiffs must show that Parmalat's and PCFL's managers were not ***in any way*** conducting the companies' business – that is, that the insiders neither intended to benefit the companies nor actually created any short- or long-term benefit for them. *Bondi III*, 383 F. Supp. 2d at 597 (imputation applies unless the individual "'does not act in any official or representative capacity for the corporation'"); *Bondi V*, 421 F. Supp. 2d at 714 (imputation applies unless "[t]he ***only*** sense in which Parmalat . . . participated was as the insiders' puppet") (emphasis added); *Kirschner*, 2009 WL 996417, at *6; *Cohen v. Morgan Schiff & Co.*, 385 B.R. 381, 453-54 (S.D. Ga. 2008); *Grede I*, 2008 WL 4425447, at *5 (exception applies "only when the wrongdoing can in no way be described as beneficial to the company"); *accord Cobalt Multifamily Investors I, LLC v. Shapiro*, 2008 WL 833237, at *4 (S.D.N.Y. Mar. 28, 2008); *In re Tyco Int'l*, 2004 WL 2348315, at *5 (D.N.H. Oct. 14, 2004).

Plaintiffs cannot make this showing. They cannot show that Parmalat's managers totally abandoned Parmalat's interests in pursuing Parmalat's massive fraud. Nor can they show that Parmalat's managers were acting completely adversely to Parmalat in participating in the conduct alleged against BoA and GT-Italy. Each of these failures is sufficient to require dismissal of these lawsuits in their entirety.

**1.    The Fraud Was Not A "Total Abandonment" By Parmalat's Managers.**

Parmalat's managers were not acting adversely to Parmalat in perpetrating Parmalat's decades-long fraud, and Bondi is collaterally estopped from arguing otherwise. In granting

– 25 –

summary judgment against him, the New Jersey Superior Court definitively held that Parmalat's

decades-long fraud must be imputed to the corporation:

> Under the lens of summary judgment, it is clear beyond cavil that . . . multiple
> high-ranking Parmalat directors and officers conducted themselves in ways that
> had the clear capacity to mislead, misdirect, and mishandle the financial
> community vis-à-vis Parmalat's true fiscal malaise. This conduct persisted over
> many years, in multiple transactions, with impunity and cupidity. No rational
> trier of fact could conclude otherwise. Plainly, if a pre-insolvency Parmalat were
> the plaintiff here, it would be tarnished with the enduring conduct of the
> entrenched control group of insiders. These actors were neither inconsequential
> nor idiosyncratic. They were the public faces of Parmalat and represented the
> engine that propelled the company from its hope-filled public debut in 1990 to its
> humiliating deflation in 2003. . . .
>
> Discovery. . . has plainly demonstrated that the narrow application of [the adverse
> interest exception] has no currency. *No rational trier of fact could reach a
> conclusion that over so many years, involving so many transactions, involving
> so many participants, [Parmalat's] culpable managers were doing nothing for
> the company.* The legions of vendors, customers, employees, and consumers of
> Parmalat were enjoying the fruits of [the] conduct of the insiders just as assuredly
> as the insiders may have been individually profiting from keeping the company
> afloat. *The record does not bespeak a situation where a jury needs to sift
> through conflicting evidence to see if an abandonment of [Parmalat's] interests
> occurred. Clearly, it did not.*

2008 WL 1772647, at 18 (emphasis added). In light of that ruling, Bondi may not now contend

that Parmalat's fraud represented a total abandonment of its interests.[20] *See supra* at 22. Even

were that decision not sufficient to foreclose the argument, however, discovery has broken down

plaintiffs' carefully pleaded insistence that the sole purpose of the massive fraud was to enable

the insiders to steal from Parmalat or PCFL. Accordingly, the adverse interest exception does

not apply.

---

[20] Although Judge Harris allowed Bondi to proceed in relation to funds that were allegedly looted by Parmalat's
insiders, a similar carve-out is not appropriate here, for a variety of reasons. Among other things, Bondi has no
admissible evidence of looting, *supra* at 16-18, let alone looting that is traceable to conduct involving these
defendants, *see, e.g., infra* at 33-39. And Citigroup did not, as defendants do here, argue and prove that

### a.    The Fraud Was Committed On Parmalat's Behalf.

The adverse interest rule applies only where the fraud can be described as one committed *against* the corporation instead of on its behalf. *Rogers*, 521 F.3d at 394-95; *Shrader & York*, 991 F.2d at 223-24; *FDIC* v. *Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992); *Cenco Inc.* v. *Seidman & Seidman*, 686 F.2d 449, 456 (7th Cir. 1982); *Kirschner*, 2009 WL 996417, at *5-6; *DGM Invs., Inc.* v. *N.Y. Futures Exch.*, 265 F. Supp. 2d 254, 262 (S.D.N.Y. 2003).

Bondi has admitted repeatedly that this was not the case. He admitted long ago that Parmalat's managers undertook the fraud to obtain financing for at least three purposes: (a) to fund Parmalat's massive acquisition campaign, (b) to enable officers and directors to steal from the company, and (c) to keep the company afloat "amid a mounting wave of losses, debts and disappearing funds." *Bondi-BoA Compl.* ¶ 204. That admission was largely responsible for this Court's initial ruling that *in pari delicto* applied. *See Bondi III*, 383 F. Supp. 2d at 590, 597 (quoting *Bondi-BoA Compl.* ¶ 204). Bondi's lawyers scrubbed the admission from his amended pleadings, but

. Bondi made similar concessions

. Similarly, PCFL's Complaint

remains replete with admissions that Parmalat's fraud allowed it to expand and "maintain an investment grade credit rating" necessary to access capital. *See PCFL-BoA Compl.* ¶¶ 41-47, 50.

The undisputed evidence supports those concessions. Parmalat was insolvent

. Parmalat and PCFL concealed that insolvency by

. *See*

*supra* at 5-7. Parmalat used that capital to survive and grow for more than a decade despite its insolvency. *See supra* at 9-11. Any injury that flowed from Parmalat's fraud was thus felt exclusively by the creditors who were duped into funding Parmalat's growth and covering its

losses. *Pappas* v. *BoA*, 501 F. Supp. 2d 560, 576 (S.D.N.Y. 2007) (an insolvent company has "nothing to lose simply by continuing to operate, even if that [means] the continued depletion of [its] assets") *aff'd* 2009 WL 382602 (2d Cir. Feb. 17, 2009); *Kirschner*, 2009 WL 996417, at *9 n.16 (where the debtor was insolvent at the time of the wrongdoing, "any interests held [by the corporation or its shareholders] . . . were already 'lost' and only [the debtor's] *creditors* suffered") (emphasis in original); *Fehribach*, 493 F.3d at 909 (where a company is carrying a net deficit, it has "nothing more to lose" and the only potentially-injured parties from "the prolongation of the corporation's miserable existence" are "the corporation's creditors").[21]  Thus, this is a case of fraud against Parmalat's creditors – including BoA – not against Parmalat.  The adverse interest exception is simply inapposite. *DGM Invs.*, 265 F. Supp. 2d at 262; *see also Kirschner*, 2009 WL 996417, at *6 (burden of a fraud that "enabled the false reporting of the company's steady growth, which in turn attracted and retained capital from investors . . . was not borne by [the company]. . . but rather by outside parties").

### b.    "Looting" Was Not The Sole Purpose Of The Fraud.

Bondi cannot prove that looting was the sole purpose of the fraud.  In fact, he has not substantiated any concrete examples of "looting" in the first place.  Rather, he points to inadmissible hearsay documents that purport to summarize, without actually identifying, of alleged "misappropriations" from PSPA and of allegedly illegitimate transactions through Wishaw. *See* .

Even were the Court to ignore the numerous failures plaguing Bondi's evidence, *see supra* at 16-18, the total amount of the alleged misappropriations pales in

---

[21] *See also Holland* v. *Arthur Andersen*, 571 N.E.2d 777, 782 (Ill. App. Ct. 1991); *Nisselson* v. *Lernout*, 568 F. Supp. 2d 137, 147 (D. Mass. 2008); *Askanase* v. *Fatjo*, 1996 WL 33373364, at *28 (S.D. Tex. Apr. 1, 1996).

comparison to the amount Parmalat raised through its fraud                and even to the

amount indisputably spent on investments and acquisitions                    . Such

investments allowed Parmalat to increase its production facilities from            , its operational

presence from            countries, its workforce from                employees, its product line

to            items, and its production value from                    . *See supra* at 9-11.

Even if it did entail some amount of looting, a fraud that facilitates such exponential growth

cannot be considered a total abandonment. *Tyco Int'l*, 2004 WL 2348315, at *5 (no adverse

interest exception based on looting where "accounting fraud benefited [the company] by

allowing it to generate cash through stock sales and borrowing to fund its acquisition strategy"

because the looting furthered the fraud by "giving the individual defendants a financial incentive

to implement the scheme"); *Cobalt*, 2008 WL 833237, at *4 & n.10 (no adverse interest where

the "majority" – "but not all" – of the fraud's proceeds were looted); *Baena*, 453 F.3d at 8 ("A

fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not

in the long-term interest of the company" but "profits the company in the first instance").

Furthermore, what Bondi calls "misappropriations" may not necessarily be "looting" at

all. The GdF undertook to identify                                    *see*

*supra* at 16-18, which is not the same as identifying theft. Similarly, Lagro and his colleagues

specifically did not conclude that                        *Id.* Instead, they simply

claimed that there was                                    *Id.*

Bondi interprets that                        to mean that there is "

" for those expenditures.            But a claim that an

"                            lacked a "                is not equivalent

to proof that management totally abandoned the corporate interest. If it were, the adverse

interest exception would apply in nearly every case of fraud. Indeed, if all Bondi can say about these transactions is that he has                of their purpose, he cannot possibly carry his burden of proof. As this Court has pointed out, it is just as likely – absent proof to the contrary – that the spending by Wishaw was "part of an effort to benefit Parmalat . . . rather than looting." *Bondi III*, 383 F. Supp. 2d at 599 n.57. In fact, discovery has confirmed that to be the case. *See, e.g., Defs.' Mot. in Limine*, at 14-15

For its part, PCFL has not shown any looting. Despite the fact that PCFL's pleadings directly allege that its funds were "looted," *e.g., PCFL-BoA Compl.* ¶¶ 7-8, 137, PCFL has made no effort to determine                . Instead, PCFL has simply adopted the unsubstantiated position that 

. This interpretation of the term "looting" is patently absurd. PCFL's mission was always to 

PCFL's transactions                furthered that goal. Such disbursements cannot be considered "looting," and the fraud that allowed PCFL to raise those funds cannot be considered a "total abandonment" of corporate purpose. *See Kirschner*, 2009 WL 996417, at *9 (rejecting an attempt to "parse the [] fraud in pursuit of establishing a corporate injury to some particular corporate unit within [the debtor]" because "[d]istributing cash to keep the fraud going is not evidence of corporate harm").

In sum, plaintiffs have not substantiated their claims of misappropriations, and they could not defeat summary judgment even if they had. To the extent there was any looting by

individual officers or directors (and plaintiffs cannot prove there was), it happened within the context of a larger fraud that plainly was for Parmalat's benefit.  Under these circumstances, the adverse interest exception does not apply.  *Tyco Int'l*, 2004 WL 2348315, at *5; *Cobalt*, 2008 WL 833237, at *4 n.10; *see also Kirschner*, 2009 WL 996417, at *6 ("where a corporation benefits to *any* extent from the fraudulent acts of its agents, the agents cannot be said to have 'totally abandoned' the interests of the corporation") (quoting *Cobalt*).

### c.    Parmalat's Managers Intended To Save Parmalat.

Whether Parmalat's or PCFL's managers "totally abandoned" the companies turns primarily on "the nature and consequences" of their decades-long fraud and not the extent to which they acted "from self-interested motives."  *Kirschner*, 2009 WL 996417, at *7 (distinguishing *Bankruptcy Services, Inc.* v. *Ernst & Young*, 529 F.3d 432, 451 (2d Cir. 2008)) *see also Grede I*, 2008 WL 4425447, at *5 (focus must be on benefit to the corporation because "corporate officers, even in the most upright enterprises can always be said, in some meaningful sense, to act for their own interests").  But to the extent that subjective motivations are relevant, Parmalat's managers have testified that their intent was always to save Parmalat from its financial distress.                                                                                                                  *Del Soldato Milan Tr.* at 228; *Bocchi Milan Tr.* at 254-55.  For example, Tonna testified that the purpose of 99% of Parmalat's fraudulent devices was to cover up Parmalat's commercial problems, that Parmalat's fraud indisputably "served to maintain a good appearance for Parmalat," and that his intent had always been to effect the "rescue" of the group.  *Tonna Milan Tr.* at 42-43, 181-83.  In light of such testimony, this was *at worst* a case of dual motives, to which the adverse interest exception would not apply.  *Bondi III*, 383 F. Supp. 2d at 597; *Hartmann*, 9 F.3d at 1210.

As Judge Harris concluded, "No rational trier of fact could reach a conclusion that over so many years, involving so many transactions, involving so many participants, [Parmalat's]

culpable managers were doing nothing for the company." *Citi I*, 2008 WL 1772647 at 18. Standing alone, this is a sufficient basis for concluding that the adverse interest exception cannot save plaintiffs' claims.

### 2. Parmalat's And PCFL's Transactions With BoA Were Also Not A Total Abandonment.

Plaintiffs' claims against BoA are also barred for the independent reason that plaintiffs cannot establish that Parmalat's and PCFL's managers totally abandoned Parmalat and PCFL when entering them into transactions with the Bank. Transactions that raised capital for Parmalat – such as the ones at issue here – cannot in and of themselves be considered adverse. *See Pappas*, 501 F. Supp. 2d at 574 (debt financings have no effect on a company's net worth).[22] Any adversity stems not from the loan itself, but from how management chooses to spend the proceeds. *Id.* at 574-75; *Kirschner*, 2009 WL 996417, at *9.

Here, however, plaintiffs cannot even claim adversity from how Parmalat used the funds it received. Parmalat expended the funds generated by its transactions with BoA to

*See supra* at 15-16. That is more than sufficient to negate the adverse interest exception. *Bondi IV*, 412 F. Supp. 2d at 401 (plaintiffs must show the transactions "served no corporate purpose"); *Cobalt*, 2008 WL 833237, at *4 (adverse interest exception does not apply where funds were used to pay debts); *James Ventures, L.P.* v. *TIMCO Aviation Servs.*, 2008 WL 190499, at *3 & n.3 (S.D. Fla. Jan. 22, 2008) (same). Relatedly, PCFL cannot claim to

---

[22] *See also Kirschner*, 2009 WL 996417, at *8 ("It is a basic principle of corporate finance that extending credit to a distressed entity in itself does the entity no harm. Cash infusions expand the debt of a corporation in precise proportion to the expansion of assets in the form of new cash contributed by the underwriters and investors. Accordingly, with respect to injury to the corporate body, as distinguished from injury . . . to creditors . . . the extension of credit is—at worst—neutral.") (internal citation omitted); *Grede* v. *Bank of N.Y.*, 2009 WL 188460, at *8 n.10 (N.D. Ill. Jan. 27, 2009); *Grede I*, 2008 WL 4425447, at *6 n.7.

have been harmed by its decisions to distribute funds to other Parmalat companies. Doing so was PCFL's entire purpose, and was disclosed to everyone doing business with it. *Supra* at 20.

### a.     Refinancing Debt Was Not Adverse To Parmalat.

Plaintiffs may argue that simply because the transactions with BoA refinanced Parmalat's prior debts, they should be deemed a total abandonment.

Any such argument must fail. Refinancing debt is a normal business activity (and provides benefits such as lengthened maturity profiles) to which the adverse interest exception does not apply. *James Ventures*, 2008 WL 190499, at *3 & n.3; *Buchwald* v. *Renco Group*, 399 B.R. 722, 760 (Bankr. S.D.N.Y. 2009); *Kirschner*, 2009 WL 996417, at *9; *see also Pappas*, 501 F. Supp. 2d at 574 (when a company "borrows cash . . . [i]ts ability to pay its debts as they become due . . . may be better").

Even if it is assumed that refinancing could somehow harm a corporation, that alone cannot establish a total abandonment. *Rogers*, 521 F.3d at 394-95 (fact that corporation was ultimately damaged does not trigger the adverse interest exception); *Cenco*, 686 F.2d at 456 (the fact that a corporation may not be a "net" beneficiary after the fraud is unmasked goes only to the question of damages, not to the applicability of the adverse interest exception); *MCA Fin. Corp. v. Thornton*, 687 N.W.2d 850, 858 (Mich. Ct. App. 2004) (assuming that "deepening insolvency" is a valid form of damages, alleging such a harm "does not provide a basis to invoke the adverse interest exception"); *cf. Kirschner*, 2009 WL 996417, at *9 n.15 ("The harm of deepening insolvency . . . necessarily accrues to the corporation's creditors").

### b.     The Proceeds Of The BoA Transactions Were Not "Looted."

After four years of discovery, plaintiffs have not identified *a single cent* of the proceeds of Parmalat's transactions with BoA that was stolen by Parmalat's managers.

The best plaintiffs can do is to claim that

This is a red herring.  First, the issue before the Court is whether to impute the conduct of

Parmalat's and PCFL's managers to those entities.  Allegations that BoA employees

do not amount to a showing that the proceeds of the transactions

were "looted" by *Parmalat's managers*.  Second, even if

such conduct remains attributable to Parmalat, which received the benefit of its transactions with

BoA, *see Bondi III*, 383 F. Supp. 2d at 601, and not the Parmalat insiders, who received no

money from those transactions or from any BoA employee.  Plaintiffs cannot show – as they

must – that the *sole* motivation behind the transactions was to enrich Parmalat's managers.

Finally, any other "looting" that is alleged to have occurred at Parmalat has no bearing on

whether Parmalat must be deemed an equal participant in its transactions *with BoA*.  Having

never transacted with PFC or Wishaw, BoA cannot be held responsible for how those entities

used the funds they obtained through transactions with other institutions.  *See Pappas*, 501 F.

Supp. 2d at 580.  At a minimum, this disconnect means that plaintiffs cannot leverage "looting"

that allegedly took place from PFC or Wishaw into an argument that Parmalat's and PCFL's

separate transactions with BoA were a total abandonment.

---

[23] Bondi's objections to these proffered 56.1 facts are baseless.  Once defendants asserted that there was no evidence to support a contention on which Bondi bears the burden, it was Bondi's responsibility to come forward with admissible evidence to the contrary.  *See, e.g., U.S. Philips* v. *Iwasaki Elec.*, 2006 WL 2792693, at *6 (S.D.N.Y. Sept. 28, 2006).  Regardless, Bondi's own consultant

For its part, PCFL is unable to identify

This unsubstantiated argument clearly does not satisfy PCFL's burden of coming forward with evidence of looting,

3.    **In Preparing Parmalat's Fraudulent Financial Statements, Allegedly With The Help Of GT-Italy, Parmalat's Management Did Not Totally Abandon The Corporate Interests.**

With respect to GT-Italy as well, there can be no doubt that Parmalat and PCFL

participated in the wrongdoing alleged against it. "The imputation doctrine in accountant

malpractice cases allows the wrongdoing of corporate officers to be attributed to the corporation

to bar an action for damages if (1) . . . the officers and directors of a corporation did in a knowing

fashion all that the accountant is charged with; and (2) . . . such actions by the corporation's top

management amounted to fraud on behalf of the corporation." *First Nat'l Bank of Sullivan* v.

*Brumleve & Dabbs*, 539 N.E.2d 877, 881 (Ill. App. Ct. 1989); *Holland*, 469 N.E.2d at 426. That

was certainly the case here. As discussed above, Parmalat and its subsidiaries had a starring role

in the decades-long fraud, and that alone is sufficient to bar their claims. But even if the Court

were to limit its analysis to the very specific acts charged against GT-Italy, there still can be no

doubt that Parmalat "did in a knowing fashion all that the accountant is charged with." For that

reason too, the claims against GTI and GT-US must fail.

Parmalat's managers were knowingly complicit in the conduct charged against GT-Italy

– a financial fraud that concealed Parmalat's insolvency and used sham companies to hide losses

and create false revenue. Curcastle, Zilpa, and Bonlat were used to

. Again, it was Parmalat –

not GT-Italy – that prepared the financial statements and put this fraud in place. Further,

according to Bondi, Parmalat's managers themselves

See supra at 12.

As detailed above, Parmalat's financial statement fraud – allegedly assisted by GT-Italy –

allowed Parmalat to raise                    , and the company put these funds              . See

supra at 9-11, 15-16.  Accordingly, the fraud was *for* the company, not against it.  See Cenco,

686 F.2d at 454 (fraudulent inflation of inventory and stock price, enabling acquisitions and

borrowing); Kirschner, 2009 WL 996417, at *2-3, *6 (no adverse interest where insiders used a

related entity to hide uncollectible losses and operating expenses, artificially inflate earnings,

create hundreds of millions of dollars in fictitious revenue, misappropriate customer assets, and

fraudulently raise money from outside investors to prop up insolvent entities and hide the fraud);

Grede I, 2008 WL 4425447, at *4-5 (no adverse interest where misstated financials were used to

attract clients, attract capital, reduce debt, and increase income); Baena, 453 F.3d at 8 (no

adverse interest where earnings were overstated to "facilitate stock sales or acquisitions").

Indeed, even if plaintiffs could prove that the insiders looted some portion of the fraud's

proceeds, the overall thrust of the fraud – as well as all of the particular conduct in which GT-

Italy participated – was on behalf of Parmalat.  To the extent that any looting gave management

an incentive to continue the fraud, it too was ultimately for the corporation's benefit. Tyco Int'l,

2004 WL 2348315, at *5.  For this reason as well, the claims based on GT-Italy's alleged

misconduct fail as a matter of law.

## C.     Parmalat And PCFL Were Completely Dominated.

Parmalat's officers acted within the scope of their authority and did not totally abandon

Parmalat or PCFL.  Even were the Court to disagree, however, the adverse interest exception

gives way to the sole actor rule. Breeden v. Kirkpatrick & Lockhart, LLP, 336 F.3d 94, 100 (2d

Cir. 2003). This rule applies where "those responsible for the scheme" exercise complete control over the debtor's affairs. *Nisselson*, 469 F.3d at 154-55.[24]  Where the sole actor rule applies, conduct by management that constitutes a "total abandonment" is attributed to the corporation – even conduct underlying claims that sound in looting or corporate theft. *See, e.g.*, *Mediators, Inc.* v. *Manney*, 105 F.3d 822, 827 (2d Cir. 1997).

There can be no dispute that the so-called "corrupt insiders" completely dominated Parmalat's financial affairs. PSPA's board

. For his part, Tonna

. The two wielded their powers

. As Bondi has explained,

. Parmalat's

Parmalat's

, is more than sufficient to trigger the sole actor rule. As this Court has written, "where a principal is completely dominated by the agent and habitually does whatever he requests, such that the agent has been permitted to act without meaningful oversight or control, the principal is deemed to have abdicated its control of

---

[24] *See also* Robinson, *supra*, § 16.06 ("[A] corporation may be deemed to have general knowledge of facts known to persons by whom it is completely dominated."); *First Nat'l Bank of Cicero* v. *Lewco Sec. Corp.*, 860 F.2d 1407, 1418 (7th Cir. 1988) (sole actor exception applies when "the whole procedure . . . was entrusted by [the principal] to the initiation and execution of the agent" or where the agents were "in complete control of [the principal's] affairs") (alterations in original).

its agents and will be held accountable for the agents' actions." *FHL* v. *BoA*, 477 F. Supp. 2d

602, 610 (S.D.N.Y. 2007) (alterations and internal quotation marks omitted).[25] Having vested

Tanzi and Tonna with absolute power, Parmalat cannot be heard to disavow their actions.

    Parmalat's abdication of any oversight of Tanzi and Tonna is not, however, the only

reason that the sole actor rule must apply in this case.  Bondi has repeatedly admitted that

    .  As

Judge Harris observed, those fraudsters were Parmalat's most senior officers and its "public

faces." *Citi I*, 2008 WL 1772647, at 18.  They included Parmalat's


    .  By any standard, that is enough to

show the wrongdoers' complete domination of Parmalat's financial affairs.

    Bondi's lawsuits in Italy provide still a third reason to apply the sole actor rule.  Bondi

has


    Bondi's admissions in Italy dictate that

Parmalat be charged with even the ostensibly "adverse" conduct of its managers.  *See Buchwald*,

399 B.R. at 768 (dismissing trustee's claims because the trustee had alleged that all of the

debtors' directors were "wrongdoers"); *O'Connell* v. *Arthur Andersen*, 383 B.R. 231, 273

(Bankr. S.D.N.Y. 2008) (same).

---

[25] *See also Anderson* v. *Missouri State Life Ins.*, 69 F.2d 794, 798 (6th Cir. 1934) ("When members of a board or committee representing a corporation surrender their powers to an individual . . . the dominant individual is the sole actor, and others are to be ignored as if they did not in fact, as they do not functionally, exist."); *Cenco*, 686 F.2d at 451, 455-56 (although 7 of 9 board members were not complicit, "the corporation should not be allowed to shift the entire responsibility for the fraud to its auditors" where the uncontested "fraud permeat[ed] the top management").

At the pleading stage in the *Bondi-Auditor* case, the Court held open the possibility that under Illinois law, Bondi might overcome the sole actor exception by proving that "the adverse party knew that the agent was acting adversely to his employer," *Bondi V*, 421 F. Supp. 2d at 715 ("it is impossible to say, *solely on the basis of the pleading*, that the sole actor exception to the adverse agent rule applies") (emphasis added). As it turns out, however, Bondi has no such proof. The operative question is *not* whether GT-Italy knew about the fraudulent financial statements through which Parmalat concealed its insolvency. Rather, the question is whether GT-Italy knew the insiders were acting adversely to Parmalat by pursuing a course that was *solely* for the purpose of looting. Even if GT-Italy knew about a financial statement fraud to overstate revenues and understate losses, that is fundamentally different from knowledge of the single-minded looting that Bondi must establish to bring the analysis to this stage. On that issue, there is no evidence at all, let alone evidence sufficient to raise a jury question.

Finally, any portion of PCFL's claims found to fall within the adverse interest exception would also be subject to the sole actor rule. PCFL's transactions – including those with BoA – were                                    . PCFL's roles in those transactions must therefore be attributed to the corporation even if the transactions could be considered a total abandonment. *See Claybrook* v. *Broad & Cassel, P.A.*, 364 B.R. 562, 569 (Bankr. D. Del. 2007) ("A board of directors voting unanimously qualifies as a sole actor for purposes of the sole actor exception."); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 360 (3d Cir. 2001) ("The possible existence of any innocent independent directors does not alter the fact that the [culpable insiders] controlled and dominated the Debtors."). Furthermore, it is clear that the only relevant decision makers at PCFL were

and all agree that they were among the masterminds of Parmalat's fraud,

## III.   PLAINTIFFS' CASES ARE ENTIRELY BARRED BY *IN PARI DELICTO*.

Plaintiffs have previously suggested that *in pari delicto* does not apply to certain of their causes of action. They are mistaken. *See, e.g., Rogers*, 521 F.3d at 387-89 (federal RICO); N.C. Gen. Stat. § 75D-8(c) (N.C. RICO); *Baena v. KPMG LLP*, 389 F. Supp. 2d 112, 121 (D. Mass. 2005) (aiding and abetting breach of fiduciary duty); *Claybrook*, 364 B.R. at 574 (breach of fiduciary duty); *Grede I*, 2008 WL 4425447, at *1 (accounting malpractice and aiding and abetting fraud); *Merrill Lynch v. Nickless*, 324 B.R. 10, 16 (D. Mass. 2005) (negligent misrepresentation); *Cobalt*, 2008 WL 833237, at *2, 5 (conversion and unjust enrichment); *Bondi III*, 383 F. Supp. 2d at 599 (fraud), 600-01 (unjust enrichment), 602-03 (civil conspiracy). The application of the *in pari delicto* defense turns on questions of agency and imputation. The test is "whether the plaintiff requires the aid of the illegal transaction to establish his case. If a plaintiff cannot open his case without showing that he has broken the law, a court will not assist him." *Devor v. Knauer*, 84 Ill. App. 184, 186 (Ill. App. Ct. 1899); *see also Kessinger v. Standard Oil Co.*, 245 Ill. App. 376, 380 (Ill. App. Ct. 1925) ("the test in each case is, whether, when all the facts are disclosed, the action appears to be founded in a violation of law, in which the plaintiff has taken part"); *Bledsoe v. Coxe Lumber*, 48 S.E.2d 50, 56 (N.C. 1948) (("[T]he law will not lend its aid to those who found their claim for relief upon their own unlawful acts."); *accord Turner v. Eford*, 58 N.C. 106, 108 (N.C. 1859). Parmalat and PCFL were participants in all of the wrongdoing at issue here. Thus, all four suits must be dismissed in their entirety.

### CONCLUSION

For the foregoing reasons, this Court should enter summary judgment in the defendants' favor and dismiss all of Bondi's and PCFL's claims with prejudice.

Dated:  June 1, 2009

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP

By: _____

James L. Bernard (JB-4273)
180 Maiden Lane
New York, NY  10038
(212) 806-5400
(212) 806-6006 (fax)
jbernard@stroock.com

*Attorneys for Grant Thornton International*

WINSTON & STRAWN LLP

By: _____

Bruce R. Braun (BB-2505)
Linda T. Coberly (LC-8078)
Andrew R. DeVooght (AD-0250)
35 West Wacker Drive
Chicago, IL  60601
(312) 558-5600
(312) 558-5700 (fax)
adevooght@winston.com

*Attorneys for Grant Thornton LLP*

SIDLEY AUSTIN LLP

By: _____

Joseph B. Tompkins, Jr.
Alan C. Geolot
Mark P. Guerrera
Robert D. Keeling
1501 K Street N.W.
Washington, DC  20005
(202) 736 – 8000
(202) 736 – 8711 (fax)
jtompkins@sidley.com

A. Robert Peitrzak (AP-6711)
Thomas McC. Souther (TS-6615)
Daniel A. McLaughlin (DM-2688)
787 Seventh Avenue
New York, NY  10019
(212) 839 – 5000
(212) 839-5599 (fax)
dmclaughlin@sidley.com

*Attorneys for Bank of America Corporation,*
*Bank of America, N.A., Bank of America*
*National Trust & Savings Association, Banc of*
*America Securities LLC, Banc of America*
*Securities Limited, and BankAmerica*
*International Limited*

Dated:  June 1, 2009

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP

SIDLEY AUSTIN LLP

By: _____

      Jamie L. Bernard (JB-4273)
      180 Maiden Lane
      New York, NY  10038
      (212) 806-5400
      (212) 806-6006 (fax)
      jbernard@stroock.com

*Attorneys for Grant Thornton International*

By: _____

      Joseph B. Tompkins, Jr.
      Alan C. Geolot
      Mark P. Guerrera
      Robert D. Keeling
      1501 K Street N.W.
      Washington, DC  20005
      (202) 736 – 8000
      (202) 736 – 8711 (fax)
      jtompkins@sidley.com

      A. Robert Peitrzak (AP-6711)
      Thomas McC. Souther (TS-6615)
      Daniel A. McLaughlin (DM-2688)
      787 Seventh Avenue
      New York, NY  10019
      (212) 839 – 5000
      (212) 839-5599 (fax)
      dmclaughlin@sidley.com

WINSTON & STRAWN LLP

By: *[signature: Andrew R. DeVooght]*

      Bruce R. Braun (BB-2505)
      Linda T. Coberly (LC-8078)
      Andrew R. DeVooght (AD-0250)
      35 West Wacker Drive
      Chicago, IL  60601
      (312) 558-5600
      (312) 558-5700 (fax)
      adevooght@winston.com

*Attorneys for Grant Thornton LLP*

*Attorneys for Bank of America Corporation,
Bank of America, N.A., Bank of America
National Trust & Savings Association, Banc of
America Securities LLC, Banc of America
Securities Limited, and BankAmerica
International Limited*

Dated:  June 1, 2009

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP

SIDLEY AUSTIN LLP

By:

By:

Jamie L. Bernard (JB-4273)
180 Maiden Lane
New York, NY  10038
(212) 806-5400
(212) 806-6006 (fax)
jbernard@stroock.com

*Attorneys for Grant Thornton International*

Joseph B. Tompkins, Jr.
Alan C. Geolot
Mark P. Guerrera
Robert D. Keeling
1501 K Street N.W.
Washington, DC  20005
(202) 736 – 8000
(202) 736 – 8711 (fax)
jtompkins@sidley.com

A. Robert Peitrzak (AP-6711)
Thomas McC. Souther (TS-6615)
Daniel A. McLaughlin (DM-2688)
787 Seventh Avenue
New York, NY  10019
(212) 839 – 5000
(212) 839-5599 (fax)

WINSTON & STRAWN LLP

By:

Bruce R. Braun (BB-2505)
Linda T. Coberly (LC-8078)
Andrew R. DeVooght (AD-0250)
35 West Wacker Drive
Chicago, IL  60601
(312) 558-5600
(312) 558-5700 (fax)
adevooght@winston.com

*Attorneys for Grant Thornton LLP*

*Attorneys for Bank of America Corporation,*
*Bank of America, N.A., Bank of America*
*National Trust & Savings Association, Banc of*
*America Securities LLC, Banc of America*
*Securities Limited, and BankAmerica*
*International Limited*