UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

This document relates to:   04 Civ. 9771
06 Civ. 0704
06 Civ. 2991

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MASTER DOCKET
04 MD 1653 (LAK)

```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____          │
│ DATE FILED #: 9|18|09           │
└─────────────────────────────────┘
```

**OPINION**

Appearances:

John B. Quinn
Kathleen Sullivan
Peter E. Calamari
R. Brian Timmons
Johanna Y. Ong
Terry L. Wit
Adam S. Cashman
QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP
*Attorneys for Plaintiff Dr. Enrico Bondi*

Allan B. Diamond
J. Gregory Taylor
J. Benjamin King
P. Jason Collins
DIAMOND MCCARTHY LLP
*Attorneys for Plaintiff Parmalat Capital
Finance Limited*

Joseph B. Tompkins, Jr.
Alan C. Geolot
Mark P. Guerrera
Robert D. Keeling
A. Robert Peitrzak
Thomas McC. Souther
Daniel A. McLaughlin
SIDLEY AUSTIN LLP
*Attorneys for Defendants Bank of America
Corporation, Bank of America, N.A., Bank of
America National Trust & Savings Association,
Banc of America Securities LLC, Banc of
America Securities Limited, and Bank of
America International Limited*

Linda T. Coberly
Bruce R. Braun
Andrew R. DeVooght
WINSTON & STRAWN LLP
*Attorneys for Defendant Grant Thornton LLP*

James L. Bernard
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Defendant Grant Thornton
International*

Lewis A. Kaplan, *District Judge.*

Parmalat Finanziaria, S.p.A., Parmalat S.p.A. and their affiliates (collectively, "Parmalat") collapsed upon the discovery of a massive fraud that reportedly involved the understatement of Parmalat's debt by nearly $10 billion and the overstatement of its net assets by $16.4 billion.[1]  Plaintiffs, Dr. Enrico Bondi ("Bondi"), who has served since December 2003 as the Extraordinary Commissioner of Parmalat in Italian reorganization proceedings,[2] and Parmalat Capital Finance Limited ("PCFL"), a wholly owned subsidiary of Parmalat, seek damages against Parmalat's accountants, banks and others.  In a series of decisions, the Court granted in part and denied in part various motions to dismiss.  The matter now is before the Court on the motion of Grant Thornton International ("GTI") and Grant Thornton LLP ("GT-US") (collectively "Grant Thornton") and Bank of America Corporation and affiliates[3] (collectively "BoA")  for summary judgment dismissing the complaints in these three actions.

*Facts*

*The Parmalat Scandal*

Parmalat, an Italian dairy conglomerate known for its long shelf-life milk, began as a

---

[1] Third Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Cpt.") ¶ 4.

[2] As a result of the Italian proceedings, a new Parmalat was created. Bondi now serves as the chief executive officer of the new entity.

[3] The affiliates are Bank of America Corporation, Bank of America, N.A., Bank of America National Trust & Savings Association, Banc of America Securities LLC, and Banc of America Securities Limited ("BASL").  The complaint names also Bank of America International Limited, but the parties agree that that entity is the same as BASL. *See In re Parmalat Secur. Litig.*, 383 F. Supp.2d 587, 598 n.2 (S.D.N.Y. 2005).

small dairy distributor in Parma, Italy, and grew to a diversified, multi-national food company by 1990.[4] Beginning in the late 1980s, however, the company experienced some difficulties including a 100 billion Italian lira loss as a result of the purchase and subsequent bankruptcy of a media company and, following the Chernobyl disaster, an investigation for radioactive milk and related product recall and drop in consumer confidence.[5] It needed constant infusions of cash to cover its losses and service its massive debt.[6] But cash could be obtained only so long as Parmalat appeared to be a sound investment. To this end, insiders at Parmalat and its outside auditor concocted schemes involving misleading transactions and off-shore entities that created the appearance of financial health.[7] Loans obtained on the basis of these transactions were used to service debt and obtain more loans. These schemes were hidden in financial statements prepared by Parmalat's directors and approved by its auditors.[8] Parmalat continued its fraud until its massive collapse more than a decade later.

Parmalat used its fraudulently gained financing to keep the company afloat and expand. It obtained over €14.353 billion from debt and equity markets and used it to expand its operations

---

[4]
      Rule 56.1 St. of Undisputed Facts Relating to *In Pari Delicto* Jointly Proffered By Defendants (hereinafter "IPD") ¶¶ 2, 47, 174-79, 189. All cited averments in the IPD cited herein are admitted by plaintiffs.

[5]
      *Id.* ¶¶ 51-52.

[6]
      *Id.* ¶¶ 53-55.

[7]
      *Id.* ¶¶ 56-63.

[8]
      *Id.* ¶¶ 64-72.

across the globe.[9]  Between 1990 and 2003, Parmalat opened 136 production facilities and enlarged its workforce from 1,217 to 36,356 employees and its product line to 10,000 items.[10]  During this time also, the company spent roughly €4 billion on acquisitions as it expanded operations from five countries to thirty.[11]

Grant Thornton, S.p.A. ("GT-Italy"), the Italian member firm of GTI,[12] acted as Parmalat's principal outside auditor between 1995 and 1999.[13]  Parmalat relied on its auditors to advise and assist it in concealing the fraud through the use of sham entities and transactions and provided those auditors with false financial statements and other documentation.[14]  In one particular scheme, insiders at Parmalat and GT-Italy used misleading transactions and off-shore entities to create the appearance of a fictitious sale of 300,000 tons of powdered milk to Cuba for $620 million.[15]

PCFL, a wholly owned subsidiary of Parmalat, played another important role in the perpetuation of the Parmalat fraud.  Organized in the Cayman Islands in 1997, PCFL was a financing vehicle that made over $1 billion in loans to other Parmalat entities using funds raised by issuing

---

[9]

Ex. 20,169, at 14; Rule 56.1 St. of BoA in Support of Its Motion for Summary Judgment ("BoA") ¶¶ 404, 416, 422, 424, 432-34, 438.

[10]

IPD ¶189; Guerrera Aff. Ex. C.

[11]

2005 Insolvency Report, at 6; Bondi Mar. 3, 2006 Tr., at 40-41; Parmalat S.p.A. Info. Mem. (June 2001), at 1807557-561.

[12]

For a discussion of the structure of the Grant Thornton organization, see generally *In re Parmalat Secur. Litig.*, 598 F. Supp.2d 569 (S.D.N.Y. 2009).

[13]

Rule 56.1 St. of Grant Thornton ("GTI") ¶¶ 70, 73-78.

[14]

*Id.* ¶ GTI 345; IPD ¶¶ 62, 73; Dr. Bondi's Rule 56.1 St. ("Bondi") ¶¶ 315-38.

[15]

IPD ¶¶ 57-60; *Bondi v. Grant Thornton*, No. 04 Civ. 9771 (LAK) Cpt. ¶¶ 370-76, 383-398.

securities.[16] It was also the parent of Bonlat Financing Ltd. ("Bonlat"), a wholly-owned subsidiary, that falsely claimed to have sold the powdered milk to Cuba, among other non-existent transactions.[17]

BoA allegedly became involved in the fraudulent scheme by engaging in transactions with Parmalat and PCFL that generated more than $800 million for Parmalat. Parmalat used these funds to repay existing debts and finance acquisitions, among other corporate needs.[18]

Ultimately, the scheme became unsustainable. Parmalat experienced a liquidity crisis, and the ensuing collapse was rapid. In early December 2003, Parmalat could not pay certain maturing bonds.[19] By December 11, the company's stock had lost half its value. Trading was suspended for days by Italian regulators. Parmalat's bonds rapidly lost value as well. On December 19, the company announced that a Bank of America account allegedly held by its Bonlat affiliate that supposedly contained $4.9 billion did not exist.[20]

Parmalat filed for bankruptcy in Italy on December 24 and was declared insolvent three days later.[21] Italian authorities thereafter indicted a number of Parmalat executives and two GT-Italy partners.[22] Authorities arrested many individuals connected with the fraud and seized their assets.[23]

---

[16]
    PCFL's Response to Defendants' Joint Rule 56.1 St. ("PCFL St.") ¶¶ 1-8, 12-16, 18.

[17]
    *Id.* ¶¶ 177, 180-82; IPD ¶¶ 57, 104.

[18]
    *See, e.g.*, BoA ¶¶ 312-14, 320, 326, 328-30, 335-45, 500.

[19]
    *See In re Parmalat Secur. Litig.*, 594 F. Supp.2d 444, 449 (S.D.N.Y. 2009).

[20]
    *Id.*

[21]
    *Id.*

[22]
    *Id.*; Bondi ¶¶ 341-342.

*The Complaints*

While the motion now before the Court relates to Dr. Bondi's suit against Grant Thornton (04 Civ. 9771) and PCFL's actions against both BoA and Grant Thornton (06 Civ. 0704, 06 Civ. 2291), respectively, the issues it presents were framed by another of the cases in this multidistrict litigation, *Bondi v. Bank of America*,[24] which was filed before and influenced the actions here at issue. It therefore is helpful to begin with a description of the relevant proceedings in that action before going on to the claims made in the cases that are the subject of the pending motions.[25]

  *1.*  Bondi v. Bank of America

In his original complaint against Bank of America, Dr. Bondi asserted that "Parmalat engaged in a massive fraud and [that] BoA assisted in some respects."[26] More particularly, he claimed that BoA helped Parmalat and its managers structure and execute "a series of complex, mostly off-balance sheet, financial transactions that were deliberately designed to conceal Parmalat's insolvency."[27] Through the bank's assistance, Parmalat presented false financial statements and its officers and managers continued to raise additional financing for "(a) their massive acquisition campaign, (b) their equally massive looting of the company, and (c) their effort to keep the company

---

23  One of the GT-Italy partners, Maurizio Bianchi, has since been sentenced. Bondi ¶ 342.

24  *See In re Parmalat Secur. Litig.*, 594 F. Supp.2d 444, 449 (S.D.N.Y. 2009).

25  No. 04 Civ. 4015 (LAK).

26  *Bondi v. Bank of America* is the subject of a conditional settlement.

27  *See In re Parmalat Secur. Litig.*, 383 F. Supp.2d 390 (S.D.N.Y. 2005).

  *Bondi v. Bank of America*, No. 04 Civ. 4015 (LAK) Cpt. ¶ 1.

afloat amid a mounting wave of losses, debts and disappearing funds."[28]  The complaint went on to allege the particulars of several specific transactions, all of which "were obviously the business of, and intended to benefit, Parmalat and not just its agents."[29]  Moreover, "the detailed allegations regarding the challenged transactions ma[d]e it quite clear that the Parmalat entities were crucial actors in the[] transactions."[30]

The original complaint contained also "a number of vague allegations of looting by Parmalat insiders."[31]  If read generously, it alleged also that BoA, in addition to designing and entering into the transactions by which Parmalat deceived the outside world to further its activities, somehow facilitated the alleged looting by some Parmalat insiders.

BoA moved to dismiss.  Accepting for purposes of the motion Bondi's allegations that BoA was a culpable participant in the Parmalat fraud, it argued that the action nevertheless was barred because Parmalat was *in pari delicto.*  Inasmuch as the original complaint made clear that much of what Bondi complained of constituted fraudulent behavior by Parmalat, the Court granted the motion except to the extent that Bondi asserted that BoA assisted Parmalat insiders in stealing from Parmalat.[32]

Bondi then amended the complaint.  The amended complaint

---

[28]  *Id.* ¶ 204.

[29]  *See In re Parmalat Secur. Litig.*, 383 F. Supp.2d at 598.

[30]  *Id.* at 596.

[31]  *Id.* at 599.

[32]  *Id.*

"no longer alleges that Parmalat participated in the fraud. It has been revised extensively to emphasize the mastermind role of the corrupt insiders, their entirely self-interested actions, and the subsequent harm done to Parmalat. For example, [it] alleges that the 'corrupt Parmalat managers were acting outside the course and scope of their employment and had totally abandoned the interests of Parmalat when they entered into the transactions designed and executed by [BoA] to conceal their embezzlement.' When describing specific transactions, the FAC repeatedly describes the insiders' sole purpose as to benefit themselves at Parmalat's expense."[33]

BoA moved to dismiss the new complaint, again on *in pari delicto* grounds. Obliged to accept as true for purposes of the motion the allegations that Parmalat insiders engaged in the transactions complained of solely to steal from the company and that Parmalat did not benefit from them in any respect, the Court denied the motion.[34]  The Court added, however, that, "[n]eedless to say, it remains to be seen whether Bondi can prove that transactions that raised millions of dollars for Parmalat served no corporate purpose."[35]  That case recently settled.

    *2.*    Bondi v. Grant Thornton International

In his original complaint against Grant Thornton, Dr. Bondi alleged various malpractice and fraud claims against GTI, GT-US and GT-Italy.  Although the complaint used the generic term "Grant Thornton" to refer to all of the defendant Grant Thornton entities, it was apparent from the allegations that Bondi attributed the alleged wrongdoing to GT-Italy and that he sued GTI and GT-US entirely or, at least, primarily on vicarious liability theories.[36]  GTI and GT-US moved

---

33

    *In re Parmalat Secur. Litig.*, 412 F. Supp.2d 392, 400 (S.D.N.Y. 2006) (footnotes omitted).

34

    *Id.* at 401.

35

    *Id.*

36

    *In re Parmalat Secur. Litig.*, 377 F. Supp.2d 390, 409 (S.D.N.Y. 2005).

to dismiss the complaint. As the complaint contained no specific allegations against GT-US and provided no basis for an inference that it controlled any wrongdoer, the Court dismissed all claims against that entity as well as all or parts of some of the claims against GTI.[37]

Following that ruling and the Court's dismissal of much of his original complaint in *Bondi v. Bank of America* on *in pari delicto* grounds, Dr. Bondi amended his complaint against the Grant Thornton defendants. As in his original complaint, the First Amended Complaint ("FAC") attributes substantially all of the alleged wrongdoing to GT-Italy and seeks to hold GTI and GT-US vicariously liable for the alleged wrongdoing of GT-Italy.[38]

The FAC makes substantially the same allegations as the original Grant Thornton complaint, but changes the allegations regarding the motivations of the lead actors. It emphasizes the corrupt insiders' desire to loot Parmalat and benefit only themselves.[39] In particular, the FAC alleges that Parmalat insiders, with the help of GT-Italy, set up "fictitious companies and structur[ed] fake transactions *whose only purpose* was to siphon off billions of dollars of assets from Parmalat and its

---

[37]

 *See id.* at 421.

[38]

 The FAC alleges also that GT-US was involved directly in Parmalat's operations for two reasons. First, it alleges that GT-US provided due diligence regarding Parmalat's proposed acquisition of a Dallas-based company known as The Morningstar Group. FAC ¶ 158. It alleges also that GT-US had a direct relationship with Parmalat because GT-US provided consulting services to reconcile Italian accounting with U.S. Generally Accepted Accounting Principles (GAAP) so that Parmalat could file a Form F-1 registration statement with the SEC. FAC ¶¶ 160-74. These allegations, however, do not purport to demonstrate that GT-US participated directly in any fraudulent activity with or on behalf of Parmalat. They are designed instead merely to support Bondi's vicarious liability claims against GT-US by asserting that GT-US had a direct relationship with GT-Italy. *See* FAC ¶ 174 ("[These allegations] underscore[] that GT-US dominated GT-Italy's relationship with Parmalat, both directly and . . . through its domination and control of GTI as a whole.").

[39]

 *In re Parmalat Secur. Litig.*, 421 F. Supp.2d at 714.

subsidiaries."[40] As Parmalat suffered mounting losses from the looting, the insiders sought to hide the financial hemorrhaging with misleading manipulations and false transactions.[41]   According to the FAC, none of these transactions was intended to benefit Parmalat; each instead was designed solely to facilitate the insiders' looting of the company.[42]

The FAC alleges that Parmalat's GT-Italy auditors were aware of and assisted with the looting cover-up from the beginning.[43]   Together with Parmalat's corrupt insiders, the auditors allegedly devised a scheme to use offshore companies to offload debt and manufacture the appearance of revenue.[44]  Initially, the scheme involved three shell companies that were used to hide Parmalat's losses and to divert money to the insiders.[45]  Later, in 1998, the insiders and GT-Italy incorporated Bonlat, which became the principal vehicle for the fraud.[46]  Bonlat thereafter served to hold Parmalat off balance sheet liabilities that, had they been reflected on Parmalat's consolidated balance sheet, would have demonstrated that Parmalat was in substantially worse financial health than it purported

---

[40] *Bondi v. Grant Thornton International*, No. 04 MD 9771 (LAK), FAC ¶ 3 (emphasis added).

[41] FAC ¶¶ 343, 348.

[42] *Id.* ¶ 348.

[43] *Id.* ¶¶ 355, 358.

[44] *Id.* ¶¶ 355, 358.

[45] *Id.* ¶¶ 355-66.

[46] *Id.* ¶¶ 367-76.

to be. Meanwhile, Bonlat booked fictitious sales and revenue.[47]

As a result of the fictitious transactions, Bonlat reported ownership of a BoA account containing $4.9 billion.[48] According to the FAC, GT-Italy[49] accepted, directly from Parmalat, a letter purporting to be from BoA that certified the existence of the bank account.[50] The account, however, did not exist, and the letter allegedly turned out to have been forged by a member of Parmalat's finance department.[51] GT-Italy accepted unquestioningly also the legitimacy of a $600 million investment Bonlat made in a shell company set up by Parmalat and one of its lawyers.[52] Finally, the FAC alleges that GT-Italy certified Parmalat's financial statements knowing that they were false.[53]

The FAC alleges that Parmalat and its stakeholders were damaged by these actions, which resulted in the theft or squandering of $10 billion. According to the complaint, GT-Italy's actions helped to cause this loss by concealing the looting, artificially inflating Parmalat's assets,

---

[47] *Id.*

[48] *Id.* ¶ 377.

[49] The FAC, like the original Grant Thornton complaint, uses the generic "Grant Thornton" throughout much of the complaint. As with the original complaint, however, it is clear from the context that the entity alleged to have been the primary wrongdoer is GT-Italy. *See, e.g., In re Parmalat Secur. Litig.*, 377 F. Supp.2d at 398 n.34.

[50] FAC ¶378.

[51] *Id.* ¶ 379.

[52] *Id.* ¶¶ 381-94.

[53] *Id.* ¶¶ 770-78.

under reporting its debts, and deepening its insolvency.[54] It asserts claims for professional malpractice, fraud, aiding and abetting fraud and constructive fraud, negligent misrepresentation, aiding and abetting breach of fiduciary duty, theft and diversion of corporate assets, conversion, unjust enrichment, aiding and abetting fraudulent transfer, deepening insolvency, and unlawful civil conspiracy.[55] The complaint seeks no less than $10 billion in damages.

GTI and GT-US moved to dismiss the FAC on the grounds of *in pari delicto*. As with BoA's second motion to dismiss, the Court denied the motion. The Court stated that "the FAC is . . . consistent throughout in [alleging] . . . that the only sense in which Parmalat allegedly participated [in the fraudulent scheme] was as the insiders' puppet." The Court reasoned that, although Bondi could have trouble proving those allegations, the Court was required to accept them as true on a motion to dismiss.[56]

In June 2006, the Court entered a default judgment against GT-Italy on the issue of liability, as it neither had answered the FAC nor moved to dismiss either of Dr. Bondi's complaints.[57] GTI and GT-US here move for summary judgment dismissing the complaint on the ground that Dr. Bondi is *in pari delicto* with GT-Italy. A determination in their favor on that basis would moot the question whether they are liable vicariously for misconduct by GT-Italy.

---

[54] *Id.* ¶¶ 791-93

[55] *Id.* ¶¶ 802-912.

[56] *In re Parmalat Secur. Litig.*, 421 F. Supp.2d at 714.

[57] D.I. 239.

13

*3.*    PCFL v. Grant Thornton International

PCFL filed its complaint against Grant Thornton[58] after the Court had ruled on BoA's motion to dismiss Bondi's original complaint. Like the amended complaints in Dr. Bondi's cases against BoA and Grant Thornton, it alleges that certain PCFL officers, acting exclusively in their own interests and with the knowledge and assistance of GT-Italy auditors, used (1) PCFL as an off balance sheet repository for troubled Parmalat debt and caused PCFL to raise capital and loan funds to Parmalat with the knowledge that Parmalat did not intend to repay PCFL, and (2) issued audit reports that misrepresented PCFL's financial condition.[59] It alleges the particulars of seven transactions whereby PCFL extended loans to or otherwise funded Parmalat entities. Based on GT-Italy's alleged knowledge of the Parmalat fraud, the complaint asserts, the auditors knew or should have known that the Parmalat entities never intended to repay the loans.[60]

In addition to those seven transactions, the *PCFL v. Grant Thornton* complaint alleges that GT-Italy assisted Parmalat insiders by creating Bonlat to hide debt and record fictitious sales.[61] By the end of 2002, "PCFL's financial statements reflected a receivable balance from Bonlat in the amount of $6.942 billion."[62]

---

[58]

*PCFL v. Grant Thornton International*, 06 Civ. 2991 (LAK), Cpt.

PCFL's complaint against Grant Thornton names only GTI and GT-Italy as defendants. GT-Italy never has appeared in the case, but PCFL has not moved for a default judgment against it.

[59]

*Id.* ¶¶ 4-6, 9-10.

[60]

*Id.* ¶¶ 61-66, 84-124.

[61]

*Id.* ¶¶ 67-77.

[62]

*Id.* ¶ 80.

The complaint alleges that GT-Italy certified materially misleading financial statements with respect to the Bonlat transactions[63] and that it should have known that entering into those transactions would leave PCFL with worthless assets.[64] It asserts also that PCFL suffered over $1 billion in damages as a result of GT-Italy's failure to disclose the schemes of Parmalat insiders to loot PCFL and its assistance in transferring troubled Parmalat debt to PCFL and falsifying PCFL's financial statements.[65] PCFL's suit against GTI, like Dr. Bondi's against GTI and GT-US, is based solely on theories of vicarious liability for the acts of GT-Italy.[66] The complaint asserts claims for negligent misrepresentation, aiding and abetting breaches of fiduciary duty and accounting malpractice.[67]

The Court denied Grant Thornton's motion to dismiss the complaint.[68]

4.     PCFL v. Bank of America

As with PCFL's complaint against Grant Thornton, the *PCFL v. Bank of America* complaint alleges that the defendants "worked with Parmalat insiders to orchestrate a series of transactions designed to conceal Parmalat's insolvency" which were intended exclusively to benefit

---

[63]     *Id.* ¶ 83.

[64]     *Id.* ¶ 81.

[65]     *Id.* ¶ 3

[66]     *Id.* ¶¶ 135, 147, 152.

[67]     *Id.* ¶¶ 128-152.

[68]     *In re Parmalat Secur. Litig.*, No. 04 MD 1653 (LAK), 2007 WL 5008628, at *1-2 (S.D.N.Y. Feb. 21, 2007).

BoA and Parmalat but not PCFL.[69] BoA allegedly designed these transactions to conceal the fact that the proceeds would be given to Parmalat to repay its debts, including its debts to BoA, and to fund illicit payments to Parmalat and BoA insiders."[70] In some cases, BoA structured inter-company transfers or loans between or among BoA, PCFL and Parmalat entities that appeared to be conventional BoA loans but in fact were designed to be passed through PCFL to fund repayments of some Parmalat debts. These transactions transferred any credit risk from BoA to PCFL.[71] Other transactions purported to be debt offerings to third parties underwritten by BoA, but were actually vehicles for the funding of loans by PCFL to other Parmalat entities. Again, BoA allegedly structured the transactions to place any financial risk on PCFL.[72] BoA received tens of millions of dollars in fees for structuring these transactions.[73]

As a result of BoA's alleged acts, PCFL claims that it lost hundreds of millions of dollars and incurred additional debt.[74] It asserts claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, and unlawful civil conspiracy[75] and seeks damages for losses that PCFL allegedly incurred as a result of BoA's actions.

---

[69] *PCFL v. Bank of America*, No. 06 Civ. 704(LAK) Cpt. ¶¶ 3-4.

[70] *Id.* ¶¶ 7, 56, 58-59.

[71] *Id.* ¶ 58.

[72] *Id.* ¶ 59.

[73] *Id.* ¶ 61.

[74] *Id.* ¶¶ 136-37, 144

[75] *Id.* ¶¶ 138-169.

The Court denied BoA's motion to dismiss the complaint except to the extent that PCFL's claims were based in fraud.[76]

## Discussion

Grant Thornton and BoA (collectively "defendants") move for summary judgment dismissing the complaints against them. They argue that plaintiffs' claims are barred by the doctrine of *in pari delicto*.[77] In essence, they now assert that the proof on the pivotal allegations that allowed the current complaints in these three actions to avoid the fate of Dr. Bondi's original complaint in his BoA case – the allegations that the actions of which plaintiffs complain were carried out for the exclusive benefit of corrupt Parmalat insiders and therefore were not a part of Parmalat's business – is insufficient to raise a genuine issue of material fact.

## A.    Summary Judgment Standard

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[78] In deciding a motion for summary judgment, a

---

[76]

      *In re Parmalat Secur. Litig.*, No. 04 MD 1653 (LAK), 2007 WL 656845, at **1-2 (S.D.N.Y. Feb. 28, 2007).

[77]

      The phrase is short for "*in pari delicto potior est conditio possidentis [defendentis]*," or "in case of equal or mutual fault . . . the condition of the party in possession [or defending] is the better one." *In re Parmalat Secur. Litig.*, 383 F. Supp.2d 587, 595 n.42 (S.D.N.Y. 2005) (citing *Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 270, 333 S.E.2d 236, 239 (1985)).

[78]

      FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir.2000).

court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.[79] Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non-movant's claim.[80]  In that event, the non-moving party must raise a genuine issue of fact for trial in order to avoid summary judgment.[81]  It is the non-moving party's burden to make this showing on the basis of affidavits "made on personal knowledge, ... set[ting] forth such facts as would be admissible in evidence, and ... show[ing] affirmatively that the affiant is competent to testify to the matters stated therein."[82]  Were there any doubt as to the meaning of this precept, it long ago was eliminated by a parade of decisions making clear that only admissible evidence may be considered in passing on motions for summary judgment.[83]

---

[79] See *Anderson*, 477 U.S. at 255.

[80] *Celotex*, 477 U.S. at 322-323; *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[81] *Celotex*, 477 U.S. at 322-323; *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir.1997).

[82] FED. R. CIV. P. 56(e).

[83] *E.g.*, *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 371 (2d Cir. 2003); *Burt Rigid Box, Inc. v. Travelers Property Cas. Corp.*, 302 F.3d 83, 92 (2d Cir. 2002); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998); *Raskin*, 125 F.3d at 65-66.

B.     *Choice of Law*

PCFL v. Bank of America Corp.[84] and the two actions against Grant Thornton[85] were transferred to this Court under 28 U.S.C. § 1407 from the Western District of North Carolina and the Northern District of Illinois, respectively.  In such circumstances, a transferee court applies its own interpretation of federal law, not that of the transferor court.[86]  Where such an action involves issues of state law, however, the transferee court applies the state substantive law that would have been applied in the transferor court pursuant to the state choice of law rules that would have governed in that forum.[87]  Here, the applicable state law is that of North Carolina for the action against BoA and of Illinois for the actions against Grant Thornton.

C.     *The* In Pari Delicto *Defense Is Available Against These Plaintiffs*

Dr. Bondi does not quarrel with the proposition that any defenses that would have been available in an action brought by Parmalat are available against him.[88]  He stands in Parmalat's shoes.

PCFL takes a different position.  It contends that an *in pari delicto* defense based on its own fraudulent and improper behavior is not available to defendants because PCFL now is controlled

---

[84]
    No. 06 Civ. 704 (LAK).

[85]
    *Bondi v. Grant Thornton*, No. 04 Civ. 9771 (LAK); *Parmalat Capital Finance Ltd. v. Grant Thornton Int'l*, No. 06 Civ. 2991 (LAK).

[86]
    *Menowitz v. Brown*, 991 F.2d 36, 40-41 (2d Cir.1993).

[87]
    *See Van Dusen v. Barrack*, 376 U.S. 612, 638-39 (1964).

[88]
    *See In re Parmalat Secur. Litig.*, 383 F. Supp.2d at 594-95, 96-99.

by court appointed liquidators rather than former Parmalat bad actors who previously controlled it.[89]

The doctrine of *in pari delicto* prevents a party from suing others for a wrong in which the party itself participated.[90] A court "will not aid a fraudfeasor who invokes the court's jurisdiction" to relieve it of the consequences of its fraud.[91]

Corporations can act only through their agents,[92] including their employees and officers.[93] Acts performed and knowledge acquired by a corporate officer or agent within the scope of his or her employment are imputed to the corporation.[94] In the corporate context, therefore, the *in pari*

---

[89]

Pl. Mem. at 36-40.

[90]

*See In re Parmalat Secur. Litig.*, 383 F. Supp.2d at 595 & n.42, 596; *In re Parmalat Secur. Litig.*, 421 F. Supp.2d 703, 713 (S.D.N.Y. 2006); *King v. First Cap. Fin. Serv. Corp.*, 215 Ill.2d 1, 33-34, 828 N.E.2d 1155, 1173-74 (2005); *Byers v. Byers*, 223 N.C. 85, 90, 25 S.E.2d 466, 469-70 (1943).

[91]

*In re Parmalat Secur. Litig.*, 421 F. Supp.2d at 713; *Mettes v. Quinn*, 89 Ill. App. 77, 80, 44 Ill. Dec. 427, 411 N.E.2d 549, 551 (1980); *see also Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 271, 333 S.E.2d 236, 239 (1985).

[92]

*Alpha Sch. Bus Co., Inc. v. Wagner*, No. 1-06-3427, ___N.E.2d ___, 2009 WL 1373149, at *10 (Ill. App. May 15, 2009); *Small v. Sussman*, 306 Ill. App.3d 639, 645-646, 239 Ill. Dec. 366, 713 N.E.2d 1216 (1999); *McGladrey, Hendrickson & Pullen v. Syntek Finance Corp.*, 92 N.C. App. 708, 712, 375 S.E.2d 689, 692 (App. 1989).

[93]

*See Alpha Sch. Bus*, 2009 WL 1373149 at *10; *McGladrey*, 92 N.C. App. at 712; RESTATEMENT (THIRD) OF AGENCY § 1.01, Comment c, at 19 (2006) ("The elements of common-law agency are present in the relationships between employer and employee, corporation and officer").

[94]

*First Chicago v. Industrial Comm'n*, 294 Ill. App.3d 685, 691, 691 N.E.2d 134, 138 (Ill. App. 1998); *Ahlgren v. Blue Goose Supermarket, Inc.*, 266 Ill. App.3d 154, 162, 639 N.E.2d 922, 928 (Ill. App. 1994); *Whitten v. Bob King's AMC/Jeep, Inc.*, 292 N.C. 84, 91, 231 S.E.2d 891, 895 (1977); *In re Knight*, 60 Ill. App.2d 457, 460, 208 N.E.2d 679, 681 (Ill. App. 1965); *Sledge Lumber Corp. v. So. Builders Equip. Co.*, 257 N.C. 435, 439, 126 S.E.2d 97, 100 (1962); *see Trust Co. of Chicago v. Sutherland Hotel Co.*, 389 Ill. 67, 72, 58 N.E.2d 860, 863 (Ill. 1945); *Le Duc v. Moore*, 111 N.C. 516, 15 S.E. 888, 888 (1892); *see also* 3 FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 790 ("the

*delicto* defense rests on the fact that misconduct by a corporate agent committed within the scope of the agent's employment is imputed to the corporation. Where, as here, the corporation rather than the individuals who control it is the plaintiff, any change in control of the corporate entity is immaterial to the availability of the defense. In short, there is no innocent successor exception that would prevent application of *in pari delicto* to PCFL here.

D.     *Applicability of the* In Pari Delicto *Defense*

Here, there is no dispute that Parmalat and PCFL officers engaged in a massive fraud that ended in the collapse of Parmalat.[95] Nor do plaintiffs dispute that Parmalat's and PCFL's officers acted within the scope of their authority when they issued fraudulent financial statements, established new Parmalat entities, approved PCFL's transactions with BoA, made acquisitions, accessed the capital markets, and did many other things.[96] Nor could they. The preparation, approval and oversight of financial statements are ordinary functions of management. That typically is alone sufficient to attribute such actions to the company itself.[97] As Parmalat's and PCFL's agents were acting within the scope of their employment when they took all or most of the actions that underlie plaintiffs' claims and form the basis of defendants' *in pari delicto* defense, the knowledge and actions of those agents must

---

general rule is well established that a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority") (perm. ed. 2002) (hereinafter "FLETCHER").

[95]

*See* Pl. Mem. at 2, 6, 16; Def. Mem. at 1.

[96]

*See generally* Pl. Mem. (omitting any such threshold argument and moving directly to argue that the adverse interest exception applies).

[97]

*See Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir. 2006) (citing RESTATEMENT (SECOND) OF AGENCY § 257).

be imputed to the plaintiff corporations themselves absent some exception to the general rule. On the other hand, as the Court held in ruling on the motion to dismiss in *Bondi v. Bank of America*,[98] any theft by Parmalat and PCFL officers from their respective companies was outside the scope of their employment and not imputable to their employers.[99]

1.  *Adverse Interest Exception Requires Total Abandonment*

This rule of imputation reflects a judgment that there is an mutuality of interest between the principal and the agent in respect of matters within the scope of the agency, that the agent has a duty to communicate to the principal whatever the agent knows that is pertinent to the agency, and that the principal therefore should be charged with the knowledge or actions of the agent gained or undertaken in service of the principal's interest.[100] Where, however, the agent acts adversely to the principal, the rationale breaks down, for it cannot be assumed that a faithless agent will confess the breach of the agent's duty to the principal.[101]

Many states[102] – including Illinois and North Carolina – express this rule by saying that

---

[98]

05 Civ. 4015, D.I. 11.

[99]

*In re Parmalat Secur. Litig.*, 383 F. Supp.2d at 599.

[100]

*See generally* RESTATEMENT (THIRD) OF AGENCY § 5.03, cmt. b.

[101]

*See Ash v. Georgia-Pacific Corp.*, 957 F.2d 432, 436 (7th Cir. 1992) (applying Illinois law); *Brite v. Penny*, 157 N.C. 110, 72 S.E. 964, 965 (1911); *Cowan v. Curran*, 216 Ill. 598, 617, 75 N.E. 322, 329 (1905); RESTATEMENT (THIRD) OF AGENCY § 5.04 & cmt. b.

[102]

*See e.g.*, *MCA Financial Corp. v. Grant Thornton, LLP*, 263 Mich. App. 152, 164, 687 N.W.2d 850, 857 (App. Ct. 2004); *Christopher S. v. Douglaston Club*, 275 A.D.2d 768, 770, 713 N.Y.S.2d 542, 543 (2d Dep't 2000); *American Fidelity & Cas. Co. v. Backstrom*, 47 Wash.2d 77, 82, 287 P.2d 124, 127 (1955); *Goldstein v. Union Nat'l Bank*, 109 Tex. 555, 568, 213 S.W. 584, 591 (1919); *Smith v. Boyd*, 162 Mo. 146, 62 S.W. 439, 444 (1901).

the principal suffers imputation as long as the agent in some respect served the principal or, stated another way, unless the agent totally abandoned the principal's interests.[103] The rule of imputation absent total abandonment, moreover, is not simply a matter of mechanics or rhetoric. It embodies a determination that it would be undesirable to permit principals to avoid responsibility for an agent's actions or knowledge whenever an agent could be said to have acted even in part for the agent's own interest notwithstanding that the agent simultaneously served the interests of the principal.

---

[103]

*Brite v. Penny*, 157 N.C. 110, 72 S.E. at 965 ("[A] corporation is not bound by the action or chargeable with the knowledge of its officers or agents in respect to a transaction in which such officer or agent is acting in his own behalf, and does not act in *any* official or representative capacity for the corporation.") (emphasis added); *Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d 1207, 1210 (7th Cir. 1993) (applying Illinois law) ("[I]n general when an agent acts *entirely* on his own behalf . . . the principal is not bound.") (emphasis in original); *Ash*, 957 F.2d at 436; *McRaith v. BDO Seidman, LLP*, 391 Ill. App.3d 565, 619, 909 N.E. 310, 332 (App. Ct. 2009) ("[A] party who receives *no* benefit from the transaction cannot be charged with knowledge of the fraud.") (emphasis added); *Grede v. McGladrey & Pullen, LLP*, No. 08 C 2205, 2008 WL 4425447, at *5 (N.D. Ill. Sept. 26, 2008); *In re Parmalat Secur. Litig.*, 421 F. Supp.2d at 714 (applying Illinois law); *In re Parmalat Secur. Litig.*, 383 F. Supp.2d at 597 (applying North Carolina law); *Hice v. Hi-Mil, Inc.*, 301 N.C. 647, 273 S.E.2d 268, 272 (1981); *Sparks v. Union Trust Co. of Shelby*, 256 N.C. 478, 482, 124 S.E.2d 365, 368 (1962); *Travis v. Duckworth*, 237 N.C. 471, 474, 75 S.E.2d 309, 311 (1953); *Sledge Lumber Corp.*, 126 S.E.2d at 100; *Brinson v. Mill Supply Co.*, 219 N.C. 505, 14 S.E.2d 509, 514 (1941); *Federal Reserve Bank of Richmond v. Duffy*, 210 N.C. 598, 188 S.E. 82, 84 (1936) (citations omitted); *Woodlawn Farm Company v. Farmers & Breeders Livestock Ins. Co.*, 227 Ill.App. 577, 1923 WL 3143, at *3 (App. Ct. 1923) (interests of agent were entirely adverse to principal); *Stansell v. Payne*, 189 N.C. 647, 127 S.E. 693, 695 (1925); *Wilson Lumber & Milling Co. v. Atkinson*, 162 N.C. 298, 78 S.E. 212, 215 (1913); RESTATEMENT (THIRD) AGENCY § 5.04 ("[F]or purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act *solely* for the agent's own purposes or those of another person.") (emphasis added); 3 FLETCHER § 819; RESTATEMENT (SECOND) AGENCY § 282(1) (1958) ("A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and *entirely* for his own or another's purposes[.]") (emphasis added).

While other Illinois cases speak of an agent acting adversely to the interests of his or her principal rather than entirely adversely, *see, e.g., Cowan*, 216 Ill. at 617, neither plaintiffs nor the Court has located a case that expressly rejected a total abandonment requirement. Tr. Jul. 28, 2009, at 14.

2.    *Parmalat and PCFL Officers Did Not Abandon Totally Corporate Interests*

By any standard, theft from a corporation by insiders is entirely against the corporation's interest.[104] Not surprisingly, no one disputes that any theft by Parmalat and PCFL insiders from their respective corporations cannot be imputed to those entities. Accordingly, the *in pari delicto* defense would not avail defendants to the extent, if any, that there is evidence that they were culpable participants in the theft of corporate assets by Parmalat and PCFL insiders. But given the evidence actually before the Court, that is not what this case ultimately is about.

Bondi alleges that GT-Italy harmed Parmalat by misrepresenting its true financial condition, artificially inflating its assets and under reporting its debts, and advising and assisting Parmalat in the use of sham entities and transactions to conceal looting and squandering of corporate assets.[105] The preparation and certification of financial statements and advising Parmalat with respect to structuring financing vehicles and moving or keeping debt off consolidated balance sheets were corporate activities. Indeed, they assisted Parmalat in obtaining over €14 billion in capital,[106] much of which Parmalat invested to expand its production facilities from three to 130, its workforce from 1,217 to 36,356 employees, its product line to 10,000 items, and its international presence from five countries to thirty.[107] Even assuming that individual agents stole some of the money, Parmalat's officers and employees manifestly were engaged in conducting the work of Parmalat, growing and expanding the

---

[104]

    *In re Parmalat Secur.*, 383 F. Supp.2d at 599.

[105]

    *Bondi v. Grant Thornton*, No. 04 Civ. 9771 (LAK) Cpt. 793.

[106]

    *Bondi v. Citigroup* Statement of Facts ("Bondi-NJ") ¶ 118; Ex. 20,169 at 14; BoA ¶¶ 8-10, 404, 416-23, 429-30, 433-34, 438.

[107]

    Bondi-NJ ¶¶ 35-38; IPD ¶¶ 177, 188-89, 190-91; Guerrera Aff. Ex. C; Parmalat S.p.A. Info. Mem. (June 2001), at 1807557-561.

business, when they engaged in all of the activities alleged in the complaint save theft from Parmalat.

The same can be said for the alleged actions of Grant Thornton with respect to PCFL. PCFL alleges that GT-Italy materially misrepresented the true nature of PCFL's financial condition and knowingly provided assistance in planning transactions that harmed PCFL.[108]   While PCFL alleges generally that these actions facilitated looting,[109] the complaint focuses almost exclusively on transactions that were the *raison d'etre* of PCFL[110] – raising capital and loaning funds to Parmalat. The presumption that PCFL corporate insiders would have passed on to their principal information concerning the transactions described in either of the PCFL complaints is perfectly sensible here.

Resisting this conclusion, plaintiffs argue that looting and squandering even a small portion of corporate assets would be sufficient to establish the adverse interest exception to the imputation rule. According to plaintiffs, the question whether agents have totally abandoned corporate interests should be answered by looking at the long term effects on the corporation of the agents' acts and at the agents' intent rather than the nature of the business itself or the amount actually looted or squandered.[111]

Taken to its logical end, plaintiffs' argument would mean that an employee who steals – even a company pencil – from a corporation could not be acting also in the interests of the corporation and, in consequence, that no other actions or knowledge of that agent properly may be imputed to the

---

108

      *PCFL v. Grant Thornton* Cpt. ¶ 10.

109

      *Id.* ¶ 126.

110

      *Id.* ¶¶ 9-10, 61-121.

111

      Plaintiffs do not dispute defendants' assertion that Parmalat fraudulently obtained €14 billion in financing, nor do they contend that any looting or squandering constituted more than half that amount. *See* Pl. Mem. at 24.

company.  This argument is not persuasive.

An employee may steal from a company while also doing the company's business.  Thus, the adoption of plaintiffs' view would gut the *in pari delicto* defense altogether, as it always could be said that a defalcating agent in that respect acted to benefit the agent personally and that the defalcation itself did not benefit the corporation.  The critical point is that, while the theft from a company of even a pencil is an act solely for the benefit of the employee, the raising of capital for a corporation is part of the corporate business.  That is so despite the fact that the financing ultimately provides the money to buy the pencil that the employee then steals.

To be sure, this case involves alleged theft of considerably more than a pencil although plaintiffs, as will appear, have provided no admissible evidence of any theft at all.  But putting that failure of proof aside and assuming extensive theft for purposes of analysis,[112] even extensive theft would not change this conclusion.  Plaintiffs simply cannot get around the fact that Parmalat, by means

---

[112]

    *See* Pl. Mem. at 24.

    Plaintiffs claim that the corrupt Parmalat insiders misappropriated €7 billion of which €2 billion was "looted" €5 billion "squandered."  Pl. Mem. at 10.  Even assuming that there were admissible evidence to support this claim, which there is not, *infra,* the figures would be vastly inflated.  First, the Court sees no defensible basis for including funds that were wasted or poorly used in any evaluation of the extent to which insiders were acting in their own interests rather than serving corporate interests, which is the concern of the adverse interest exception to the general rule of imputation.  Regrettably, corporate officers and agents frequently make business decisions that turn out badly while acting with entire fidelity to their corporate employers.  Thus, even according to plaintiffs, the relevant figure is €2 billion, the total amount they say was looted as distinct from "squandered."  Pl. Mem. at 10.  Second, plaintiffs include in that total €1.118 billion, which represents expenditures for which, in their opinion, sufficient documentation is lacking.  *See* Bondi ¶ 1526.  But plaintiffs have not met their burden of coming forward with admissible evidence sufficient to raise a genuine issue of material fact with respect to their contention that corrupt insiders totally abandoned the corporations' interests to the extent of these expenditures simply by saying that they cannot figure out where the money went.  Thus, the €2 billion figure would be a vast overstatement even if there were evidence that the insiders actually looted €882 million (€2 billion less €1.118 billion).  Moreover, as we shall see, there is no admissible evidence to support even that figure or, indeed, any theft at all.

of the transactions complained of, raised and spent millions of euros for corporate purposes. The actions of its agents in so doing were in furtherance of the company's interests even if some of the agents intended at the time they assisted in raising the money to steal some of it from the company.

This point is illustrated, although concededly on less extreme facts, by *In re American International Group, Inc., Consolidated Derivative Litigation.*[113]   There, AIG sued third parties who allegedly had conspired with former AIG officials to, among other things, write fake reinsurance contracts so that AIG could inflate its loss reserves, thus making AIG appear to be a healthier company than it actually was and inflating AIG's stock price.   AIG resisted the application of the *in pari delicto* defense by arguing that the culpable former insiders had been motivated by a desire to benefit personally and that the adverse interest exception therefore precluded imputation of their misconduct to AIG.   But the Chancery Court ruled that even a desire by the former insiders to benefit personally in that manner would not defeat imputation of their actions to AIG in light of the nature of the transactions in question:

> "Even read in the most plaintiff-friendly way, the Complaint contends that the fraud was not implemented solely to benefit the insiders committing it. No doubt many of the AIG insiders stood to reap indirect personal benefits if AIG's stock price stayed artificially high or if AIG reaped revenue from selling questionable income-smoothing products, receiving its healthy share of rigged bids, or secretly buying up elderly people's insurance policies . . . . As indicated, that exception only applies when the corporate insiders have acted entirely for their own benefit and without any intention to benefit the corporation. That is not the situation that existed here. The pled facts do not support any inference except that Greenberg and his subordinates wanted AIG to benefit in the first instance from the misconduct, and that they would derive their gains from those reaped by AIG, in the form of higher actual revenues, higher reported earnings, and a higher stock price."[114]

In a subsequent opinion in the same case, the Vice Chancellor explained that the AIG plaintiffs in

---

[113]      965 A.2d 763 (Del. Ch. 2009).

[114]      *Id.* at 826-27.

substance were seeking to expand the adverse interest exception beyond any proper bounds:

> "[T]he plaintiffs would have this court embrace an extension of the adverse interest exception to the in pari delicto doctrine that would, in effect, cover more terrain than the rule itself. They do so by grounding their argument in the notion that the top-ranking AIG officials involved in the Fake Reinsurance and Bid-Rigging Conspiracies had an admixture of corporate and personal objectives in mind when they acted. Although the Complaint plainly pleads that AIG's participation in each of the schemes resulted in tangible (if eventually short-lived) benefits to the corporation in the form of, among other things, higher profits, a guaranteed stream of profitable insurance contracts, a stronger reported balance sheet, and a better stock price, the plaintiffs suggest that the AIG insiders also had personal motives for their actions because they stood to receive greater compensation and chances for promotion if AIG did better. The plaintiffs contend that in these circumstances in pari delicto should give way so that AIG can recover for the harm that it experienced because the corporate action was motivated at least in part by the disloyal interests of AIG's fiduciaries. But, such a 'personal interest' exception, if accepted, would gut the in pari delicto doctrine as applied to corporate plaintiffs.

> "The gutting of the basic rule would result because there is little doubt that in almost every situation where a corporate insider causes a corporation to engage in illegal acts so as to increase the corporation's actual or reported profitability, the insider will have personal interests that might arguably also be advanced if the illegal scheme succeeds. Here, for example, it is arguable that Hank Greenberg, who was among AIG's largest stockholders and was its CEO, stood to benefit from anything that helped AIG. Senior executives like Matthews and Tizzio also had large stakes in AIG that would increase in value along with AIG. Allowing corporations to sue co-conspirators whenever such an argument can be ginned up would give corporations a gaping exception from the in pari delicto doctrine, putting them on a different plane from actual human beings."[115]

This reasoning is perfectly applicable here. The transactions of which plaintiffs complain are the types of transactions by which corporations conduct their businesses – the issuance of financial statements, borrowing money, and so forth. The acts and knowledge of those corporate agents who effected them are the responsibility of the corporations. That some of those agents also stood to benefit personally, whether through a higher stock price as in *AIG* or because the corporations

---

[115]    *In re American International Group, Inc., Consolidated Derivative Litigation,* 976 A.2d 872, 892 (Del. Ch. 2009) (footnote omitted).

had more money for them to steal, as allegedly occurred here, provides no basis for allowing such corporations to avoid responsibility for that which so patently is done on their behalf.

Plaintiffs contend that the fact that the fraudulent financings and other transactions were conducted on behalf of and benefitted the company is immaterial because both Parmalat and PCFL ultimately collapsed due to the fraud. But that assertion obscures more than it reveals and ultimately does not assist the plaintiffs.[116]

These complaints allege two kinds of fraud. There was a fraud conducted *by Parmalat*, the objects of which included raising capital for use in the business by false financial statements and by other means. And there was the fraud allegedly perpetrated *on Parmalat* by corrupt insiders who stole from the company.[117] A corporation may be injured and even destroyed when agents commit fraud on its behalf just as when agents commit fraud upon it.[118] In the former case, their activities subject the corporation to lawsuits, often ruinous liability, and in some instances even criminal prosecution.[119] In the latter, the agents steal the corporation's property and may prevent it from meeting its obligations. Hence, plaintiffs' proposed focus on the end result for purposes of determining whether the adverse interest exception to the rule of imputation underlying the *in pari delicto* defense is misdirected. As the *AIG* cases suggest, the appropriate focus instead is on whether the agents were

---

[116]    *See* RESTATEMENT (THIRD) OF AGENCY § 5.04 cmt. c ("[T]he fact that an action taken by an agent has unfavorable results for the principal does not establish that the agent acted adversely.")

[117]    *See Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 456 (7th Cir.1982) (noting in the context of in pari delicto that "[f]raud on behalf of a corporation is not the same thing as fraud against it").

[118]    *Id.* at 876.

[119]    *Cenco*, 686 F.2d at 456.

committing fraud on behalf of the corporation in taking the actions upon which the plaintiff's claim rests.

Here, the allegedly dishonest Parmalat and PCFL officers were doing corporate business in obtaining financing from BoA and in providing fraudulent financial statements to auditors and others. Whether and to what extent they also stole or embezzled money from their respective corporations for their own benefit is therefore of no consequence for purposes of the *in pari delicto* defense except to the extent, if any, that there is evidence of culpable participation by defendants in those thefts.[120] Such actions, however reprehensible, would not tend to show that they totally abandoned the corporate interests.

Plaintiffs are incorrect also in contending that the Court must look primarily to the intent of the agents while ignoring or discounting evidence that the agents acted for the benefit of the company.[121] They rely upon *CBI Holding Company, Inc. v. Ernst & Young LLP*,[122] but that reliance is not compelling.

In *CBI*, the Second Circuit assumed that the intent of the president and chairman of a bankrupt pharmaceutical company who had carried out an inventory fraud to raise money for the company was pertinent in deciding whether he had totally abandoned the company's interests. The Circuit's holding, however, was simply that the bankruptcy court's finding of total abandonment was supported by an accounting supervisor's testimony that "'the real reason' for the fraud was to maximize

---

[120]  *See Baena*, 453 F.3d at 7-8; *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir.1998).

[121]  Pl. Mem. at 20; Tr. 7/28/09, at 21.

[122]  529 F.3d 432 (2d Cir. 2008).

the [chairman's] bonus"[123] and therefore not "clearly erroneous."[124]

To be sure, the *CBI* panel's assumption that the personal subjective intent of the company president sufficed to come within the adverse interest exception, if it were a holding controlling this case, would support plaintiffs' argument. But it is not a holding and is not controlling here. The holding was simply that the factual finding was not clearly erroneous. And even if the decision were construed as holding that the personal motive of the company president was determinative of the applicability of the adverse interest exception, it would reflect only a reinterpretation of New York law[125] and would not control these cases, which are governed by the law of Illinois or North Carolina. The authority plaintiffs cite from the controlling jurisdictions stands only for the unremarkable proposition that courts may consider evidence of an agent's motive.[126]

As plaintiffs have offered no admissible evidence that could justify a conclusion that Parmalat and PCFL's officers totally abandoned the interests of their respective principals when engaging in the vast bulk of the fraudulent actions of which plaintiffs complain, their knowledge and actions are imputed to Parmalat and PCFL. Accordingly, defendants are entitled to judgment as a matter of law because plaintiffs were *in pari delicto* with respect to the fraud of which they complain, putting to one side for the moment the question whether there is sufficient evidence to get to a jury on

---

[123]
    *Id.*

[124]
    *Id.* at 449-51.

[125]
    As the *AIG* case pointed out, such a holding would be in serious tension, to say the least, with the governing decision of the New York Court of Appeals. 965 A.2d at 826-27 & n.243.

[126]
    *See Duffy*, 188 S.E. at 84; *Reinninger v. Prestige Fabricators, Inc.*, 136 N.C.App. 255, 262, 523 S.E.2d 720, 725 (N.C. Ct. App. 1999); *McKey & Poague, Inc. v. Stacklet*, 63 Ill. App.3d 142, 152, 379 N.E.2d 1198, 1205 (App. Ct. 1978).

any claim of culpable participation by defendants in theft from plaintiffs by plaintiffs' officers and agents. Moreover, the Court would reach the same result even if the standard governing applicability of the adverse interest exception to the *in pari delicto* defense were more forgiving to plaintiffs than the requirement of proof of total abandonment of the corporate interests.

3.    *The Adverse Interest Exception Would Not Apply Even If Total Abandonment Were Not the Standard*

Plaintiffs assert that certain Parmalat and PCFL officers stole from and otherwise looted those companies. Presumably they do so for two reasons. As we have seen, they argue that looting by Parmalat and PCFL officers would defeat the *in pari delicto* defense even as to misconduct from which those officers did not personally benefit.[127] And they suggest that plaintiffs are entitled to recover from defendants whatever those individuals may have stolen, at least to the extent that the defendants were culpable with respect to the thefts themselves.[128]

To the extent plaintiffs do so in service of the argument that knowledge of corporate acts from which the insiders derived no immediate personal benefit is not imputable to Parmalat and PCFL, the argument is unpersuasive for the reasons just discussed. Were there admissible evidence to support their allegations, however, the *in pari delicto* defense would be no obstacle to recovery from defendants of anything that miscreant corporate officials stole with the defendants' culpable participation.[129] But,

---

[127]

    *See* Pl. Mem. at 20-23.

[128]

    *See Bondi v. Grant Thornton*, No. 04 Civ. 9771 (LAK) Cpt. (praying for damages award of "no less than $10 billion . . . for the losses . . . incurred as a result of the acts and omissions of the defendants set forth in the complaint").

[129]

    *In re Parmalat Secur. Litig.*, 383 F. Supp.2d at 599.

in the last analysis, there is no such admissible evidence. This is independently fatal to plaintiffs' attempt to avoid the *in pari delicto* defense as to losses allegedly sustained through the panoply of corporate transactions of which they complain. It is fatal in and of itself to their attempt to recover from defendants anything that any dishonest corporate agents may have stolen.

The Court is well aware of the publicity surrounding the Parmalat fraud, the indictments in Italy of various Parmalat insiders and GT-Italy personnel, and the widely accepted view that some insiders stole from Parmalat with both hands, to put it colloquially. Nevertheless, despite all of the publicity, all of the proceedings in Italy and the millions of dollars spent on discovery in this MDL, plaintiffs rely on only a handful of pieces of evidence in their effort to establish the theft and looting of which they speak so extensively. And the Court is confined to the record before it – it may not rely on newspaper accounts and what may pass for common knowledge in the business community. So it turns to the record in these cases.

### (a)    The Guardia di Finanza Report

Plaintiffs rely for the proposition that Parmalat insiders stole from the company first on a report by the Guardia di Finanza (the Italian finance police)[130] that concluded that more than €943 million was "diverted" from Parmalat between 1992 and 2003.[131] But Guardia officer Pietro Curia testified that the definition of "diversion" used in the report included money paid to Parmalat

---

[130]

Bondi ¶ 340.

[131]

Pl. Mem. at 11; Dr. Bondi's Counterstatement of Additional Facts ¶ 654; March 24, 2004 Verbale Report at PP19226.

subsidiaries to cover their debt.[132] Thus, the Guardia report, even if it were admissible, would not support plaintiffs' contention that corrupt insiders stole the €943 million or used it in some other way for their personal benefit and against the interests of the company. But the report is not admissible in evidence to begin with, as it must be for consideration on these motions.

The report, of course, is hearsay – an out of court statement offered to prove the truth of the matters asserted. It is admissible only if plaintiffs have offered sufficient evidence to bring it within an exception to the hearsay rule.

Plaintiffs argue first that it is admissible as a record of a regularly conducted activity under Federal Rule of Evidence 803(6).[133] That exception applies, however, only if the report was made in the "regular practice" of the declarant, the Guardia di Finanza.[134] But Officer Curia testified that the report "was not a document that [wa]s commonly issued" by the Guardia.[135] While it is not surprising, in view of the dimensions of the Parmalat collapse, that the Guardia would make such a report, the fact that the making of the report was not a part of its regular practice is fatal to this exception.

Plaintiffs' fallback position is that the findings in the report are admissible under Federal Rule of Evidence 803(8) because they come within the public record exception. But Rule 803(8) renders admissible over hearsay objection only factual findings with respect to matters observed

---

[132]

Curia Dep. (2/5/2007) at 65, 68-69, 99, 111-13 (The money was diverted so that a Parmalat owned company "could cover its debt and survive for a further period of time."); *see also* March 24, 2004 Verbale Report at PP19212.

[133]

Pl. Mem. at 12.

[134]

FED. R. EVID. 803(6).

[135]

Curia Dep. (2/5/2007) 34:3-18.

pursuant to duty or that were derived from "sources of information [that] . . . indicate . . . trustworthiness."[136] The Guardia report does not purport to set forth observations in the requisite sense, *i.e.*, matters that Guardia officers perceived with their own senses.[137]   Further, it is filled with conclusions based heavily on statements of former Parmalat insiders, all of whom had motives to conceal or minimize their own culpability, shift responsibility to others, and be less than forthright with Guardia investigators in other ways.[138]   The sources of information underlying the report's findings therefore indicate untrustworthiness.


    *(b)*    *Plaintiffs' Experts*

      Plaintiffs rely also on reports and deposition testimony of proposed experts, which purport to find evidence of misappropriation of €943 million.[139]   These reports stand them in no better

---

[136]
    FED. R. EVID. 803(8).

[137]
    *See* FED. R. EVID. 803(8) Advisory Comm. Note ("Police reports have generally been excluded except to the extent to which they incorporate firsthand observations of the officer."); *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) ("It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted but that statements made by third persons under no business duty to report may not.") (internal quotation marks omitted).

[138]
    *See In re Parmalat*, 477 F. Supp.2d 637, 641 (S.D.N.Y. 2007); *see also United States v. Romo*, 914 F.2d 889, 895-96 (7th Cir. 1990) (statement contained in police report compiled with assistance of informants inadmissible due to lack of trustworthiness when there was no evidence about how the report was prepared or the basis of the information in report); *cf. Robbins v. Whelan*, 653 F.2d 47, 50 (1st Cir. 1981) (Department of Transportation report of vehicle safety testing admissible even though it was based in part on information supplied by automobile manufacturers because investigation was completely unrelated to accident and because agency had established standards by which private parties were to collect data, had first hand knowledge of investigation, and had found information supplied by automobile manufacturers sufficiently reliable to publish).

[139]
    Pl. Mem. at 11 (citing reports of Oliver Galea and Roberta Megna).

stead.

As an initial matter, the experts' reports already have been excluded as inadmissible.[140] And they would be of no help even if they were admissible. The reports say that €943 million was misappropriated. But they defined as "misappropriated" any payment by Parmalat, either to an individual or another company, that became uncollectible.[141] They therefore equate bad debts with misappropriated or stolen funds. Accordingly, they do not support the suggestion that the €943 million was stolen or otherwise misappropriated in the ordinary sense of that word.

Plaintiffs rely also on deposition testimony as distinct from the previously excluded reports. But the cited deposition testimony merely recites the inadmissible facts and data contained in the reports and is inadmissible for the same reasons.[142]

_____

[140]

See *In re Parmalat Secur. Litig.*, 477 F. Supp.2d at 641-42 (excluding report by Dr. Chiaruttini because "the circumstances of its preparation indicate[d] a lack of reliability"); *In re Parmalat Secur. Litig.*, No. 04 MD 1653 (LAK), 2007 WL 1169217, at **1-2 (S.D.N.Y. Apr. 18, 2007) (excluding Galea-Megna report and PricewaterhouseCoopers ("PwC") report because they were produced by paid advocates).

The plaintiffs rely also on Dr. Bondi's Supplemental Report on the Causes of Insolvency, dated May 4, 2005. *See,e.g.*, Bondi ¶ 1526. This is inadmissible also because it is hearsay and as a party to the litigation, Dr. Bondi's report is even more susceptible to bias than that of the paid experts.

[141]

Galea Dep. (3/2-3/2007) at 108, 119-21; Galea & Megna Rep. § 12.1, at 106257.

[142]

*See*, Pl. Mem. at 11 (citing Bondi ¶ 1523, relying on Galea Tr. (3/2-3/2007) at 123-24, 317-18; 321-22); *id.* (citing Bondi ¶ 1522, relying on Galea Tr., (3/3/2007), at 106-08, 112-13; Chiaruttini Tr. (8/2/2007), at 517-20).

As further support, plaintiffs cite the fact that GT expert Paul F. Charnetzki conceded that there was evidence of looting. *See* Bondi ¶ 469. Charnetzki's testimony is likewise inadmissible because it recites also inadmissible facts and data contained in plaintiffs' reports. Even if it were admissible, however, Charnetzki did not conclude that there was evidence of looting. Instead, he determined that of the more than $2 billion that Dr. Bondi identified in his report as having been "misappropriated," only $65 million involved "suspect transactions" that warranted further investigation. *See* Charnetzki Expert Report

Plaintiffs allege also that the transfer of an additional €1.118 billion out of the Parmalat Group through Wishaw Trading constituted looting.[143] But this amount too represents transfers for which the experts could find "no evidence supporting a legitimate business purpose."[144]

The fact that plaintiffs' experts could not account for these funds is evidence that Parmalat's bookkeeping was sloppy. While it is consistent with theft, it is consistent also with legitimate uses of the money for corporate purposes. Indeed, Dr. Bondi's expert and PwC partner Franco Lagro testified that "some of the financing Wishaw raised was used to pay the debt of Parmalat's Brazilian operations" while additional funds were transferred to other companies in the Parmalat group.[145]

### (c)    Alleged Statements of Former Parmalat Insiders

#### (1)    Italian police summaries

Plaintiffs claim also that former corrupt Parmalat managers have admitted, in what plaintiffs' describe as sworn statements and former testimony, to stealing money by diverting corporate funds to themselves, their families, and their friends.[146] But plaintiffs have offered no such "sworn

---

[143] ¶¶ 13, 30, 101; Charnetzki Dep. (8/22/2007), at 172-73.

[144] Pl. Mem. at 11.

[145] Dr. Bondi's Statement of Additional Disputed Material Facts ¶ 1526; see Report of Franco Lagro ("Wishaw Report"), dated Mar. 18, 2004, at 3365848; see also Pl. Mem. at 11.

[146] Lagro Fact Tr. dated Feb. 27, 2007, at 250-51; see also Wishaw Trading Report, at P3774533 (reporting sums in the hundreds of millions of dollars transferred from Wishaw Trading to Parmalat Partecipaçòes to finance the latter's own subsidiaries).

Pl. Mem. at 11-12.

statements" or admissible former testimony.

First, what plaintiffs describe as sworn statements actually are documents that purport to be unsworn summaries by Italian police of unsworn statements[147] allegedly made to them by former insiders. Thus, the material relied upon, even assuming authenticity, is double hearsay. It consists of out of court statements by Italian police officers that purport to summarize what others allegedly said to the police officers and they are offered for the truth of what those others allegedly said. Even the statements by the police officers are not admissible, over hearsay objection, to establish that those with whom they spoke said what the police reports say they said. The reports certainly are not admissible for the truth of the matters asserted by those with whom the police say they spoke.[148]

Plaintiffs argue that the summaries "may be treated as affidavits"[149] that outline witnesses' expected testimony at trial or, in the event that the witnesses are unavailable, as statements against interest pursuant to Federal Rule of Evidence 804(b)(3). They rely on *International Distributing Corp. v. American District Telegraph Company*.[150] But they are mistaken.

---

[147] Although plaintiffs describe the statements as "sworn," there is no indication in the summary reports provided that the statements in fact were given under oath. *See* Bondi ¶¶ 436, 466, 470-86.

[148] In support of their contention that Parmalat insiders looted the company, plaintiffs cite also unsworn statements of BoA insiders confessing that they diverted funds from Parmalat's transactions with the bank. Pl. Mem. at 12. The same analysis applies to these statements. *See* Giuralarocca Inter. (4/7/2005); Sala Inter. (2/24/2004, 2/27/2004, 3/1/2004, 3/9/2004, 3/17/2004).

Moreover, even if these statements were admissible, the fact that BoA officers stole money involved in Parmalat transactions does not support the contention that Parmalat officers looted their own company.

[149] Pl. Mem. at 11 n.15.

[150] 569 F.2d 136 (D.C. Cir. 1977).

In *International Distributing,* the D.C. Circuit considered whether the district court had correctly granted summary judgment to a plaintiff who had sued a burglar alarm company when two of its employees robbed the plaintiff's liquor store. In affirming the grant of summary judgment to plaintiff on its breach of contract claim, the court held that an affidavit by a police officer who obtained confessions of the two employees had properly been considered on the motion. It explained that the employees' incriminating statements would have been admissible at trial either through their own testimony or as statements against interest.[151]

*International Distributing* does not take plaintiffs where they wish to go. First, the unsworn police summaries here, unlike the affidavits in that case, are not affidavits, made under oath, as to what allegedly was said to the police officers. So the analogy to *International Distributing* fails at the first step. Affidavits by persons with personal knowledge may be considered under Rule 56(e). Unsworn statements may not.

Second, even if the Italian police summaries were in affidavit form, the statements they attribute to the former Parmalat employees would be admissible only if a hearsay exception were established. Plaintiffs argue that those statements were statements against penal interest. Even if they were, however, such statements would be admissible under the relevant hearsay exception only if the declarants were unavailable. There has been no such showing here.[152]

---

[151] *Id.* at 138.

[152] This makes it unnecessary to determine whether the fact that the materials are second party summaries rather than statements by the declarants would be independently fatal. Nor need the Court analyze separately whether each averment contained in the statements was self-inculpatory, as would be necessary to warrant admissibility. *See Williamson v. United States,* 512 U.S. 594, 600-01, 604 (1994).

(2)    *Statements to Italian courts*

Plaintiffs next rely on assertions by former Parmalat chief financial officer Fausto Tonna in unsworn statements before an Italian court.[153]  They contend that these statements are admissible under hearsay exceptions for statements against interest and former testimony.[154]  They are mistaken.

First, there are three assertions in Tonna's testimony arguably relevant to demonstrating looting: that (1) Parmalat outside lawyer Gianpaolo Zini formed two companies for Parmalat and knew that they functioned to conceal embezzlements from Parmalat, (2) Parmalat founder Calisto Tanzi and his family embezzled about €1 billion, and (3) Tonna and others at Parmalat were aware of the "financial situation of the [Parmalat] group."[155]

The initial problem with plaintiffs' reliance on these statements is that they would have been obliged to adduce evidence sufficient to justify a finding that Tonna had personal knowledge of the facts asserted even if they fell within a hearsay exception.[156]  This they have failed to do.  But there is no indication that Tonna had personal knowledge of the first two of the  statements or of as much of the third statement as purports to speak to the knowledge of persons other than Tonna.  All that remains, therefore, is Tonna's testimony that he was aware of the financial situation of the group.  And the Court fails to see how that rather Delphic statement is probative on the question whether insiders

---

[153]    *See generally* Tonna Milan Tr. (5/9/2006); Bondi ¶ 654.

[154]    FED. R. EVID. 804(b)(1) & (3); Pl. Mem. at 12 n.15.

[155]    Tonna Milan Tr. (5/9/2006), at 178-79.

[156]    FED. R. EVID. 602; *see also Thomas v. Stone Container Corp.*, 922 F. Supp. 950, 957 (S.D.N.Y. 2006) (citing *Litton Systems, Inc. v. American Telephone & Telegraph Co.*, 700 F.2d 785, 816-17 (2d Cir.1983), *cert. denied*, 464 U.S. 1073 (1984)).

were stealing. Even if one were to assume that the financial condition of the group was dire, that situation may have arisen due to any number of reasons not involving looting or embezzlement. So the Court does not need to reach the hearsay question. Almost all of the statements are excluded for lack of personal knowledge and the remaining statement because it is not relevant – it would not tend to establish any fact material to this motion.

Even if plaintiffs somehow had laid a foundation, Tonna's statements would not be admissible under either hearsay exception. The former testimony exception would not apply because that rule requires that the party against whom the testimony – if indeed the unsworn statements are properly so characterized, which the Court need not decide – is offered have "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."[157]  There is no suggestion that defendants or anyone with a similar motive had the opportunity to question Tonna during the Italian criminal proceeding.

Moreover, both the statement against interest and former testimony exceptions require a showing that the declarant is unavailable to testify at trial.  In the case of the statement against interest, this means that the declarant is both absent and that the proponent of the statement "has been unable to procure the . . . declarant's attendance or testimony."[158]  Here, plaintiffs have made no showing that they tried and failed to take Tonna's deposition or that he otherwise is unavailable.[159]

---

[157]    FED. R. EVID. 804(b)(1); *see also Lamberti v. United States*, 22 F. Supp.2d 60, 71 & n.53 (S.D.N.Y. 1998), *aff'd without consideration of the point sub nom. Badalamenti v. United States*, 201 F.3d 430 (table), 1999 WL 1212654 (2d Cir. Dec. 10, 1999) (unsworn statements to an Italian judge do not constitute former testimony).

[158]    FED. R. EVID. 804(a)(5).

[159]    *See Lucas v. Chance*, 121 Fed. Appx. 77, 80 (6th Cir. 2005) (assertion did not fall within Rule 804 hearsay exceptions for summary judgment purposes when proponents made no showing that declarant was unavailable); 1337523 *Ontario, Inc. v. Golden State Bancorp,*

*In pari delicto* is an affirmative defense which defendants have the burden to prove.[160] But the burden of proving an exception to the rule is on the plaintiffs.[161]  Plaintiffs have failed to carry that burden here, and the Court may not assume it away on the basis of newspaper reports, supposed common knowledge, or anything else.  Given this record, there is no admissible evidence that the Parmalat and PCFL insiders acted adversely to their companies, let alone that they did so with respect to those matters in which these defendants participated.  The adverse interest exception therefore does not apply, and plaintiffs have failed to rebut the presumption of imputation.  Accordingly, *in pari delicto* bars plaintiffs' claims.

E.    In Pari Delicto *Bars All of Plaintiffs' Claims*

Plaintiffs contend that if the *in pari delicto* doctrine is applicable here, it is not a valid defense to all of their causes of action.[162]  But plaintiffs offer no support for the proposition that the defense is not a categorical bar.  Indeed, the nature of the defense is that, where it applies, "the law will not aid either party, but will leave them without remedy as against each other."[163]  Nevertheless, the

---

*Inc.*, 163 F. Supp.2d 1111, 1120 (N.D. Cal. 2001) (same); *Biggers on Behalf of Key v. Southern Ry. Co.*, 820 F. Supp. 1409 (N. D. Ga. 1993) (same).

[160]    *See Williams Elec. Games, Inc. v. Garrity*, 366 F.3d 569, 573 (7th Cir. 2004) (applying Illinois law); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 951 F. Supp. 1233, 1234 (M.D.N.C. 1996) (applying North Carolina law).

[161]    *In re Parmalat Secur. Litig.*, 412 F. Supp.2d at 401; *In re Parmalat Secur. Litig.*, 421 F. Supp.2d 714.

[162]    Pl. Mem. at 30.

[163]    *Vine Street Clinic v. HealthLink, Inc.*, 222 Ill.2d 276, 297, 856 N.E.2d 422, 436 (Ill. 2006); *Bledsoe v. Coxe Lumber*, 229 N.C. 128, 135, 48 S.E.2d 50, 56 (1948).

Court will consider each of plaintiffs' claims.

### 1.    Breach of Fiduciary Duty

Plaintiffs argue that a corporation can sue its agent for breach of fiduciary duty notwithstanding that it is *in pari delicto* with the defendant. They do not, however, cite any authority that supports that contention. *In pari delicto* may – and in this case does – bar the claim of a corporation when it is equally at fault with a second corporation.[164]

Plaintiffs argue also that BoA breached its fiduciary duties to PCFL based in part on the actions of a single rogue BoA officer. They contend that *in pari delicto* should not apply to bar PCFL's breach of fiduciary duty claim against BoA because this officer's theft constituted an independent wrong by BoA and the doctrine bars only claims between parties that behaved "'wrongfully in conjunction with one another during the same act.'"[165]

This argument rests on several instances of embezzlement or theft carried out by Luca Sala, a senior BoA officer based in Milan. To the extent that plaintiffs rely on admissible evidence, however, it shows that Sala was stealing from BoA by, among other things, negotiating fees and interest rates on deals with plaintiffs but reporting to the bank that Parmalat had agreed to pay less. Sala then pocketed the difference.[166] Thus, the misconduct by Sala on which plaintiffs rely was adverse to the

---

[164]
See, e.g., *OHC Liquidation Tr. v. CSFB*, 389 B.R. 357, 365-68 (D. Del. 2008).

[165]
Pl. Mem. at 31 (quoting *Food Lion*, 951 F. Supp. at 1234).

[166]
See, e.g., Bondi's Rule 56.1 St. in Support of His Motion for Summary Adjudication of His Breach of Fiduciary Duty Claim ¶¶ 2263-2274, 2320-2336.

In one such transaction, Sala negotiated with Parmalat a 2.75 percent arrangement fee on a financing transaction. He informed BoA that the agreed upon fee was only 1.5 percent and pocketed the difference, which amounted to $3.75 million. *Id.* ¶¶ 2275-78, 2333;

interests of BoA.  Knowledge of these dishonest acts therefore is not imputed to the bank, which is fatal to PCFL's breach of fiduciary duty claim against BoA.  The bank cannot have breached a duty to its fiduciary based on acts about which it had no knowledge.

### 2.    Auditor Malpractice

Plaintiffs in the suits against Grant Thornton argue that Illinois' audit interference doctrine precludes application of the *in pari delicto* doctrine to bar their claims for accounting malpractice.[167]

The Illinois auditor interference doctrine permits an accountant sued for malpractice to assert his or her client's negligence as a defense only where that negligence interferes with the accountant's "failure to perform his contract and report the truth."[168]  It exists to limit the defense of contributory negligence, but at least one Illinois court has found it applicable in the context of comparative fault as well.[169]  In other words, the doctrine may be asserted by an accountant or firm to limit or preclude the accountant's liability for malpractice.  But it has nothing to do with the separate *in pari delicto* defense which, where it applies, operates as an absolute bar to a claim based on equally wrongful acts of both parties.

---

[167]    PCFL's Rule 56.1 St. ¶¶ 110-115.

*Id.* at 31-32.

Only Illinois law is relevant here, as the two suits that allege accounting malpractice were transferred from Illinois.

[168]    *Bd. of Trustees of Comm. Coll. Dist. No. 508, County of Cook v. Coopers & Lybrand*, 208 Ill.2d 259, 266, 803 N.E.2d 460, 464-65 (2003).

[169]    *Id.*

3.    *Aiding and Abetting Fraud, Breach of Fiduciary Duty, or Unlawful Civil Conspiracy*

Plaintiffs argue that the *in pari delicto* doctrine does not apply to aiding and abetting and conspiracy claims because, under the imputation rule, an agent's bad acts are imputed to his or her principal only where a third party, seeking to recover for damages based on those acts, is unaware that the agent is adverse to the principal.[170] They contend that defendants therefore cannot benefit from the *in pari delicto* defense by imputing the actions of Parmalat's and PCFL's agents' acts to their principal corporations because the defendants allegedly were involved in Parmalat's fraud.

Plaintiffs' explanation of the general agency principle is correct as far as it goes, but it has no application here. Plaintiffs have failed to raise a genuine issue of material fact for their contention that Parmalat's and PCFL's agents acted adversely to their principals with respect to the events that form the basis of plaintiffs' claims. Moreover, the primary purpose of the *in pari delicto* defense is to prevent courts from getting involved in suits among co-conspirators and others who are jointly at fault.[171] Holding that it does not bar aiding and abetting and conspiracy claims would defeat that purpose entirely.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment [04 MD 1653 docket item 1717; 04 Civ. 9771 docket item 632; 06 Civ. 2991 docket item 190; 06 Civ. 0704 docket

---

[170]    Pl. Mem. at 34-35 (citing *Mut. Life Ins. Co. of New York v. Hilton-Green*, 241 U.S. 613, 623 (1916)).

[171]    *See, e.g., Food Lion*, 951 F. Supp. at 1234; *Dunning v. Bathrick*, 41 Ill. 425, 1866 WL 4614 (1866) (law will not aid either party when both were involved in systematic effort to defraud a property owner of his property).

item 231 ] dismissing the complaints is granted.

        SO ORDERED.

Dated:       September 18, 2009

                                                  Lewis A. Kaplan
                                       United States District Judge