UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re PARMALAT SECURITIES LITIGATION

This document relates to:    05 Civ. 9934 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FOOD HOLDINGS LIMITED, et al.,

                    Plaintiffs,

          -against-

BANK OF AMERICA CORPORATION, et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MASTER DOCKET
04 MD 1653 (LAK)

## OPINION

Appearances:

          Allan B. Diamond
          J. Gregory Taylor
          J. Benjamin King
          Richard I. Janvey
          DIAMOND, MCCARTHY, TAYLOR, FINLEY & LEE, LLP
          *Attorneys for Plaintiffs*

          Joseph B. Tompkins, Jr.
          Alan C. Geolot
          Mark P. Guerrera
          David J. Lewis
          Robert D. Keeling
          A. Robert Pietrzak
          Thomas McC. Souther
          Daniel A. McLaughlin
          SIDLEY AUSTIN LLP
          *Attorneys for Defendants*

**Table of Contents**

I.   Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     A.   Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     B.   Structured Finance Transactions and Cayman Islands Special Purpose Entities
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
          1.   Structured Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
          2.   Cayman Islands SPEs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     C.   Parmalat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     D.   BoA's Relationship with Parmalat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     E.   The BoA Deal Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     F.   This Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          1.   Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          2.   Early Iterations of the Deal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
               a.   January 1998 Proposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
               b.   July 1998 SCM and the Deloitte Valuation . . . . . . . . . . . . . . . 9
               c.   August 1998 SCM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
               d.   October 1998 SCM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
               e.   The NMS Valuation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
               f.   January 1999 SCM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          3.   BoA Prepares to Close the Deal Even Before Approving It  . . . . . . . . . 18
          4.   BoA Finally Approves the Transactions  . . . . . . . . . . . . . . . . . . . . . . . 20
          5.   SPE Board Action  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
          6.   Sala's Diversion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
          7.   Closings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
          8.   Transaction Documents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
     G.   Parmalat's Collapse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     H.   The Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

II.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
     A.   The Fraud Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
          1.   Sala's Diversion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
          2.   Parmalat's Financial Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          3.   Parmalat Brazil . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
     B.   The Breach of Fiduciary Duty Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
          1.   Fiduciary Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
          2.   Breach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
               a.   The Bank's Rejections of the Deal  . . . . . . . . . . . . . . . . . . . 44
               b.   The Deloitte and NMS Valuation Opinions . . . . . . . . . . . . . . 47
          3.   Causation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
     C.   The Breach of Contract Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
     D.   The Unjust Enrichment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

III. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Lᴇᴡɪѕ A. Kᴀᴘʟᴀɴ, *District Judge*.

This case had its genesis in the desire of Parmalat, which collapsed in 2003, to raise money by selling a minority of the stock of its Brazilian subsidiary, Parmalat Administracao ("Parmalat Brazil"), at a time when that stock could not be sold in equity markets. Bank of America (together with its affiliates, "BoA") conceived of and Parmalat engaged in a pair of matched transactions that were intended to provide off-balance sheet debt financing to bridge the gap until the Parmalat Brazil stock could be sold on attractive terms.

In concept, the transactions were no different from many other structured finance deals. BoA arranged for the creation of two special purpose entities ("SPEs") – in this case, both Cayman Islands companies – that would exist only on paper and only for the purpose of completing the transaction. The SPEs would (a) borrow $300 million from institutional investors, and (b) buy the Parmalat Brazil stock from Parmalat Brazil for $300 million. The debt eventually was to have been repaid with the proceeds of the sale by the SPEs of the Parmalat Brazil stock.

This deal had at least two attractions to Parmalat beyond the fact that it raised $300 million. First, assuming that it was structured to conform to the relevant accounting rules – and no one suggests that it was not – the debt incurred by the SPEs would not appear on Parmalat's consolidated balance sheet. Second, by "selling" this minority interest to the SPEs for $300 million, the transaction implied a high value for Parmalat Brazil as a whole and thus for the majority stake in Parmalat Brazil that Parmalat continued to own.

But why would institutional investors pay $300 million for notes of the SPEs in circumstances in which the only source of money to pay the notes when due would have been the hoped-for proceeds of a minority interest in Parmalat Brazil that could not have been sold for such a price at the inception of the deal? The short answer is that they would not. So BoA, in order to

2

make the deal salable, recommended and Parmalat provided two additional sources of funds to pay the debt in the event the Parmalat Brazil stock could not be sold at a price sufficient to satisfy the notes. The first was a "put" option to give the SPEs the right to sell their Parmalat Brazil stock to Parmalat Capital Finance Limited ("PCFL") for $300 million if that stock could not otherwise be sold for a sufficient sum. The second was a guarantee by Parmalat of PCFL's obligation to perform if the put option were exercised. Thus, the ability of the institutional investors to be repaid depended upon any one of three conditions being satisfied: (1) the successful sale of the SPEs' Parmalat Brazil stock for at least $300 million, (2) the performance by PCFL of its obligations under the put, or (3) Parmalat's performance of its guarantee.

In the end, none of these conditions was satisfied. The structure failed. The institutional investors – chief among them BoA, which had bought $165 million of the notes – were left holding the bag.

In hindsight, the reasons for this debacle are plain. Even when the deal closed, the likelihood that the Parmalat Brazil stock was worth or, in any reasonable time frame, likely to be worth $300 million was uncertain at best. The only apparently solid sources of funds to repay the debt issued by the SPEs were the PCFL put and the Parmalat guarantee. But Parmalat and its entire organization, including PCFL, collapsed in December 2003 upon the discovery of a massive fraud. This resulted in defaults on the PCFL put and on the Parmalat guarantee, not to mention a blizzard of lawsuits of which this is one. This case, however, is particularly interesting because the plaintiffs are the SPEs created by BoA, who claim that they were defrauded and otherwise wronged by the entity that created them and that held a majority of the debt they issued.

Like any other fraud plaintiffs, the SPEs argue that they would not have bought the overvalued Parmalat Brazil stock in the first place if they had known the truth regarding Parmalat

Brazil and BoA's internal assessments of the deal.  One focus of this case therefore must be on what BoA knew, when it knew it, what if any material information it failed to disclose, and the other facts pertinent to claims of fraud and breach of trust.  But the fact that the plaintiffs are the SPEs creates a second focus.

SPEs formed to engage in structured finance transactions like this one have no past, no future, and no employees.  They are creatures of the financial services companies that cause their creation.  They are phantoms, endowed by law with legal personality but having no real existence. The questions whether these SPEs could have been deceived or whether they would have acted differently if only one or another piece of information had been fully and fairly disclosed therefore arise in a context rather different from that of the usual fraud or breach of fiduciary duty case.

In the last analysis, I conclude that BoA did not commit fraud because it lacked culpable intent.  In the particular circumstances of this case, however, BoA owed the SPEs fiduciary duties and breached them by failing to disclose all material facts.  But the SPEs were not injured because they never considered the business merits of this deal in the first place and would have gone forward regardless of any other or additional disclosures by BoA.

This conclusion would be almost inconceivable if the controversy had arisen between substantial and responsible companies.  But it should not be surprising here.   The SPE "directors" who nominally approved the deal were hired by BoA for a fee.  They never met or discussed the transaction.  They made no serious business judgment as to the desirability of the deal from the SPEs' standpoint – after all, had the deal worked, the SPEs neither would have benefitted nor been harmed.  The directors consented to the transaction essentially on the basis that it was sponsored by Parmalat, then thought to be a reputable company, and BoA.  In short, they were engaged to vote "yes."  This they did.  This they would have done even if the allegedly concealed information had

4

been disclosed to them.  Hence, there is no causal relationship between BoA's breach of fiduciary duty and any injury suffered by the SPEs.

I.      Facts

   A.      Parties

    Plaintiffs Food Holdings Limited ("FHL") and Dairy Holdings Limited ("DHL") (collectively, the "Companies") are two Cayman Islands SPEs that entered into the matched transactions at issue in this case.  Defendants are Bank of America Corp., Bank of America, N.A., and Banc of America Securities, LLC (collectively, "BoA").[1]

    BoA created and used the Companies as vehicles for an investment in Parmalat's Brazilian operations.[2]

   B.      Structured Finance Transactions and Cayman Islands Special Purpose Entities

    1.      Structured Transactions

    Structured finance transactions typically involve an "originator" that transfers one or more assets to an SPE for the purpose of raising capital.  The SPE is a separate corporate entity that raises funds from investors, uses the money to acquire specific assets from the originator, and later – if all goes well – repays the borrowed money with proceeds derived from the acquired assets.[3]

---

[1]
   See Cpt. [DI 1] ¶¶ 18-25.

[2]
   Stip. Fact ¶ 151.

[3]
   PX-312, Galloway Decl. ¶ 24.

The SPE typically is liquidated once the transaction is completed.

As noted, structured transactions can be attractive means of raising capital because, perhaps among other things, the SPE's financial statements are not consolidated with those of the originator.  Hence, the debt incurred by the SPE does not appear on the originator's consolidated balance sheet.  In addition, such transactions are "bankruptcy remote" in that the bankruptcy of the sponsor usually would not affect the assets.

### 2.   Cayman Islands SPEs

SPEs usually are located in and formed under the laws of tax neutral jurisdictions. The Caymans are a particularly attractive venue for SPEs because SPEs are not taxed there when they buy or sell assets.[4]   In addition, there are no foreign exchange controls or regulatory requirements applicable to Cayman Islands SPEs that lend, borrow, or issue debt securities.[5]

### C.   Parmalat

Parmalat was founded in 1961 as a small, family-run dairy distributor in Parma, Italy.[6]  It expanded rapidly in the 1990s by acquiring other food and dairy companies, including companies in Brazil.[7]  By 2003, Parmalat had operations in over thirty countries and was the leading

---

[4]
    *Id.*

[5]
    *See* DX-322, at 2.

[6]
    Stip. Fact ¶ 22.

[7]
    *Id.* ¶¶ 32-33.

6

milk distributor in Italy, Canada, and Brazil.  It had tens of thousands of employees and reported more than $7 billion in revenues worldwide.[8]

### D.    BoA's Relationship with Parmalat

Financial institutions such as BoA viewed Parmalat as a potentially lucrative client and sought to profit from its growth.  BoA began financing Parmalat transactions in 1994.[9]  From 1994 until Parmalat's collapse in 2003, BoA provided $665 million in loans to Parmalat entities in ten different transactions.[10]

### E.    The BoA Deal Team

Luca Sala, an officer at BoA's Milan branch, was involved in all transactions between Parmalat and BoA during all or most of that period.  He served also as BoA's Parmalat relationship manager from 1997 through June 2003 and was among the BoA officers most knowledgeable about BoA's relationship with Parmalat.[11]

Sala's assistant, Antonio Luzi, was an officer at BoA's Milan branch beginning in 2000.  He assessed Parmalat's financial statements and creditworthiness and prepared certain

---

[8]  *Id.* ¶ 36.

[9]  *Id.* ¶ 67.

[10]  *Id.* ¶ 68.

[11]  *Id.* ¶¶ 91, 94.

internal credit approval memoranda ("CAMs") relating to proposed BoA-Parmalat transactions.[12] CAMs and Standard Credit Memoranda ("SCMs") outlined proposed transactions and contained BoA's credit and risk analyses.  They were required to contain all material information underlying a proposal to extend credit.[13]

Patrizia Medvedich, a BoA vice president, and Luis Moncada also worked on Parmalat CAMs and SCMs at BoA's Milan branch.[14]  A senior credit officer at the Milan branch, Moncada was responsible for evaluating the creditworthiness of Parmalat transactions that Sala proposed.[15]

The SCMs proposed by the Milan branch were subject to review by a hierarchy of officers within BoA's Credit Risk Management Group.  Omar Bouhadiba, head of BoA's Europe, Middle East, and Africa Division Credit Administration, reviewed transactions emanating from the Milan branch.  After BoA merged with NationsBank in September 1998, Paolo Rizzuti assumed Bouhadiba's responsibilities and reported his recommendations to his superior, Trevor Kelly.[16] David Chalk succeeded Rizzuti as the credit officer responsible for reviewing Parmalat transactions.[17]  Chalk, who later became the head of BoA's Global Financial Institutions Risk

---

[12]

    *Id.* ¶¶ 99-100.

[13]

    Mernick Dep. 29:10-30:3; Chalk Dep. 137:16-138:1, 140:18-141:19.

[14]

    Stip. Fact. ¶¶ 97, 101-02.

[15]

    Chalk Dep. 32:23-33:4; Bouhadiba Dep. 43:16-24; Luzi Dep. 85:5-19.

[16]

    Kelly Dep. 41:5-42:1.

[17]

    *Id.* at 115:13-117:10.

Management Group, approved BoA's investment in the transaction between BoA and the Companies.  Paul Dorfman, head of credit for the International Division, was the credit officer senior to Bouhadiba and Chalk.

F.    *This Transaction*

1.    *Purpose*

In this instance, Parmalat sought to raise hundreds of millions of dollars for its Brazilian subsidiary, Parmalat Brazil.  In 1997, it contacted BoA to work on a deal that would achieve its objective.[18]   BoA agreed to structure a transaction allowing an SPE to sell debt to investors and then use the proceeds to purchase equity in Parmalat Brazil.  The proposed transaction underwent several iterations before BoA ultimately approved it.

2.    *Early Iterations of the Deal*

a.    *January 1998 Proposal*

In January 1998, Sala proposed a $300 million "equity placement" to Pier Giorgio Rota Baldini, BoA's Italian country manager.  He contemplated that an equity investor – BoA, a "pool of investors" led by BoA, or an SPE – would purchase a minority of the shares of Parmalat Brazil for $300 million.[19]   The investor was to be repaid with the proceeds of an anticipated initial

---

[18]

Stip. Fact ¶¶ 126-27.

[19]

*See* PX-165, at P 03861387 ("Parmalat Brasil would issue new shares for up to 25% of its share capital.  The new equity will be utilized to finance the expected growth of Pbrasil. These will be underwritten by the equity investor (BofA and/or a pool of investors lead [sic] by BofA to be defined, or an SPC specially incorporated to this end with a leveraged structure) within the end of the first quarter of 1998.").

public offering ("IPO") of the Parmalat Brazil shares.[20]  Repayment would be assured through a "put option . . . in case the agreed price of the stocks to be placed is not consistent with the then prevailing market conditions."[21]  He urged that BoA "express its interest in doing this transaction at the highest management level."[22]

It is not clear from the record what happened to that proposal in the ensuing months save that the deal was not done in the form proposed.  Nevertheless, perhaps with a view toward that proposed transaction, BoA's Milan branch retained Deloitte & Touche Corporate Finance in Sao Paolo ("Deloitte") to perform a valuation of Parmalat Brazil.[23]

### b.     July 1998 SCM and the Deloitte Valuation

At Sala's request, Moncada on July 14, 1998 submitted an SCM outlining a structured transaction involving the purchase of Parmalat Brazil shares by an SPE for $500 million, which the SPE would borrow from and through BoA.[24]  The SPE later would sell the Parmalat Brazil stock in a public offering to raise the money needed to repay the debt.  If the public offering proved not to be feasible, Parmalat would refinance and sell its Brazilian assets to repay the debt.

---

[20]

   *Id.* ("Within a time frame to be agreed – in principle up to two years – we would place these shares in a stock exchange market to be agreed.").

[21]

   *Id.* at P 03861387 ("The put option will be priced as if BofA's equity injection were a loan . . . .").

[22]

   *Id.* at P 03861386.

[23]

   *See* PX-17.

[24]

   PX-120, at PP 00023101, PP 00023112-13.

The SCM described the public offering as the "primary source of repayment" of the debt and the refinancing and sale of Parmalat's Brazilian assets as the "secondary source."[25]  To assure repayment, the SCM provided also that the SPE would have the right to put the Parmalat Brazil stock to Parmalat S.p.A. if the anticipated proceeds of an IPO should prove insufficient to repay the loan.[26]  BoA sought "to fully underwrite the transaction" and planned to "place up to $400 million of the debt" among institutional investors "within 6 months of disbursement."[27]  The SCM noted, however, that SPE would "not have the opportunity to perform a detailed due diligence."[28]

A short time later, Deloitte issued a report that concluded that the equity value of Parmalat Brazil as a whole was between $1.36 billion and $1.57 billion,[29] which implied a value of

---

[25]

Id. at PP 00023112-13.

[26]

Specifically, the SCM provided, "To compensate for the lack of control over the investment, the investor will get a Put Option (Put) from Parmalat S.p.A. (PI) allowing the Investor to put the PB shares back to PI in the following circumstances: (1) The warrants and representations made on PB prove not to be correct; (2) The Business Plan is not met or PB take certain pre-defined actions which the investor feel may damage he value or the shares; (3) At the time of the IPO, the market value of the shares is lower than the Put Option Price, [and] (4) PI fails to satisfy the terms and conditions of any current/future financing agreement."  The Put Option Price "will be calculated as if the investor's equity injection was a loan priced at Libor plus 2-3% p.a. (to be agreed)."  BoA reasoned that "[t]he structure of the transaction is such that the investor will not take any market risk nor any Brasilian country risk as the Put will protect the investor from such events, making the transaction a pure PI risk."  Id. at PP 0002311.

[27]

Id. at PP 00023110-11.

[28]

Id. at PP 00023111.

[29]

Stip. Fact ¶ 131; PX-18.

no more than $247 to $285 million for an 18.18 percent interest, the amount ultimately purchased.[30] The valuation was based upon "base" and "downside" forecasts of Parmalat Brazil EBIT[31] of $151 million and $122.8 million, respectively, for 1999.[32]

Despite the rosy Deloitte valuation, Moncada's superior, Omar Bouhadiba, advised on July 30, 1998, that he would "not be supporting this deal." He believed that the proposed public offering of Parmalat Brazil, the primary source of repayment, was predicated on an operation that had "no track record of significant profitability or cash generation" and that Deloitte's valuation of Parmalat Brazil was "based . . . on Parmalat's assumptions [including its EBIT projections] that have not been tested."[33]  In addition, Bouhadiba advised that a sale of Parmalat Brazil's assets and the right to put the Parmalat Brazil shares to Parmalat S.p.A. were "unreliable and dependent" on the primary source of repayment because "close to 40% of [Parmalat S.p.A's] consolidated EBIT is generated in Brazil."[34]  He concluded that the deal was "a purely Brazilian play" because of Parmalat's dependence on the earnings of its Brazilian subsidiary.[35]

---

[30]
This proposal contemplated that the Companies would purchase a 25 percent interest in Parmalat Brazil.  *See* PX-120, at PP 00023111.  It should be noted that a minority position in Parmalat Brazil doubtless would have been worth considerably less than its proportionate share of the value of the entire company, at least as long as there was another controlling shareholder.  *See* Caldwell Decl. ¶¶ 70-71.

[31]
"EBIT" is an acronym for earnings before interest and taxes.

[32]
PX-18; PX-313, Caldwell Decl. ¶ 79.

[33]
PX-2, at BOFA-2003181.

[34]
*Id.*; Bouhadiba Dep. 189:8-14; 195:4-23; 197:2-6.

[35]
PX-002, at BOFA-2003181; Bouhadiba Dep. 195:4-23; 200:9-23.

### c.    August 1998 SCM

Sala and Moncada in August 1998 prepared a revised SCM, which reduced the size of the transaction.  It proposed a $300 million "bullet loan" to an SPE, of which $250 million would be underwritten by BoA.[36]  The SPE would use the proceeds to purchase a minority equity interest in Parmalat Brazil for $300 million.  The proposal involved also an anticipated public offering of Parmalat Brazil shares to repay the debt at maturity and the right to put the Parmalat Brazil shares to Parmalat S.p.A if a public offering were not feasible.[37]  Moncada stated that the SPE "will not take any equity market risk nor Brazilian country risk as the Put Option will protect it from such events, making the transaction a pure US dollar [Parmalat S.p.A.] risk."[38]  BoA planned to "sell down" the entirety of its debt "within 180 days of disbursement" and claimed to have "received written selldown commitments" from several institutional investors.[39]

Bouhadiba initially approved this iteration of the proposed transaction on August 3, 1998 at a meeting with Sala.[40]  He soon thereafter withdrew that approval, however, asserting that the "primary source" of repayment, the IPO of Parmalat Brazil shares, would be "unreliable"

---

[36]    PX-4, at P 03862065.

[37]    Id.

[38]    Id. at P 03861066.

[39]    Id. at P 03861065.

[40]    Id. at P 03861067.

because the Brazilian market was deteriorating.[41]  He reasoned also that the strength of the put was "marginal" because Parmalat S.p.A. was dependent on Parmalat Brazil's cash flow.[42]

Although Sala and Moncada appealed Bouhadiba's assessment to Paul Dorfman, the credit officer senior to Bouhadiba, Dorfman also rejected the transaction.  On September 8, 1998, he informed Sala that "[t]he deal structure is not as straight forward as loaning the money to the parent or the Brazilian subsidiary with the guarantee of the parent" because the "various sources of repayment . . . are so closely intertwined as to decrease one's confidence in repayment."[43]  He feared that a public offering of Parmalat Brazil shares would not be successful and that "Parmalat itself is materially dependent on Brazil."[44]  He therefore concluded that he did "not agree with the repeated statement in the [SCM] that this is a transaction with Italian risk rather than Brazilian risk."[45]

Daniel Heitner of the BoA Credit Derivatives Group reiterated Dorfman's rejection of the transaction on October 19, stating that Dorfman had "made perfectly clear that he'd had more than one reason to reject the Parmalat deal into Brasil when it first came to him, and that he was not

---

[41]

    *Id.*

[42]

    *Id.*

[43]

    PX-3, at BOFA-1861367.

[44]

    *Id.*

[45]

    *Id.*

    Two days later, Dorfman wrote that he had "decided not to do this deal": (1) the transaction carried "Brazil risk" because of "the importance of Brazil to Parmalat's operations"; (2) Parmalat was rapidly growing and had a high risk rating; and (3) if Parmalat went bankrupt, a court might find that Parmalat S.p.A.'s obligation to purchase the Parmalat Brazil stock ranked behind its obligations to other creditors.  *See* PX-5.

14

going to approve anything that touched it in any way, shape, form, or degree . . . . So the instant

proposal seems unpromising."[46]

d.      October 1998 SCM

To address the credit group's concerns, Moncada prepared a revised SCM, which

reduced BoA's debt contribution, on October 13, 1998.[47]  Like its predecessor, it provided that BoA

would arrange a structured transaction in which an SPE would take on $300 million in debt and use

the proceeds to purchase equity in Parmalat Brazil.  It too anticipated a public offering of Parmalat

Brazil shares to repay the debt and proposed a put guaranteed by Parmalat S.p.A.[48]  This proposal,

however, contemplated that the $300 million would be provided in three "tranches": (1) $100

million to be underwritten by BoA, (2) $100 million "from a US investor," and (3) $100 million "to

be placed in the US Private Placement market."[49]  In addition, BoA would retain the "whole equity

upside . . . on the portion to be retained on the bank's books."   The SCM stated also that, "[a]t our

request, a valuation of [Parmalat Brazil] has been completed by Deloitte & Touche," whose opinion,

---

46

PX-8A, at P 07362513.

47

PX 122.

48

*Id.* at BOFA-2258094-95 ("The Put Option is intended to provide downside protection for this transaction, in the event an IPO either does not occur or cannot be done at a minimum price which would provide us with the same return.  It is our expectation that the IPO will occur, and that we will in fact be repaid by sale of our shares in that offering."). In addition, the SCM acknowledged that the SPE would "not have the opportunity to perform a detailed due diligence" due to "time constraints."  *Id.* at BOFA-2258094.

49

*Id.* at BOFA-2258094.

it said, supported the value BoA had applied to the transaction.[50]   BoA was to receive a fee of 1.5 percent of the transaction.

This proposal too was turned down by BoA.   Paolo Rizzuti recommended to his superior, Trevor Kelly, that BoA reject it because he was concerned about the "Brasilian nature of this deal."[51] He stated, "As you are aware the primary source of repayment will be represented by an IPO on the Brasilian market in the next two years.   While possible, we have to be skeptical on the probability of this exit strategy, given the current markets [*sic*] condition."[52]   In addition, he cautioned Kelly, "the alternative repayment source, Parmalat S.pA. (PI) carries a significant amount of risk in that PI derives half of its revenues from South American Operations."[53]   Kelly therefore rejected Moncada's proposal.[54]

### e.   The NMS Valuation

On September 30, 1998, NationsBank acquired Bank of America, thus creating a

---

[50]

PX-122, at BOFA-2258096 ("[Deloitte] has indicated to us a total value of the company between USD 1.36 and USD 1.57 billion.   The value used in the structure is USD 1.35 billion."); *see also* PX-120, at PP 00023111 (July 14, 1998 SCM); PX-124 (Jan. 7, 1999 SCM, "The value of [Parmalat Brazil] has been agreed to be $1.35 billion.").

[51]

PX-7 at P 04981166.

[52]

*Id.*

[53]

*Id.*

[54]

*Id.*

16

much larger bank.[55]   One month later, NationsBanc Montgomery Securities ("NMS"), its investment banking subsidiary, valued Parmalat Brazil based on, among other things, discounted cash flow and comparable transaction analyses.[56]   On November 3, 1998, it issued a report that valued Parmalat Brazil at between $9 million and roughly $2 billion according to various methodologies and assumptions.[57]   The opinion was based in part upon base and downside forecasts of Parmalat Brazil's 1999 EBIT of $155.9 million and $110.4 million, respectively.[58]

### f.     January 1999 SCM

Undaunted by the rejection of the October 1998 proposal, the Milan branch persisted. Moncada on January 7, 1999 submitted another revised SCM, which yet again proposed the creation of an SPE to take on $300 million in debt and use the debt proceeds to purchase $300 million of Parmalat Brazil equity.[59]   As before, the debt ultimately was to be repaid with the proceeds of an anticipated public offering of the Parmalat Brazil shares.  This time, however, repayment was to be assured by giving the SPE the right to put the Parmalat Brazil shares to a Parmalat Luxembourg subsidiary or to convert the SPE's investment into shares of Parmalat's Italian parent company.[60]

---

[55]     Stip. Fact ¶ 5.

[56]     *Id.* ¶ 133.

[57]     PX-19; PX-20; PX-313, Caldwell Decl. ¶ 79.

[58]     *Id.*

[59]     PX-124, at PP 00023140.

[60]     *Id.*

17

The performance by Parmalat Luxembourg under the put was to be fully guaranteed by Parmalat S.p.A.  In addition, the proposal tweaked the framework of the debt tranches as follows: (1) $150 million was to be underwritten by BoA and "sold down to zero in the US private placement market," (2) $50 million was to be placed in the US private placement market by NMS on a "best effort basis," and (3) $100 million was to come from an American investor.[61]  The SCM described the sale of debt in the US private placement market as the "primary source of repayment" and the IPO of Parmalat Brazil shares as the "secondary source."[62]  BoA stood to receive a 1.5 percent fee "as well as most of the expected equity upside" for arranging the transaction.[63]

Rizzuti and Kelly reiterated their rejection of the deal on January 12, 1999 because of "the continued problems Brasil is experiencing and . . . the possible impact those problems might have on Parmalat's creditworthiness."[64]  The next day, the Brazilian government devalued its currency because of volatility in the Brazilian market.[65]

---

[61]

 Id.

 The SCM noted that BoA had "negotiated and obtained" a $100 million commitment from an American investor, "thus confirming the current market appetite for Parmalat risk."  Id. at PP 00023142.

[62]

 Id. at PP 00023142-43.

[63]

 Id. at PP 00023142.

[64]

 PX-177A at P 07272655.

[65]

 Stip. Fact ¶ 134.

18

3.    *BoA Prepares to Close the Deal Even Before Approving It*

Despite the fact that BoA repeatedly had rejected the deal, work went ahead on the transaction, apparently in anticipation that it ultimately would be approved.

As early as September 1998, BoA's counsel, Mayer Brown, retained Maples & Calder, a Cayman Islands law firm that had an extensive relationship with BoA and had worked on other BoA transactions, and its related entity, QSPV Limited ("Maples Finance"), to work on the proposed Parmalat Brazil transaction and to incorporate a Cayman Islands SPE for that purpose.[66] Among the tasks that Maples was to perform was to supply directors for the SPE.  A Maples & Calder marketing brochure stated that the SPE directors it supplied typically approved structured transactions upon the receipt of the "fee[s] for undertaking the transaction[s]," the board's determination of the "overall integrity of the transaction documents," and a conclusion that "there is ultimately little risk to the SP[E]."[67]

In late 1998, Sala negotiated the fee BoA would receive for arranging the transaction and hatched a scheme to steal a portion of it.  Although the previous internal BoA proposals contemplated a fee to the bank of 1.5 percent of the transaction, Sala on December 11, 1998 sent a term sheet – which he did not share with BoA[68] – to Fausto Tonna, Parmalat's chief financial officer,

---

[66]

       Baker Dep. 257:7-12; *see* Stip. Fact ¶ 149.

       Among other things, Maples & Calder had represented Parmalat in 1997 when it incorporated PCFL in the Caymans and continued to represent PCFL in connection with PCFL's issuance of securities in 1997 and 1998.  Stip. Fact. ¶¶ 148-49.

[67]

       DX-322, at 3.

[68]

       *See* Trial Tr. at 40:1-10.

stating that the bank's fee would be 2.75 percent.[69] Tonna, as revealed by his later conduct, agreed. Six days later, Sala told several BoA officers that BoA's fee would be 1.5 percent.[70] As we shall see, Sala ultimately stole the remaining 1.25 percent.

On April 22, 1999, still long before BoA had approved any transaction, Bank of America Securities, LLC, and Bank of America, N.A., entered into an indemnification agreement with Parmalat S.p.A. in which they expressly acknowledged BoA's "engagement . . . to advise and assist Food Holdings Limited and Dairy Holdings Limited," the names chosen for the as-yet unformed SPEs, with respect to an as-yet unapproved $300 million private placement.[71] Furthermore, in June 1999, BoA prepared and Parmalat chief financial officer Tonna approved a Parmalat private placement memorandum ("PPM") for use in selling the debt contemplated by the proposed transaction. The PPM included Parmalat's consolidated financial statements but contained also a disclaimer that stated that BoA "make[s] no representation or warranty, express or implied, and assume[s] no responsibility for the accuracy or completeness of the information contained herein and furnished herewith regarding Parmalat."[72]

On October 21, 1999, Maples & Calder sent BoA a letter quoting its fee for the deal. The letter stated that the necessary due diligence regarding investors and sources of funds would be

---

[69] DX-61, at P00004701.

[70] PX-175, at P 03861042.

[71] Stip. Fact ¶ 128; PX-47, at P 0135499.

[72] PX-22, at BOFA-2048353.

the responsibility of Parmalat or BoA as opposed to the SPEs.[73]

### 4.   BoA Finally Approves the Transactions

Toward the end of 1999, Moncada prepared new CAMs in another effort to obtain approval. These incorporated by reference the transaction outlined in Moncada's January 7, 1999 proposal but added a credit default swap ("CDS")[74] provision to further protect BoA.[75]

In the meantime, David Chalk had succeeded Rizzuti in reviewing Moncada's proposals.  On November 30 and December 17, 1999, respectively, he approved the revised CAMs concerning the FHL and DHL transactions.[76]  In doing so, he reasoned that the CDS would "cover[]" BoA's "full exposure" and allow its loan to the SPEs to "serve as a bridge to an anticipated private

---

[73]

See PX-12 (Oct. 21, 1999 fee quote letter).

On November 3, 1999, Mayer Brown informed BoA by letter that "Maples & Calder and QSPV Limited have indicated that they will proceed with incorporating Food Holdings and setting up the charitable trust as soon as they have confirmation that the attached fee schedule is acceptable to Bank of America and Parmalat."  See PX-310.

[74]

"A credit default swap is a derivative, in which the buyer makes a series of payments to the seller and, in exchange, receives a payment for the notional amount of the CDS from the seller if the underlying credit instrument, in this case a loan, goes into default."  DX-332, Chalk Decl. ¶ 70.

[75]

PX-130 ("The Parmalat Brasil Equity Transaction is described in the CAM dated 1-7-99 in the name of Special Purpose Company (now Food Holding Limited).  The USD 15 million subject of this approval were expected to be covered by a Credit Default Swap from inception of the overall transaction.").

[76]

See PX-130 ("Report the action of CRM David Chalk in having approved a USD 15 million participation in the first tranche (USD 150 million) of the Parmalat Brazil Equity Transaction."); PX-131 ("This CAM records the approval to underwrite the second tranche of the USD 300 million Parmalat Brazil Equity transaction.").

placement that was to take place in 2000."[77]   At trial, he testified that he did not recall having

reviewed the rejections of earlier iterations of the transaction.[78]

### 5.    SPE Board Action

Maples Finance incorporated FHL and DHL on November 30, 1999 and December

20, 1999, respectively.[79]   Neither Company had any management, staff, offices, or operations.[80]

Each had four directors – Hugh Thompson, Martin Couch, Phillip Hinds, and Anthony Baker – all

supplied by Maples Finance for a fee.[81]   Each director served simultaneously on the boards of

between three hundred and eight hundred other SPEs created and administered by Maples Finance.[82]

The FHL and DHL boards approved the transactions on December 15 and 21, 1999,

respectively.[83]   Although the FHL board "minutes" state that the board's formal approval came at

a "meeting" at which "all the Directors were present in person or by proxy," no meeting in fact took

---

[77]

> Id. ¶¶ 67-68.

> The CDS allowed BoA to sell down its note purchase exposure by April 2000, before the private placement was to have taken place.  Id.

[78]

> Id. ¶ 76.

[79]

> Stip. Fact ¶¶ 7-8; PX-303, at BOFA-2071463.

[80]

> DX-324, Request for Admission No. 18; Baker Dep. 133:1-11, 203:4-13.

[81]

> Stip. Fact ¶¶ 153, 165.

[82]

> Id. ¶¶ 165-66.

[83]

> PX-61; PX-302, at BOFA-2071465; PX-303, at BOFA-0011625.

place.  The directors never met to discuss or deliberate and never asked any questions of BoA.[84]
Although Anthony Baker, the Companies' "lead director," did review the transaction documents,
he approved the transaction based primarily on the reputations of Parmalat and BoA.[85]  He testified
that the SPEs were not equipped to perform due diligence, which he understood to be the sole
responsibility of BoA.[86]  In all the circumstances, I find that three of the four directors paid no
material attention to the transactions at all and that none of the four evaluated the transactions from
a business or economic perspective.  They – actually, Baker alone – simply read the contracts and
other documents.  Nor did Maples do anything more in terms of exercising business judgment.  It
did, however, issue an opinion letter to the FHL board on December 17, 1999 – two days after the
FHL board approved the deal – recommending its approval of the transaction based on its
assessment of the transaction documents.[87]

　　　　　In addition, the FHL and DHL boards appointed Sala and Medvedich attorneys in fact
to "approve, settle, amend, sign or execute" the transaction documents on behalf of the SPEs and

---

[84]

　　　Stip. Fact ¶¶ 168-69; Baker Dep. 165:10-25.

　　　The record is silent as to whether the DHL board behaved in a similar fashion. Given
　　　that the directors of both companies were the same, that all were supplied as part of
　　　Maples' standard package, and that these from Maples' point of view were  "cookie
　　　cutter" deals, I find that it did.

[85]

　　　Baker Dep. 37:7-21, 55:15-56:20, 57:14-20, 157:20-158:8, 165:10-25, 178:1-8.

[86]

　　　*Id.* at 49:17-60:4, 339:18-341:4.

[87]

　　　*See* PX-195.

　　　I imply no conclusion as to whether Maples & Calder, as a Caymans law firm, was obliged
　　　or qualified to exercise business judgment on behalf of the boards of its nominal "clients,"
　　　the SPEs.  I make this point simply to point out that Maples did not exercise any more
　　　business judgment about these deals than did the directors.

to "do all acts . . . as may be necessary or desirable in connection with" those documents.[88]

### 6.      *Sala's Diversion*

At just about the same time, Sala took the final steps in furtherance of his scheme to steal a portion of BoA's arrangement fee.  On December 11, 1999, he sent Parmalat a revised term sheet that reduced BoA's fee from 2.75 to 1.5 percent, the fee that BoA thought all along that it would receive.[89]  He did not send that revised term sheet to BoA.

On the following day, PCFL paid $3.75 million, the 1.25 percent difference between the 2.75 percent fee to which Parmalat had agreed and the 1.5 percent that was paid to BoA, as a commission to a Swiss bank, Graubundner Kantonalbank ("GKB"), ostensibly for services provided by GKB in connection with the transaction.[90]  In fact, however, GKB performed no services and, without BoA's knowledge, diverted those funds to an entity owned and controlled by Sala.[91]

### 7.      *Closings*

The FHL and DHL transactions closed on December 17, 1999 and December 22, 1999, respectively.[92]  Through transaction documents prepared by BoA's attorneys, Mayer Brown,

---

[88]

    *See* DX-302; DX-303.

[89]

    PX-291, at P 00398475.

[90]

    PX-189, at PP 00405578.  BoA did not receive a copy of that letter.  Stip. Fact ¶ 110.

[91]

    *Id.*; Trial Tr. at 41:12-23.

[92]

    Stip. Fact ¶ 170.

24

BoA caused the Companies then to sell notes to BoA and institutional investors it had procured for $300 million and then to use the proceeds to buy $300 million of Parmalat Brazil shares.[93]  Indeed, BoA's Medvedich signed the subscription agreements on behalf of FHL and DHL as attorney in fact.[94]  The SPEs pledged the shares thus acquired to Wells Fargo as trustee for the benefit of the noteholders.[95]  When the notes came due, repayment was to come from a public offering of the Parmalat Brazil shares.  BoA was to get the upside if a sale of the Parmalat Brazil stock yielded more than was necessary to repay principal and pay the interest on the notes.[96]

As previously contemplated, the SPEs received from PCFL a "put," i.e., a right sell the Parmalat Brazil shares to PCFL for $300 million when the notes matured.[97]  Its purpose was to provide an alternative means of turning the Parmalat Brazil shares into cash in the event that an IPO to repay the notes proved not to be feasible.  Parmalat S.p.A. guaranteed PCFL's performance of its obligations under the put.  Thus, the anticipated IPO, the put, and the guarantee were the three potential sources of funds to repay the notes.[98]

From the perspective of the SPEs, these transactions indisputably were a $300 million equity purchase in Parmalat Brazil.  Given the overall structure of the deals, however, BoA

---

[93]  *Id.* ¶¶ 173-75.

[94]  *See* PX-40, at JL0008368; PX-41, at BOFA-2049494.

[95]  Trial Tr. 452:18-453:19.

[96]  Stip. Fact ¶¶ 172, 214-15.

[97]  *Id.* ¶ 196.

[98]  *Id.* ¶ 195.

25

ultimately had come to view them internally as loans by the noteholders secured by (1) a pledge of Parmalat Brazil stock of uncertain value and liquidity, (2) the PCFL put, and (3) Parmalat's guarantee.[99]  In other words, the bank internally thought of these transactions in substance as loans made on the credit of Parmalat.

### 8. *Transaction Documents*

Although the minutiae of the transaction documents need not detain us, a few details warrant mention in light of the claims asserted in this case.

First, the Companies and Parmalat Brazil entered into subscription agreements pursuant to which the Companies purchased Parmalat Brazil shares.  Attached to those agreements was Parmalat Brazil's business plan, which contained Parmalat Brazil's 1998 annual financial statements and updated 1999 earnings projections.[100]  A comparison between the business plan earnings projections, on one hand, and even the downside projections upon which the Deloitte and NMS valuations rested, at least in part, shows that the outlook for Parmalat Brazil at the time of the closings was significantly worse than it had been when Deloitte and NMS had valued the company.[101]  The updated 1999 earnings projections in the business plan would have made clear to a knowledgeable business person aware of the Deloitte and NMS valuations that the minority interest in Parmalat Brazil the Companies bought probably was worth dramatically less than $300 million at the dates of the closings.  BoA, however, never disclosed the Deloitte and NMS valuations

---

[99]

 *See, e.g.*, DX-117; DX-337, Schwartz Decl. ¶¶ 16-17.

[100]

 Stip. Fact ¶¶ 184-85.

[101]

 PX-40, at JL 0008366; PX-41, at BOFA-2049489; PX-313, Caldwell Decl. ¶ 79.

to the Companies.

Second, the Companies entered into support and inducement agreements with Parmalat S.p.A. and PCFL.  These represented that the PPM "fairly describes, in all material respects, the general nature of the business and principal properties of Parmalat Italy and its Subsidiaries and does not contain any untrue statement of fact or omit to state any material of fact . . . ."[102]  The Companies argue that BoA is chargeable with the Parmalat representations and that it thereby defrauded them because BoA knew that Parmalat's financial statements were materially false.

Third, BoA entered into management agreements, drafted by Mayer Brown, with the Companies.  Pursuant to those agreements, each of the Companies appointed BoA "Manager," which "shall be fully invested with and responsible for the general management and conduct of the business of the [SPE] and shall advise the Board on all matters of policy."[103]  The Companies likewise "invest[ed] the Manager with all rights and powers" necessary to manage the SPEs' "day to day business affairs."[104]  In addition, BoA undertook to "keep the Board fully informed as to the discharge of the Manager's duties hereunder."[105]

---

[102]

PX-38, at BOFA-2010660; PX-39, at BOFA-2016430.

[103]

PX-33 ¶ 3.1; PX-34 ¶ 3.1.

[104]

PX-33 ¶¶ 3.2, 3.4, Sched. 2; PX-34 ¶¶ 3.2, 3.4, Sched. 2.

[105]

*Id.*

G.     *Parmalat's Collapse*

We now know that Parmalat perpetrated one of the largest financial frauds in history. From 1990 through 2003, it offered and sold more than $1 billion in debt securities in the United States based on fraudulent financial statements that concealed rising debts and shrinking assets and on materially false representations by its senior management.  A subsequent investigation revealed that Parmalat in fact had operated at a loss during that period.  Its actual debt was €14.5 billion, €8 billion more than it had reported.  Although Parmalat announced aggregate net profits from 1990 to 2003 of €1.513 billion, it in fact sustained losses of €3.694 billion.  During that time Parmalat's insiders falsified the company's financial statements, hiding the company's true financial condition.[106]

In December 2003, Parmalat entered extraordinary administration in Italy upon the revelation of its fraud.[107] Parmalat Brazil went into bankruptcy in Brazil, and PCFL was placed into liquidation.[108]  The Companies' Parmalat Brazil shares could not be sold.  PCFL defaulted on the put, Parmalat S.p.A. defaulted on the guarantee, and the Companies defaulted on the notes.  The noteholders filed "winding up" petitions in a Cayman Islands court, and the Companies too were placed into liquidation.[109]

---

[106]

Stip. Fact ¶¶ 42-51.

[107]

*Id.* ¶ 56.

[108]

*See* Trial Tr. 448:13-25; Stip. Fact ¶¶ 15, 56.

[109]

Stip. Fact ¶¶ 15, 232-38.

H.      *The Litigation*

Many actions were brought after Parmalat's collapse.   All federal suits were consolidated for pretrial proceedings in this Court.[110]

The Companies here seek damages from BoA for fraud, breach of fiduciary duty, negligent misrepresentation, breach of contract, and unjust enrichment.   The complaint alleges that the transactions orchestrated by BoA "served primarily, if not exclusively, to enrich various Bank of America entities (and certain Bank of America personnel and Parmalat insiders) while creating the illusion that Parmalat was a profitable company and an attractive credit risk."[111]   It further asserts that BoA's plan was a sham from the beginning and that its formation of the Companies was part of a scheme to hide Parmalat's fraud.[112]   In particular, the Companies argue that BoA defrauded them by failing to disclose Sala's diversion, Parmalat's true financial condition, and BoA's internal credit documentation and valuations, which allegedly would have revealed that the Companies' minority interest in Parmalat Brazil was worth far less than $300 million.   Those allegedly material omissions are the basis also for the Companies' negligent misrepresentation claim.

II.     *Discussion*

The Companies' fraud and breach of fiduciary duty claims share a common factual basis.   They assert that BoA misstated or failed to disclose facts material to the SPEs' decisions to

---

[110]

*See, e.g.*, *In re Parmalat Secs. Litig.*, 376 F. Supp. 2d 472 (S.D.NY. 2005)*; In re Parmalat Secs. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005).

[111]

Cpt. ¶ 59.

[112]

*Id.* ¶¶ 5, 82-88.

29

approve the transaction.  Those fall into three categories.

First, as we have seen, Sala diverted "for his personal use"[113] $3.75 million of the arrangement fee Parmalat agreed to pay BoA.  The Companies contend that Sala's personal stake in the deal gave him a conflict of interest and improper incentive to obtain approval of the transaction.  They assert that knowledge of Sala's scheme is chargeable to BoA and that BoA's failure to disclose it to the Companies was wrongful.

Second, the Companies claim that BoA adopted and is responsible for Parmalat's concededly fraudulent financial statements.  They assert that Parmalat's financial condition was material to their decision to approve the transaction because it reflected on the value of the put and guarantee.

Third, the Companies argue that BoA failed to disclose facts material to their assessment of the value of the Parmalat Brazil shares.  Specifically, BoA did not disclose the Deloitte and NMS valuations or the projections that underlay them.  A comparison between those projections and the updated figures in the 1999 business plan that was attached to the subscription agreements strongly would have suggested that the value of the minority interest in Parmalat Brazil that the Companies bought was far below what it had been when Parmalat and/or BoA attributed the $300 million value to it.  The Companies contend that they would have rejected the deal if BoA had disclosed those valuations and the projections that were at least part of the basis upon which they rested.

---

[113] Pl. Pre Trial Br. at 61.

Case 1:04-md-01653-LAK-HBP   Document 1819   Filed 02/17/10   Page 32 of 57

A.      The Fraud Claim

To succeed on a fraud claim under New York law, a plaintiff must establish (1) a material misrepresentation or omission (2) made with knowledge of its falsity, (3) intent to defraud, (4) reliance, and (5) damage caused by the misrepresentation or omission.[114]  Fraud must be proven by clear and convincing evidence.[115]

1.      Sala's Diversion

The Companies assert that Sala's scheme to steal $3.75 million from these transactions gave him an improper incentive to obtain approval for them.  They seek to impute knowledge of that scheme to BoA and maintain that BoA's failure to disclose the scheme and the fact that Sala had a conflict of interest in pushing the deal was fraudulent.  There is not the slightest merit in this claim.

Corporations act only through their agents.  Acts performed and knowledge acquired by a corporate agent within the scope of his or her employment are imputed to the corporation.[116]  The misconduct of an agent therefore is imputed to the corporation if committed within the scope of the agent's employment.  This principle, however, is not without limits.

---

[114]

See, e.g., *MacDraw, Inc. v. CIT Group Equip. Fin.*, 157 F.3d 956, 961 (2d Cir. 1998).

[115]

*Id.*

[116]

*In re WRT Energy Secs. Litig.*, No. 96 Civ. 3610, 1999 WL 178749, at *11 (S.D.N.Y. Mar. 31, 1999); *see also* 3 WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 790 ("[T]he general rule is well established that a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority.") (perm. ed. 2002) (hereinafter FLETCHER).

A principal is not charged with the acts or knowledge of an agent when the agent acts outside the scope of the agent's employment.  As our Circuit has stated, "[W]here an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside the scope of his agency, and it would therefore be unjust to charge the principal with knowledge of it."[117]  But what about the middle ground where an agent might be said to have been committing a fraud for his own benefit while serving also the interests of the principal?

Under New York law, a principal is chargeable with the acts and knowledge of an agent as long as the agent in some respect served the principal or, stated differently, unless the agent "totally abandoned" the principal's interests and "acted entirely for his own or another's purpose."[118] But "[w]hen an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person,  he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose."[119]  "Accordingly, whatever an agent does or knows purely in the course of defrauding the principal, such as stealing from it, is not chargeable to the principal.[120]  Indeed, I have applied that precept in ruling that theft by Parmalat and PCFL officers from their respective companies was outside the scope of their employment and not chargeable to their employers.[121]

---

[117]

   *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (quoting *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir. 1936)).

[118]

   *See In re Mediators, Inc.*, 105 F.3d 822, 826 (2d Cir. 1997); *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784-85, 497 N.Y.S.2d 898 (1985).

[119]

   *In re CBI Holding Co. v. Ernst & Young*, 529 F.3d 432, 448 (2d Cir. 2008).

[120]

   *In re Parmalat Secs. Litig.*, 659 F. Supp. 2d 504, 517-18 (S.D.N.Y. 2009).

[121]

   *See id.*; *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 590, 599 (S.D.N.Y. 2005).

Contrary to the Companies' assertions, Sala did not divert funds in the course of "performing his normal job responsibilities"[122] except in the somewhat indirect and immaterial sense that he was employed by BoA when he did it.  Rather, he stole "for his personal use" $3.75 million that Parmalat had agreed to pay BoA.[123]  He did it by falsely telling BoA that Parmalat had agreed to pay a 1.5 percent fee when in fact it had agreed to pay 2.75 percent and then taking the $3.75 million difference for his own benefit through the Swiss bank, GKB.[124]  Although Sala did this during his term of employment by BoA, he did it solely to benefit himself at BoA's expense.  In this respect, he totally abandoned his role as BoA's agent.[125]  That BoA may have benefitted from its role as arranger of the larger transactions is immaterial because BoA was the victim of Sala's fraud.  In consequence, knowledge of Sala's diversion of $3.75 million from BoA cannot be imputed to BoA. That branch of the fraud claim fails.

### 2.    Parmalat's Financial Condition

The Companies allege that BoA misrepresented and omitted material facts concerning Parmalat's financial condition in the PPM and other pertinent documents, including the

---

[122]

See Pl. Pre Trial Br. at 62.

[123]

Id. at 61.

[124]

Stip. Fact ¶ 110.

[125]

See CBI Holding Co., 529 F.3d at 451 (stating that the "'total abandonment standard' looks principally to the intent of the managers engaged in the misconduct").

support and inducement agreements and note purchase agreements, [126] which attached Parmalat's materially false consolidated financial statements.   Even assuming *arguendo* that the misrepresentations and omissions concerning Parmalat's financial condition that appeared in the PPM and the other documents relied upon are attributable to BoA, however, the Companies nevertheless have not established, even by a preponderance let alone the requisite clear and convincing evidence,  that BoA acted with the requisite *scienter.*

The Companies assert that Sala and Moncada were aware of or recklessly indifferent to Parmalat's true financial condition.  They rely heavily on a purported expert witness, who pointed to their failure to respond to what the witness called "red flags."   They point also to Sala's and Moncada's awareness that BoA on various occasions failed to verify Parmalat's cash and debt balances, to require Parmalat to provide consolidated financial statements, and to apply "heightened scrutiny" to Parmalat's high cash balances. [127]

All that may be.  And certainly Sala was a crook to the extent that he stole the $3.75 million from BoA.  But the fact remains that none of the evidence plaintiffs rely upon convinces me that Sala or Moncada knew that the Parmalat financial statements were materially misleading or was reckless in any respect material to this claim.

The Companies assert also that others at BoA, particularly those in the hierarchy that passed on the various deal proposals, knew or were recklessly indifferent to the fraudulent nature of Parmalat's financial statements and the vastly overstated picture of its financial soundness that

---

[126]

This discussion includes any misstatements or omissions concerning the put and guarantee because their viability depended on the financial condition of Parmalat.

[127]

*See* Pl. Pre Trial Br. at 72.

34

Parmalat portrayed.  The testimony of BoA's credit officers, including those who approved and promoted the transactions, however, reveals that BoA was unaware of Parmalat's fraud and that the Parmalat financial information contained in the PPM was inaccurate.[128]  In fact, BoA bought $165 million of the Companies' debt based on its faith in Parmalat's guarantee, whereas its fee for the deal was only $4.5 million.[129]  It would not have done so, even in the extraordinary atmosphere that brought about the financial crisis that befell the world in the fall of 2008, if it had had any real inkling that Parmalat was a financial house of cards.  In short, there is no persuasive evidence that BoA knew of or recklessly disregarded Parmalat's disastrous financial situation.  This aspect of the fraud claim lacks merit.

        3.     *Parmalat Brazil*

The Companies claim also that BoA fraudulently failed to disclose the Deloitte and NMS valuations and the earnings projections they contained which, they assert, were material to their decision to approve the transaction.[130]

As previously noted, Deloitte in July 1998 valued the equity of Parmalat Brazil at

---

[128]

      *See* DX-331, Johnson Decl. ¶ 31; DX-332, Chalk Decl. ¶ 41; DX-333, Lau Decl. ¶ 47.

[129]

      Stip. Fact ¶¶ 173, 175.  In 2003 the DHL transaction was restructured and its notes were reissued pursuant to a revised note purchase agreement with U.S. private placement investors, including BoA.  *Id.* ¶ 176.  BoA and its affiliates currently hold $94.5 million of FHL and DHL Class A notes.  *Id.* ¶ 223.  When Parmalat collapsed in 2003, BoA's exposure pursuant to the FHL and DHL swap agreements was $98.4 million.  *Id.* ¶¶ 225-26.

[130]

      *See* Pl. Pre Trial Br. at 29-32.

between $1.36 billion and $1.57 billion[131] based, at least in part, on base and downside forecasts of that company's 1999 EBIT of $122.8 to $151 million.[132]  Similarly, NMS on November 3, 1998, valued Parmalat Brazil at $9 million and roughly $2 billion[133] based, in part, upon base and downside Parmalat Brazil 1999 EBIT forecasts of $110.4 to $155.9 million.[134]

The Parmalat Brazil business plan attached to the December 1999 subscription agreements contained a revised EBIT projection for 1999 of 106.1 million reals ($58.6 million), or slightly more than half of the lowest downside figure used by either Deloitte or NMS.   Thus, disclosure of the Deloitte and NMS valuations, to one who considered the matter with any care, would have revealed that Parmalat Brazil was underperforming significantly even the downside earnings projections on which the valuations upon which the $300 million purchase price had been based or, at least, justified internally at BoA.  The Companies therefore contend that BoA knew or recklessly disregarded the fact that stock being sold to the Companies was worth substantially less than they were paying and, in any case, fraudulently withheld the Deloitte and NMS valuations.

I assume that the Deloitte and NMS valuations, including but not limited to the 1999 EBIT projections upon which they at least party rested, were material and that the failure to disclose them was a material omission.  That said, the question remains whether the charge of fraud has been proved, which requires among other things clear and convincing proof that BoA acted with *scienter*

---

[131]     Stip. Fact ¶ 131; PX-18.

[132]     PX-18; PX-313, Caldwell Decl. ¶ 79.

[133]     PX-19; PX-20, at BOFA-2076103-07; PX-313, Caldwell Decl. ¶ 79.

[134]     *Id.*; PX-313, Caldwell Decl. ¶ 79.

in failing to make this disclosure.  The Court concludes that plaintiffs have not met their burden.

There is no persuasive evidence that BoA ever made the analysis that underlies this claim, i.e., a comparison of the projections disclosed in the business plan with those contained in the earlier Deloitte and NMS work coupled with an evaluation of the effect that the much poorer December 1999 EBIT figures would have had on the earlier valuations had those figures been known to Deloitte and NMS.  The fact is that BoA ultimately viewed these transactions internally as loans on the strength of a pledge of Parmalat Brazil stock of uncertain value,[135] the PCFL put, and Parmalat's guarantee.  At the time it approved the transaction, BoA's credit group believed that the put and guarantee were reliable and compensated for the potential uncertainty of an IPO of Parmalat Brazil shares.[136]  David Chalk, the BoA credit officer, who approved the transaction notwithstanding his knowledge of the valuations, credibly testified that his credit assessment focused on only Parmalat S.p.A. because the guarantee "provided assurance that the principal and interest would be repaid regardless of the performance (or value) of the Parmalat Administracao shares."[137]  BoA in fact bought $165 million of the debt on its faith in Parmalat's credit and belief that the deal would

---

[135]

      This surely is supported by the fact that NMS valued the company at between $9 *m*illion and $2 *b*illion.

[136]

      *See, e.g.*, DX-337, Schwartz Decl. ¶¶ 16-17.

[137]

      DX-332, Chalk Decl. ¶¶ 83-87.  The Court imputes to BoA Chalk's, Sala's, and Moncada's collective knowledge because they acquired such knowledge within the scope of their employment and orchestrated BoA's approval of the transaction and representations and omissions concerning Parmalat Brazil.  In consequence, there is no issue of "collective scienter."  *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008); *First Equity Corp. v. Standard & Poor's Corp.*, 869 F.2d 175 (2d Cir. 1989).

be profitable.[138]   In the absence any reason to believe that BoA connected the dots that plaintiffs now connect, I am not persuaded that BoA knew that the failure to disclose the Deloitte and NMS opinions and the projections they contained was misleading.   Nor am I convinced that it recklessly disregarded any likelihood that the omission rendered what was disclosed misleading.   The Companies therefore have failed to prove *scienter* because they have not shown by clear and convincing evidence that BoA acted with the requisite culpable knowledge and intent.   Their fraud claim fails entirely.

B.       *The Breach of Fiduciary Duty Claim*

The alleged misstatements and omissions that ground plaintiffs' fraud claim are the basis of its claim of breach of fiduciary duty.   Under New York law, a claim for breach of a fiduciary duty requires a showing of (1) the existence of a fiduciary relationship, (2) the intentional or negligent breach of that duty, and (3) damages suffered because of that breach.[139]   The Companies therefore need not prove *scienter* to recover on this theory, and the claim must be proven only by a preponderance of the evidence.[140]

_____

138

*See, e.g.*, DX-333, Lau Decl. ¶¶ 130-33.

139

*See, e.g.*, *DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ. 318 (RJS), 2009 WL 2242605, at *28 (S.D.N.Y. Jul. 27, 2009); *Kidz Cloz, Inc. v. Officials for Kids, Inc.*, No. 00 Civ. 6270 (DC), 2002 WL 392291 (S.D.N.Y. Mar. 13, 2002).

140

*See, e.g.*, *Dagen v. CFC Group Holdings Ltd.*, No 00 Civ. 5682 (CBM), 2004 WL 830057, at *4 (S.D.N.Y. Apr. 13, 2004); *TD Waterhouse Invest. Servs., Inc. v. Integrated Fund Servs., Inc.*, No. 01 Civ. 8986, 2003 WL 42013, at *14 (S.D.N.Y. Jan. 6, 2003).

### 1.    Fiduciary Relationship

The parties first lock horns on the question whether BoA owed the Companies a fiduciary duty.

BoA correctly asserts that a fiduciary duty typically does not arise from an arm's-length business transaction.[141]  Nevertheless, the existence of a fiduciary duty "cannot be determined by recourse to rigid formulas"[142] and often is a factual question.[143]   It arises, for example, when a party "repose[s] trust or confidence in another who thereby gains a resulting superiority or influence over the first."[144]   It exists also when a party exercises "*de facto* control" over or assumes responsibility for the affairs of another.   This is exemplified by the "long . . . settled law that the promoter of a corporation owes that corporation a fiduciary duty" and that the promoter's fiduciary duty ends only "when the corporation has been established and an independent board of directors takes charge."[145]

In this case, BoA exercised absolute or virtually absolute control over the Companies

---

141

       *See Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 151 (S.D.N.Y. 2000) (citing *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 426 (S.D.N.Y. 1992)).

142

       *Scott v. Dime Sav. Bank of N.Y.*, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 107 (2d Cir. 1996).

143

       *See Lehman Bros.*, 179 F. Supp. 2d at 151 (S.D.N.Y. 2000).

144

       *Id.*

145

       *Pub. Inv. Ltd. v. Bandeirante Corp.*, 740 F. 2d 1222, 1234-35 n.72 (D.C. Cir. 1983). *Accord, Gladstone v. Bennett,* 38 Del. Ch. 391, 398-99, 153 A.2d 577, 582 (1959); *Bovay v. H.M. Byllesby & Co.,* 25 Del. Ch. 1, 18-19, 12 A.2d 178, 186 (1940); 14A FLETCHER § 192.10, at 345.

even after their boards were appointed.  In 1998, it retained Maples & Calder and its affiliate,

Maples Finance – firms with which both BoA and Parmalat had established relationships – to work

on the proposed Parmalat Brazil transaction[146] and to supply the Companies' directors.[147]  BoA

expressly recognized that the directors would rely upon BoA to perform the necessary due diligence,

not only because that was the custom in such transactions involving Caymans SPEs,[148] but because

of the "time constraints" that BoA imposed.[149]  Indeed, through BoA's attorneys, Mayer Brown, it

arranged for Maples to incorporate FHL and DHL only seventeen and two days, respectively, before

the transactions closed.[150]  The directors, consistent with their usual practice and constrained also

by the force of circumstances created by BoA, relied on BoA and Mayer Brown to structure the deal,

to make sure that it was sound, to draft the papers, to supply the Companies' lawyers and themselves

---

[146]

Stip. Fact ¶¶ 148-49; *see* Baker Dep. 266:7-23.

[147]

Stip. Fact ¶ 165.

[148]

In the October 1999 fee quote letter, Baker agreed on behalf of Maples Finance to provide directors for the SPEs subject to the "requirement" that  "[t]he promoter or arranger [] perform the necessary due diligence regarding investors and sources of funds."  PX-012, at P 04958417. He testified that the SPEs were not equipped to perform due diligence, which he understood to be the sole responsibility of Banc of America Securities.  Baker Dep. 59:17-60:4, 339:18-341:4. Although BoA contends that it never "accepted" the "unilateral" terms of Baker's letter, *see* Def. Post Trial Br. at 7, that letter nevertheless demonstrates BoA's awareness and understanding that the Companies were relying on it to perform due diligence because they could not do so on their own.

[149]

*See, e.g.*, PX-120, at PP00023111 ("Due to time constraints, the investor will not have the opportunity to perform a detailed due diligence."); PX-124, at PP00023140 ("Due to time constraints, the SPV will not have the opportunity to perform a detailed due diligence.").

[150]

Stip. Fact ¶ 151; *see* DX-302; DX-303.

40

as directors, and – in a phrase – to put the whole package together.[151]  The only function of the directors was to say "yes" and thereby enable Maples & Calder and Maples Finance to collect their fees.  And although Maples & Calder suggested changes in some of the legal documents, neither it nor its affiliate ever purported to give any business advice.[152]  In short, BoA well knew that the directors' approval was a "foregone conclusion."[153]  Moreover, the subscription agreements by which the Companies committed to buy the Parmalat Brazil stock were signed on their behalf by a BoA officer who had their powers of attorney.

Despite all of this, BoA persists in contending that the Companies were independent entities that made their own judgments with the benefit of independent advice.  They argue, among other things, that the Companies had directors and were represented independently by "counsel negotiating on [their] behalf . . . at arm's length."[154]

---

[151]

BoA not only put the whole deal together, it served also as placement agent for the Companies' notes and solicited note purchasers on their behalves.  BoA employees Sala and Medvedich acted as attorneys in fact of the Companies to "approve, settle, amend, sign or execute" the transaction documents on behalf of BoA and to "do all acts . . . as may be necessary or desirable in connection with" those documents.  *See* DX-302; DX-303.

[152]

*See* Baker Dep. 134:13-136:6.

[153]

DX-333, Lau Decl. ¶ 28.

[154]

*See* Def. Post Trial Br. [DI 315] at 3.

The cases upon which BoA relies are inapposite.  In *Cafferty v. Scotti Bros. Records, Inc.*, 969 F. Supp. 193 (S.D.N.Y. 1997), the court found that the plaintiffs had failed to allege any facts "from which a jury could find the special circumstances necessary for the creation of a fiduciary relationship."  *Abercrombie v. Andrew College*, 438 F. Supp.2d 243 (S.D.N.Y. 2006), involved a testimentary gift from an alumna to her alma mater.

BoA curiously cites also *Solutia Inc. v. FMC Corp.*, 456 F. Supp.2d 429 (S.D.N.Y. 2006).  There the court denied the defendant's motion for summary judgment dismissing the plaintiff's fiduciary duty claim, finding, among other things, that the defendant "possessed

The fact that the Companies ultimately came to have directors does not preclude a finding that BoA's fiduciary duty continued.  "[E]stablishment of a board of directors which is not truly independent will not suffice to terminate the promoter's fiduciary duty."[155]  The directors were not independent and certainly were not expected to perform any substantial function.[156]  In light of the relationships between Maples & Calder and Maples Finance, on the one hand, and BoA and its counsel, on the other, that assertion is entitled to no credence.  Maples and its affiliate were beholden to BoA and Mayer Brown, not in any meaningful degree to their nominal clients.   In these circumstances, BoA quite plainly owed the Companies a fiduciary duty.

BoA further argues that the "assumption" is that a fiduciary duty does not arise between two commercial parties when a contract governs their relationship "unless the contract provides otherwise."[157]  It then contends, on the one hand, that the indemnification agreement, the management agreements, the fee letter, and the powers of attorney are, at most, ordinary contracts that do not give rise to fiduciary duties and, on the other, that they do not reflect any acceptance by BoA of any position of special trust or confidence.   The argument, whichever way BoA wants to have it, is not persuasive.

---

superior knowledge" and could not invoke exculpatory clauses to shield itself from liability for material omissions.  *Id.* at 448.

[155]

*Pub. Inv. Ltd.,* 740 F.2d at 1234-35; 14A FLETCHER § 192.10, at 345.

[156]

Indeed, as the expert on Caymans practice testified, "the common practice in the Cayman Islands is for the directors of the special purpose vehicles to rely for the completeness and accuracy of the information that is provided to them on people whom they know have a conflict of interest," i.e., the promoters and arrangers of the deals they approve.  Trial Tr. 69:7-70:20.

[157]

Def. Post Trial Br. [DI 315] at 6.

42

A party may maintain a claim for breach of fiduciary duty so long as it is not "merely duplicative" of a claim for breach of contract.[158]  Here, however, the Companies allege that BoA's fiduciary duty is a product of its superior knowledge and position of trust as arranger and promoter the transaction, not merely of contractual obligations.  These Companies were entirely dependent on BoA for all of the reasons previously stated.  The existence of these agreements is not inconsistent with the existence of a fiduciary duty.

BoA next seeks to deny the existence of a fiduciary duty by arguing that such a duty would have conflicted with the duties it owed its client, Parmalat.  That rather nervy assertion, however, is singularly unconvincing.  It is no different in principle from an argument by a lawyer who represents both sides in a transaction that he or she could not owe a fiduciary duty to Client A because that would conflict with the duty owed to Client B.  If, as occurred here, a bank or other entity conducts itself with respect to one party to a transaction in a manner that gives rise to a fiduciary duty, it is no answer to say that the bank owed a conflicting duty to another.  That makes matters worse, not better.

Nor is it any answer to say that this is the way things are done in structured finance transactions generally or in the Cayman Islands in particular.[159]  Perhaps it is.  But that is beside the point.  In the overwhelming majority of these deals, the question whether the arranger owes a fiduciary duty to the SPE never arises because the cash flow proves sufficient to service the debt or the deal, however precisely it is structured, works out without controversy.  This one did not.  It

---

[158]

    *See, e.g., Banco Espirito Santo De Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537 (MBM), 2003 WL 23018888, at *15 (S.D.N.Y. Dec. 22, 2003).

[159]

    *See* Def. Post Trial Br. [DI 315] at 2-4.

therefore falls to the Court to determine, on the particular facts of this case, whether BoA, the arranger, owed a fiduciary duty to the SPEs.  I hold that it did.

    2.    *Breach*

The duties owed by a fiduciary are plain.  "Perfect candor, full disclosure, good faith, in fact, the utmost good faith, and the strictest honesty are required of promoters [and other fiduciaries], and their dealings must be open and fair, or without undue advantage taken."[160]  As Chief Judge, later Justice, Cardozo famously put it years ago:

> "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate.  Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. [citation omitted]  Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."[161]

Hence, "it is well established that, when a fiduciary, in furtherance of its individual interests, deals with the beneficiary of the duty in a matter relating to the fiduciary relationship, the fiduciary is strictly obligated to make full disclosure of all material facts."[162]

---

[160]    14A FLETCHER § 192.10, at 348-50; *see Gladstone,* 38 Del. Ch. at 399, 153 A.2d at 582.

[161]    *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).

[162]    *Blue Chip Emerald LLC v. Allied Partners*, 299 A.D.2d 278, 279, 750 N.Y.S.2d 291, 294 (1st Dep't 2002); *see also Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 738-39 (2d Cir. 1984) ("[T]his Court has expressly held that, under New York law, a duty to disclose material facts is triggered: first, where the parties enjoy a fiduciary relationship . . . and second, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.") Delaware courts similarly impose on boards of directors and majority shareholders a duty of "complete candor" to disclose "fully all facts and circumstances" surrounding a proposed action.  *See, e.g.*, *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 279 (Del. 1977).

44

BoA concededly failed to disclose (1) BoA's rejections of prior iterations of the transaction, and (2) the Deloitte and NMS valuation opinions and the Parmalat Brazil 1999 EBIT projections that were among their bases.   It maintains that these were immaterial to the transaction.[163]

### a.   The Bank's Rejections of the Deal

I begin with BoA's several rejections of early iterations of the transaction before its ultimate approval in November 1999.

Like the approved transaction, each of those iterations involved (1) the creation of an SPE to take on debt, (2) the SPE's use of the debt proceeds to buy equity in Parmalat Brazil, (3) an anticipated IPO of Parmalat Brazil stock at a price sufficient to repay the debt, and (4) the right of the SPEs to put the Parmalat Brazil stock to Parmalat or an affiliate if the IPO proved infeasible. Until the very last moment, each of these proposals was rejected by BoA, essentially because a successful Parmalat Brazil IPO was too uncertain:

- In July 1998, Omar Bouhadiba rejected the deal because, among other things, he believed that the proposed public offering of Parmalat Brazil was predicated on an operation that had "no track record of significant profitability or cash generation" and that Deloitte's valuation of Parmalat Brazil was "based . . . on Parmalat's assumptions that have not been tested."[164]

---

[163]   *See* Def. Post Trial Br. at 11.

[164]   PX-2, at BOFA-2003181.

45

- Later that summer, Bouhadiba and Dorfman turned down a somewhat revised proposal for much the same reasons.[165]

- In October 1998, Rizzuti and Kelly declined to approve yet another iteration of the deal because, as Rizzuti put it, "the primary source of repayment [would] be represented by an IPO on the Brasilian market in the next two years.  While possible, we have to be skeptical on the probability of this exit strategy, given the current markets [*sic*] condition."[166]  In addition, "the alternative repayment source, Parmalat S.pA. (PI) carrie[d] a significant amount of risk in that PI derives half of its revenues from South American Operations."[167]

- Rizzuti and Kelly turned down another version of the deal in January 1999 because uncertainty in the Brazilian market made a Parmalat Brazil IPO an uncertain proposition and threatened Parmalat's credit worthiness.

BoA insists that these rejected proposals and internal credit assessments were immaterial and therefore did not have to be disclosed because the approved transaction was entirely different from the earlier proposals.  BoA underscores changes in the size of the deal and the fact that BoA's merger with NationsBank increased BoA's lending capacity and ability to absorb risk.[168]

---

[165]     PX-3.

[166]     PX-7.

[167]     *Id.*

[168]     *See* Def. Pre Trial Br. [DI 300] at 71; Stip. Fact ¶ 5.

46

BoA misses the point.  Although the modifications to the proposed transaction help explain why BoA ultimately approved it, they do not go to the question of whether BoA's internal reservations about Parmalat Brazil would have been material to the Companies, the beneficiary of its fiduciary duty.  The standard for materiality is whether a reasonable person "would attach importance [to the omission] in determining his choice of action in the transaction in question."[169] Materiality therefore is assessed objectively from the standpoint of the Companies' decision to approve the transaction, not BoA's assessment of its own exposure as a lender.

From the point of view of a reasonable purchaser of the Parmalat Brazil shares in the Companies' position, what mattered was whether the purchaser ultimately would be in a position to pay off the notes.  The IPO was one of only three possible sources of funds for that purpose, the others being the option to put the shares to PCFL and Parmalat's guarantee of performance of that option.  While the issue is not entirely free of doubt, I find that an objective purchaser in the Companies' position would have considered important that BoA repeatedly had rejected earlier iterations of the transactions on the grounds that (1) the likelihood of a successful IPO was speculative and (2) Parmalat itself was sufficiently dependent upon the uncertain Brazilian situation. That information would have cast doubt on the values of the shares as well as the value of the PCFL put and the Parmalat guarantee.  The Court therefore concludes that the failure to disclose this information was material and that it breached BoA's duty of candor to the Companies.

---

[169]

Moy v. Adelphi Inst., Inc., 866 F. Supp. 696, 707 (S.D.N.Y. 1989) (quoting List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir.1965)).

In the context of claims arising under the Securities Exchange Act of 1934, the Supreme Court articulated that the standard of materiality as whether there is a "substantial likelihood that a reasonable shareholder would consider [the omission] important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 2132 (1976).

b.       *The Deloitte and NMS Valuation Opinions*

The Companies claim also that BoA breached its fiduciary duty by failing to disclose the 1998 Deloitte and NMS opinions and the 1999 Parmalat Brazil EBIT projections upon which they rested, at least to some extent.  Their point is that a comparison between the updated EBIT projection attached to the Companies' subscription agreements and those in the Deloitte and NMS valuations would have revealed that Parmalat Brazil had significantly underperformed the projections on which the price of the Parmalat Brazil shares had been based.  BoA, however, contends that the valuation opinions were not subject to disclosure for three reasons.

First, BoA argues that disclosure would have been contrary to BoA policy, which precludes disclosure of internal credit analyses.  But that contention is preposterous.  It amounts to an assertion that BoA may avoid duties imposed upon it by law by adopting internal policies inconsistent with its legal obligations.

BoA next contends that the Deloitte and NMS valuations and the underlying projections were not material to BoA's consideration of the transaction.[170]  But even BoA's internal credit memoranda belie that assertion.  In fact, three different BoA SCMs touted the Deloitte opinion as supporting the Bank's valuation of Parmalat Brazil.[171]  Although BoA asserts that the conditions in the market at the time it approved the transaction in 1999 were "materially different from the

---

[170]       *See* Def. Post Trial Br. at 11-12.

[171]       *See* PX-122, at BOFA-2258096 ("[Deloitte] has indicated to us a total value of the company between USD 1.36 and USD 1.57 billion.  The value used in the structure is USD 1.35 billion."); *see also* PX-120, at PP 00023111 (Juy 14, 1998 SCM); PX-124 (Jan. 7, 1999 SCM, "The value of [Parmalat Brazil] has been agreed to be $1.35 billion.").  Sala stated also in December 18, 1999 press release that "[t]he total implied value attributed to Parmalat Administracao amounts to some USD 1.35 billion."  PX-306.

48

scenario in 1998," a comparison between the projections used by Deloitte and NMS and those in the business plan showed clearly that Parmalat Brazil had underperformed since 1998 and had not recovered from the Brazil currency crisis. In any case, this information would have been important to a reasonable business person in the position of the Companies.

Finally, in a variation on the preceding argument, BoA contends that the Deloitte and NMS valuations were too "old" and therefore "irrelevant" to a transaction that was "materially different" by the time it closed in 1999.[172]   In fact, however, the EBIT projections in the Deloitte and NMS valuations were for the same 1999 time period as that in the later business plan.  They key point was that the considerably poorer figures in the business plan demonstrated that Parmalat Brazil had underperformed expectations.  That would have raised substantial questions as to whether the Parmalat Brazil shares that the Companies were buying had been priced appropriately in light of that deterioration.  And the changes in the deal were not relevant to this point.  The backstop for the anticipated IPO ultimately remained the Parmalat guarantee, and Parmalat remained materially dependent on Brazil.

Accordingly, the Court finds that the 1998 Deloitte and NMS opinions and the Parmalat Brazil EBIT projections for 1999 upon which they rested were material to the Companies and holds that  BoA's failure to disclose them breached its duty of candor.[173]

---

[172]

See Trial Tr. 431:15-16; Def. Post Trial Br. at 16.

[173]

Contrary to BoA's contentions, reliance is not an element of a claim for breach of fiduciary duty under New York law.  See, e.g., Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs., 388 F. Supp. 2d 292, 304 (S.D.N.Y. 2005) (stating that a breach of fiduciary duty plaintiff must show (1) the existence of a fiduciary relationship between the parties and (2) a breach of the duty flowing from that relationship); Cramer v. Devon Group, Inc., 774 F. Supp. 176, 184-85 (S.D.N.Y. 1991) (same).

### 3.    Causation

A plaintiff seeking damages for breach of fiduciary duty must demonstrate that the defendant's conduct proximately caused its injury.[174] Where, as here, a plaintiff seeks compensatory damages for injuries allegedly sustained as a result a defendant's misstatements or omissions, it therefore must establish a causal link between the wrongful conduct and any damages sustained.[175] The Court therefore passes to the question whether BoA's breach of its fiduciary duty proximately caused any loss to the Companies.

To be sure, disclosure to the directors of BoA's internal credit memoranda and the Deloitte and NMS materials would have been unusual for transactions like these. The Companies, moreover, emphasize Baker's testimony that the value of the Parmalat Brazil stock was material to the directors and that they would not have approved the transaction if they had known the stock was not worth $300 million.[176] They likewise assert that it would have been illogical for the directors

---

[174]

*Norwind v. Taylor*, 584 F.3d 420, 433 (2d. Cir. 2009); *LNC Invs., Inc. v. First Fidelity Bank, N.A. N.J.*, 173 F.3d 454, 465 (2d Cir. 1999) *LNC Invs., Inc.*, 173 F.3d at 465; *see R.M. Newell Co. v. Rice*, 236 A.D.2d 843, 653 N.Y.S.2d 1004, 1005 (4th Dep't 1997) ("[A]s a matter of law, any damages sustained by plaintiff were not proximately caused by wrongful conduct on the part of defendants, an essential element of plaintiff's causes of action against defendants.").

BoA argues this point in terms of loss and transaction causation rather than the traditional New York proximate cause rule. There would be no difference in the outcome of this case were the Court to apply those concepts. Accordingly, there is no need to elaborate upon them.

[175]

*Laub v. Faessel*, 297 A.D.2d 28, 31-32, 745 N.Y.S.2d 534 (1st Dep't 2002); *R.M. Newell*, 236 A.D.2d 843, 653 N.Y.S.2d at 1005; *Stoeckel v. Block*, 170 A.D.2d 417, 566 N.Y.S.2d 625, 626 (1st Dep't 1991) (refusing to set aside jury verdict in favor of plaintiff because "it was not demonstrated that [defendant's loss] was attributable to plaintiff's alleged wrongful conduct").

[176]

Baker Dep. 403:22-404:20.

50

to have approved the purchase of stock worth a fraction of the purchase price.[177]  But Baker's claim is subject to substantial doubt in and of itself, and other evidence points in the opposite direction.

As an initial matter, Baker testified also that he believed the potential uncertainty of a public offering of Parmalat Brazil shares posed no risk to the Companies.  He said that he had "[n]o concern" about Parmalat Brazil because "[w]e felt good about the guarantee being in place as a protection for the financial interests of the company.  And also we felt that if these companies were being put forward by Banc of America Securities and Parmalat as arranger and principal they were fit for purpose."[178]  He said that he therefore "did not think it would have been necessary" to review a valuation of Parmalat Brazil[179] because "there was no risk to [the Companies], there was no reason to carry out detailed business analysis."[180]  To Baker, it was sufficient that "[w]e had limited recourse, we had a put, we had a guarantee."[181]  In consequence, there is reason to doubt his claim that the Deloitte and NMS valuations and the Parmalat Brazil projections would have made a difference.

---

[177]

See Pl. Post Trial Br. at 21.

[178]

Baker Dep. 58:24-59:16.

[179]

Id. at 59:17-60:4.

[180]

Id. at 178:2-8.

[181]

Id. at 178:9-12.

The Court is not convinced that Mr. Baker's testimony, to the extent that he claims to have considered the transactions from a business point of view and concluded that they were appropriate in light of the put and the Parmalat guarantee, is credible although it does not doubt his sincerity.  It is more likely that the testimony reflects Mr. Baker's current view of the matter, formed with the benefit of hindsight, and that he did not consider the transactions from that point of view at the time.

There is, moreover, ample evidence that the Companies' directors would have approved the transaction notwithstanding any disclosure of the internal credit memoranda and the Deloitte and NMS materials. Three of the four SPE directors testified that they did not engage in any substantive analysis of the transaction, read the transaction documents, or ask any questions of BoA.[182] The board conducted no due diligence, and Baker, the only SPE director who reviewed even the transaction documents, testified that he approved the transaction based primarily on the reputation of the parties involved and saw "no reason" to carry out a detailed business analysis.[183] He did not even review the financial statements or the PPM.[184] As the Court has found, none of the directors of either company made any business judgment about the wisdom or attractiveness of the transactions.[185] It was, quite simply, not the job they were hired to do. Nor is this surprising. As an expert on Caymans practice in these situations, Andrew Galloway, testified, it was the custom and practice of Caymans directors to assume the trustworthiness of the promoter and approve such

---

[182]

See, e.g., Couch Dep. 21:18-24:23, 39:23-42:16, 124:4-126:3; Hinds Dep. 28:24-29:11, 32:24-33:20; Thompson Dep. 46:14-25, 74:9-25, 91:9-92:5.

[183]

See Baker Dep. 37:7-21, 55:15-56:20, 57:14-20, 157:20-158:8, 165:10-25, 178:1-8. Although the directors, to be sure, owed duties of care and loyalty to the Companies, their conduct is not before the Court.

[184]

Baker Dep. 55:15-19 ("Q. Did you personally review Parmalat's financial statements? A. No. Q. Did you review them at the board meetings? A. No."), 62:5-14 ("Q. Do you remember reviewing the private placement memorandum that Bank of America – that was issued to private placement investors? A. I recall it, but I don't recall an instance of reviewing it. Q. When you say you recall it, what do you recall about it? A. I recall the presence of the document.").

[185]

Nor did Baker recall having rejected on the basis of transaction documentation any of the "hundreds" of other transactions he had approved as an SPE director. Id. 32:9-19, 37:7-21.

transactions on the basis of its reputation.[186]

In addition, the Companies' directors had a strong financial incentive not to disrupt or refusal approval for the transactions that BoA had assembled.  The directors were employees of Maples Finance, a company controlled by Maples & Calder, which had a "preexisting" and "extensive relationship" with BoA."[187]  As would have been expected of individuals who, as a result of their relationships with Maples Finance, served simultaneously as directors of several hundred companies, their common interest was to generate additional business for Maples and appointments as directors of SPEs for themselves in exchange for fees paid to Maples Finance, their employer.  They therefore had a powerful motive to further Maples Finance's business relationship with BoA, of which the Food and Dairy Holdings transactions were only a small part.

In all of the circumstances, disclosure of the materials BoA withheld would not likely have altered the directors' decision to approve the deal.  I therefore am not convinced that BoA's breach of fiduciary duty was a proximate cause of the Companies' alleged injury.[188]  While BoA most assuredly did not conduct itself in an appropriate manner, it is not liable for damages for its

---

[186]

PX-312, Galloway Decl. ¶ 40.

[187]

Baker Dep. 257:7-12.

[188]

The foregoing analysis is fatal also to the Companies' negligent misrepresentation claim, as injury proximately caused by the breach of duty is an essential element of the cause of action. *See, e.g., Friedman v. Anderson,* 23 A.D.3d 163, 164-65 803 N.Y.S.2d 514, 515 (1st Dept. 2005); *Laub v. Faessel*, 297 A.D.2d 28, 30-31 745 N.Y.S.2d 534, 535 (1st Dept. 2002).

I should note also that the Companies' claim technically includes an assertion that BoA was negligent in failing to understand that Parmalat's financial condition was disastrous and to disclose that fact.  Had it done so, the disclosure might have brought down the house of cards and affected the Companies' directors.  But I am not persuaded that BoA was negligent in this respect.  After all, Parmalat fooled the entire world for more than a decade.

breach of duty.

       C.     *The Breach of Contract Claim*

      The Companies assert that BoA breached the management agreements whereby BoA agreed to "be fully invested with and responsible for the general management and conduct of the business of the [SPE] and [] advise the Board on all matters of policy."[189]  They reason that BoA abandoned its due diligence obligations and failed adequately to advise the SPE boards.

      The management agreements expressly limited BoA's liability to "gross negligence or wilful breach of duty."[190]  As the New York Court of Appeals has stated, "gross negligence, when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must 'smack[] of intentional wrongdoing' [and] evince[] a reckless indifference to the rights of others."[191]

      Although BoA's failure to disclose material information to the Companies constituted a breach of fiduciary duty, it cannot be said that its failure "smack[ed] of intentional wrongdoing." BoA viewed the transaction as a loan made on the strength of Parmalat's credit, not as an equity purchase in Parmalat Brazil by the noteholders.  It believed that the put and guarantee ensured repayment of the notes.  While BoA acted poorly, its breaches of duty were not wilful and did not rise to the level of gross negligence.  In any case, the management agreements were signed at the same time as the deals closed.  BoA's wrongful failure to disclose the pertinent facts preceded the

---

[189]

      PX-33 ¶ 3.1; PX-34 ¶ 3.1.

[190]

      PX-33, at P 03904262; PX-34, at BOFA-1893678.

[191]

      *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554, 593 N.E.2d 1365, 1371 (1992) (citing RESTATEMENT (SECOND) OF CONTRACTS § 195).

closings.  BoA's actions breached no contractual duty that existed at the time its missteps occurred.

Nor may liability be premised on actions following the closing, as the Companies have offered no

evidence of any breach of duty thereafter.  The contract claim therefore is without merit.


        D.       *The Unjust Enrichment Claim*

        To prevail on a claim of unjust enrichment, a plaintiff must show that (1) the

defendant was enriched (2) at the plaintiff's expense and (3) that it would be against equity and good

conscience to permit the defendant to retain what is sought to be recovered.[192]

        Although the complaint alleges that BoA "obtain[ed] some of the funds FHL and

DHL were wrongfully induced to provide to [Parmalat Brazil],"[193] there was no such evidence.

After Parmalat Brazil received $300 million from the SPEs in exchange for its shares, it transferred

approximately $288 million to Wishaw Trading, a Parmalat subsidiary.  Wishaw used approximately

$280 million from the transaction to purchase bonds issued by another Parmalat subsidiary and held

by Bank of Boston and ING Capital.[194]  The Companies have not adduced any evidence that BoA

received any of the remaining funds from Parmalat Brazil.  And while BoA received an arrangement

fee, there is no evidence that the fee was paid from the funds Parmalat Brazil received from the

---

[192]

        *See, e.g.*, *Clark v. Daby*, 300 A.D.2d 732, 751 N.Y.S. 2d 622 (3d Dep't 2002); *see also Marketplace LaGuardia Ltd. P'ship v. Harkey Enters.*, No. 07 Civ. 1003, 2008 WL 905188, at *6 (E.D.N.Y. Mar. 31, 2008).

[193]

        Cpt. ¶¶ 247-48.

[194]

        Stip. Fact ¶¶ 190-91.

Companies.  BoA therefore did not receive its fee at the Companies' expense.[195]

> The Companies' unjust enrichment claim fails for the independent reason that valid agreements cover the subject matter that gives rise to the alleged enrichment.  "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[196]  Here BoA's relationship with the Companies and its obligations as arranger are governed by the transaction agreements, including the management and note purchase agreements.  The Companies' claim for unjust enrichment therefore must be dismissed.

III.    Conclusion

> For the foregoing reasons, the action is dismissed.  These are my findings of fact and conclusions of law.

> SO ORDERED.

Dated:        February 17, 2010

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[195]

> *Marketplace LaGuardia*, 2008 WL 905188, at *6 ("Where the defendant receives a benefit, but not at the plaintiff's expense, an unjust enrichment claim fails.") (citing *Giant Supply Corp. v. City of N.Y.*, 248 A.D.2d 231, 235, 670 N.Y.S. 2d 29 (1st Dep't 1998)).

[196]

> *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653 (1987) ("A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment."); *see also Trafalgar Power Inc. v. Aetna Life Ins. Co.*, 396 B.R. 584, 594 -595 (N.D.N.Y. 2008) ("A claim for unjust enrichment only applies in the absence of an express agreement.").